1   XAVIER BECERRA
    Attorney General of California
2   PAUL STEIN
    Supervising Deputy Attorney General
3   SHARON L. O'GRADY
    Deputy Attorney General
4   State Bar No. 102356
    NATASHA SAGGAR SHETH
5   Deputy Attorney General
    State Bar No. 282896
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-3834
     Fax:  (415) 703-1234
8    E-mail:  Sharon.OGrady@doj.ca.gov
    *Attorneys for Defendant Warren Stanley, in*
9   *his official capacity as Commissioner of*
    *California Highway Patrol*
10
                    IN THE UNITED STATES DISTRICT COURT
11
                    FOR THE SOUTHERN DISTRICT OF CALIFORNIA
12

13

14

15   **SUSAN PORTER,**                    3:18-cv-1221-GPC-LL

16                          Plaintiff,    **EXHIBITS 1–3**

17        **v.**                          Date:        November 27, 2020
                                          Time:        1:30 PM
18   **WILLIAM D. GORE, Sheriff of San**  Courtroom:   2D
     **Diego County, in his official capacity;**  Judge:       The Honorable
19   **WARREN STANLEY, Commissioner**                  Gonzalo P. Curiel
     **of California Highway Patrol, in his**
20   **official capacity,**              Action Filed:  6/11/2018

21                          Defendants.

22

23   SA2018102010
     42311667.docx
24

25

26

27

28

                                    1

# Exhibit 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   SUSAN PORTER,

 5              Plaintiff,

 6        vs.                    CASE NO. 18-cv-1221-GPC-LL

 7   WILLIAM D. GORE, Sheriff of
     San Diego County, in his
 8   official capacity; WARREN
     STANLEY, Commissioner of
 9   California Highway Patrol,
     in his official capacity,
10
                Defendants.
11   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13

14

15                       DEPOSITION OF

16                       SUSAN PORTER

17

18

19                     November 5, 2019

20                       10:07 a.m.

21

22                    600 West Broadway
                         Suite 1800
23                   San Diego, California

24

25               Lisa Jones, CSR No. 8142
```



```
 1                    APPEARANCES OF COUNSEL

 2

 3    For the Plaintiff:

 4         FOLEY & LARDNER, LLP
           MIKLE JEW, ESQ.
 5         KADMIEL PEREZ, ESQ.
           Suite 300
 6         3579 Valley Centre Drive
           San Diego, California  92130
 7         858.847.6700
           858.792.6773 Fax
 8         mjew@foley.com
           keperez@foley.com
 9

10    For the Defendant Warren Stanley, Commissioner of
      California Highway Patrol:
11
           CALIFORNIA DEPARTMENT OF JUSTICE
12         ATTORNEY GENERAL'S OFFICE
           SHARON L. O'GRADY, ESQ.
13         Suite 11000
           455 Golden Gate Avenue
14         San Francisco, California  94102-7004
           415.510.3834
15         415.703.1234 Fax
           sharon.ogrady@doj.ca.gov
16

17    For the Defendant William D. Gore, Sheriff of San
      Diego County:
18
           COUNTY OF SAN DIEGO
19         OFFICE OF COUNTY COUNSEL
           TIMOTHY WHITE, ESQ.
20         Room 355
           1600 Pacific Highway
21         San Diego, California  92101
           619.531.4865
22         760.531.6005 Fax
           timothy.white@sdcounty.ca.gov
23

24

25
```



```
 1              INDEX OF EXAMINATION

 2

 3   WITNESS:  SUSAN PORTER

 4   EXAMINATION                                    PAGE

 5   By Ms. O'Grady                                5, 76

 6   By Mr. White                                     39

 7

 8

 9

10

11

12

13            INSTRUCTION NOT TO ANSWER

14                  PAGE        LINE

15                   34          21

16                   37           8

17

18

19

20

21

22

23

24

25
```



SUSAN PORTER                                    November 05, 2019
PORTER vs GORE                                                4

```
 1                     INDEX TO EXHIBITS

 2    EXHIBIT              DESCRIPTION              PAGE

 3
      Exhibit 1      Complaint for Declaratory        8
 4                   and Injunctive Relief dated
                     6/11/18
 5
      Exhibit 2      Plaintiff's Responses and       11
 6                   Objections to Defendant
                     Stanley's Requests for
 7                   Admission, Set One, dated
                     11/1/19
 8
      Exhibit 3      Notice of Errata to             19
 9                   Plaintiff's Complaint for
                     Declaratory and Injunctive
10                   Relief dated 2/7/19

11

12

13

14

15

16

17

18

19
      (Original exhibits have been attached to the original
20                         transcript.)

21

22

23

24

25
```



```
 1                  DEPOSITION OF SUSAN PORTER

 2                       November 5, 2019

 3

 4                         SUSAN PORTER,

 5       having been first duly sworn, testifies as follows:

 6                         EXAMINATION

 7    BY MS. O'GRADY:

 8       Q.  And could you please state your name for the

 9    record.

10       A.  Susan Porter.

11       Q.  And what is your address?

12       A.  4984 Lamia Way.

13          (Discussion held off the record)

14    BY MS. O'GRADY:

15       Q.  Do you have a middle name?

16       A.  Lynn.

17       Q.  And I'm sorry.  Now I missed the address.

18       A.  I never gave it.  4984 Lamia Way, Oceanside,

19    California.

20       Q.  And have you ever been a party to a lawsuit

21    before?

22       A.  No.

23       Q.  And have you ever had your deposition taken?

24       A.  No.

25       Q.  And have you met with your counsel in
```



1    preparation for this deposition?

2         A.   Yes.

3         Q.   And what, if anything, did you do to prepare

4    for your deposition?

5         A.   They just kind of explained to me the process

6    of how it was going to work.

7         Q.   And did you review any documents?

8         A.   No.

9         Q.   So I know that you've spoken with your

10   attorney, but just so everything is clear, you

11   understand you're under oath?

12        A.   Yes.

13        Q.   And the court reporter will be taking down my

14   questions and your answers, and it will be prepared in

15   a little booklet or a big booklet that you'll have a

16   chance to review.

17        A.   Um-hum.

18        Q.   And you may make corrections or changes.  If

19   you do, they -- those changes or corrections could be

20   commented on in court.  So obviously it's important

21   that your testimony be as accurate as possible and

22   also that we don't talk over each other.  So if you

23   wait until I finish my questions and I'll try to wait

24   until you finish your answers, she'll have a clean

25   transcript.



1          And if you don't hear a question or if you

2    don't understand it, let me know because if you don't,

3    I'll assume that you've heard my question and you

4    understand it.

5          A.   Okay.

6          Q.   Your counsel may object during the course of

7    the deposition, but unless -- for the record, but

8    unless your counsel instructs you not to answer,

9    notwithstanding an objection, you should proceed to

10   answer the question.

11         A.   Okay.

12         Q.   Are you under any medication that would

13   affect your ability to testify today?

14         A.   No.

15         Q.   Is there any other medical or other reason

16   that would impair your ability to testify truthfully

17   today?

18         A.   No.

19         Q.   What is the highest level of education that

20   you've achieved?

21         A.   I'm a college graduate.

22         Q.   And what is your degree?

23         A.   Business administration.

24         Q.   And from what school?

25         A.   Arizona State.



1      Q.   How old are you?

2      A.   65.

3      Q.   Are you a licensed driver in California?

4      A.   Yes.

5      Q.   And how long have you been licensed in

6    California?

7      A.   Well, approximately -- I have to think back.

8    Approximately 25 years.

9      Q.   And have you been licensed in any other

10   state?

11     A.   Yes.  Quite a few.

12     Q.   Okay.  So how long -- how long have you been

13   licensed to drive anywhere?

14     A.   Since I was 16 years old in Ohio.

15     Q.   Okay.  Fair enough.

16          And you're familiar with the complaint in

17   this action?

18     A.   Yes.

19     Q.   I'm going to mark the complaint as Exhibit 1.

20          (Exhibit 1 marked)

21   BY MS. O'GRADY:

22     Q.   And did you read the complaint before it was

23   filed?

24     A.   Months ago.  I haven't read it recently, no.

25     Q.   To the best of your knowledge, are all of the



1  statements in it accurate?

2      A.  Yes.

3      Q.  The complaint alleges that you participated

4  in protests at Representative Darrell Issa's office on

5  October 17, 2017, correct?

6      A.  Yes.

7      Q.  And how long were you at that protest?

8      A.  Approximately an hour.

9      Q.  And were you just in your car?  Were you

10 marching?  What were your activities?

11         MR. JEW:  Objection.  Compound.

12         You can answer.

13         THE WITNESS:  Okay.

14     A.  Initially I parked my car and I went to the

15 rally.  Then quite a few sheriff's department officers

16 showed up and started writing tickets for everything

17 like your wheels weren't turned the right way or

18 whatever.  So where I had parked was a little unclear

19 because there was a fire hydrant and I wasn't sure if

20 I was far enough away from the fire hydrant, so I went

21 back to my car to move my car, and that's when I drove

22 past the protest and beeped my horn.

23 BY MS. O'GRADY:

24     Q.  And approximately how many people were at the

25 protest?



1        A.   I can only give you a ballpark figure.   Say

2    maybe 50 to 75.

3        Q.   And were there -- and what was the protest

4    about?

5        A.   These were ongoing protests about the

6    objections of Darrell Issa's actions in congress.

7        Q.   And so they were directed at Representative

8    Issa in particular?

9        A.   They -- sometimes they were directed at him.

10   Sometimes it was just, say, if there had been a

11   shooting, it might be -- the subject of that protest

12   might just be gun violence.   But, again, it would

13   usually go back to Darrell Issa's stance on gun

14   control.

15       Q.   And were there also counterprotesters at the

16   protest?

17       A.   There was usually one person -- no, two

18   people across the street.

19       Q.   And on October 17, 2017, in particular, were

20   there counterprotests?

21       A.   Yes.   I believe there was only two people.

22   There could have been a few more.

23       Q.   And according to the complaint, you received

24   a citation.   And that's correct, right?

25       A.   Yes.



1    Q.  And the deputy that issued the citation was
2    Deputy Klein?
3    A.  Yes.
4    Q.  And you didn't receive any citation there
5    from the California Highway Patrol, correct?
6    A.  Correct.
7    Q.  And is -- did you see any highway patrol at
8    the protest?
9    A.  I did not personally see any highway patrol.
10   Q.  Did anyone tell you that any highway patrol
11   personnel were there?
12   A.  No.
13   Q.  And I'm going to mark as Exhibit 2 the
14   responses to our request for admissions.
15        MR. WHITE:  That's request for admissions,
16   set one?  I don't think you've received responses to
17   set two.  Oh, request for admission.  I'm sorry.
18        MS. O'GRADY:  Request for admission.  It is
19   set one, but it's the only request that's been served
20   to date, just for the record.
21        (Exhibit 2 marked)
22   BY MS. O'GRADY:
23   Q.  And are you familiar with that document?
24   Have you seen it before?
25   A.  I don't think so.



 1          MR. JEW:  Can she review it before you ask
 2    her any questions?
 3          MS. O'GRADY:  Absolutely.
 4          MR. JEW:  Take your time.  You can just let
 5    us know when you're done reading it.
 6          THE WITNESS:  Okay.  I'm done.
 7    BY MS. O'GRADY:
 8       Q.  And did you review that document before it
 9    was served to the other parties?
10       A.  It was probably a long time ago because I
11    reviewed all the documents at the time I was given
12    them.
13       Q.  Well, this was just sent out on November 1.
14       A.  Oh, then no.
15       Q.  So this is the first time you've seen it?
16       A.  Yes.
17       Q.  RFA asked you to admit that no officer or
18    employee of the CHP was present when you were cited on
19    October 17, 2017, and you denied that.
20          What is the basis of your denial?
21          MR. JEW:  I'm sorry.  Can you repeat the
22    question.
23          MS. O'GRADY:  I said -- do you want to read
24    it.
25          (Record read)



```
 1              MR. JEW:  Thank you.
 2              THE WITNESS:  Okay?
 3              MR. JEW:  Yeah.
 4      A.  My denial would be that because there was a
 5  lot of officers there, I have no clue if there was a
 6  CHP officer there.  There could have been and I just
 7  did not see them.
 8  BY MS. O'GRADY:
 9      Q.  But you have no reason to think that there
10  was a CHP officer there.
11      A.  No, I do not.
12      Q.  Or any other employee of the California
13  Highway Patrol.
14      A.  Again, I wouldn't have any way of knowing
15  that but not to my knowledge.
16      Q.  And when I use "CHP," you understand I am
17  referring to the California Highway Patrol?
18      A.  Yeah, I do.
19      Q.  And you're not aware of any facts.  No one
20  told you or gave you any information that would
21  suggest that any officer or member of the highway
22  patrol was present?
23      A.  No.
24      Q.  Have you ever received any warning by a
25  highway patrol -- California Highway Patrol person for
```



1   honking your horn?

2        A.   I have to think back.   No.

3        Q.   And you've never been cited by a California

4   Highway Patrol for honking your horn?

5        A.   No.

6        Q.   And at the time of the incident you were in

7   fact honking, correct?

8        A.   At the time of the incident, yes, I did honk

9   my horn.

10       Q.   And how many times did you honk it?

11       A.   I think three, beep, beep, beep.   I think I

12  did that twice.

13       Q.   And you intended by your honking to signify

14  support of the protest; is that correct?

15       A.   That is correct.

16       Q.   And that was the only reason you honked your

17  horn?

18       A.   That is correct.

19       Q.   So there was no traffic safety reason why you

20  were honking your horn?

21       A.   No.

22            MR. WHITE:   Can I just get a clarification?

23            Did you say that you honked your horn three

24  times twice?   So six beeps total?

25            THE WITNESS:   Yeah.



1          MR. WHITE:  Okay.  Thank you.

2          THE WITNESS:  It was like a beep, beep, beep.

3          MR. JEW:  Not a beep, beep, beep, but a beep,

4   beep, beep.

5          THE WITNESS:  Yeah, beep, beep, beep.

6          MR. WHITE:  This will show up great on the

7   transcript.

8   BY MS. O'GRADY:

9      Q.  So you believe you honked your horn six

10  times.

11     A.  I believe so.  It's been two years, so yes.

12     Q.  And were there other people near you also

13  honking their horn?

14     A.  Yes.

15     Q.  How many others?

16     A.  Truthfully, I would have no clue.  People

17  honk their horn at every protest.  Sometimes we'd

18  maybe have ten people honk their horns.  Sometimes

19  we'd have five people honk their horns.  So it just

20  depended, you know.

21     Q.  Pretty noisy?

22     A.  Well, let me clarify noisy is that there was

23  a -- the counterprotester was a DJ, and he would bring

24  his huge speakers and megaphone and blast the

25  protesters.  That's what was noisy.  It wasn't so much



1   the horns that were noisy.

2        Q.   So tell me about -- so the counterprotester

3   was there -- and right know I'm just asking about

4   October 17.  So if I say "the day of the incident" or

5   "the incident," you'll understand that's what I mean?

6        A.   Um-hum.

7        Q.   Okay.  And he's an individual who has

8   typically shown up at the protests?

9        A.   Correct.

10       Q.   And what was he doing on that occasion?

11       A.   He was doing what he always did.  He would

12   set up his sound booth or whatever it was and his

13   truck with his big speakers, and he would blast

14   messages.  He would blast sometimes songs.  And that's

15   what he did to try to drown out the protesters.

16       Q.   And what were the protesters doing when he

17   was doing that?

18       A.   We were trying to proceed with the program

19   that had been set forth for us that day.

20       Q.   And what was the program?

21       A.   Well, it would vary from week to week, so it

22   would -- one week it might be gun control.  One week

23   it may be healthcare.  Depends on whatever topical

24   issue there was that week.

25       Q.   Do you know what the -- as you sit here



1  today, do you recall what the issue was on October 17,

2  the day of the incident?

3      A.  No, I don't.

4      Q.  And how did the protesters implement that

5  program?  What was happening on that side of the road?

6          MR. JEW:  Objection.  Compound.

7      A.  You mean that particular day?

8  BY MS. O'GRADY:

9      Q.  Yes.

10     A.  Well, the protesters had a -- I guess you'd

11 kind of call it a flatbed truck, and they would have

12 speakers get up and talk, so different speakers.  And

13 we would sing hymns and sometimes do a chant.

14     Q.  And was there sound amplification on the

15 truck?

16     A.  Just a megaphone held by the --

17     Q.  Just a --

18     A.  I believe it was just a megaphone.

19     Q.  Was it an electronic megaphone or just a

20 horn?

21     A.  I don't know.

22     Q.  Okay.  You don't know?

23     A.  Yeah.

24     Q.  Okay.  And did you observe anyone else being

25 cited for honking?



1      A.   No.

2      Q.   But you did observe other people being cited

3  for --

4      A.   Other things, yes.

5      Q.   -- other things.

6           And did you see any supporter for Darrell

7  Issa, any counterprotester being cited?

8      A.   I did not see it.   I heard about it later.

9      Q.   And what did you hear?

10     A.   That he didn't have the wheels of his

11 motorcycle turned the right way.

12     Q.   And was cited as a result?

13     A.   Yes.

14     Q.   And when Deputy Klein cited you, was he

15 polite to you?

16     A.   No.

17     Q.   He was rude?

18     A.   Yes.

19     Q.   Okay.   And what did he say?   Was there any --

20 were there any particular words he used that were

21 rude?

22     A.   Well, when he came up to the car, he was very

23 abrupt, and he wouldn't tell me anything.   He wouldn't

24 tell me what I did wrong.   I'm like, "What did I do?"

25          And he would -- "I just need your insurance



1  and driver's license."  He wouldn't even talk to me

2  like a human being.  I guess it would be that way in

3  my perception.

4      Q.  Your perception, okay.

5          And you did receive a citation?

6      A.  I did.

7      Q.  And I'm going to mark your notice of errata

8  with the citation attached as Exhibit 3.

9          (Exhibit 3 marked)

10         MR. JEW:  Thank you.

11 BY MS. O'GRADY:

12     Q.  And you can actually use the actual exhibit

13 as long as you don't mark on it.

14     A.  Okay.

15     Q.  That's for you.

16     A.  These are my copies?

17         MR. JEW:  Would you like to review it before

18 she asks you any questions?

19     A.  Okay.

20 BY MS. O'GRADY:

21     Q.  Wasn't there a second side to this document?

22 A reverse?

23         MR. WHITE:  There is.  I have a copy if you

24 want to make a copy or use my copy.

25     A.  I don't know.  I have the original at home.



1    I don't really -- I haven't looked at it in a long

2    time.

3    BY MS. O'GRADY:

4        Q.   So you don't know whether this is complete or

5    not?

6        A.   I know this, what I'm reading here, is

7    completely filled out.  I don't know what the other

8    side is.

9        Q.   And at the time you received it, were you --

10   was your address 24461 Via Cecreto, Lake Forest?

11       A.   No.

12       Q.   You were living in your current residence?

13       A.   Correct.  I hadn't gotten my new driver's

14   license yet.

15       Q.   So you've indicated and your complaint

16   alleges that the Issa protests were weekly protests,

17   the theme of which slightly changed.  And they

18   occurred every week, as far as you know?

19       A.   As far as I know, yes.

20       Q.   And Paragraph 12 of the complaint, which is

21   Exhibit 1, states that the protests began soon after

22   the November 2016 election.  Do you know how soon

23   after they started?

24       A.   No, I didn't because I wasn't living in the

25   area at that time.



1    Q.  And it alleges that they ended in April of

2    2018.  Do you know when they ended?

3    A.  I don't know the exact date.  I know that

4    once Darrell Issa resigned, that they kind of scaled

5    back and I think then they ended.

6    Q.  And when did you start attending the

7    protests?

8    A.  I could not give you the exact day.  I

9    retired in July 2017, so I probably started going, you

10   know, sometime after that point.

11   Q.  And did you continue attending the protests

12   until they stopped in April of 2018?

13   A.  Off and on.  I did not go every week.

14   Q.  And how frequently did you attend the

15   protests?

16   A.  I'd say a ballpark, two to three a month.

17   Q.  And did you honk your horn at any of the

18   other protests that you attended?

19   A.  No.

20   Q.  Not before or after October 17, 2017?

21   A.  No.

22   Q.  Did you receive any other citations at any of

23   the other protests?

24   A.  No.

25   Q.  Were there any other incidents when you



1  observed anyone citing protesters during the other

2  protests?

3       A.  Not that I saw.

4       Q.  And did anyone tell you that that happened at

5  another protest?

6       A.  No one ever told me.

7       Q.  And did you see any California Highway Patrol

8  at any of these protests that you attended?

9       A.  I personally did not.

10      Q.  And did anyone tell you that any California

11 Highway Patrol personnel were at any of the protests?

12      A.  No one told me that.

13      Q.  Other than the -- so you attended two to

14 three times a month.  Other than the Darrell Issa

15 protests, have you ever participated in any other

16 protests?

17      A.  Yes.

18      Q.  How many?

19      A.  I would just have to take a guess.  Maybe

20 three to four.

21      MR. JEW:  I'm going to instruct you not to

22 guess.  If you know the answer, you can --

23      THE WITNESS:  I don't know.  I don't

24 specifically know the answer.

25      MR. JEW:  You can let her know that you don't



1  know.

2      A.  I don't know.

3  BY MS. O'GRADY:

4      Q.  Do you recall participating in any other

5  protests?

6      A.  Yes.

7      Q.  But you don't know whether it was one or more

8  than one?

9      A.  It was more than one.

10     Q.  Was it more than five?

11     A.  I don't know.

12     Q.  And do you remember the first protest you

13  attended?

14     A.  I believe the first protest -- now, this

15  is -- I can't go back through my whole 65 years and

16  remember, but I would say the one that comes to my

17  memory off the top was the first Women's March here in

18  San Diego.

19     Q.  And when was that?

20     A.  Right after Trump got elected, so when he was

21  inaugurated.  That's when the first Women's March was.

22  So January of -- I don't know.  When did he come into

23  office?  '17?  '16?  '16.

24     Q.  I'm mourning too.

25     A.  Okay.



1     Q.  And was that a one-time event that you

2  attended, the Women's March?

3     A.  Well, they've had Women's Marches every year

4  since then.  I attended the one this year but in

5  Oceanside, not in San Diego.

6     Q.  And so in terms of the Women's Marches, you

7  attended a total of two?

8     A.  The Women's Marches, yes.

9     Q.  And do you remember any other protests that

10  you participated in?

11     A.  Yes.  There was one in Escondido right after

12  the Florida shooting, high school shooting, and there

13  was a protest for gun control, and that was in

14  Escondido.  I do not remember the date.

15     Q.  And do you know the year that it occurred?  I

16  guess I can figure it out from the newspapers.

17     A.  I think it was last year, wasn't it, when

18  that Florida high school shooting?  Whenever that

19  happened, that's when it was.

20     Q.  And do you recall any other protests that you

21  participated in?

22     A.  Yes.  There was one in Carlsbad, and it was I

23  think -- I think it was in regards to when Trump was

24  going to try to get rid of Mueller.

25     Q.  Any other protests you recall participating



1   in?

2        A.   No.

3        Q.   Did you honk your horn at any of these other

4   protests?

5        A.   No.  I did not drive by them.

6        Q.   You were marching?

7        A.   I parked my car and went, yeah.

8        Q.   And were any of these protests after

9   October 17, 2017?

10       A.   Yes.

11       Q.   And which of the protests were after that

12   date?

13       A.   Except for the first Women's March, I believe

14   all of them were after that.

15       Q.   Okay.  And you yourself did not honk your

16   vehicle horn because you were not in your vehicle,

17   correct?

18       A.   Correct.

19       Q.   And were there other people honking at those

20   protests?

21       A.   Yes.

22       Q.   And did you observe people being cited at

23   those protests?

24       A.   No.

25       Q.   So if you can look again at Exhibit 3, the



1    request for admission.

2             MR. JEW:  I believe that's Exhibit 2.

3             MS. O'GRADY:  Is that Exhibit 2?

4             THE WITNESS:  Yes.

5    BY MS. O'GRADY:

6        Q.  If you can look at Exhibit 2.  RFA 7 asked

7    you to admit that you have no evidence that any

8    officer or employee of the California Highway Patrol

9    has ever enforced Vehicle Code section 27001 in

10   retaliation for any person's participation in any

11   protest activities.

12            Do you see that?

13       A.  It's on Page 5.  I was looking on Page 7.

14   Sorry.  Okay.

15       Q.  And Vehicle Code 27001, that's the horn

16   honking statute?

17       A.  Right.

18       Q.  You denied that request for admission.  On

19   what do you base your denial?

20       A.  Because I have no idea whether they have or

21   have not.

22       Q.  So you have no evidence that they ever have

23   enforced it, correct?

24            MR. JEW:  Objection.  Calls for a legal

25   conclusion.



1          You can answer.

2     A.  No, I do not.

3  BY MS. O'GRADY:

4     Q.  You're not aware of any facts that indicate

5  that they have ever enforced it in retaliation for

6  participation in protest activities?

7     A.  I do not have any facts.

8     Q.  And you don't have any reason to believe that

9  they have ever enforced Vehicle Code 27001 in

10 retaliation for any person's participation in protest

11 activities?

12    A.  I wouldn't have no knowledge of that, so no,

13 I don't know.

14    Q.  RFA 10 asked you to admit that you have no

15 reason to believe that any officer or employee has

16 ever enforced Vehicle Code section 27001 in

17 retaliation for any person's participation in protest

18 activities.

19         You actually don't have any reason to believe

20 that, correct?

21         MR. JEW:  Objection.  Calls for a legal

22 conclusion.

23         You can answer.

24    A.  Okay.  No.

25 BY MS. O'GRADY:



1      Q.   And RFA No. 8 states admit that you have no
2   evidence that any officer or employee of the
3   California Highway Patrol has ever enforced Vehicle
4   Code section 27001 in retaliation for any person's
5   exercise of his or her First Amendment rights.
6           Do you see that?
7      A.   Um-hum, I do see that.
8      Q.   And you denied that request for admission as
9   well.  Do you see that?
10     A.   Yes.
11     Q.   What is the basis for that denial?
12     A.   Again, I have no evidence, so I would not
13   know in retaliation.  However, I think it's stated
14   somewhere here in the beginning that they have to
15   enforce all the laws, so I don't know if they
16   particularly enforce that one or not.
17     Q.   But enforcing the laws wouldn't necessarily
18   mean that they did so in retaliation of anything.
19     A.   Yes, correct.
20     Q.   And request for admission No. 9 states admit
21   you have no reason to believe that any officer or
22   employee of the California Highway Patrol has ever
23   enforced Vehicle Code section 27001 in retaliation for
24   any person's exercise of his or her First Amendment
25   rights.



1        And you don't have any reason to believe they

2    have ever done that, correct?

3        MR. JEW:  You can answer.

4        A.  No, no, I do not.

5    BY MS. O'GRADY:

6        Q.  So that is correct, you don't have any

7    reason.

8        A.  No.

9        Q.  Just to make the record clear, when you say

10   no, you're disagreeing with me.

11       A.  Okay.  I do not have any reason to believe

12   that a highway patrol -- I do not have any evidence or

13   believe that -- I wouldn't have no way of knowing

14   that, if they did it or did not do it.

15       Q.  RFA, request for admission No. 10 -- I'm

16   sorry.  Request for admission No. 11 asks you --

17   again, they're very similar, but to admit that you

18   have no evidence that any officer or employee of the

19   California Highway Patrol has ever enforced Vehicle

20   Code section 27001 in order to silence any person's

21   exercise of his or her First Amendment rights.

22        And you denied that request for admission.

23   Do you see that?

24       A.  Um-hum.

25       Q.  And what is the basis for your denial?



1    A.   I don't have any evidence, so I'm not sure.
2    I think I maybe did not understand that it was saying
3    that I knew if they had enforced it when I don't know
4    if they've enforced it or not.
5    Q.   Okay.   And request for admission No. 12 asks
6    you to admit you have no reason to believe that any
7    officer or employee of the California Highway Patrol
8    has ever enforced Vehicle Code section 27001 in order
9    to silence any person's exercise of his or her First
10   Amendment rights.
11        And, again, you denied that request.   On what
12   do you base that denial?
13   A.   I, again, would not have any knowledge of --
14   I have not researched if a California Highway Patrol
15   has ever enforced this, so I don't know why I wouldn't
16   have any reason to believe it or not believe it, I
17   guess would be my answer, because I don't know.
18   Q.   Do you believe that the California Highway
19   Patrol did anything wrong in connection with the Issa
20   protest at which you were cited?
21   A.   I don't know.   I don't even know if they were
22   there.
23   Q.   Do you believe they did anything wrong in
24   connection with any of the Issa protests at which you
25   were present?



1      A.   Again, I don't know if they were there or

2    not.

3      Q.   If you could take a look at Exhibit 1,

4    Paragraph 35, which is on Page 5, you allege that the

5    actions of Sheriff -- I'm focused on the commissioner,

6    not the sheriff.  The actions have chilled, deterred,

7    and infringed, and are continuing to chill, deter, and

8    infringe your right to engage in protected speech.

9          Do you see that?

10     A.   Yes.

11     Q.   What actions by the highway patrol are you

12   referring to?

13     A.   Well, I'm not even sure who Commissioner

14   Stanley is.  They -- the very citation itself has

15   chilled, deterred, and infringed on my right to engage

16   in protected speech because I no longer will blow my

17   horn for any cause.

18     Q.   But that citation was not issued by the

19   highway patrol, correct?

20     A.   But doesn't the Vehicle Code cover the CHP

21   and the sheriff's office?

22     Q.   The Vehicle Code is the state law, but you

23   didn't answer my question.  Your citation was not

24   issued by the California Highway Patrol, correct?

25     A.   Correct.



1  Q.  And Commissioner Stanley who you have sued --

2  A.  Okay.

3  Q.  -- is the commissioner of the highway patrol.

4  A.  Okay.

5  Q.  So if you need clarification on who he is --

6  A.  Okay.

7  Q.  -- that's who he is.

8  A.  Thank you.

9  Q.  Are you aware of any action he has taken?

10  A.  No.

11  Q.  And other than the fact that the law exists

12  and the California Highway Patrol is an arm of the

13  government that enforces the law, you're not aware of

14  any action taken by the highway patrol or any member

15  of the highway patrol that has chilled, deterred, or

16  infringed on your right to engage in protected speech?

17        MR. JEW:  Objection.  Calls for a legal

18  conclusion.

19        You can answer.

20  A.  No.

21  BY MS. O'GRADY:

22  Q.  Paragraph 36, the next paragraph of the

23  complaint, reads, "The acts, omissions, policies,

24  customs, and/or practices of Sheriff Gore and

25  Commissioner Stanley in their official capacities and



1    their employed personnel, as alleged herein, are

2    causing irreparable harm to Ms. Porter due to

3    interference with her constitutional right to freedom

4    of speech and expression, for which she has no

5    adequate remedy at law."

6         With respect to Commissioner Stanley and the

7    personnel of the California Highway Patrol, what acts,

8    omissions, policies, customs, and/or practices are you

9    referring to in that paragraph?

10        A.  If they have ever enforced section 27001,

11   that would impede it.  So if I was driving down the

12   freeway and there was a banner that said "Support Our

13   Veterans," I now would not honk my horn because the

14   CHP could pull me over.

15        Q.  But you're not aware of any actual action by

16   the CHP or policy by the CHP?

17        A.  On myself?

18        Q.  Yes.

19        A.  No.

20        Q.  Not aware of any customs or practices by the

21   CHP?

22        A.  No.

23        Q.  I should have told you, if you want a break

24   at any time, I'm happy to --

25        A.  Okay.  I'm good right now.



1      Q.  You're good for now?

2      A.  Yeah.

3          MR. JEW:  I think we'll maybe ask for a break

4   once every hour, if that's okay it.

5          MS. O'GRADY:  Okay.  I have no idea what time

6   it is.

7          THE WITNESS:  Ten till 11:00.

8          MR. JEW:  10:47.  So we've been going for

9   like 30 minutes.

10          Are you okay to continue?

11          THE WITNESS:  Yes.  As long as I don't drink

12   a lot of water.

13   BY MS. O'GRADY:

14      Q.  When did you first consult an attorney about

15   the possibility of bringing this lawsuit?

16      A.  Probably within a few days after it happened.

17      Q.  And who did you consult?

18      A.  David Loy.

19      Q.  And were you instructed to preserve documents

20   that might be relevant to the litigation?

21          MR. JEW:  Objection.  Attorney-client

22   privilege.

23          You don't have to answer.

24          THE WITNESS:  Okay.

25          MS. O'GRADY:  Are you instructing her not to



1   answer?

2        MR. JEW:  I'm instructing her not to answer.

3   BY MS. O'GRADY:

4        Q.  Did you preserve documents, any documents

5   relevant to the incident on October 17, 2017?

6        A.  Yes.

7        Q.  And do you have an e-mail account?

8        A.  Yes.

9        Q.  And do you send e-mails to other people?  You

10  use that account?

11       A.  From my account -- let me clarify the

12  question.  From my e-mail account do I send e-mails to

13  other people?

14       Q.  Um-hum.

15       A.  Yes.

16       Q.  And what is your e-mail?  First of all, do

17  you have more than one?

18       A.  I have more than one, but I only use one.

19       Q.  And what is that?

20       A.  Sporter92630@gmail.com.

21       Q.  And have you sent or received any e-mails

22  concerning the incident that occurred on October 17,

23  2017, to anyone?

24       A.  Yes.

25       Q.  And did you provide -- and to whom did you



1  send or receive those e-mails?

2      A.  My lawyers.

3      Q.  And did you send or receive e-mails on that

4  subject to any other person?

5      A.  Let me think.  I had correspondence with a

6  reporter, but I did not send them anything.

7      Q.  Did you receive anything from them?

8      A.  No.

9      Q.  And so what did your communication with a

10  reporter -- what was it?

11      A.  That she was trying to get in touch with me

12  so she could talk to me.

13      Q.  Was it a telephone call?

14      A.  Yes.

15      Q.  And you didn't exchange anything in writing

16  with her?

17      A.  No.

18      Q.  Didn't send or receive an e-mail?

19      A.  No.

20      Q.  You didn't send or receive any e-mails with

21  any family member about this lawsuit or about the

22  incident on October 17, 2017?

23      A.  I might have sent the link to the newspaper

24  article to my kids.  That's, again, my recollection

25  from two years ago.  That's probably -- I know that's



1   the only thing I sent my kids was the link to

2   newspaper article.

3       Q.  And did you provide that document to your

4   attorneys?

5       A.  The newspaper article?

6       Q.  The e-mail.

7       A.  No, I don't think so.

8           MR. JEW:  Objection.  Calls for

9   attorney-client privilege.

10          You don't have to answer that.

11          THE WITNESS:  Okay.

12          MR. JEW:  I'm instructing her not to answer.

13          MS. O'GRADY:  You're instructing her not to

14  answer?

15      Q.  Did you provide any documents to your

16  attorney relating to the incident that occurred on

17  October 17?

18      A.  Yes, I did provide documents.

19      Q.  What documents did you provide?

20      A.  The ticket, the link -- well, I provided the

21  link to the e-mail -- I mean to the newspaper story.

22  I don't think I provided a hard copy of the newspaper.

23  The ticket, newspaper article.  I think that's it.

24      Q.  And when you provided them the link, did you

25  forward it by e-mail?



1    A.  Yes.

2    Q.  Do you use social media?

3    A.  Rarely.

4    Q.  Do you have a Facebook account?

5    A.  I have a Facebook account.

6    Q.  And do you use it?

7    A.  I usually use it just to see what my kids are

8  doing.

9    Q.  Do you use any other social media like

10  Twitter or anything?

11    A.  No.

12    Q.  And have you posted anything to Facebook

13  concerning either this lawsuit or the incident on

14  October 17, 2017?

15    A.  No.

16    Q.  And do you have -- and you've retained all of

17  the documents -- to the extent you have any documents,

18  you've retained them?

19    A.  Yes.

20        MS. O'GRADY:  I don't have any other

21  questions.

22        MR. WHITE:  I will.

23        MS. O'GRADY:  Shall we take a break before

24  you start?

25        MR. JEW:  Let's take a break.



SUSAN PORTER                                    November 05, 2019
PORTER vs GORE                                                    39

```
 1        (Recess)

 2                   EXAMINATION

 3   BY MR. WHITE:

 4       Q.  Miss Porter, my name is Tim White.  I'm from

 5   County Counsel's office.  I'm representing Sheriff

 6   Gore in his official capacity today.

 7            Since I had an outline but I'm not the first

 8   to ask you questions, some of the questions in my

 9   outline have been asked or asked in a different way,

10   so forgive me if I ask you one or two questions that

11   have been asked before.

12       A.  Okay.

13       Q.  I made notes of what you've answered, but

14   it's a possibility.  So I'm just going to go through

15   my outline.

16            With respect to your name, you gave your name

17   and your middle name.  Have you ever gone by any other

18   names besides Susan Lynn Porter?

19       A.  Yes.

20       Q.  And what other names have you used?

21       A.  My first married name was Park, P-a-r-k.

22       Q.  Okay.

23       A.  And you're going to laugh at this one.  My

24   maiden name was Butt, B-u-t-t.

25       Q.  Okay.  Any others?
```



 1      A.   Nope.   That's it.

 2      Q.   And when did you move to the Lamia Way

 3  address in Oceanside?

 4      A.   In April of 2017.

 5      Q.   And before -- immediately before that, did

 6  you live at the Lake Forest address that was on the

 7  citation?

 8      A.   Correct.

 9      Q.   And how long did you live there,

10  approximately?

11      A.   22 years.

12      Q.   And do you have any other family members in

13  your household at the present time?

14      A.   Yes.   My husband.

15      Q.   His name, please?

16      A.   Tom.

17      Q.   And between October 2017 and today, have

18  there been any other family members residing in your

19  household?

20      A.   No.

21      Q.   When Ms. O'Grady was asking you about your

22  driver's licenses or history, I believe you stated

23  that you've had licenses in multiple states.   Is that

24  correct?

25      A.   Correct.



1    Q.   And you've mentioned so far California and

2  Ohio.

3    A.   Um-hum.

4    Q.   What other states have you had a license in?

5    A.   Well, I can't remember all of them because my

6  ex-husband was in the service so we moved a lot, but I

7  can remember before California, I lived in Arizona.

8  And before I lived in Arizona, I lived in Florida.

9  And before Florida, I lived in South Carolina.  And

10  other places we were there for a short time so I don't

11  think I got driver's licenses in those states because

12  we were only there for three or four months.

13    Q.   This is a question we ask of all witnesses.

14         Have you ever been convicted or pled guilty

15  or no contest to a crime?  Not a citation but an

16  actual crime.

17    A.   No.

18    Q.   And you've never been a party to a lawsuit

19  besides this one.  Is that correct?

20    A.   Other than the normal recall product, no.

21  You know the mass -- you know what I mean.

22    Q.   You've never been a party to a lawsuit

23  against a public entity or public employee?

24    A.   No.

25    Q.   Have you ever besides this case -- well,



1    strike that.

2         Have you ever filed a claim against a public

3    entity or public employee?

4         A.   No.

5         Q.   With respect to your educational history,

6    when did you graduate from Arizona State?

7         A.   1990.

8         Q.   And is that the extent of your post high

9    school education?

10        A.   Yes.

11        Q.   I want to go over your employment history.

12             Are you currently employed?

13        A.   No.

14        Q.   When is the last time you were employed?

15        A.   July 2017.

16        Q.   And what was your employment at that time?

17        A.   The company?  Is that what you're asking me?

18        Q.   Correct.

19        A.   PADI, P-A-D-I, all caps.  Stands for the

20    Professional Association of Diving Instructors.

21        Q.   And how long were you employed by PADI?

22        A.   Almost ten years.

23        Q.   Were you employed anywhere else during the

24    ten years you were with PADI?

25        A.   You mean at the same time?



SUSAN PORTER                                        November 05, 2019
PORTER vs GORE                                                    43

1        Q.   Correct.  During those ten years at all, did

2    you have --

3        A.   No.

4        Q.   -- any other jobs?

5             And before PADI, where were you employed?

6        A.   Edwards Life Sciences.

7        Q.   And I'm sorry.  What did you do at PADI?

8        A.   I was a senior business analyst.

9        Q.   And you said Edwards Life Sciences?

10       A.   Correct.

11       Q.   How long were you there?

12       A.   I don't really recall.  Two or three years.

13       Q.   What was your position there?

14       A.   I don't remember the title, the exact title.

15       Q.   Have you ever worked in law enforcement?

16       A.   No.

17       Q.   And have you ever been in the military?

18       A.   No.

19       Q.   Other than your attorneys and other than your

20   husband, have you talked with anyone else or talked

21   with anyone about being deposed or this deposition?

22       A.   No.

23       Q.   Our office recently produced additional

24   materials and documents in this case, including the

25   video footage from a body-worn camera that Deputy



 1   Klein was wearing at the time of the interaction with
 2   you.
 3       A.   Um-hum.
 4       Q.   Have you reviewed that video?
 5       A.   No.
 6       Q.   Is there any particular reason you haven't?
 7   Did you know it existed?
 8       A.   I did as of yesterday.
 9       Q.   Okay.  You just haven't been able to yet?
10       A.   No, I haven't.
11       Q.   Before the first Women's March in San Diego,
12   had you ever attended or been involved in a protest or
13   demonstration before that date?
14       A.   I can't say for sure.  I don't remember being
15   in one.
16       Q.   Do you recall ever engaging in civil
17   disobedience outside -- I'm not saying that you did at
18   any of the protests that you mentioned, but outside of
19   those protests, did you ever engage in civil
20   disobedience?
21       A.   Can you explain what you mean by "civil
22   disobedience"?
23       Q.   Correct.  So a historical example would be in
24   the Jim Crow South where there was a law against using
25   the fountain or whatever, and people would potentially



1  go and use the fountain they weren't allowed to in

2  order to protest what they felt was an unjust law.  So

3  you may have people that may occupy an intersection or

4  occupy a building or something like that --

5      A.  No.

6      Q.  -- as a form of protest.

7      A.  No.

8      Q.  Other than the subject citation for honking

9  your horn, have you ever received a ticket or citation

10  for any activities related to a protest?

11      A.  No.

12      Q.  And how long have you been licensed to drive

13  total?

14      A.  Let's see.  Let's do the math.  65 from 16.

15      Q.  Okay.  Since you were 16.

16      A.  Yes.  So almost 50 years.

17      Q.  And have you ever been pulled over for

18  honking your horn before in any state --

19      A.  No.

20      Q.  -- other than the one we're talking about.

21          I'm just skimming through some of the

22  questions that have already been asked, so pardon the

23  pause here.

24          How did you find out or first hear about the

25  protest outside of Congressman Issa's office?



1        A.   Newspaper.

2        Q.   Is that the Union Tribune?

3        A.   Yes.

4        Q.   And was there any type of Facebook group or

5   mailing list, e-mail list or anything for the protests

6   that would send communications from the organizers,

7   for example?

8        A.   Yes.

9        Q.   And can you describe what those groups or

10  social media or group lists were?

11       A.   There was -- well, there's several.  For the

12  actual protests themselves, there was an e-mail.  You

13  signed up to be on the e-mail list to get notified

14  about the protests.  There is -- well, there was.

15  It's morphed so I'm not sure what it is now.  There

16  was a Facebook page, but I didn't ever really -- I

17  might have gone on it once or twice just to look at

18  it.  Then there was -- there's Indivisible 49.

19       Q.   Is that a group?

20       A.   It is.

21       Q.   And do they have a Facebook page or some

22  other type of --

23       A.   I don't know if they have a Facebook page.

24  They do send out e-mails.

25       Q.   And the initial e-mail list you mentioned



 1  with respect to the protests outside Congressman

 2  Issa's office, who, if you know, sends out the e-mails

 3  or sent out the e-mails for that list?

 4      A.  I believe they came from Ellen Montoya.  I'm

 5  not sure how you spell her last name.

 6      Q.  And are those e-mails -- did they go to the

 7  e-mail address you already put on the record?

 8      A.  Yes.

 9      Q.  And do you have those e-mails in that e-mail

10  account still?

11      A.  No.

12      Q.  What happened to those e-mails?

13      A.  I deleted them.  They were just about the

14  protests.

15      Q.  And when did you delete those?

16      A.  Usually right after I got them.

17      Q.  Did you delete any of those after this

18  lawsuit in this case was filed?

19      A.  Yes.

20      Q.  And when did you delete those e-mails after

21  the lawsuit was filed?

22      A.  Right after I got them.

23      Q.  Okay.  So at the time you filed this lawsuit,

24  did you have any previous e-mails from that e-mail

25  list still in your e-mail inbox or a subfolder?



1      A.  From the group, no, I did not save any from

2  the group.  I saved some from Indivisible 49.

3      Q.  And when did the protests at Congressman

4  Issa's office stop?

5      A.  I believe it was April or May of 2018.

6      Q.  Okay.  So your lawsuit was filed in

7  June 2018, June 11th.  Were you still receiving

8  e-mails from an e-mail list as of June 11, 2018?

9      A.  I can't say exactly for sure, but I don't

10  think so because the protests were over.

11      Q.  Was it your practice to always delete the

12  e-mails from that e-mail list as soon as they came in

13  and you read them?

14      A.  Yes.

15      Q.  Was there ever a point where after you

16  received the subject citation where you deleted

17  multiple e-mails from that e-mail list?

18      A.  No.

19      Q.  What was the Facebook page for the protest

20  that you mentioned?

21      A.  I don't know the exact name of it.

22      Q.  Do you know whose Facebook page it was or who

23  ran it?

24      A.  I know the person that organized the protests

25  was Ellen Montoya.  I'm not sure if she was in charge



1    of the Facebook page or not.

2        Q.  And are you still a Facebook friend or a

3    member of that Facebook page or group?

4        A.  The one for the protests I don't think is

5    active anymore.  I think it morphed into a -- more of

6    a Democratic activist page, but I can't say for sure.

7    I'm not really active in that group.

8        Q.  But have you taken any steps to actively

9    disassociate yourself from that Facebook group such as

10   unfriending them or doing some other action on

11   Facebook that would remove you from the group, so to

12   speak?

13       A.  No.

14       Q.  And with respect to Indivisible 49, do you

15   still have e-mails that Indivisible 49 sent you?

16       A.  Yes.  I get e-mails from them at least once a

17   week.

18       Q.  And during the time of the protests, those

19   e-mails related to the protests outside of Congressman

20   Issa's office.  Is that correct?

21       A.  Indivisible 49 -- I can't remember how

22   everything morphed, but I think the protests might

23   have evolved to Indivisible 49.  But at the time when

24   we were getting e-mails about the protests, it was

25   just a weekly reminder about the protest and what the



1    topic was going to be.

2        Q.   From the Indivisible 49 e-mail?

3        A.   Not from the Indivisible 49 e-mail.  From the

4    list of the protests.  I don't know if it had an

5    official name.  I don't know.

6        Q.   And when did you start receiving e-mails from

7    Indivisible 49?

8        A.   I think the e-mail list came from when we

9    signed up for the e-mail list at the protest.

10       Q.   So that group was out at the protest site?

11       A.   Right.  I'm not even sure if Indivisible 49

12   was a group at the time of the protest or if they

13   morphed from that.  I'm not sure when Indivisible 49

14   was created.

15       Q.   I don't know this offhand.  Was Congressman

16   Issa, was he in the 49th Congressional District of

17   California?

18       A.   He was.

19       Q.   And do you know who runs Indivisible 49?

20       A.   No.

21       Q.   What is your Facebook -- do you have like a

22   Facebook name or account number or name?

23       A.   Just under my name, Sue Porter.  There's just

24   a few of those out there, let me tell you.

25       Q.   So there's not -- I haven't been on Facebook



1    for years so I forget how it works.

2        Is there not a specific identifier to

3    differentiate one Sue Porter from somebody who may

4    have signed up earlier who has the same name?

5        A.  I don't think so.  I think you just have to

6    look at the picture.

7        Q.  And is your Facebook page public or private?

8        A.  I think it's public.

9        Q.  I'm sorry.  When did you start attending the

10   protests outside Congressman Issa's office?

11       A.  I don't know the exact first one I went to,

12   but I retired in July of 2017 so I wasn't able to go

13   before then, so I would say sometime after July '17,

14   and obviously I was there in October.

15       Q.  And where were the protesters -- strike that.

16       Were the protesters typically congregating or

17   located in a specific spot with respect to Congressman

18   Issa's office?

19       A.  Yes.  There was a specific spot that we had

20   to stay in, and it was outside of his office on -- we

21   had to be on the sidewalk and the street.  We weren't

22   supposed to be on the grass.  However, sometimes there

23   was so many of us that we were on the grass.

24       Q.  So on the sidewalk area and maybe spilling

25   into the grass a little bit.  On the sidewalk that's



1   on the same side of the street as Congressman Issa's

2   office?

3       A.   Correct.

4       Q.   Were there certain people at the protests

5   that you knew well, that you regularly spoke with?

6       A.   Regularly, no.  Some of my neighbors would be

7   there, but we didn't coordinate being there together.

8       Q.   And do you know any of the organizers of that

9   protest?

10       A.   I do now.

11       Q.   Who do you know?

12       A.   I know Ellen Montoya.

13       Q.   Anyone else?

14       A.   I know a few others by face, but I'm not sure

15   of their names.

16       Q.   Have you discussed the ticket you received,

17   the horn honk ticket with Miss Montoya?

18       A.   Yes.

19       Q.   And have those discussions been solely in

20   person or over other media?

21       A.   They have not been solely in person, no.

22       Q.   How else have you communicated with

23   Miss Montoya about the ticket you received?

24       A.   E-mail.

25       Q.   Do you still have those e-mails?



1        A.   No.

2        Q.   When did you discuss the ticket you received

3   with Miss Montoya over e-mail?

4        A.   Within a few days after it happened.

5        Q.   How many times have you discussed the ticket

6   issue with Miss Montoya, if you can estimate?

7        A.   I don't know.

8        Q.   Do you believe it's more than five times?

9        A.   In person and in e-mail?

10       Q.   Correct.

11       A.   Yes.

12       Q.   When is the most recent time, generally

13   speaking, when you discussed the ticket issue with

14   Miss Montoya?

15       A.   Within the last year.  That's all I can

16   guess.

17       Q.   Have you discussed the lawsuit with

18   Miss Montoya, this lawsuit?

19       A.   I just told her there was one.

20       Q.   Was that done over e-mail as well?

21       A.   No.  That was done in person.

22       Q.   And did you delete your e-mails with

23   Miss Montoya about the ticket?

24       A.   I would have to go back and check my e-mail

25   account, but probably.



1    Q.  And when would that have been done?

2    A.  Within a month after the ticket.

3    Q.  Do you know her e-mail address offhand?

4    A.  No.

5    Q.  Have you talked with -- strike that.

6        Have you communicated with Miss Montoya about

7    the fact that you were going to be deposed in this

8    action?

9    A.  No.

10   Q.  Do you recall whether any of the -- strike

11   that.

12       Do you recall if there were any traffic

13   control measures in place during the protest?

14   A.  Yes.

15   Q.  And what do you recall about traffic control

16   measures in place?

17   A.  There was -- I'm not sure if they were

18   volunteers or official, but there was people there

19   with vests on to make sure that people crossed the

20   street at a certain place and made sure -- and

21   assisted people, made the cars stop so people could

22   get safely across the street.  There was also always

23   an officer there.  Usually just one officer there.

24   I'm not sure why he was there.  I'm not sure if it was

25   traffic or crowd control.  I'm not sure why he was



1  there, but there was usually one officer there.

2      Q.  Okay.  And when you say "officer," you mean a

3  sheriff?

4      A.  A sheriff, yes.

5      Q.  Someone from the sheriff's department?

6      A.  Yes.

7      Q.  Did you always drive to the protests?

8      A.  Yes.

9      Q.  At the time of your ticket you had a 2000 --

10  or strike that -- you were driving a 2013 Honda CR-V.

11  Is that correct?

12      A.  Correct.

13      Q.  And was that a vehicle you owned?

14      A.  Yes.

15      Q.  And do you still have that vehicle?

16      A.  Yes.

17      Q.  And where would you park for the protest, if

18  there was typical parking area?

19      A.  Wherever you could find a spot, usually.  But

20  usually I tried to park before -- from my house to get

21  to the protest, I would usually come and I would be

22  parked before the actual protest started because it

23  was closest to where I lived.  Unless I couldn't find

24  a parking spot.  So I normally did not drive past the

25  protest unless there was no parking.



1    Q.  When you say you didn't drive past, what

2  direction would that be heading?

3    A.  You're really -- I could not tell you

4  direction.  I have no idea.

5    Q.  But you were coming from your house in

6  Oceanside?

7    A.  Correct.  So if you come -- okay.

8  Shadowridge -- well, you probably don't know the

9  streets anyway.  You come down Shadowridge and you

10  would make a left, so whatever that would be.

11    Q.  Okay.  So from your house you would

12  eventually get to Shadowridge.  Come down Shadowridge,

13  make a left on Thibodo?

14    A.  Yes.

15    Q.  And you would park typically before you

16  reached Congressman Issa's office?

17    A.  Correct.

18    Q.  And would you always park on the street?

19    A.  I wouldn't say always.  There were a few

20  times I parked in the church parking lot because there

21  was no parking.

22    Q.  And which church was that?

23    A.  I don't know the name of it.

24    Q.  Was that on Thibodo near the office?

25    A.  Correct.



1       Q.   Was it on the same side of the street?

2       A.   Other side of the street.

3       Q.   Had you ever received a parking ticket while

4   you were parked for the protest?

5       A.   No.

6       Q.   And other than the subject ticket, did you

7   ever -- and this is before or after October 17, 2017,

8   receive a traffic ticket in the area of the protest?

9       A.   No.

10      Q.   Other than the traffic stop on the day of the

11  incident and receiving a citation for the horn honk,

12  did you have any interaction with any law enforcement

13  during the protest?

14      A.   No.

15      Q.   Has your only interaction with Deputy Klein

16  been when he pulled you over and then when you were

17  interacting with him at the time of receiving the

18  ticket?

19      A.   Yes.

20      Q.   Do you know who Lieutenant Munsey then with

21  the sheriff's department is?

22      A.   No.

23      Q.   Did you have any communications with any

24  sheriff deputies or personnel at the scene of the

25  protest other than the interaction you had with Deputy



1   Klein on October 17, 2017?

2        A.  No.

3        Q.  Have you had any contact with the sheriff's

4   department with respect to your ticket other than the

5   contact at the scene with Deputy Klein?

6        A.  Well, I went to court.

7        Q.  Okay.  And did you have contact with anyone

8   from the sheriff's department at your court

9   appearance?

10       A.  No.  He didn't show up.

11       Q.  Okay.  So have you had any communication or

12   contact with the sheriff's department regarding your

13   ticket other than the interaction with Deputy Klein at

14   the scene that day?

15       A.  No.

16       Q.  So no phone calls to the sheriff to complain

17   or anything like that?

18       A.  No.

19       Q.  Do you know if there were any liaisons or

20   points of contact from your protest group for dealings

21   or communications with the sheriff's department?

22       A.  I don't have any direct knowledge.

23       Q.  Same question with respect to the people from

24   the City of Vista, do you know if there was anyone

25   from your group who was the point person for



1   communications with the City of Vista?

2       A.  Well, I think the point person for any

3   communications would have been Ellen Montoya.

4       Q.  You or maybe your attorney's office, I guess,

5   has produced documents in this case that were received

6   I believe by them from the City of Vista, and I'll

7   represent to you that a lot of those documents

8   including, as an example, a May 15, 2017, letter from

9   the City of Vista that's Bates labeled SP001, it is

10  addressed to an Ellen Montanari, M-o-n-t-a-n-a-r-i.

11          Do you know if that's who you're referring

12  to --

13      A.  Yes.

14      Q.  -- as Ellen Montoya?

15      A.  Yes.

16      Q.  So in this transcript of this deposition when

17  there's been references to Ellen Montoya, should it be

18  Ellen Montanari?

19      A.  Yes.

20      Q.  Did you hear from any other protesters any

21  complaints about the sheriff's department or sheriff

22  personnel in their activities at the protest scene?

23      A.  Yes.

24      Q.  What did you hear in that respect?

25      A.  A lot of people got tickets for not turning



1  their wheels the right way.  Some got tickets for not

2  having a front license plate.  That's the only ones I

3  really know about.

4      Q.  Okay.  And as far as you know, were those

5  complaints related to October 17, 2017, or -- well

6  that's my question.

7      A.  Yes, they were.

8      Q.  Did you ever hear any complaints regarding

9  tickets or sheriff law enforcement activities at the

10 protest on other dates?

11     A.  No.

12     Q.  So focusing on the date of the incident, when

13 you drove to the protest that day, did you have any

14 passengers in your vehicle?

15     A.  No.

16     Q.  And when you finally left the scene that day,

17 did you have any passengers in your vehicle?

18     A.  No.

19     Q.  Did your -- when I say "your side," the side

20 protesting against Congressman Issa.  Does that make

21 sense?

22     A.  Yes.

23     Q.  Okay.  Do you recall if your side had

24 amplified sound at the protest that day?

25     A.  Well, we had a megaphone.  I'm not sure if



1  the megaphone was amplified or not.

2     Q.  Do you recall whether on at least some of the

3  days where you attended those protests, whether your

4  side had amplified sound beyond a megaphone, such as

5  speakers?

6     A.  They might have had speakers.

7     Q.  Do you recall anybody on your side of the

8  protest having any instruments or other

9  noise-producing devices that were played, whether or

10  not they were amplified electronically?

11     A.  One guy had a drum.

12     Q.  And at the protest was there chanting and

13  singing from your side at times?

14     A.  Yes.

15     Q.  Did anybody -- strike that.

16     At the protest were protesters holding picket

17  signs?

18     A.  Yes.

19     Q.  Do you recall at the protest if there were

20  anything set up on the sidewalks, like tables or audio

21  equipment, canopies, those type of things?

22     A.  There was a sign-in table.  That was it.

23     Q.  From your observation and experience there,

24  if people needed to cross the street, Thibodo Street,

25  during, before or after the protest, either to get to



1  their vehicle or for some other reason, is there a

2  nearby crosswalk to cross, or people would cross just

3  in the street in front of Congressman Issa's office?

4      A.  There was not a crosswalk there.  We had

5  volunteers to help people get back and forth across

6  the street.

7      Q.  So on the date of the incident, October 17,

8  2017, before the ticket, where was your vehicle

9  parked?

10      A.  It was parked -- again, I'm not

11  directionally -- I'm directionally challenged, but it

12  was before the protest.

13      Q.  Was it on the same side of the street as

14  Congressman Issa's office?

15      A.  Correct.

16      Q.  And how long had you been at the protest that

17  day before you decided to move your vehicle?

18      A.  Half hour, 45 minutes.

19      Q.  And what was the reason you moved your

20  vehicle?

21      A.  Because they were ticketing people and I

22  wasn't sure if I was too close to a fire hydrant.

23      Q.  How close would you estimate that you were?

24      A.  I have no idea.  They didn't paint the red

25  curb thing.  Too close for my comfort.  Let's put it



1   that way.

2       Q.   Okay.   And where were you moving your vehicle

3   to?

4       A.   I was moving it past the protest down the

5   street, and I was going to go up to the church.

6       Q.   Now, after you received your ticket and you

7   were able to go on your way, did you leave the area or

8   did you go park somewhere else and rejoin the protest?

9       A.   No.   I parked, but the protest was just

10   coming to an end.   By the time I got the ticket, found

11   a place to park, went back, the protest was just

12   wrapping up.

13       Q.   And then did you end up parking at the church

14   after the ticket?

15       A.   No.   There was parking on the street, on the

16   other side of the street by that time.

17       Q.   Did you take any pictures that day while at

18   the scene?

19       A.   No.

20       Q.   Did you take any video that day?

21       A.   No.

22       Q.   Did you record any audio that day?

23       A.   No.

24       Q.   And that includes in your vehicle during the

25   interaction with Deputy Klein?



1    A.  That's correct.

2    Q.  At any -- on any other -- strike that.

3        On the other days that you were at the

4  protest, did you ever take pictures at the protest

5  scene?

6    A.  I don't think I ever took any pictures.

7    Q.  Did you ever take any video from the protest

8  scene?

9    A.  No.

10   Q.  And, again, not just focusing on the day of

11  the ticket, but did you ever record any audio from the

12  scene?

13   A.  No.

14   Q.  Do you know of anyone else who took pictures

15  from the protest scene on October 17, 2017?

16   A.  I know people did.  I don't know them.

17   Q.  Okay.  Do you have any access to any of those

18  photos?

19   A.  I have access to the photos the reporter took

20  just from the link.

21   Q.  Is that a reporter with the Union Tribune?

22   A.  Yes.

23   Q.  Do you know if it was Teri Figueroa or

24  somebody else?

25   A.  That sounds familiar.  That's who it was.



1    Q.  Whoever reported on this incident?

2    A.  Yes.

3    Q.  And have you seen photos taken on that day by

4  anyone else besides a reporter?

5    A.  I've seen pictures of the -- but I think that

6  was in the paper too.  The only photos I've really

7  seen were in the paper.

8    Q.  Do you know if any video was taken at the

9  scene on October 17, 2017, other than the camera that

10 Deputy Klein was wearing?

11   A.  I know there is video.  I have not seen it.

12   Q.  How do you know that there is video?

13       MR. PEREZ:  If you can answer without

14 revealing any attorney-client communication, you can

15 go ahead, but otherwise --

16   A.  Okay.  My attorneys told me.

17 BY MR. WHITE:

18   Q.  You haven't seen any videos from the --

19   A.  No.

20   Q.  -- accident scene -- or the incident scene?

21   A.  No.

22   Q.  And do you know if any audio recordings taken

23 at the protest scene on October 17, 2017, exist other

24 than audio that may have been captured on a video?

25   A.  No, I don't know of any.



1    Q.  While you were at the scene that day before

2    you got back in your car to move it, did you see any

3    sheriff law enforcement activity --

4    A.  Yes.

5    Q.  -- that day?

6         Okay.  What did you see?

7    A.  I saw a swarm of officers come down the

8    street start writing tickets.

9    Q.  Okay.  How many sheriff deputies do you

10   recall seeing writing tickets on October 17, 2017?

11   A.  I can't give you an exact number.  I would

12   say more than five, less than ten.

13   Q.  And was that all going on at one time?

14   A.  Yes.

15   Q.  Did you speak with anybody who received a

16   parking -- strike that -- who received a ticket for

17   their vehicle while their vehicle was parked that day?

18   A.  No.

19   Q.  Did your vehicle have front and rear license

20   plates that day?

21   A.  Yes.

22   Q.  Now, is it your belief that at the time of

23   your horn honk that there was a counterprotester

24   playing amplified music or messages at that time?

25   A.  Yes.



1    Q.  And was that something that was audible from

2    across the street?

3    A.  Yes.

4    Q.  You said that it drowned out the protesters?

5    A.  He attempted to, yes.

6    Q.  Do you know who the counterprotester was?

7    A.  No.

8    Q.  Or is?

9    A.  No.

10   Q.  But he was at the scene that day?

11   A.  Yes.

12   Q.  Do you recall any type of setup that he may

13   have had, whether equipment or canopies or signs or

14   anything to that effect?

15   A.  He had a truck.  I think he had a canopy.  He

16   had great big speakers and a sound system.

17   Q.  And did you speak to anyone about that

18   counterprotester, anyone from the City or the

19   sheriff's department?

20   A.  No.

21   Q.  Do you know if anyone else spoke with the

22   City or the sheriff's department about the

23   counterprotester and his noise?

24   A.  I don't know.

25   Q.  Why did you honk your horn on the date of the



1    incident while driving past the protest area?

2         A.   Because other people had been honking their

3    horn all day, and when I started to go past, I was

4    going to honk my horn to show my support also.

5         Q.   Do you recall if there were any signs visible

6    from the roadway such as "Honk in Support of the

7    Protest" or anything to that effect?

8         A.   No.

9         Q.   Where were you with respect to the assembled

10   group of protesters when you honked the horn?

11        A.   I honked the horn twice because -- because we

12   weren't allowed to go on the grass, the protest would

13   be very long along the sidewalk, so I did the first

14   beep, beep, beep towards the front of the protesters,

15   and then when I got kind of towards the middle, I

16   beeped again.

17        Q.   Do you recall whether you received any

18   response from either side of the --

19        A.   Oh, yeah.

20        Q.   -- the protesters?

21        A.   The protesters all cheered.

22        Q.   Was that the first time that you had ever

23   honked at that protest?

24        A.   Yes.

25        Q.   Why was that the first time you had ever



1   honked for this protest?

2       A.   Because I had never driven past it while it

3   was in progress before.

4       Q.   Now, when Ms. O'Grady was questioning you, I

5   believe you testified that in your opinion, Deputy

6   Klein was rude, correct?

7       A.   Correct.

8       Q.   Okay.  Is that based on anything other than

9   him not responding to you when you had asked a

10  question?

11      A.   It is my perception based on other

12  experiences with officers.  They come up and they

13  introduce themselves and at least say something.  He

14  was just -- came to the window and said, "I need your

15  driver's license and insurance."  And I was asking

16  questions, and he just -- he ignored me and just kept

17  saying, "Give me your driver's license and insurance."

18      Q.   Any other reason that you felt he was rude

19  that day?

20      A.   He was very abrupt.  He wouldn't answer my

21  questions.  He wouldn't tell me why he had pulled me

22  over until he handed me the ticket.

23      Q.   Is there anything in particular that he said

24  to you that you felt was rude?

25      A.   It was not so much what he said.  It was his



1   tone.

2       Q.  Did he raise his voice at you?

3       A.  No.

4       Q.  So when you were describing his tone, you

5   described it as abrupt.

6       A.  Abrupt.  I felt like I was a criminal.

7       Q.  And you mentioned your other interactions

8   with law enforcement.  What other interactions have

9   you had with law enforcement at the scene of the

10  protest, if any?

11      A.  None.

12      Q.  And you hadn't been pulled over at the scene

13  of the protest before?

14      A.  No.

15      Q.  While you were waiting for Deputy Klein to

16  return with your driver's license and ultimately the

17  ticket, did you contact anyone from your car?

18      A.  I think I might have called my husband, and

19  he didn't answer.  Then I think I called my son.  I

20  can't remember if I called him before or after, but at

21  some point in time during that, I called my husband

22  and my son.

23      Q.  And how old is your son?

24      A.  46.

25      Q.  Is he in town?  Or where does he live?



1      A.   Oceanside.

2      Q.   What's his name?

3      A.   Shannon.

4      Q.   Same last name, Porter?

5      A.   No.   Park.

6      Q.   And what did you discuss with your son?

7      A.   That I was getting a ticket for honking my

8   horn.

9      Q.   Did you contact anybody else during that

10   time?

11      A.   No.

12      Q.   Have you posted on social media about the

13   ticket, receiving the ticket?

14      A.   No.

15      Q.   Have you e-mailed -- sent out any e-mails

16   other than to your attorneys about receiving the

17   ticket?

18      A.   To my family.

19      Q.   And when you say your family, who in your

20   family would you have e-mailed about receiving the

21   ticket?

22      A.   My husband and my kids.

23      Q.   And when were those e-mails sent?

24      A.   After the newspaper article was published.

25      Q.   You mentioned sending an e-mail with a link



1  to the article.  Is that correct?

2      A.  Yes, I did.

3      Q.  Did you send any other e-mails about the

4  ticket besides those e-mails with the link?

5      A.  The only other e-mails that were sent back

6  and forth were initially between Ellen whose name you

7  pronounced better than I do and David Loy.

8      Q.  And I think he's an attorney of record in

9  this case.  I don't want to know about the content of

10  that e-mail or those e-mails with Mr. Loy.

11      Can you just describe briefly how the ticket

12  was -- how you ultimately handled the ticket and how

13  it was disposed of, I guess, or process, if that's a

14  better word.

15      A.  The process, you mean after I got the ticket?

16      Q.  Correct.

17      A.  After I got the ticket I went to court where

18  I had to plead guilty or not guilty.  I pled not

19  guilty.  Then I had to set up a court date to come

20  back, and the officer didn't show up.

21      Q.  Okay.  And was the ticket dismissed at that

22  point then?

23      A.  Yes.

24      Q.  I think you stated that you have not honked

25  your horn in support of any protest or cause since



1    October 17, 2017.  Is that correct?

2        A.  That is correct.

3        Q.  You may have done this already.  I apologize.

4            Can you briefly describe why you will not or

5    have not done so?

6        A.  Because I don't want another ticket.

7        Q.  Have you been in any position to do so since

8    October 17, 2017?

9        A.  Yes.

10       Q.  And when was that?

11       A.  When I went to the Women's March in

12   Oceanside, when I went to the protest in Carlsbad,

13   which I can't really remember.  I think it was about

14   Mueller.  I think those were the two.  The gun control

15   one, I can't really -- gun control was like a while

16   back, and I don't think we drove past the protest.

17       Q.  So the Women's March in Oceanside, that was

18   in 2018 or 2019?

19       A.  '19.

20       Q.  And the protest in Carlsbad regarding the

21   special counsel issue, what year was that, if you

22   recall?

23       A.  I can't say for sure.  I think it was 2018.

24       Q.  Have you had occasion to use your horn since

25   October 17, 2017, for any other purposes?



1      A.  Yes.

2      Q.  Briefly describe what those were.

3      A.  Someone is pulling over into my lane, someone

4  sitting at a light on their phone and the light turns

5  green.  That's about it.

6          MR. WHITE:  Okay.  I just have a few more

7  questions and then we'll be done, unless you have more

8  questions.

9          MS. O'GRADY:  I have a few.

10          MR. WHITE:  I know we're getting close to

11  lunchtime, but I assume you guys are okay with just

12  soldiering through if we don't have too much longer.

13          MR. PEREZ:  What's too much longer?  Like

14  another half hour?

15          MR. WHITE:  I don't have even that much.

16          MR. JEW:  Sue, are you okay?

17          THE WITNESS:  I'm fine.

18          MR. WHITE:  Does anyone need a five-minute

19  break?

20          THE WITNESS:  I'm good.

21          MR. WHITE:  I just have a few more questions.

22      Q.  Miss Porter, in this case we've been served

23  by your attorneys in July of 2019 with your second

24  amended initial disclosures, and there's a space where

25  you or your side had to identify individuals that are



1   likely to have discoverable information that you or

2   your side may use to support your claims or defenses.

3   And I just want to go over the people that were

4   listed, and if you can let me know, one, if you know

5   who these people are, and, two, I may just have a few

6   questions about who they are.

7            We've already talked, I believe, about Ellen

8   Montanari.

9       A.   Um-hum.

10      Q.   The second one is Scott Hanson.

11      A.   No.

12      Q.   Do you know who that is?

13      A.   No.

14      Q.   Steve Bosworth?

15      A.   No.

16      Q.   Tim O'Healy?

17      A.   No.

18      Q.   Cindy Jerromes?

19      A.   No.

20      Q.   I may be saying this wrong.  Steve Jerromes?

21      A.   No.

22      Q.   And I don't know if it's pronounced Hispanic

23  or Spanish, so I may be saying it wrong, but the last

24  name, in case you've heard it pronounced differently,

25  is J-e-r-r-o-m-e-s.



```
 1        A.  Is that his first name?
 2        Q.  That's the last name.  So Cindy and Steve
 3   with that last name.
 4        A.  No.
 5        Q.  And Erin with E-r-i-n Tracey?
 6        A.  No.
 7        Q.  So at this point those names don't mean
 8   anything to you, other than Ellen Montanari.
 9        A.  Yeah.
10        Q.  Do you have any information regarding any
11   sheriff policy or direction by Sheriff Gore with
12   respect to the issuance of horn honk tickets?
13        A.  No.
14        Q.  Let me just look through your complaint real
15   quick to see if I have any other questions about your
16   allegations.
17            Have we discussed all communications you've
18   had with anyone from the sheriff's department
19   regarding the ticket you received?
20        A.  Yes.
21            MR. WHITE:  I don't have any further
22   questions.
23            MS. O'GRADY:  I just have very few.
24                    FURTHER EXAMINATION
25   BY MS. O'GRADY:
```



1      Q.  You indicated that you had communications

2   with Ellen Montanari within the past year in response

3   to a question by Mr. White.

4      A.  I saw her in person.  She was at a meeting I

5   was at.

6      Q.  And did you have any other communications

7   with her --

8      A.  No.

9      Q.  -- within the last year?

10         Okay.  And you stated that you had -- that

11   you were differentiating your experience with

12   Deputy Klein with experience with other officers, I

13   think you said who introduced themselves.  What other

14   experience did you have with other officers?

15      A.  I got a speeding ticket.

16      Q.  And when was that?  Was it once?  More than

17   once?

18      A.  Well, in my whole lifetime probably more than

19   once.  I haven't had a speeding ticket in over ten

20   years.

21      Q.  So when you're referring to the experience

22   with other officers, is that going back ten years ago

23   or more?

24      A.  It would be going back further.  For example,

25   the CHP pulled over my husband the other day driving



1   the RV, and the officer came up, introduced himself,

2   said, "Do you know why I pulled you over?" da, da, da,

3   da, da, and had more of a conversation with my

4   husband.  Whereas this guy just came up and just

5   started like -- wouldn't even talk to me.

6       Q.  And when was the experience you related when

7   your husband was pulled over by the CHP?

8       A.  Two weeks ago.

9       Q.  And were there any other experiences with the

10  officers that you were thinking about when you were

11  making -- talking about them introducing themselves?

12      A.  Well, I've had experience with officers.

13  Like there was an accident and I pulled over to help

14  the people, and so I had interaction with the officers

15  there.

16      Q.  You indicated that you hadn't honked at any

17  of the previous protests, Issa protests, because you

18  hadn't driven by the protests.

19          Following the incident did you ever drive by

20  the Issa protest after that?

21      A.  Yes, because they -- yes.  A couple were very

22  crowded so there was no parking, so I had to go down

23  and park by the church, and I did not honk my horn.

24      Q.  And that occurred on a couple of occasions

25  after October 17?



1      A.   Yes.

2      Q.   Sorry.  Just for clarity --

3      A.   That's okay.  Yes, it is.

4      Q.   And you indicated that you didn't honk at the

5  Women's March.  Did you drive by that protest?

6      A.   Yes.  The last one in Oceanside.

7      Q.   Right.

8           And the Carlsbad protest, did you also drive

9  by that one?

10     A.   Yes.

11          MS. O'GRADY:  I don't have anything else.

12          MR. WHITE:  Nothing.  Thank you.  I guess

13  we'll go by --

14          MR. JEW:  For the record, can the Plaintiff

15  request a review of the transcript?

16          MR. WHITE:  Sure.  I think that's done under

17  Rule 30(e) or (f).  You have 30 days from when they

18  notify you.

19          MR. JEW:  Correct.

20          MR. WHITE:  So we'll go -- well, it's your

21  deposition, I guess.

22          MS. O'GRADY:  So we're just following the

23  Federal rules.

24          MR. WHITE:  Yeah.  Except they specifically

25  requested to review and sign a statement and all that



SUSAN PORTER                                    November 05, 2019
PORTER vs GORE                                              80

1   under Rule 30.

2          (The deposition concluded at 12:10 p.m.)



1                    REPORTER'S CERTIFICATION

2

3       I, Lisa Jones, a Certified Shorthand Reporter in

4   and for the State of California, do hereby certify:

5

6       That the foregoing witness was by me duly sworn;

7   that the deposition was then taken before me at the

8   time and place herein set forth; that the testimony

9   and proceedings were reported stenographically by me

10  and later transcribed into typewriting under my

11  direction; that the witness has requested a review

12  pursuant to Rule 30(e)(2); that the foregoing is a

13  true record of the testimony and proceedings taken at

14  that time.

15

16      IN WITNESS WHEREOF, I have subscribed my name

17  this 5th day of November, 2019.

18

19                          

20                  _____

21                  Lisa Jones, CSR No. 8142

22

23

24

25

```
 1                   DEPOSITION ERRATA SHEET

 2

 3

 4    Assignment No. J4626693

 5    Case Caption:  Susan Porter vs. William D. Gore

 6

 7

 8            DECLARATION UNDER PENALTY OF PERJURY

 9

10        I declare under penalty of perjury that I have

11    read the entire transcript of my deposition in the

12    above-captioned matter or the same has been read to

13    me, and the same is true and accurate, save and except

14    for changes and/or corrections, if any, as indicated

15    by me on the DEPOSITION ERRATA SHEET hereof, with the

16    understanding that I offer these changes as if still

17    under oath.

18

19        Signed on the _____ day of _____,

20    20___.

21

22

23                        _____

24                             SUSAN PORTER

25
```



```
 1              DEPOSITION ERRATA SHEET

 2

 3   Page No. _____ Line No. _____ Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No. _____ Line No. _____ Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No. _____ Line No. _____ Change to:_____

10   _____

11   Reason for change:_____

12   Page No. _____ Line No. _____ Change to:_____

13   _____

14   Reason for change:_____

15   Page No. _____ Line No. _____ Change to:_____

16   _____

17   Reason for change:_____

18   Page No. _____ Line No. _____ Change to:_____

19   _____

20   Reason for change:_____

21   Page No. _____ Line No. _____ Change to:_____

22   _____

23   Reason for change:_____

24   SIGNATURE:_____DATE_____

25              SUSAN PORTER
```



```
 1              DEPOSITION ERRATA SHEET

 2

 3   Page No. _____ Line No. _____ Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No. _____ Line No. _____ Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No. _____ Line No. _____ Change to:_____

10   _____

11   Reason for change:_____

12   Page No. _____ Line No. _____ Change to:_____

13   _____

14   Reason for change:_____

15   Page No. _____ Line No. _____ Change to:_____

16   _____

17   Reason for change:_____

18   Page No. _____ Line No. _____ Change to:_____

19   _____

20   Reason for change:_____

21   Page No. _____ Line No. _____ Change to:_____

22   _____

23   Reason for change:_____

24   SIGNATURE:_____DATE_____

25                   SUSAN PORTER
```



# Exhibit 1

Exhibit

Exhibit No.: 1
Name: S. Porter
Date: 11/5/19
ⒺESQUIRE

1  J. MARK WAXMAN, CA Bar No. 58579
       mwaxman@foley.com
2  MIKLE S. JEW, CA Bar No. 316372
       mjew@foley.com
3  **FOLEY & LARDNER LLP**
   3579 VALLEY CENTRE DRIVE, SUITE 300
4  SAN DIEGO, CA 92130
   TELEPHONE:  858.847.6700
5  FACSIMILE:   858.792.6773

6  DAVID LOY, CA Bar No. 229235
       davidloy@aclusandiego.org
7  **ACLU FOUNDATION OF SAN
   DIEGO & IMPERIAL COUNTIES**
8  P.O. Box 87131
   SAN DIEGO, CA 92138-7131
9  TELEPHONE:  619.232.2121
   FACSIMILE:   619.232.0036
10
   Attorneys for Plaintiff Susan Porter
11

12              **UNITED STATES DISTRICT COURT**

13            **SOUTHERN DISTRICT OF CALIFORNIA**

14

15  SUSAN PORTER,                          )  Case No.  '18CV1221 GPC JMA
                                           )
16                        Plaintiff,       )  **COMPLAINT FOR DECLARATORY
                                           )  AND INJUNCTIVE RELIEF**
17              vs.                        )
                                           )
18  WILLIAM D. GORE, Sheriff of San        )
   Diego County, in his official capacity; )
19  WARREN STANLEY, Commissioner of        )
   California Highway Patrol, in his official)
20  capacity,                              )
                                           )
21                        Defendants.      )
                                           )
22                                         )
                                           )
23                                         )
                                           )
24                                         )

25

26

27

28

              COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
                                           Case No.

4842-8289-3667.1

1    Plaintiff Susan Porter ("Ms. Porter") brings this free speech case against Sheriff

2  William D. Gore ("Sheriff Gore") and California Highway Patrol Commissioner Warren

3  Stanley ("Commissioner Stanley") in their official capacities, and alleges as follows.

### INTRODUCTION

5    1.    This Complaint seeks declaratory and injunctive relief to protect and

6  vindicate the rights of the concerned citizens of the City of Vista and other communities

7  within California against unconstitutional enforcement of California Vehicle Code §

8  27001 to silence expression in support of political protests and otherwise.  By prohibiting

9  numerous uses of a vehicle horn for expressive purposes, regardless of noise level or

10  impact on traffic safety, the statute violates the First Amendment of the United States

11  Constitution and Article I, § 2 of the California Constitution.

### JURISDICTION AND VENUE

13    2.    The Court has original jurisdiction over Plaintiff's federal claim under 28

14  U.S.C. §§ 1331 and 1343(a)(3).

15    3.    The Court has supplemental jurisdiction over Plaintiff's state law claim

16  under 28 U.S.C. § 1367 because the state law claim is so related to the claim over which

17  the Court has original jurisdiction that it forms part of the same case or controversy under

18  Article III of the United States Constitution.

19    4.    The Court may grant declaratory and injunctive relief pursuant to 42 U.S.C.

20  § 1983, 28 U.S.C. § 2201, and/or Federal Rules of Civil Procedure 57 and 65.

21    5.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because

22  the events that give rise to this action occurred within this district.

23    6.    The Court has personal jurisdiction over Sheriff Gore and Commissioner

24  Stanley, who on information and belief are residents of the state of California.

### PARTIES

26    7.    Plaintiff Susan Porter is a resident of the State of California and County of

27  San Diego.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
-1-                                   Case No.

1    8.    Upon information and belief, Defendant Sheriff Gore is the Sheriff of San

2  Diego County, responsible for direction, control, management, and oversight of the San

3  Diego County Sheriff's Department, including its enforcement of traffic laws in

4  unincorporated areas of San Diego County and the cities of Del Mar, Encinitas, Imperial

5  Beach, Lemon Grove, Poway, San Marcos, Santee, Solana Beach and Vista.  He is sued

6  in his official capacity.

7    9.    Upon information and belief, Defendant Commissioner Stanley is

8  Commissioner of the California Highway Patrol ("CHP").  CHP is under the direction

9  and control of the commissioner. Cal. Veh. Code § 2107.  The CHP commissioner "shall

10  perform all duties, exercise all powers and jurisdiction, assume and discharge all

11  responsibilities, and carry out and effect all purposes vested by law in the department,"

12  including but not limited to direction and control of traffic enforcement by all CHP

13  officers. Cal. Veh. Code § 2108.  He is sued in his official capacity.

14    10.    The CHP "commissioner shall enforce all laws regulating the operation of

15  vehicles and the use of the highways," Cal. Veh. Code § 2400(b), and "make adequate

16  provision for patrol of the highways at all times of the day and night," Cal. Veh. Code

17  § 2401.   Under California law, a "highway" is "a way or place of whatever nature,

18  publicly maintained and open to the use of the public for purposes of vehicular travel.

19  Highway includes street." Cal. Veh. Code § 360.

20    11.    "All members of the California Highway Patrol have the powers of a peace

21  officer." Cal. Veh. Code § 2409.  As a result, the authority of CHP officers under the

22  direction and control of Commissioner Stanley "extends to any place in the state." Cal.

23  Penal Code § 830.2.

24                    **FACTUAL BACKGROUND**

25    12.    Ms. Porter lives in Oceanside and has participated in weekly protests at the

26  district office of Representative Darrell Issa in Vista, which occurred on Tuesdays from

27  10:00 a.m. to 11:00 a.m., beginning soon after the November 2016 election and

28  concluding in April 2018.   The protests generated noise from both opponents and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
-2-                                          Case No.

1    supporters of Representative Issa.  For example, a supporter of the Representative often

2    employed a sound system with loud speakers across the street from the office.

3         13.    Representative Issa's Vista office is located in an office building at 1800

4    Thibodo Road, Vista, California, 92081.  The building faces Thibodo Road, a main

5    arterial road, with no buildings immediately adjacent to it.  Across from the building is a

6    wooded slope with houses at the top.  Behind the building is California Route 78, a six-

7    lane freeway.

8         14.    On October 17, 2017, Ms. Porter participated in the weekly protest at

9    Representative Issa's office, and parked her car nearby.

10        15.    On that date, while she was participating in the protest, a number of deputy

11   sheriffs arrived at the location of the protest, and issued citations to various individuals.

12        16.    While deputies were present during the protest, Ms. Porter moved her car.

13   As she did so, she drove past the protest, and sounded her vehicle horn to express her

14   support of the protest.

15        17.    Other drivers often sounded their vehicle horns in support of the protest, and

16   were doing so on that day.

17        18.    In a multitude of circumstances, drivers routinely sound vehicle horns to

18   express support or approval of parades, protests, rallies, demonstrations, or fundraising or

19   for other expressive purposes such as greeting a relative, friend, or acquaintance.

20        19.    Such uses of vehicle horns are expressive because they are intended to

21   convey a message unrelated to a safety related warning and are so understood by the

22   general public.

23        20.    Ms. Porter's use of a vehicle horn to show support for the weekly protest at

24   Representative Issa's office was expressive, because it was intended to convey a message

25   of support for the protest, and was so understood by others.

26        21.    After Ms. Porter sounded her horn in support of the protest, Sheriff's Deputy

27   K. Klein ("Deputy Klein"), I.D. Number 7275, directed Ms. Porter to pull over.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

-3-

Case No.

22.   Deputy Klein told Ms. Porter she was pulled over for sounding her vehicle horn, and issued her a citation for alleged violation of Vehicle Code § 27001, which states that "[t]he driver of a motor vehicle when reasonably necessary to insure safe operation shall give audible warning with his horn," but "[t]he *horn shall not otherwise be used, except as a theft alarm system*" (emphasis added). Cal. Veh. Code § 27001.

23.   Section 27001 does not require that the use of a horn meet any specified noise level, disturb the peace, distract drivers or pedestrians, or endanger safety.

24.   Upon information and belief, Deputy Klein was acting within the course and scope of his duties as a Sheriff's Deputy, and at the direction and under the control of Sheriff Gore at all relevant times.

25.   Ms. Porter's citation, copy of which is attached hereto as Exhibit A, states that the citation was for violation of "27001(A) cvc [sic] – unreasonable use of horn" and contains no allegations as to noise level, disturbing the peace, distracting drivers or pedestrians, or endangering safety.

26.   The citation had an appearance date of December 12, 2017, which Ms. Porter attended.  Her hearing to contest the citation was scheduled for February 5, 2018, but when Deputy Klein did not appear, the citation was dismissed.

27.   Ms. Porter regularly drives her vehicle in areas of San Diego County and the State of California where the Sheriff's Department or California Highway Patrol is responsible for traffic enforcement.

28.   In driving her vehicle in those areas, Ms. Porter observes rallies, protests, demonstrations, or other events for which she would like to express her support through use of her vehicle horn.

29.   Given the citation issued to her and her knowledge of the statute, Ms. Porter reasonably fears that the Sheriff's Department or California Highway Patrol will enforce section 27001 against her if she uses her vehicle horn for such expressive purposes.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
-4-
Case No.

4842-8269-3667.1

30.   As a result, Ms. Porter is censoring herself by refraining from using her vehicle horn for expressive purposes, including but not limited to expressing support for political protests, rallies, or demonstrations.

31.   Upon information and belief, in issuing the citation Deputy Klein was acting pursuant to official Sheriff's Department policy or direction issued, promulgated, or approved by Sheriff Gore as a policymaker for law enforcement matters.

32.   Upon information and belief, pursuant to said policy or direction, the Sheriff's Department continues or will continue to enforce section 27001 against the use of a vehicle horn for expressive purposes.

33.   By letter dated November 9, 2017, counsel for Ms. Porter asked Sheriff Gore "to refrain from enforcing section 27001 against protected speech."

34.   By letter dated November 29, 2017, Sheriff Gore's chief legal adviser, speaking on behalf of and with the authority of Sheriff Gore, declined to do so, contending "Ms. Porter's citation was not issued as a content-based regulation of speech, but rather a straight forward violation of the Vehicle Code," and "Whether your legal theory is valid or not is something that is best left for a court to decide."

35.   The actions of Sheriff Gore and Commissioner Stanley, in their official capacities, have chilled, deterred, and infringed and are continuing to chill, deter, and infringe Ms. Porter's right to engage in protected speech.

36.   The acts, omissions, policies, customs, and/or practices of Sheriff Gore and Commissioner Stanley in their official capacities, and their employed personnel, as alleged herein, are causing irreparable harm to Ms. Porter due to interference with her constitutional right to freedom of speech and expression, for which she has no adequate remedy at law.

37.   An actual controversy has arisen and now exists between Ms. Porter and Defendants in their official capacities regarding Ms. Porter's ability to exercise her right to use her vehicle horn for expressive purposes, including but not limited to showing support for political protests, rallies, or demonstrations.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
-5-                                                              Case No.

## FIRST CLAIM

### VIOLATION OF 42 U.S.C. § 1983 (First Amendment, Against All Defendants)

38.   Ms. Porter hereby alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 37 above, inclusive.

39.   On its face or as applied, Vehicle Code § 27001 violates the First Amendment because it constitutes an overbroad restriction on the use of a vehicle horn for speech or expression.

40.   On its face or as applied, Vehicle Code § 27001 violates the First Amendment because it constitutes a content-based restriction on the use of a vehicle horn for speech or expression that is not narrowly tailored to a compelling governmental interest.

41.   On its face or as applied, even if it is considered content-neutral, Vehicle Code § 27001 violates the First Amendment because it prohibits numerous uses of a vehicle horn for speech or expression and burdens substantially more speech or expression than necessary to protect legitimate governmental interests.

42.   In their official capacities, Defendants are violating or imminently will violate the First Amendment by enforcing section 27001 against protected speech or expression.

### SECOND CLAIM

### VIOLATION OF Article I, § 2 of the California Constitution (Against Sheriff Gore)

43.   Ms. Porter hereby alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 37 above, inclusive.

44.   On its face or as applied, Vehicle Code § 27001 violates Article I, § 2 of the California Constitution because it constitutes an overbroad restriction on the use of a vehicle horn for speech or expression.

45.   On its face or as applied, Vehicle Code § 27001 violates Article I, § 2 of the California Constitution because it constitutes a content-based restriction on the use of a

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

-6-

Case No.

1  vehicle horn for speech or expression that is not narrowly tailored to a compelling
2  governmental interest.

3      46.    On its face or as applied, even if it is considered content-neutral, Vehicle
4  Code § 27001 violates Article I, § 2 of the California Constitution because it prohibits
5  numerous uses of a vehicle horn for speech or expression and burdens substantially more
6  speech or expression than necessary to protect legitimate governmental interests.

7      47.    In his official capacity, Sheriff Gore is violating or imminently will violate
8  Article I, Section 2 of the California Constitution by enforcing section 27001 against
9  protected speech or expression.

10                      **PRAYER FOR RELIEF**

11      WHEREFORE, Plaintiff respectfully requests the Court to enter judgment against
12  Defendants as follows:

13      1.    Preliminarily and permanently enjoining Defendants and Defendants'
14  officers, agents, servants, and employees and any other persons who are in active concert
15  or participation with any of the foregoing persons from enforcing Vehicle Code § 27001
16  against protected speech or expression;

17      2.    Declaring the enforcement of Vehicle Code § 27001 against protected
18  expression to be unlawful.

19      3.    Awarding Plaintiff costs and attorney fees as authorized by Fed. R. Civ. P.
20  54, 42 U.S.C. § 1988, and/or any other applicable law; and

21      4.    Awarding other such relief as the Court deems just and proper.

22
23  DATED: June 11, 2018             Respectfully submitted,

24

25

26                      By: *s/ Mikle S. Jew*
                     J. Mark Waxman
27                       Mikle S. Jew
                     Foley & Lardner LLP
28                       Attorneys for Plaintiff Susan Porter

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
-7-                         Case No.

# Exhibit 2

Exhibit
Exhibit No.: 2
Name: S. Porter
Date: 11/5/19
ⒺESQUIRE

1  J. MARK WAXMAN, CA Bar No. 58579
      mwaxman@foley.com
2  MIKLE S. JEW, CA Bar No. 316372
      mjew@foley.com
3  KADMIEL E. PEREZ, CA Bar No. 318719
      kperez@foley.com
4  **FOLEY & LARDNER LLP**
   3579 VALLEY CENTRE DRIVE, SUITE 300
5  SAN DIEGO, CA 92130
   TELEPHONE:  858.847.6700
6  FACSIMILE:   858.792.6773

7  DAVID LOY, CA Bar No. 229235
      davidloy@aclusandiego.org
8  **ACLU FOUNDATION OF SAN**
   **DIEGO & IMPERIAL COUNTIES**
9  P.O. Box 87131
   SAN DIEGO, CA 92138-7131
10  TELEPHONE:  619.232.2121
   FACSIMILE:   619.232.0036
11
   Attorneys for Plaintiff Susan Porter
12

13                **UNITED STATES DISTRICT COURT**

14                **SOUTHERN DISTRICT OF CALIFORNIA**

15

16  SUSAN PORTER,                      ) Case No. 18-cv-1221-GPC-LL
                                        )
17                      Plaintiff,      ) **PLAINTIFF SUSAN PORTER'S**
                                        ) **RESPONSES AND OBJECTIONS TO**
18            vs.                       ) **DEFENDANT COMMISSIONER**
                                        ) **WARREN STANLEY'S REQUESTS**
19  WILLIAM D. GORE, Sheriff of San     ) **FOR ADMISSION, SET ONE**
   Diego County, in his official capacity; )
20  WARREN STANLEY, Commissioner of    )
   California Highway Patrol, in his official )
21  capacity,                          )
                                        )
22                      Defendants.     )
   _____ )

23

24  PROPOUNDING PARTY:      Defendant, WARREN STANLEY, in his official
25                          capacity as Commissioner of California Highway Patrol

26  RESPONDING PARTY:       Plaintiff, SUSAN PORTER

27  SET NO:                 ONE (Nos. 1-12)

28

1    Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and the Local

2    Rules of this Court, Plaintiff SUSAN PORTER ("Porter"), hereby makes the following

3    objections and responses to Defendant WARREN STANLEY's ("Stanley") First Set of

4    Requests for Admission (Nos. 1-12) (the "Requests" or individually, "Request"), dated

5    October 3, 2019, as follows:

### INTRODUCTION

7    These objections and responses are based solely on the documents, facts and

8    contentions known and available to Porter at this time.  Because Porter's investigation,

9    research and analysis of the facts and documents relating to this action is ongoing, it is

10   likely that additional documents, facts or contentions will be disclosed or add meaning to

11   already known documents, facts or contentions.  Without obligating herself to do so, Porter

12   reserves her right to amend, modify or supplement the objections and responses stated

13   herein.  Porter further reserves the right to rely on any facts, documents or other evidence

14   that are (i) subsequently discovered; (ii) subsequently determined to be relevant for any

15   purpose; or (iii) subsequently determined to have been omitted from a production.

### GENERAL OBJECTIONS

17   The following General Objections apply to each of the Requests.  Because these

18   General Objections apply to each Request, they are for convenience set forth immediately

19   below and not repeated in response to each specific Request.  The assertion of the same,

20   similar, or additional objections in response to a specific Request does not waive any of

21   these General Objections.  Any specific objection made by Porter in no respect limits or

22   modifies the General Objections stated herein.  Porter reserves the right to amend or

23   supplement these objections as may be appropriate.

24   1.   In responding to the Requests, Porter fully preserves:

25        a.   all objections as to competency, materiality, and admissibility;

26        b.   all rights to object on any grounds to the use of the responses herein

27             in any subsequent proceedings, including the trial of this action;

28        c.   all objections as to vagueness and ambiguity;

     d.    all rights to object on any grounds to any further interrogatories or other discovery requests involving or related to the subject matter of the requests; and

     e.    all rights to make objections based upon the attorney-client privilege, the attorney work-product doctrine, joint-defense privilege, common-interest privilege, and any other judicially recognized protection or privilege with respect to all information and to each document protected by a privilege.

2.    Porter objects to each and every Request, definition, and instruction to the extent they purport to impose obligations that are greater or more burdensome than, or contradict those imposed by, the Federal Rules of Civil Procedure, any Local Rules of this District, and the rules of this Court.

3.    Porter objects to each and every Request, definition, and instruction to the extent they seek information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, the joint defense privilege, and/or any other applicable privileges, protections, or immunities.  By responding to the Requests, Porter does not waive, and intends to preserve, all applicable privileges and protections.  Accordingly, where Porter has agreed to provide information responsive to the Requests, Porter will provide only that information which is relevant and non-privileged.  In the event that Porter discloses any privileged or protected information, its disclosure is inadvertent and shall not constitute waiver of any privilege or protection.

4.    Porter objects to each and every Request, definition, and instruction to the extent they seek information that is neither relevant to the claims or defenses of any party, is disproportional to the needs of the case, or is not reasonably calculated to lead to the discovery of admissible evidence.

5.    Porter objects to each and every Request, definition, and instruction to the extent they are vague and ambiguous.

6.   Porter objects to each and every Request, definition, and instruction to the extent they call for a legal conclusion.

7.   Porter objects to each and every Request, definition, and instruction to the extent they are overbroad and unduly burdensome.

8.   Porter objects to all definitions provided by Stanley to the extent that they:

    a.   assume or assert accuracy;

    b.   assume facts not established in this action;

    c.   are overly broad, unduly burdensome, or vague and ambiguous; and/or

    d.   contradict, are inconsistent with, or seek to impose any obligation or burden on Porter not specifically required by the Federal Rules of Civil Procedure and/or Local Rules of this Court.

9.   Each and every General Objection, and each and every of the Objections to Stanley's Definitions (above) shall be deemed to be incorporated in full into each of the individual responses set forth below.   Any specific objections made in response to a Request (the "Specific Objections") are in addition to the General Objections and Objections to Stanley's Definitions, not a replacement for them.

## SPECIFIC OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 1:**

Admit that no officer or employee of the California Highway Patrol was present when you were given a citation for violation of Vehicle Code section 27001 on October 17, 2017.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Porter objects that the term "present" is vague. Subject to that objection and the General Objections above, Porter responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 2:**

Admit that the only person who issued you a citation on October 17, 2017 for violation of Vehicle Code section 27001 was San Diego Sheriff's Deputy K. Klein.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Subject to the General Objections above, Porter responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 3:**

Admit that you have never received a citation for violation of Vehicle Code section 27001 from any officer or employee of the California Highway Patrol.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Subject to the General Objections above, Porter responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that no officer or employee of the California Highway Patrol has ever threatened to issue a citation to you for violation of Vehicle Code Section 27001.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Subject to the General Objections above, Porter responds as follows: While no California Highway Patrol officer or employee has personally told Porter that he or she would issue a citation to Porter for violation of Vehicle Code Section 27001, the California Highway Patrol is under the direction and control of Defendant Stanley, who "shall enforce all laws regulating the operation of vehicles and the use of the highways," Vehicle Code § 2400(b), and "make adequate provision for patrol of the highways at all times of the day and night," Vehicle Code § 2401. Under Defendant Stanley's direction and control, the California Highway Patrol is responsible for enforcing all laws regulating the operation of vehicles, including Vehicle Code Section 27001, on all highways and streets in California. The authority of California Highway Patrol officers to enforce Vehicle Code Section 27001 extends to any place in California.

**REQUEST FOR ADMISSION NO. 5:**

Admit that the only time you have ever received a citation for violation of Vehicle Code section 27001 was on October 17, 2017.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Subject to the General Objections above, Porter responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 6:**

Admit that you have not participated in any Protest Activities outside the district office of Representative Darrell Issa in Vista, California since May 1, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Subject to the General Objections above, Porter responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 7:**

Admit that you have no evidence that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in retaliation for any person's participation in any Protest Activities.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Subject to the General Objections above, Porter responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 8:**

Admit that you have no evidence that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in retaliation for any person's exercise of his or her First Amendment rights.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Subject to the General Objections above, Porter responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 9:**

Admit that you have no reason to believe that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in retaliation for any person's exercise of his or her First Amendment rights.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Subject to the General Objections above, Porter responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 10:**

Admit that you have no reason to believe that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in retaliation for any person's participation in any Protest Activities.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Subject to the General Objections above, Porter responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 11:**

Admit that you have no evidence that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in order to silence any person's exercise of his or her First Amendment rights.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Subject to the General Objections above, Porter responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 12:**

Admit that you have no reason to believe that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in order to silence any person's exercise of his or her First Amendment rights.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Subject to the General Objections above, Porter responds as follows: Deny.

DATED: November 1, 2019

By:*/s/ Mikle S. Jew*
J. Mark Waxman
Mikle S. Jew
Kadmiel E. Perez
Foley & Lardner LLP
Email:  mwaxman@foley.com
mjew@foley.com
kperez@foley.com

David Loy
ACLU Foundation of San Diego & Imperial Counties
Email:  davidloy@aclusandiego.org

Attorneys for Plaintiff Susan Porter

## **CERTIFICATE OF SERVICE**

I am a citizen of the United States of America and I am employed in San Diego, California. I am over the age of 18 and not a party to the within action. My business address is 3579 Valley Centre Dr., Suite 300, San Diego, CA 92130.

On November 1, 2019, I served the within **PLAINTIFF SUSAN PORTER'S RESPONSES AND OBJECTIONS TO DEFENDANT COMMISSIONER WARREN STANLEY'S REQUESTS FOR ADMISSION, SET ONE** on the parties or their counsel shown below, by having the enclosed served by e-mail, pursuant to the parties' agreement for electronic service, a true copy thereof was transmitted to said parties at the e-mails address(es) indicated below:

| | |
|---|---|
| Xavier Becerra | Attorneys for Warren Stanley, |
| Attorney General of California | Commissioner of California |
| Paul Stein | Highway Patrol |
| Supervising Deputy Attorney General | |
| Sharon L. O'Grady | |
| Deputy Attorney General | |
| Natasha Saggar Sheth | |
| Deputy Attorney General | |
| Office of the California Attorney General | |
| 455 Golden Gate Avenue, Ste. 11000 | |
| San Francisco, CA 94102 | |

E-mail: paul.stein@doj.ca.gov
        sharon.ogrady@doj.ca.gov
        natasha.sheth@doj.ca.gov
        susan.chiang@doj.ca.gov

Thomas E. Montgomery                    Attorneys for William D. Gore,
County Counsel                          Sheriff of San Diego County in
Timothy M. White                        his official capacity
Senior Deputy
Office of County Counsel
County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101
E-mail: timothy.white@sdcounty.ca.gov
        thomas.velasquez@sdcounty.ca.gov
        april.sapida@sdcounty.ca.gov


Dated:  November 1, 2019              FOLEY & LARDNER LLP


                                     /s/ Mikle S. Jew
                                     Mikle S. Jew

# Exhibit 3

Exhibit

Exhibit No.: **3**

Name: **S. Porter**

Date: **11/5/19**

ⒺESQUIRE

1   J. MARK WAXMAN, CA Bar No. 58579
       mwaxman@foley.com
2   MIKLE S. JEW, CA Bar No. 316372
       mjew@foley.com
3   **FOLEY & LARDNER LLP**
    3579 VALLEY CENTRE DRIVE, SUITE 300
4   SAN DIEGO, CA 92130
    TELEPHONE:  858.847.6700
5   FACSIMILE:   858.792.6773

6   DAVID LOY, CA Bar No. 229235
       davidloy@aclusandiego.org
7   **ACLU FOUNDATION OF SAN**
    **DIEGO & IMPERIAL COUNTIES**
8   P.O. Box 87131
    SAN DIEGO, CA 92138-7131
9   TELEPHONE:  619.232.2121
    FACSIMILE:   619.232.0036
10
    Attorneys for Plaintiff Susan Porter
11

12                 **UNITED STATES DISTRICT COURT**

13                 **SOUTHERN DISTRICT OF CALIFORNIA**

14

15   SUSAN PORTER,                          )  Case No. 18-cv-1221-GPC-JMA
                                            )
16                         Plaintiff,        )  **NOTICE OF ERRATA TO**
                                            )  **PLAINTIFF'S COMPLAINT FOR**
17            vs.                            )  **DECLARATORY AND INJUNCTIVE**
                                            )  **RELIEF**
18   WILLIAM D. GORE, Sheriff of San         )
     Diego County, in his official capacity; )
19   WARREN STANLEY, Commissioner of         )
     California Highway Patrol, in his official )  Judge:      Honorable Gonzalo P. Curiel
20   capacity,                               )  Dept.:      2D
                                            )
21                         Defendants.       )  Trial Date:  None set
                                            )
22                                           )  Case Filed:  6/11/2018
                                            )
23                                           )
                                            )
24                                           )

25

26

27

28

                                                    NOTICE OF ERRATA
                                              Case No. 18-cv-1221-GPC-JMA

TO THE COURT AND ALL PARTIES OF RECORD:

Plaintiff Susan Porter respectfully submits this Notice of Errata to her Complaint for Declaratory and Injunctive Relief ("Complaint"), which was filed on June 11, 2018, at Docket no. 1, in order to correct an inadvertent error. Counsel for Plaintiff inadvertently did not include Exhibit A when filing the Complaint. Courtesy copies of Exhibit A were transmitted electronically to Defendants on February 6, 2019.

Attached hereto is a true and correct copy of Exhibit A to the Complaint.

DATED: February 7, 2019                  Respectfully submitted,


By: *s/ Mikle S. Jew*
J. Mark Waxman
Mikle S. Jew
Foley & Lardner LLP

David Loy
ACLU Foundation of San Diego & Imperial Counties

Attorneys for Plaintiff Susan Porter

NOTICE OF ERRATA
Case No. 18-cv-1221-GPC-JMA

-1-

4810-7990-5927.1

# EXHIBIT A

Defendant Copy

**San Diego County Sheriff's Department**    **932969**

**NOTICE TO APPEAR**   ☐ Traffic  ☐ Nontraffic  ☐ Misdemeanor

| Date of Violation | Time | ☐ AM Day of Week | Case Number |
|---|---|---|---|
| 10/17/17 | 1045 | ☐ PM  S M T W T F S | |

Name (First, Middle, Last)     ☐ Owner's Responsibility (VC 40001)
SUSAN LYNN PORTER

Address                                    Juvenile (Phone No.)
24441 VIA SECRETO

City              State    ZIP Code    E-mail Address
LAKE FOREST   CA   92630

| Driver's License Number | State | Class | Commercial | Birth Date | Age |
|---|---|---|---|---|---|
| A7381658 | CA | C | ☐ Yes ☒ No | 02/24/64 | |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Commercial Veh. (VC 15210(b)) |
|---|---|---|---|---|---|---|
| F | BCN | HZL | 5'4 | 135 | W | |

| Vehicle License Number / VIN | State | Reg. MO/YR | ☐ Hazardous Material (VC253) |
|---|---|---|---|
| 62WU287 | CA | 04/18 | |

| Year of Veh. | Make | Model | Body Style | Color |
|---|---|---|---|---|
| 2012 | HONDA | LM | UV | GRAY |

Registered Owner or Lessee                  ☒ Same as Driver

Address                                    ☒ Same as Driver

City              State    Zip Code    ☐ Evidence of Financial Responsibility

| | Yes | No | Code and Section | Description | Misdemeanor or Infraction (Circle) |
|---|---|---|---|---|---|
| Correctable Violation (Veh. Code, § 40610) | ☐ | ☒ | 27001(a) CVC – UNREASONABLE | | M Ⓘ |
| | ☐ | ☐ | USE OF HORN | M | Ⓘ |
| | ☐ | ☐ | | M | I |
| | ☐ | ☐ | | M | I |

☐ Booking Required (see reverse)

| Speed Approx. | P.F. Max. | Veh. Lmt. | Safe Spd. | Radar | Beat | ☐ Continuation Form Issued |
|---|---|---|---|---|---|---|
| | | | | | 315 | |

Location of Violation(s)                   City of Occurrence     ☐ Unincorp.
1500 THIBODO DR               VISTA

| Weather Conditions | Road Conditions | Traffic Conditions | Station/Sub-Stn. | Division |
|---|---|---|---|---|
| | | | VISTA | TRF |

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| 10/17/17 | K. KLEIN | 7275 |
|---|---|---|
| Dec. Date | Arresting or Citing Deputy | I.D. Number |

| | | |
|---|---|---|
| Dec. Date | Name of Arresting Deputy, if different from Citing Deputy | I.D. Number |

**WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW**

X Signature [signature]

Superior Court of San Diego County:      FOLLOW THE INSTRUCTIONS ON THE REVERSE

| ☐ North Division - Criminal | 325 South Melrose, Vista, CA 92081 | (760) 201-8800 |
|---|---|---|
| ☐ North Division - Traffic | 325 S. Melrose, Ste 350, Annex Bldg  Vista, CA 92081 | (760) 201-8500 |
| ☐ East Division | 250 East Main Street, El Cajon, CA 92020 | (619) 456-4100 |
| ☐ Central Division - Criminal | 220 West Broadway, San Diego, CA 92101 | (619) 450-5400 |
| ☐ Central Division - Traffic | 8950 Clairemont Mesa Blvd., San Diego, CA 92123 | (858) 634-1800 |
| ☐ Juvenile Division | 2851 Meadowlark Drive, San Diego, CA 92123 | (858) 634-1616 |
| ☐ South Division | 500 Third Avenue, Chula Vista, CA 92010 | (619) 746-6200 |

DATE 12/12/17  TIME 0800 ☐ AM ☐ To be  ☐ You may arrange with the clerk to
                         ☐ PM  notified    appear at a night session of the court
SO-99  REV 11/13  Judicial Council of California Form Rev. 06/01/15 (Veh. Code § 40500(b), 40513(b), 40522, 40600; PC § 853.9) TR-130

Exhibit A - Page 8

# Exhibit 2

J. MARK WAXMAN, CA Bar No. 58579
    mwaxman@foley.com
MIKLE S. JEW, CA Bar No. 316372
    mjew@foley.com
KADMIEL E. PEREZ, CA Bar No. 318719
    kperez@foley.com
**FOLEY & LARDNER LLP**
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CA 92130
TELEPHONE:  858.847.6700
FACSIMILE:  858.792.6773

DAVID LOY, CA Bar No. 229235
    davidloy@aclusandiego.org
**ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES**
P.O. Box 87131
SAN DIEGO, CA 92138-7131
TELEPHONE:  619.232.2121
FACSIMILE:  619.232.0036

Attorneys for Plaintiff Susan Porter

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN PORTER,<br><br>                     Plaintiff,<br><br>    vs.<br><br>WILLIAM D. GORE, Sheriff of San Diego County, in his official capacity; WARREN STANLEY, Commissioner of California Highway Patrol, in his official capacity,<br><br>               Defendants. | Case No. 18-cv-1221-GPC-LL<br><br>**PLAINTIFF SUSAN PORTER'S AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT COMMISSIONER WARREN STANLEY'S REQUESTS FOR ADMISSION, SET ONE** |

PROPOUNDING PARTY:    Defendant, WARREN STANLEY, in his official capacity as Commissioner of California Highway Patrol

RESPONDING PARTY:    Plaintiff, SUSAN PORTER

SET NO:    ONE (Nos. 1-12)

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff SUSAN PORTER ("Porter"), hereby makes the following amended objections and responses to Defendant WARREN STANLEY's ("Stanley") First Set of Requests for Admission (Nos. 1-12) (the "Requests" or individually, "Request"), dated October 3, 2019, as follows:

## INTRODUCTION

These objections and responses are based solely on the documents, facts and contentions known and available to Porter at this time.  Because Porter's investigation, research and analysis of the facts and documents relating to this action is ongoing, it is likely that additional documents, facts or contentions will be disclosed or add meaning to already known documents, facts or contentions.  Without obligating herself to do so, Porter reserves her right to amend, modify or supplement the objections and responses stated herein.  Porter further reserves the right to rely on any facts, documents or other evidence that are (i) subsequently discovered; (ii) subsequently determined to be relevant for any purpose; or (iii) subsequently determined to have been omitted from a production.

## GENERAL OBJECTIONS

The following General Objections apply to each of the Requests.  Because these General Objections apply to each Request, they are for convenience set forth immediately below and not repeated in response to each specific Request.  The assertion of the same, similar, or additional objections in response to a specific Request does not waive any of these General Objections.  Any specific objection made by Porter in no respect limits or modifies the General Objections stated herein.  Porter reserves the right to amend or supplement these objections as may be appropriate.

1. In responding to the Requests, Porter fully preserves:

   a.   all objections as to competency, materiality, and admissibility;

   b.   all rights to object on any grounds to the use of the responses herein in any subsequent proceedings, including the trial of this action;

   c.   all objections as to vagueness and ambiguity;

AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT STANLEY'S 1ST RFA

-1-                               Case No. 18-cv-1221-GPC-LL

    d.    all rights to object on any grounds to any further interrogatories or other discovery requests involving or related to the subject matter of the requests; and

    e.    all rights to make objections based upon the attorney-client privilege, the attorney work-product doctrine, joint-defense privilege, common-interest privilege, and any other judicially recognized protection or privilege with respect to all information and to each document protected by a privilege.

2.    Porter objects to each and every Request, definition, and instruction to the extent they purport to impose obligations that are greater or more burdensome than, or contradict those imposed by, the Federal Rules of Civil Procedure, any Local Rules of this District, and the rules of this Court.

3.    Porter objects to each and every Request, definition, and instruction to the extent they seek information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, the joint defense privilege, and/or any other applicable privileges, protections, or immunities.  By responding to the Requests, Porter does not waive, and intends to preserve, all applicable privileges and protections. Accordingly, where Porter has agreed to provide information responsive to the Requests, Porter will provide only that information which is relevant and non-privileged.  In the event that Porter discloses any privileged or protected information, its disclosure is inadvertent and shall not constitute waiver of any privilege or protection.

4.    Porter objects to each and every Request, definition, and instruction to the extent they seek information that is neither relevant to the claims or defenses of any party, is disproportional to the needs of the case, or is not reasonably calculated to lead to the discovery of admissible evidence.

5.    Porter objects to each and every Request, definition, and instruction to the extent they are vague and ambiguous.

6.    Porter objects to each and every Request, definition, and instruction to the extent they call for a legal conclusion.

7.    Porter objects to each and every Request, definition, and instruction to the extent they are overbroad and unduly burdensome.

8.    Porter objects to all definitions provided by Stanley to the extent that they:

    a.    assume or assert accuracy;

    b.    assume facts not established in this action;

    c.    are overly broad, unduly burdensome, or vague and ambiguous; and/or

    d.    contradict, are inconsistent with, or seek to impose any obligation or burden on Porter not specifically required by the Federal Rules of Civil Procedure and/or Local Rules of this Court.

9.    Each and every General Objection, and each and every of the Objections to Stanley's Definitions (above) shall be deemed to be incorporated in full into each of the individual responses set forth below.  Any specific objections made in response to a Request (the "Specific Objections") are in addition to the General Objections and Objections to Stanley's Definitions, not a replacement for them.

## SPECIFIC OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 1:**

Admit that no officer or employee of the California Highway Patrol was present when you were given a citation for violation of Vehicle Code section 27001 on October 17, 2017.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Porter objects that the term "present" is vague. Subject to that objection and the General Objections above, Porter responds as follows: Porter admits that she did not personally observe the presence of an officer or employee of the California Highway Patrol when she was given a citation for violation of Vehicle Code section 27001 on October 17, 2017.  Pursuant to Federal Rule of Civil Procedure 36(a)(4), Porter lacks

knowledge or information sufficient to admit or deny the remainder of Request for Admission No. 1 after a reasonable inquiry was made to Stanley, in his official capacity as Commissioner of the California Highway Patrol, who did not produce the requested information.

**REQUEST FOR ADMISSION NO. 2:**

Admit that the only person who issued you a citation on October 17, 2017 for violation of Vehicle Code section 27001 was San Diego Sheriff's Deputy K. Klein.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Subject to the General Objections above, Porter responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 3:**

Admit that you have never received a citation for violation of Vehicle Code section 27001 from any officer or employee of the California Highway Patrol.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Subject to the General Objections above, Porter responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that no officer or employee of the California Highway Patrol has ever threatened to issue a citation to you for violation of Vehicle Code Section 27001.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Subject to the General Objections above, Porter responds as follows: While no California Highway Patrol officer or employee has personally told Porter that he or she would issue a citation to Porter for violation of Vehicle Code Section 27001, Porter reasonably fears enforcement of Section 27001 against her if she uses her vehicle horn for political expression, for the following reasons. The California Highway Patrol is under the direction and control of Defendant Stanley, who "shall enforce all laws regulating the operation of vehicles and the use of the highways," Vehicle Code § 2400(b), and "make adequate provision for patrol of the highways at all times of the day and night," Vehicle Code § 2401. Under Defendant Stanley's direction and control, the California Highway Patrol is responsible for enforcing all laws regulating the operation

of vehicles, including Vehicle Code Section 27001, on all highways and streets in California. The authority of California Highway Patrol officers to enforce Vehicle Code Section 27001 extends to any place in California. The California Highway Patrol has previously enforced Vehicle Code Section 27001, and Stanley, in his official capacity as Commissioner of the California Highway Patrol, has defended the California Highway Patrol's right to enforce the statute and has not disavowed enforcement of the statute against the use of vehicle horns for political expression.

**REQUEST FOR ADMISSION NO. 5:**

Admit that the only time you have ever received a citation for violation of Vehicle Code section 27001 was on October 17, 2017.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Subject to the General Objections above, Porter responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 6:**

Admit that you have not participated in any Protest Activities outside the district office of Representative Darrell Issa in Vista, California since May 1, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Subject to the General Objections above, Porter responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 7:**

Admit that you have no evidence that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in retaliation for any person's participation in any Protest Activities.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Subject to the General Objections above, Porter responds as follows: Pursuant to Federal Rule of Civil Procedure 36(a)(4), Porter lacks knowledge or information sufficient to admit or deny Request for Admission No. 7 after a reasonable inquiry was made to Stanley, in his official capacity as Commissioner of the California Highway Patrol, who did not produce the requested information.

**REQUEST FOR ADMISSION NO. 8:**

Admit that you have no evidence that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in retaliation for any person's exercise of his or her First Amendment rights.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Subject to the General Objections above, Porter responds as follows: Pursuant to Federal Rule of Civil Procedure 36(a)(4), Porter lacks knowledge or information sufficient to admit or deny Request for Admission No. 7 after a reasonable inquiry was made to Stanley, in his official capacity as Commissioner of the California Highway Patrol, who did not produce the requested information.

**REQUEST FOR ADMISSION NO. 9:**

Admit that you have no reason to believe that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in retaliation for any person's exercise of his or her First Amendment rights.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Subject to the General Objections above, Porter responds as follows: Pursuant to Federal Rule of Civil Procedure 36(a)(4), Porter lacks knowledge or information sufficient to admit or deny Request for Admission No. 7 after a reasonable inquiry was made to Stanley, in his official capacity as Commissioner of the California Highway Patrol, who did not produce the requested information.

**REQUEST FOR ADMISSION NO. 10:**

Admit that you have no reason to believe that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in retaliation for any person's participation in any Protest Activities.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Subject to the General Objections above, Porter responds as follows: Pursuant to Federal Rule of Civil Procedure 36(a)(4), Porter lacks knowledge or information sufficient to admit or deny Request for Admission No. 7 after a reasonable inquiry was

made to Stanley, in his official capacity as Commissioner of the California Highway Patrol, who did not produce the requested information.

**REQUEST FOR ADMISSION NO. 11:**

Admit that you have no evidence that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in order to silence any person's exercise of his or her First Amendment rights.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Subject to the General Objections above, Porter responds as follows: Pursuant to Federal Rule of Civil Procedure 36(a)(4), Porter lacks knowledge or information sufficient to admit or deny Request for Admission No. 7 after a reasonable inquiry was made to Stanley, in his official capacity as Commissioner of the California Highway Patrol, who did not produce the requested information.

**REQUEST FOR ADMISSION NO. 12:**

Admit that you have no reason to believe that any officer or employee of the California Highway Patrol has ever enforced Vehicle Code section 27001 in order to silence any person's exercise of his or her First Amendment rights.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Subject to the General Objections above, Porter responds as follows: Pursuant to Federal Rule of Civil Procedure 36(a)(4), Porter lacks knowledge or information sufficient to admit or deny Request for Admission No. 7 after a reasonable inquiry was made to Stanley, in his official capacity as Commissioner of the California Highway Patrol, who did not produce the requested information.

///
///
///
///
///
///

DATED: July 9, 2020

By: */s/ Mikle S. Jew*
J. Mark Waxman
Mikle S. Jew
Kadmiel E. Perez
Foley & Lardner LLP
Email:  mwaxman@foley.com
          mjew@foley.com
          kperez@foley.com

David Loy
ACLU Foundation of San Diego & Imperial
Counties
Email:  davidloy@aclusandiego.org

Attorneys for Plaintiff Susan Porter

**CERTIFICATE OF SERVICE**

I am a citizen of the United States of America and I am employed in San Diego, California. I am over the age of 18 and not a party to the within action. My business address is 11988 El Camino Real, Suite 400, San Diego, CA 92130.

On July 9, 2020, I served the within **PLAINTIFF SUSAN PORTER'S AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT COMMISSIONER WARREN STANLEY'S REQUESTS FOR ADMISSION, SET ONE** on the parties or their counsel shown below, by having the enclosed served by e-mail, pursuant to the parties' agreement for electronic service, a true copy thereof was transmitted to said parties at the e-mails address(es) indicated below:

| | |
|---|---|
| Xavier Becerra | Attorneys for Warren Stanley, |
| Attorney General of California | Commissioner of California |
| Paul Stein | Highway Patrol |
| Supervising Deputy Attorney General | |
| Sharon L. O'Grady | |
| Deputy Attorney General | |
| Natasha Saggar Sheth | |
| Deputy Attorney General | |
| Office of the California Attorney General | |
| 455 Golden Gate Avenue, Ste. 11000 | |
| San Francisco, CA 94102 | |
| E-mail: paul.stein@doj.ca.gov | |
|      sharon.ogrady@doj.ca.gov | |
|      natasha.sheth@doj.ca.gov | |
|      susan.chiang@doj.ca.gov | |

Thomas E. Montgomery                    Attorneys for William D. Gore,
County Counsel                          Sheriff of San Diego County in
Timothy M. White                        his official capacity
Senior Deputy
Office of County Counsel
County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101
E-mail: timothy.white@sdcounty.ca.gov
          thomas.velasquez@sdcounty.ca.gov
          april.sapida@sdcounty.ca.gov

Dated:  July 9, 2020            FOLEY & LARDNER LLP


                                /s/ Sonia Moreno
                                Sonia Moreno

# Exhibit 3

Contains Confidential Portion

Page 1

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3

4      SUSAN PORTER,                    )
                                        )
5              Plaintiff,               ) CASE NO.
                                        ) 18-cv-1221-GPC-LL
6                                       )
       vs.                              )
7                                       )
                                        )
8      WILLIAM D. GORE, Sheriff of      )
       San Diego County, in his         )
9      official capacity; et al.,       )
                                        )
10             Defendants.              )
       _____)

11

12                 CONTAINS CONFIDENTIAL PAGE 26

13

14        VIDEOTAPED DEPOSITION OF DEPUTY KYLE KLEIN

15             WEDNESDAY, NOVEMBER 20, 2019

16                       9:17 A.M.

17

18

19

20

21

22

23

24     REPORTED BY:  KATHERINE FERGUSON, CSR NO. 12332

25     JOB NO. 172306

Contains Confidential Portion

Page 2

1

2

3

4

5                    November 20, 2019

6                     9:17 a.m.

7

8

9        Deposition of DEPUTY KYLE KLEIN, held at 1600

10   Pacific Highway, Suite 355, San Diego, California,

11   before Katherine Ferguson, Certified Shorthand

12   Reporter.

13

14

15

16

17

18

19

20

21

22

23

24

25

Contains Confidential Portion

Page 3

1    APPEARANCES:

2

     FOR PLAINTIFF:

3

         FOLEY & LARDNER

4

         BY:  KADMIEL PEREZ, ESQ.

5

         BY:  MIKLE JEW, ESQ.

6

             3579 Valley Centre Drive

7

8

             San Diego, California 92130

9

10   FOR DEFENDANT SHERIFF WILLIAM D. GORE:

11       COUNTY OF SAN DIEGO

12       OFFICE OF COUNTY COUNSEL

13       BY:  TIMOTHY WHITE, ESQ.

14           1600 Pacific Highway

15

16           San Diego, California 92101

17

     FOR DEFENDANT COMMISSIONER WARREN STANLEY:

18

         STATE OF CALIFORNIA

19

         DEPARTMENT OF JUSTICE

20

         OFFICE OF THE ATTORNEY GENERAL

21

         BY:  NATASHA SHETH, ESQ.

22

             455 Golden Gate Avenue

23

24           San Francisco, California 94102

25

Page 4

1    SAN DIEGO, CALIFORNIA; WEDNESDAY, NOVEMBER 20, 2019

2                        9:17 A.M.

3

4           THE VIDEOGRAPHER:  Good morning.  We are on

5    the record.  The time is 9:17 a.m. on November 20th,

6    2019.  We're here for the video deposition of Kyle

7    Klein testifying in the matter of Susan Porter versus

8    William D. Gore, et al.  This case is filed in the

9    United States District Court, Southern District of

10   California, case number 18-CV-1221-GPC-LL.

11           These proceedings are taking place at

12   County Counsel Office, located at 1600 Pacific

13   Highway, Room 355, in San Diego, California.

14           My name is Daniel Payan.  I'm the

15   videographer appearing on behalf of TSG and the

16   certified court reporter is Kathy Ferguson.

17           Counsel present, please voice identify

18   yourselves for the record, beginning with the

19   noticing party.

20           MR. JEW:  Mikle Jew and my colleague

21   Kadmiel Perez, here with Foley & Lardner, on behalf

22   of Plaintiff Susan Porter.

23           MS. SAGGAR SHETH:  Natasha Saggar Sheth

24   from the Attorney General's Office on behalf of

25   Defendant Warren Stanley, the Commissioner of the

Contains Confidential Portion

Page 5

1  California Highway Patrol in his official capacity.

2          MR. WHITE:  Timothy White from the County

3  Counsel's Office for the County of San Diego, along

4  with Gabriella Reynolds, an investigator with this

5  office, on behalf of Defendant Sheriff William Gore

6  in his official capacity and representing the

7  deponent, Deputy Kyle Klein.

8          THE VIDEOGRAPHER:  Thank you.  The court

9  reporter will now swear in or affirm the deponent

10 after which counsel may begin.

11

12              DEPUTY KYLE KLEIN,

13 called as a witness by and on behalf of the

14 Plaintiffs, and having been first duly sworn by the

15 Certified Shorthand Reporter, was examined and

16 testified as follows:

17

18              EXAMINATION

19 BY MR. JEW:

20     Q   Good morning, Mr. Klein.

21     A   Morning.

22     Q   As I stated, my name is Mikle Jew.  This is

23 Kadmiel Perez.  We work with Foley & Lardner.  We're

24 attorneys there and we represent -- we're working

25 with the ACLU of San Diego to represent Plaintiff

Contains Confidential Portion

Page 6

1   Susan Porter in her lawsuit against Sheriff Bill Gore

2   and Commissioner Warren Stanley in their official

3   capacities.

4         First, I would like to thank you for taking

5   the time out of your day to be with us here today.

6         Can we start by having you state and spell

7   your full name for the record.

8   A    My name is Kyle Klein; first name is

9   spelled K-Y-L-E, last is K-L-E-I-N.

10  Q    And have you ever had your deposition taken

11  before, Mr. Klein?

12  A    Yes, once before.

13  Q    Once before?

14  A    Yes, sir.

15  Q    Do you recall when?

16  A    I believe about a year and a half ago.

17  Q    And what was that in relation to?

18  A    I had arrested a person and he committed

19  suicide or he had died in custody sometime later.

20  Q    Okay.  Do you recall why you arrested him?

21  A    Yeah, he was arrested for assault with a

22  deadly weapon.

23  Q    And what was the lawsuit about?

24  A    I don't -- I don't know all the specifics.

25  Q    So you weren't a party to the lawsuit?

Contains Confidential Portion

Page 7

1       A    Honestly, I'm not sure.  I know I was

2  deposed in regards to it, but I don't know what --

3  how I was related other than I arrested that person.

4       Q    Sure.

5            And do you know if that lawsuit is still

6  pending?

7       A    I don't -- I don't know.

8       Q    Okay.  You don't know if it went to trial?

9       A    It has not gone to trial, but I don't know

10  if it's still going on.

11       Q    Okay.  I'm going to go over some basic

12  ground rules before we get into the substance of the

13  deposition.

14            First, do you understand that the oath that

15  you just took is the same oath you would take if you

16  were testifying in a court of law?

17       A    Yes, sir.

18       Q    Do you understand that you are testifying

19  under penalty of perjury?

20       A    Yes, sir.

21       Q    Do you understand that your obligation

22  today is to give truthful answers to the extent that

23  you can?

24       A    Yes, sir.

25       Q    Just to keep the record clear, as the court

Contains Confidential Portion

Page 8

1    reporter is transcribing, try to make sure that only

2    one person is speaking at a time.  I may step out of

3    line and talk over you.  If I do that, I apologize.

4    Anytime you respond to one of my questions, please

5    don't make any gestures.  Please try to answer with a

6    verbal answer, yes or no, to that extent.  If you

7    don't understand any of my questions, please tell me.

8            Do you know what the difference is between

9    a guess and an estimate?

10       A   Yes.

11       Q   Great.  Please don't guess.  And whenever

12   applicable, if I'm asking for an estimate and you

13   have an estimate, I'm entitled to an estimate, but

14   please don't try to guess.  It's perfectly fine to

15   say "I don't know" if you don't know the answer.

16           At the conclusion of your deposition, the

17   court reporter will transcribe everything into a

18   booklet and you'll have the opportunity to review

19   your transcript with your counsel and make any

20   changes to the extent the record was unclear or

21   mistranscribed.

22           Any reason that you can't provide your best

23   deposition testimony today?

24       A   No, sir.

25       Q   Are you on any medications that could

Contains Confidential Portion

Page 9

1    affect your testimony?

2         A    No, sir.

3              MR. JEW:  At this time I'm going to

4    introduce as Exhibit 1 -- mark this as Exhibit 1.

5              (Exhibit 1 was marked for identification.)

6    BY MR. JEW:

7         Q    Mr. Klein, have you seen this document

8    before?

9         A    I don't know.

10        Q    Okay.  You can take time -- take some time

11   to review it.  Let me know once you've read it.

12        A    Yeah, I've seen this.

13        Q    And do you understand that this case has

14   been brought against Sheriff Gore and Commissioner

15   Warren Stanley in their official capacities?

16        A    Yes, sir.

17        Q    And do you understand you are not

18   personally a defendant in this case?

19        A    Yes, sir.

20        Q    Other than your attorney, did you

21   communicate with anyone orally or in writing to

22   prepare for your deposition today?

23        A    No, sir.

24        Q    Did you review any documents?

25        A    No, sir.

Contains Confidential Portion

Page 10

1        Q    Did you review any video footage, body cam

2    footage?

3        A    The body cam video.

4        Q    You reviewed your body cam video?

5        A    Yes, sir.

6        Q    And what was that video?

7        A    The hour long that I had my camera on.

8        Q    On the day of the incident, the reason why

9    we're here?

10       A    Yes, sir.

11       Q    Did you attend high school?

12       A    Yes, sir.

13       Q    Where?

14       A    Paloma Valley High.

15       Q    And when?

16       A    I graduated in 2006.

17       Q    2006 you said?

18       A    Yes, sir.

19       Q    Did you attend college?

20       A    Some college.  And I'm going back to

21    college, so yes, sir.

22       Q    And when you say "some college," how much

23    -- what does that mean?

24       A    I don't have -- I don't have a degree.  I

25    have -- I have units completed.

Contains Confidential Portion

Page 11

1        Q    Do you know when you first started

2    attending college?

3        A    When I graduated high school.

4        Q    And what classes did you took?

5        A    I believe I took, like, a criminal law

6    class and, like, psychology, just general education

7    stuff.

8        Q    And you are currently taking classes now?

9        A    Yes, sir.

10       Q    What classes are those?

11       A    Finance classes, accounting classes.

12       Q    Any reason why you're taking classes right

13   now?

14       A    Just to get my degree.

15       Q    Great.

16            Did you attend the police academy?

17       A    Yes, sir.

18       Q    When?

19       A    I attended the academy, I believe, 2014,

20   the law enforcement academy.  Prior to that, I was in

21   the corrections academy in 2008.

22       Q    So there's a six-year gap between the

23   corrections academy and law enforcement academy?

24       A    Yes, sir.

25       Q    How long did it take you to complete the

Contains Confidential Portion

Page 12

1    corrections academy?

2        A    Four months.

3        Q    When did you -- sorry, strike that.

4             Where was the corrections academy located?

5        A    Miramar College.

6        Q    And what about the law enforcement academy?

7        A    Miramar College.

8        Q    Did you graduate from the corrections

9    academy?

10       A    Yes, sir.

11       Q    After four months?

12       A    Yes, sir.

13       Q    And what about the law enforcement academy?

14       A    Yes, sir, I graduated.

15       Q    How long did that take you to graduate?

16       A    About six months.

17       Q    Did you attend any other schools?

18       A    Different trainings that I've gone to.

19       Q    Can you elaborate; like where?

20       A    I've gone to training in Orange County,

21   Fullerton, and then training out here -- or down here

22   in San Diego.

23       Q    Are these mandatory trainings?

24       A    We do have mandatory training and then I

25   attended additional training just for my job.

Contains Confidential Portion

Page 13

1      Q    On your own accord?

2      A    Yeah.

3      Q    How long -- is that -- generally are those

4    trainings?

5      A    It varies.  It could be eight hours or two

6    weeks.  I've been to a two-week training class.

7      Q    Any of them last longer than two weeks?

8      A    No.

9      Q    Do you take them with other people in the

10   academy or other graduates of the academy?

11     A    Yeah, there's other law enforcement, police

12   officers, deputies there.

13     Q    Do you receive any certificate or anything

14   memorializing your completion of those training

15   courses?

16     A    Yes, sir.

17     Q    What is it?

18     A    It's usually just a certificate of -- that

19   you either passed the class or you attended the

20   training.  If there's a test, then that you passed.

21     Q    Sure.

22          Have you ever been convicted of a felony?

23     A    No, sir.

24     Q    Misdemeanor?

25     A    No, sir.

Contains Confidential Portion

Page 14

1    Q   Ever received a ticket?

2    A   Yes, sir.

3    Q   For a misdemeanor or an infraction?

4    A   It was an infraction.

5    Q   What was that infraction?

6    A   It was a stoplight violation when I was 16

7    years old.

8    Q   Before you went into law enforcement?

9    A   Yes, sir.

10   Q   Have you ever received a ticket after you

11   went into law enforcement?

12   A   No, sir.

13   Q   What was your first job?

14   A   My first job where -- well, I worked --

15   Q   Your first paid job.

16   A   My first paid job was -- I mean, I mowed

17   lawns for my neighbors.

18   Q   That counts.

19       I'm assuming in high school?

20   A   Yeah.

21   Q   After high school, what was your first job?

22   A   I worked at a grocery store.

23   Q   What store?

24   A   It was a Stater Brothers.

25   Q   Okay.  For how long did you work there?

Contains Confidential Portion

Page 15

1       A    About a year and a half.

2       Q    Was that in San Diego?

3       A    It was in Riverside County.

4       Q    And where did you live when you worked

5    there?

6       A    In Menifee.

7       Q    Menifee?

8       A    Yeah.

9       Q    And how long did you work there?

10       A    About a year and a half.

11       Q    Okay.  And why did you leave that job?

12       A    I was hired by the sheriff's department.

13       Q    How old were you when you were hired by the

14    sheriff's department?

15       A    19.

16       Q    And have you been employed by the sheriff's

17    department's ever since?

18       A    Yes, sir.

19       Q    Great.  Shifting gears.

20            When did you first get your driver's

21    license?

22       A    When I was 16.

23       Q    And how long have you been driving?

24       A    Since I was 16.  I'm 30, so --

25       Q    So about 14 years?

Contains Confidential Portion

Page 16

1       A    Yes, sir.

2       Q    Have you ever had your license suspended?

3       A    No, sir.

4       Q    When you're driving, have you ever heard a

5    honk that sounds to you like a greeting?

6            MR. WHITE:   Objection, vague and ambiguous,

7    calls for speculation.

8    BY MR. JEW:

9       Q    You can answer.

10      A    Yes, sir.

11      Q    You have heard a honk that sounds like a

12   greeting?

13      A    I guess.  I mean, if -- I don't know the

14   difference between honks, but I guess I -- by

15   assuming.

16      Q    When you say "by assuming," in what

17   circumstances would you assume that a honk is a

18   greeting?

19      A    A circumstance I could see if you're

20   driving down a road and you're driving in your

21   neighborhood and you see your neighbor, you honk to

22   get their attention to wave.

23      Q    In that situation that you just described,

24   you would be able to probably discern that because

25   there was no immediate danger perceived from the

Contains Confidential Portion

Page 17

1    person receiving the honk, correct?

2         A    Yes, sir.

3         Q    And by the example you just gave, by

4    someone driving down the road and seeing their

5    neighbor, when they honk you would perceive that as a

6    greeting because you would know that that person knew

7    their neighbor; is that correct?

8         A    Yes, sir.

9         Q    Do you know what a honk for a greeting

10   would sound like?

11        A    No, sir.

12        Q    Would it be multiple times?

13        MR. WHITE:  Objection, vague and ambiguous,

14   calls for speculation.

15        A    No, sir.

16   BY MR. JEW:

17        Q    You say "no."

18        Would it be one honk?

19        A    I would --

20        MR. WHITE:  Same objection.

21        THE WITNESS:  Yes, one honk.

22   BY MR. JEW:

23        Q    I think that's fair.

24        Have you ever heard a honk that sounds to

25   you like someone expressing support for a cause?

Contains Confidential Portion

Page 18

1          MR. WHITE:  Objection, vague and ambiguous,

2    calls for speculation.

3          A    No, sir.

4    BY MR. JEW:

5          Q    Let me rephrase.

6               Have you ever heard a honk by someone that

7    is driving by a protest?

8          MR. WHITE:  Same objections.

9          A    I have heard that, yes.

10   BY MR. JEW:

11         Q    And would you be able to discern whether

12   that honk was for an emergency reason or for support

13   for the protest?

14         A    No, sir.

15         Q    You would not be able to discern that?

16         A    No, sir.

17         Q    Okay.  Have you ever heard a honk that

18   sounds to you like a celebration?

19         MR. WHITE:  Objection, vague and ambiguous,

20   calls for speculation.

21         A    Yes, sir.

22   BY MR. JEW:

23         Q    And when you say "yes, sir," I mean, one

24   example would be at a sports rally or a homecoming.

25   Let me give you an example.

Contains Confidential Portion

Page 19

1        If someone is honking at a sports rally and

2    there's not an immediate danger that you perceive,

3    would you take that as being a honk in celebration of

4    that sport rally?

5        MR. WHITE:  Objection, vague and ambiguous,

6    calls for speculation.

7        A    Yes, sir, in the right circumstances.

8    BY MR. JEW:

9        Q    When you say "in the right circumstances,"

10   what kind of circumstances would allow you to discern

11   this was a celebration and not for an emergency?

12       A    I would say maybe in a parking lot, leaving

13   the sporting event where there's a lot of traffic, so

14   people kind of sitting there in their vehicles

15   honking the horn.

16       Q    And when someone is honking their horn in

17   celebration at a sports event, it's not going to be

18   one beep, correct?

19       MR. WHITE:  Objection, calls for

20   speculation.

21       A    It would be whatever they felt -- as many

22   honks as they wanted to.

23   BY MR. JEW:

24       Q    Sure.

25           Have you ever heard a honk that sounds to

Contains Confidential Portion

Page 20

1   you like a warning?

2       A   Yes, sir.

3       Q   And what would that sound like?

4       A   Like a honk honking.

5       Q   Possibly a horn blaring?

6       A   Yes, sir.

7       Q   And in what circumstances would you be able

8   to discern that a horn is honked for a warning?

9       A   Driving down the road, a pedestrian walks

10  out, honking the horn; if someone is going to get in

11  a car, honking their horn.

12      Q   So it sounds like you can tell the

13  difference based on the context of what a horn is

14  being honked for; is that correct?

15          MR. WHITE:  Objection, vague and ambiguous.

16      A   Yes, sir.

17  BY MR. JEW:

18      Q   While off duty, have you ever honked your

19  horn while driving?

20      A   Not that I can recall.

21      Q   You haven't honked your horn for

22  nonemergency-related reasons to your recollection?

23      A   No, sir, not that I can recall.

24      Q   To support a protest ever?

25          MR. WHITE:  Objection, asked and answered.

Contains Confidential Portion

Page 21

1      A    No, sir, not that I can recall.

2  BY MR. JEW:

3      Q    To greet anyone?

4          MR. WHITE:   Objection, asked and answered.

5      A    Not that I can recall, sir.

6  BY MR. JEW:

7      Q    For Jesus?

8          MR. WHITE:   Objection, asked and answered,

9  argumentative.

10     A    Not that I can recall.

11 BY MR. JEW:

12     Q    Do you have any kids?

13     A    No, sir.

14     Q    Maybe have you ever honked your horn to

15 pick someone up at the airport?

16     A    Not that I can recall, no.

17     Q    While off duty, have you ever observed

18 another driver honking his or her horn?

19     A    Yes, sir.

20     Q    For nonemergency-related reasons?

21     A    Yes, sir.

22     Q    And how did you know that it was for

23 nonemergency-related reasons in those situations?

24     A    I've been at lights, been behind somebody

25 or next to somebody and they start honking their horn

Page 22

1    because the vehicle in front of them might not be

2    going.

3         Q    And in that situation, when a vehicle in

4    front of them may not be going, you don't consider

5    that an emergency-related reason for honking your

6    horn?

7         A    No, sir.

8         Q    And why is that?

9         A    Because the horn is to notify people of

10   emergencies, if someone's around you, to avoid a

11   collision.

12        Q    When the person is honking their horn to

13   tell the person in front of them to move, what do you

14   think that message is conveying?

15             MR. WHITE:  Objection, vague and ambiguous.

16        A    That they want that person to move forward.

17   BY MR. JEW:

18        Q    And that is not an emergency, they just

19   want them to move, correct?

20        A    Yes, sir.

21        Q    Okay.  Switching gears back to your

22   experience at the sheriff's department, when did the

23   San Diego Sheriff's Department hire you?

24        A    In 2008.

25        Q    And you said you were 19?

Contains Confidential Portion

Page 23

1    A    Yes, sir.

2    Q    Did you apply?

3    A    Yes, sir.

4    Q    Prior to you applying, were you recruited

5   by anybody?

6    A    No, sir.

7    Q    Any of your family members ever work for

8   the San Diego Sheriff?

9    A    No, sir.

10   Q    Police officers?

11   A    No, sir.

12   Q    How long have you been a sheriff's deputy?

13   A    11 years and --

14   Q    When you were hired at 19, were you hired

15  to become a sheriff's deputy?

16   A    I was hired to be a corrections deputy.

17   Q    Can you elaborate what the difference is

18  between a collections deputy and a sheriff's deputy?

19   A    In San Diego there's detention deputies or

20  what's known as corrections deputies.  They work in

21  the jails.  And then if they want to work out on

22  patrol, work the streets, be a detective, they have

23  to go through the law enforcement or regional

24  academy.

25   Q    And how long were you a corrections deputy?

Contains Confidential Portion

Page 24

1      A    Six years.

2      Q    And in those six years you never patrolled?

3      A    No, sir.

4      Q    And where were you stationed as a

5    corrections deputy in those six years?

6      A    I worked at the San Diego Central Jail

7    right here in downtown and I worked at the Vista jail

8    in Vista, California.

9      Q    How long were you working at the San Diego

10   jail?

11     A    About a year and a half, two years.

12     Q    And then the remainder of your time as a

13   corrections deputy was at the Vista jail?

14     A    Yes, sir.

15     Q    Do you currently have a badge number?

16     A    Yes, sir.

17     Q    And what is that number?

18     A    7275.

19     Q    7275?

20     A    Yes, sir.

21     Q    Has that badge number ever changed since

22   you were hired?

23     A    No, sir.

24     Q    It's always been 7275?

25     A    Yes, sir.

Contains Confidential Portion

Page 25

1      Q    Do you have any other personal identifying

2  number assigned to you by the sheriff's department?

3      A    Yes, sir.

4      Q    What number?

5      A    We have an employee ID number.  It's a

6  county number.

7      Q    I'm sorry, you said a county?

8      A    A county number, yeah.

9      Q    Accounting or a county?

10     A    A county number.  Like -- so we have, at

11  the sheriff's department, my badge number which is

12  given to me by the sheriff's department, and because

13  I'm a county employee, we also have an employee

14  number with the county.

15          (The following testimony deemed

16  confidential and bound separately.)

17

18

19

20

21

22

23

24

25

Contains Confidential Portion

Page 26

1    Q    And what is your county number?

2    A    It's 039919.

3         (End of confidential section.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 27

1   BY MR. JEW:

2       Q   And when were you assigned this county

3   number?

4       A   When I was hired.

5       Q   And it's been that way ever since you've

6   been hired by the sheriff's department?

7       A   Yes, sir.

8       Q   Any other personal identifying number?

9       A   No, sir.

10      Q   Do you have a vehicle number?

11      A   I'm assigned a vehicle from the station,

12  yeah.

13      Q   And I'm assuming that number changes based

14  on the vehicle you're assigned?

15      A   With my job, because I work in traffic, so

16  I'm assigned a vehicle and it's just assigned to me.

17  They can switch me vehicles at any day.

18      Q   Okay.  And when they switch you vehicles

19  any day, that number changes?

20      A   Yeah, it would be a different vehicle

21  number.

22      Q   It's linked to the vehicle, not to you?

23      A   Yes, sir.

24      Q   So you have no other personal identifying

25  number associated with you by the sheriff or the

Contains Confidential Portion

Page 28

1    county?

2         A    No, sir, not that I know of.

3         Q    Do you recall what your vehicle number was

4    at the time of the October 17th, 2017 incident?

5         A    Yes.  20211.

6         Q    And has -- I was going to ask you if this

7    has changed since the incident; I'm assuming it has?

8         A    No, sir.

9         Q    It has not changed?

10        A    No, sir.

11        Q    So since October 17, 2017, you've been in

12   the same vehicle?

13        A    Yes, sir.

14        Q    And while as a law enforcement deputy, not

15   a corrections deputy but enforcement deputy, what

16   departments have you worked for?

17        A    Like at -- I'm sorry, like patrol?

18        Q    Yeah.

19             So my understanding is that there are

20   different departments in the San Diego Sheriff's

21   Department, and one may be patrol, another may be

22   corrections, another may be -- those are the only two

23   that come to mind; is that correct?

24        A    Yeah.  So I've worked patrol in Vista and I

25   currently work traffic in Vista.

Contains Confidential Portion

Page 29

1      Q   And what is the difference between patrol

2   in Vista and traffic in Vista?

3      A   So patrol, you are responsible for patrol

4   radio calls.  So when someone calls because they're

5   in an argument with their significant other, you

6   respond to those calls.  In the traffic division, you

7   are assigned to go to traffic related, so collisions,

8   DUIs, hit and runs.

9      Q   Okay.  And how long were you in the patrol

10  division?

11     A   About two years.

12     Q   And this was starting when you switched

13  over from corrections to enforcement?

14     A   Yes, sir.

15     Q   And as soon as you switched to enforcement,

16  those first two years, you were at patrol?

17     A   Yes, sir.

18     Q   And after those two years you switched to

19  traffic?

20     A   Yes, sir.

21     Q   And you've been traffic ever since?

22     A   Yes, sir.

23     Q   Were you traffic at the time of the October

24  17, 2017 incident?

25     A   Yes, sir.

Page 30

1    Q    When you became a traffic -- what's the
2    correct term for that?
3    A    Just a traffic investigator or -- we're all
4    deputies.  Just a traffic investigator.
5    Q    Thanks.
6         When you became a traffic investigator, did
7    you receive any training prior to becoming a traffic
8    investigator?
9    A    No, sir.
10   Q    No training?
11   A    No.  So when -- when you're on base
12   training for patrol, you do a week of traffic phase,
13   so you will ride with a training officer and you'll
14   go issue citations, you'll go to crashes, you'll
15   handle a DUI or two.
16   Q    So is it safe to say when you were training
17   to become a patrol officer, some of that training
18   encompassed training for traffic --
19   A    Yes, sir.
20   Q    -- traffic division?
21        So when you made that transition, you
22   didn't need to take any additional training?
23   A    No, not at the time.  You're required to go
24   to training, just because your job is different and
25   you don't get a lot of traffic training on patrol in

Page 31

1    one week.  And the sheriff's department is different

2    than the police agency because deputies usually don't

3    handle crashes outside the contract cities.  It's

4    usually CHP.

5        Q    Okay.  And then when you say after you made

6    that transition and you had to take additional

7    training, is that annually that they require you to

8    take additional training?

9        A    No, sir.

10       Q    When is it?

11       A    So they -- you'll go to a basic traffic

12   collision investigation course, you'll go to an

13   intermediate which is a little more advanced where

14   you'll learn more about skid marks and they have an

15   advanced collision course and you can go to

16   reconstruction courses.

17       Q    When you say "you can," is that optional?

18       A    Yes.

19       Q    Of the list of courses that you just gave

20   me, which one of those are mandatory?

21       A    I don't know if it's mandatory, but I know

22   when you go to traffic you're supposed to go to these

23   courses.  You're supposed to go to a basic traffic

24   collision investigation course.  They would like you

25   to go to these courses.  I don't want to say you're

Contains Confidential Portion

Page 32

1  supposed to because sometimes people, depending on

2  training schedules and where they're offered, it

3  could take up to a year to even go to one of those

4  courses.

5      Q   So it's not really a written rule in the

6  timeframe of when you're supposed to take it, but

7  it's expected you're supposed to take it?

8      A   Yes, sir.

9      Q   And of these courses that you just listed,

10  did you take all of those courses?

11     A   I attended the basic traffic collision

12  investigation and the intermediate traffic collision

13  investigation.  I've been to the radar and LIDAR

14  course.  So to use your radar, you're supposed to go

15  to training before you're certified to use that.  And

16  then DUI, been to DUI courses.

17     Q   Any others?

18     A   From -- I went to the DUI course, which is

19  24 hours of standardized field sobriety testing, 16

20  hours of advanced roadside impaired driving

21  enforcement and the 72-hour drug recognition expert

22  course.

23     Q   I'm going to ask you for an estimate now.

24         Since you transitioned to traffic division,

25  about how many courses have you taken since that

Contains Confidential Portion

Page 33

1   transition?

2       A   Five or six.

3       Q   Five or six?

4       A   Yes, sir.

5       Q   Has the San Diego Sheriff's Department ever

6   taken any disciplinary action against you?

7           MR. WHITE:   Objection, calls for personal

8   information made confidential by California Penal

9   Code Sections 832.5, 832.7 and 832.8, protected by

10  the Peace Officer's Bill of Rights, the Official

11  Information Privilege, and the privacy rights of the

12  witness.   And I would instruct the witness not to

13  answer.

14  BY MR. JEW:

15      Q   Are you choosing not answer?

16      A   Yes, sir, based on advice of my attorney.

17          MR. WHITE:   I'm happy to meet and confer on

18  a break if you want.

19          MR. JEW:   That's fine.

20  BY MR. JEW:

21      Q   Where do you normally patrol, Mr. Klein?

22      A   In Vista.

23      Q   Has that location ever changed?

24      A   I've worked overtime at other -- other

25  stations.

Contains Confidential Portion

Page 34

1      Q    What other stations?

2      A    I've worked overtime in the Fallbrook

3   substation, Encinitas station.

4      Q    What constitutes overtime?

5      A    Your day off and you go to work.

6      Q    How many hours do you work right now for

7   the sheriff's department per week?

8      A    80 hours a week.

9      Q    You work 80 hours a week?

10      A    Well, our schedules are different, so 80

11   hours every two weeks.  So I'm sorry, 40 hours a

12   week.

13      Q    I was about to say, that sounds like a lot.

14           MR. WHITE:  Lawyer hours.

15           THE WITNESS:  You can if you want to.

16   BY MR. JEW:

17      Q    So about 40 hours a week?

18      A    Yes, sir.

19      Q    And so after those 40 hours per week and

20   you're working more than 40 hours per week, that's

21   considered overtime?

22      A    Yes, sir.

23      Q    Is it strictly at the 40-hour mark, after

24   that you're considered overtime?

25      A    Yes, sir.

Contains Confidential Portion

Page 35

1    Q   And can you volunteer to do overtime or are
2    you asked to do overtime?
3    A   You volunteer.  Some instances, you know,
4    if there's a fire, they'll essentially -- they can
5    make you come in.
6    Q   So either?
7    A   Yeah.  But the majority of overtime is
8    overtime you signed up for.
9    Q   At the time of the October 17, 2017 Issa
10   protest incident, were you working overtime?
11   A   No, it was my regular shift.
12   Q   And just for clarity, whenever I refer to
13   "the incident," let's establish on the record that
14   that's referring to the October 17, 2017 protest.
15   A   Yes, sir.
16   Q   Where did you normally patrol at the time
17   of the incident?
18   A   In Vista.
19   Q   Did that change at all during 2017?
20   A   No, sir.  So let me elaborate.  So I worked
21   patrol in Vista and then when I moved over to the
22   traffic division, it was September of that year, so
23   I've been in traffic for about a month at the time.
24   Q   So you had moved over to -- I'm sorry,
25   you -- so at the time of the incident, you had been

Contains Confidential Portion

Page 36

1    in traffic for about a month?

2        A    Yes, sir.

3        Q    Do you specialize in a certain area of law

4    enforcement within traffic?

5        A    No, sir.

6        Q    Are there specializations within those

7    divisions?

8        A    Yeah.  So if you're in traffic and you've

9    gone to the classes I had mentioned, you can be on

10   the sheriff's reconstruction team, so you'll go to

11   major accidents where there's people pass away.

12       Q    And this is optional to take those

13   additional classes to become -- to get on the

14   sheriff's reconstruction team?

15       A    Yes, sir.

16       Q    Is that considered a promotion?

17       A    No.  It's -- there's an incentive, but it's

18   not a promotion.

19       Q    What's the incentive?

20       A    There's a -- it's a five percent paid

21   premium because you're -- you deal with a lot more

22   advanced investigations, you're dealing with a lot of

23   mathematical calculations because you're

24   considered -- it's like detective.

25       Q    Is there a hierarchy between the individual

Page 37

1    divisions in the sheriff's department or are they --

2           MR. WHITE:  Objection, vague and ambiguous.

3    BY MR. JEW:

4       Q   Are all the divisions equal?

5       A   I'm sorry, I don't think I --

6       Q   Let me rephrase.  Strike that.

7           Is -- does your -- is it considered a

8    promotion to go from patrol to traffic?

9       A   No, sir.

10      Q   What about the other way around?

11      A   No, sir.

12      Q   Does your pay change?

13      A   No, sir.

14      Q   I'm going to ask you for another estimate

15   again.

16          How many tickets would you say you write in

17   a given day while you're on duty?

18      A   It -- it depends.  Right now I work at

19   night, so a lot of my time is spent looking for -- or

20   doing DUI enforcements or responding to a lot of

21   crashes at night and other calls.

22      Q   When you say "at night," what are those

23   hours?

24      A   4:00 p.m. to 3:00 a.m.

25      Q   At the time of the incident, were you

Contains Confidential Portion

Page 38

1   working nights?

2        A   No, I was working dayshift.  So --

3        Q   And --

4        A   Sorry.

5        Q   Go ahead.

6        A   Dayshift is 6:00 a.m. to 4:00 p.m.

7        Q   Thank you.

8            At the time you were working the dayshift

9    at the time of the incident, about how many tickets

10   would you say you were writing on a given day?

11       A   Again, it just varies.  Some days when the

12   radio is slow and you don't have a lot of calls,

13   you'll go write different -- you'll write moving

14   violations, write parking tickets.  In our city,

15   there's only one traffic deputy during the day, so

16   you stay pretty busy with collisions.

17       Q   What does that mean, there's only one

18   traffic deputy per day?

19       A   So on most days there's one overlap day

20   that's just a scheduling.  But -- so Sunday through

21   Wednesday, the days that I worked, Sunday, Monday and

22   Tuesday, I was the only traffic investigator for the

23   city.

24       Q   For the City of Vista?

25       A   Yes, sir.

Contains Confidential Portion

Page 39

1    Q   How many radio calls would you say that
2  would entail per day?
3    A   It could be up to 15 radio calls a day.
4    Q   And maybe zero?
5    A   Sometimes, yes, sir.
6    Q   So some days you would work there, there
7  would be zero radio calls?
8    A   I probably couldn't tell you how many.
9  There's probably, I would say, less than -- actually,
10  I don't think I've ever had a day where I've never
11  had a radio call.
12    Q   So it's not very common for there not to be
13  a radio call?
14    A   Yeah.
15    Q   Is it very common for there to be 15 radio
16  calls in a day?
17    A   It can be.
18    Q   What about more than 15?
19    A   I think the most I've gone to or been
20  dispatched to would be about 15.
21    Q   And that would be considered a pretty busy
22  day?
23    A   That would be an extremely busy day.
24    Q   Are there days -- at the time of the
25  incident when you were traffic enforcement, could

Contains Confidential Portion

Page 40

1   there be days when you didn't write any tickets?

2       A    There could be days, yes, sir.

3       Q    And on the days that you did write tickets,

4   about how much would you say is the most you would

5   have written in a single day?

6       A    Probably 10 moving violations and -- in one

7   day, probably 10 moving violations and a handful of

8   parking tickets.

9       Q    And by "moving violations," I'm assuming

10  you're meaning speeding tickets?

11      A    Speeding tickets, stop sign tickets, red

12  light tickets.

13      Q    So between zero and 15 is kind of the range

14  of tickets you may give on any given day?

15      A    Yeah, working dayshift.

16      Q    And nightshift, how does that change?

17      A    Like I said, you're kind of -- you're doing

18  different things.

19      Q    And you can't really --

20      A    Yeah.  Dayshift is also difficult.  We have

21  a lot of people live in the contract city and there's

22  only one of me working.  So you're going to a lot of

23  calls and then you're writing collision reports that

24  have to be done.  You don't want to get too many of

25  those.

Contains Confidential Portion

Page 41

1     Q    What would a honking violation fall under,

2    a moving violation or a parking violation?

3     A    A moving violation.

4     Q    And how do you know that?

5     A    It's in the Vehicle Code.

6     Q    Are you required to issue a citation for

7    every violation you observe if there's probable

8    cause?

9     A    No, sir.

10    Q    What's your basis for saying that?

11    A    We're given discretion.

12    Q    Is that in a written policy or is that --

13    you're told that when you're hired?

14    A    I don't know if it's in the policy, but

15    through training I know you don't have to, you know,

16    cite everybody you stop.

17    Q    So during on-field training, you learn

18    during that process that you don't have to cite

19    anybody, even if there is probable cause?

20    A    Yes, sir.

21    Q    During your time as a sheriff's deputy in

22    the traffic division, have you ever received an

23    evaluation from your supervisors?

24    A    Yes, sir.

25    Q    On how frequent of a basis?

Contains Confidential Portion

Page 42

1    A   We receive an evaluation every year.

2    Q   Any other evaluations between that one-year

3    timeframe?

4    A   No, sir.

5    Q   Did anything related to the Issa protest

6    ever come up in any of your evaluations?

7         MR. WHITE:  Same objection.  Objection,

8    calls for personal information made confidential by

9    California Penal Code Sections 832.5, 832.7 and

10   832.8, protected by the Peace Officer's Bill of

11   Rights, the Official Information Privilege and the

12   privacy rights of the witness.  And I would instruct

13   the witness not to answer regarding his personnel

14   file.

15   BY MR. JEW:

16   Q   Are you choosing not to answer?

17   A   Yes, sir.

18        MR. WHITE:  And again, I'm happy to meet

19   and confer on a break.

20        MR. JEW:  Sure.

21   BY MR. JEW:

22   Q   Are you doing okay on time; do you need a

23   break?

24   A   I'm good.

25        MR. JEW:  Natasha, are you okay?

Page 43

1           MS. SAGGAR SHETH:   Good.

2    BY MR. JEW:

3        Q    Switching gears, I'd like to go over

4    protocol for body cam usage.

5           Do you wear a body-worn camera when you're

6    on duty?

7        A    Yes, sir.

8        Q    Does the sheriff's department mandate

9    compliance with any body-worn camera protocol?

10       A    Yes, sir.

11       Q    Is that a written protocol?

12       A    Yeah, there's policy on activating your

13   camera.

14       Q    Did you receive training regarding that

15   protocol?

16       A    Yes, sir.

17       Q    When did you receive that training?

18       A    When I was first issued the body camera

19   which was, I would estimate, in June or July of 2017.

20       Q    So prior to June or July of 2017, you had

21   not worn a body-worn camera?

22       A    No, sir.

23       Q    Why was that?

24       A    The department didn't have them at the

25   time.

Contains Confidential Portion

Page 44

1    Q   So at the time of June or July of 2017, the

2  department did a department-wide rollout of body-worn

3  cameras?

4    A   Yeah, it was sometime that year.  I don't

5  know all the specifics, but they started issuing body

6  cameras, they started sending people to the training

7  how to use them, how to upload the videos, how to tag

8  them.

9    Q   Do all sheriff's deputies get training on

10 body-worn cameras now?

11      MR. WHITE:  Objection, calls for

12 speculation.

13   A   I know all patrol deputies wear them.

14 BY MR. JEW:

15   Q   And what did -- you hadn't previously

16 mentioned that prior to using your body camera you

17 had gone through training to use it, correct?

18   A   Yes, sir.

19   Q   What did that training entail?

20   A   It was a couple hours and it was just

21 making you familiar with the camera, how to wear

22 them, different places to wear them, how to turn them

23 on, how to -- how to upload the videos, how to change

24 volume settings, what the different lights mean.

25   Q   Was there an instructor?

Contains Confidential Portion

Page 45

1       A    Yes, sir.

2       Q    And was it a class that you attended with

3   other deputies?

4       A    Yes, sir.

5       Q    And you said it was maybe a few hours?

6       A    Yes, sir.

7       Q    No more than a day?

8       A    No more than a day.

9       Q    Did you review any written material in that

10  training?

11      A    We reviewed the policy.

12      Q    And is that policy contained in the San

13  Diego Sheriff's Department's rules -- sorry --

14  policies and procedures?

15      A    Yes, sir.

16      Q    Are all sheriff's deputies required to use

17  a body camera when they're on duty?

18           MR. WHITE:  Objection, calls for

19  speculation.  You can answer, if you know.

20      A    Policy says you use them.

21  BY MR. JEW:

22      Q    Do you personally have to wear them

23  whenever you're on duty?

24      A    Yes, sir.

25      Q    And has that been the case ever since they

Page 46

1    were assigned to you in June or July of 2017?

2         A    Yes, sir.

3         Q    When are they required to be worn?

4         A    When you're in uniform.

5         Q    And you are in uniform when you show up to

6    clock in for your shift?

7         A    Yes, sir.

8         Q    So when you're putting on all of your

9    attire, you're putting on your body camera at the

10   same time?

11        A    Yes, sir.

12        Q    And is it on you throughout your whole

13   shift?

14        A    Yes, sir.

15        Q    When are they required to be on and

16   recording?

17        A    During law enforcement contacts.  I don't

18   know specifically the verbiage that they use, but I

19   know I use mine a lot.  Anytime where even if it's

20   not a contact where someone is being arrested, but if

21   I'm just talking to somebody in the public, some --

22   I'll turn it on.

23        Q    So is it safe to say that anytime you're

24   out on duty and patrolling, that it should be

25   recording?

Contains Confidential Portion

Page 47

1          MR. WHITE:  Objection, misstates testimony.

2      A    It's not recording.  So for example, right

3    now it's off.

4    BY MR. JEW:

5      Q    Sure.

6      A    When I'm out on patrol, you can have it on

7    and it's -- and it's a continuous 30-second loop, and

8    then when you go to activate it, you activate it.

9    But I don't keep my camera on rolling for 10 and a

10   half hours a day.

11     Q    So when you're in your patrol car, it might

12   be on that 30-second loop, but once you get out of

13   your patrol car, that's when you turn it on?

14     A    If you're on a contact -- if you're on a

15   law enforcement contact of any kind.

16     Q    But if you're going to lunch, you wouldn't

17   turn it on?

18     A    No, sir.

19     Q    If you're going to the office, you wouldn't

20   turn it on?

21     A    No, sir.

22     Q    But if you're responding to a radio call,

23   you would turn it on?

24     A    Yes, sir.

25     Q    Would you turn it on if you're creating a

Contains Confidential Portion

Page 48

1    radio call in your vehicle?

2         A    Yes, sir.

3         Q    Before you created the radio call, you

4    would turn it on?

5         A    It would be a variance.  It would depend on

6    the circumstance.  If something was dynamic, happened

7    quick and I didn't have a chance to put it out, I

8    would turn the camera on.  But if I'm going to create

9    a call or do something, I would create the call first

10   and then turn my camera on.

11        Q    And is all of this laid out in the policies

12   and procedures?

13        A    I'm not sure.

14        Q    When was the last time you reviewed the

15   policies and procedures?

16        A    When I was issued the camera.

17        Q    In July or June of 2017?

18        A    Yes, sir.

19        Q    Are sheriff's deputies disciplined for

20   failure to comply with that protocol?

21        A    You can be disciplined.  I don't know if

22   people are or have been.

23        Q    You're not aware of any situation where a

24   sheriff's deputy was disciplined for improper use of

25   their body-worn camera?

Page 49

1      A    No, sir.

2      Q    So you personally have never been

3   disciplined for that?

4           MR. WHITE:  Objection, calls for personal

5   information made confidential by the California Penal

6   Code Section 832.5, 832.7, 832.8; protected by the

7   Peace Officer's Bill of Rights, the Official

8   Information Privilege and/or the privacy rights of

9   the witness.  I would instruct the witness not to

10   answer regarding any personnel file or discipline

11   information.

12   BY MR. JEW:

13      Q    Are you choosing not to answer?

14      A    Yes, sir.

15           MR. JEW:  Can we go off the record?

16           THE VIDEOGRAPHER:  Off the record.  The

17   time is 10:00.

18           (Discussion was held off the record.)

19           THE VIDEOGRAPHER:  We're back on the

20   record.  The time is 10:01 a.m.

21   BY MR. JEW:

22      Q    Mr. Klein, when you turn your body-worn

23   camera on, is audio being recorded as well?

24      A    Yes, sir.

25      Q    Are you permitted to turn off your audio at

Contains Confidential Portion

Page 50

1    your own discretion when the video is rolling?

2         A    Yes, sir.

3         Q    You are?

4         A    Yes, sir.

5         Q    Is that laid out in the policies and

6    procedures?

7         A    I don't know exactly what it says, but we

8    are allowed to mute our cameras when we're -- if it's

9    a tactical consideration or if you're going to ask a

10   question, people -- I believe they've -- actually, I

11   don't know.

12        Q    You don't know.

13             What is the foundation for the testimony

14   that you just gave that you are allowed to mute your

15   body-worn camera?

16        A    I know you can mute your camera when it

17   comes to tactical considerations.

18        Q    How do you know that?

19        A    Because I was told in the training.

20        Q    You were told that in the training?

21        A    Yes, sir.

22        Q    Do you recall who told you that in the

23   training?

24        A    No, sir.

25        Q    It was the instructor, though?

Contains Confidential Portion

Page 51

1       A    Yes, sir.

2       Q    Do you know if any of your colleagues --

3   colleague deputies mute their audio while the camera

4   is rolling; have you ever observed that?

5       A    Yes.  And I've done it as well.

6       Q    Can you list all of the reasons you

7   previously stated, I think you said there were

8   others, but what are all the reasons where you might

9   mute your audio but leave the footage rolling?

10      A    A tactical consideration.  If -- I have

11  muted it in the past to have a conversation with a

12  deputy about why we might be there, you know, hey,

13  this is what I have, what do you have, what do you

14  think, to kind of roundtable different ideas at the

15  time.  I don't know if policy has changed since then.

16  I know there was an issue in the past where people

17  were just having them muted on scenes where there's

18  active things going on.  So I generally will leave

19  mine rolling and you can hear my side conversation.

20      Q    And when you said you were aware of an

21  issue in the past where there was an issue, can you

22  elaborate on that; how were you aware of that?

23      A    Just, I guess, through other people

24  talking.

25      Q    Other deputies talking?

Page 52

1      A    Yeah, and from hearing things, just in

2  passing, hey, make sure you keep your camera rolling,

3  don't mute it, don't turn them off, or if you're

4  going to mute it, make sure there's nothing going on.

5      Q    Who is your direct supervisor right now?

6      A    Herman Gonzales.

7      Q    Is he a sergeant?

8      A    Yes, sir, he's a sergeant.

9      Q    Do you have any other direct supervisors?

10     A    He's my direct supervisor.  No.  Other than

11  him, no.

12     Q    At the time of the incident, who was your

13  direct supervisor?

14     A    Herman Gonzales.

15     Q    Do you know who Herman Gonzales's direct

16  supervisor is?

17     A    At the station there's two lieutenants, but

18  I don't know which one he falls under.  There's a

19  lieutenant that handles all patrol issue, handles

20  patrol, and there's a lieutenant who is more

21  administrative, handles administrative issues.

22     Q    At the time of this incident, how many

23  sheriff's deputies were in the Vista station, if you

24  can estimate?

25     A    Patrol deputies working?

Page 53

1      Q    Yes.

2      A    Maybe five or six.

3      Q    How many are on staff at the time of the

4   incident?

5      A    Well, there's more deputies that work at

6   the station, however, assigned to patrol, there's

7   five or six deputies working patrol and then I'm the

8   traffic unit.  So in total, there's seven working in

9   the city.

10      Q    At the time of the incident there were

11   about seven deputies working?

12      A    In the city.  But you have cops units, you

13   have detectives, but they do other things.  But in

14   reference to handling radio calls and calls for

15   service, probably seven of us; six, seven.

16      Q    I'm sorry, seven patrol or seven traffic

17   enforcers?

18      A    I'm the only traffic unit.

19      Q    Okay.

20      A    So I guess maybe to clarify, there's about

21   five or six deputies that will handle calls for

22   service, go to your arguments or go to when people

23   call 911 for an array of things.  And then there's me

24   working who handles all traffic radio calls.

25      Q    And that was the case at the time of the

Contains Confidential Portion

Page 54

1   incident?

2        A   Yes, sir.

3        Q   Is that still the case?

4        A   Yes.  Staffing hasn't changed.

5        Q   At the time of the incident, when you say

6   there were about six or seven deputies that do patrol

7   and traffic at the time of the incident, how many

8   were off duty and not working, if you could estimate?

9        A   I don't know.  I mean, I don't think I

10  could put a fair estimate.  Even working, I don't --

11  there's other deputies assigned there that may be

12  working, but as far as handling patrol calls or --

13  handling patrol calls, there's about five or six.

14  I'm the only traffic unit.  So when I get a traffic

15  call, patrol deputies are not responsible to go to

16  those, I'm responsible.  I'm the sole one responsible

17  for that.

18       Q   So when you're not working, who takes over

19  your role?

20       A   There's other deputies that work at the

21  station.

22       Q   So that's my question.  I'm sorry if I'm

23  being confusing.

24           So at the time of the incident, my

25  understanding from your testimony is there were six

Contains Confidential Portion

Page 55

1    or seven officers that were working.

2        A    Uh-huh.

3        Q    How many officers were not working or

4    stationed at the City of Vista?

5        A    I don't know how many deputies work there.

6    I would --

7             MR. WHITE:  Object, calls for speculation.

8             THE WITNESS:  I don't know.

9    BY MR. JEW:

10        Q    If you could estimate.

11        A    I don't know how many deputies work or

12    assigned there.

13        Q    Fair enough.

14             At the time of the incident, how many

15    sergeants were working at the City of Vista station?

16        A    I believe two.

17        Q    And who were those sergeants?

18        A    Sergeant Juan Mazoya (ph), he was my patrol

19    sergeant when I worked patrol, and then Sergeant

20    Gonzales.

21        Q    But at the time of the incident, you had

22    just transitioned to traffic, correct?

23        A    Yes.

24        Q    And when you transitioned to traffic, your

25    sergeant was?

Contains Confidential Portion

Page 56

1      A    Sergeant Gonzales.

2      Q    And those are two sergeants, that you're

3 aware of, at the city?

4      A    That were working, yeah.

5      Q    And you previously testified that there

6 were two lieutenants, to your knowledge?

7      A    There's two lieutenants assigned there.  I

8 don't know what they do during the day.

9      Q    And was one of those lieutenants Lieutenant

10 Mike Muncy?

11     A    Yes, sir.

12     Q    Who is the other lieutenant?

13     A    I think at the time it was Giantonio.  I

14 think that was the other lieutenant at the time.

15     Q    Do you know which lieutenant was the direct

16 supervisor of your sergeant?

17     A    I don't know.

18     Q    And was there only one captain at that

19 station?

20     A    Yes, sir.

21     Q    Was that Captain Cinnamo?

22     A    Yes, sir.

23     Q    And he's been the captain ever since the

24 incident?

25     A    He's not at the station anymore.  He moved

Page 57

1   on.  I'm not sure where he works.

2       Q    Who is the current captain at the station?

3       A    Captain Rylaarstan (ph).

4       Q    Going back to the body cam, is body cam

5   footage or recordings ever edited, to your knowledge?

6       A    No.

7       Q    Why is that?

8            MR. WHITE:  Objection, calls for

9   speculation.

10      A    They could be used for evidence.

11  BY MR. JEW:

12      Q    Do you know if the policies and procedures

13  prohibit editing?

14      A    No, I don't.

15           MR. JEW:  I'm going to enter in as an

16  exhibit, mark it as Exhibit 2.

17           (Exhibit 2 was marked for identification.)

18  BY MR. JEW:

19      Q    Mr. Klein, I'm going to represent to you

20  this is the San Diego Sheriff's Department's policy

21  and procedure manual that I was able to find on the

22  San Diego Sheriff's Department's website.

23           Do you have any reason to believe this is

24  not the policy and procedure manual?

25      A    No, sir.

Contains Confidential Portion

Page 58

1      Q    Does this look like the policy and

2  procedure manual?

3      A    Yes, sir.

4           MR. WHITE:   Object, lacks foundation.

5  BY MR. JEW:

6      Q    Do you know what this is?

7      A    Yes, sir.

8      Q    What is it?

9      A    It looks like the department policy and

10 procedure manual.

11     Q    How do you know that?

12     A    Because it has the pages on it, inside it.

13     Q    Have you ever reviewed this document?

14     A    I've never read it front to back.

15     Q    But it's safe to say you looked at certain

16 sections?

17     A    Yes, sir.

18     Q    When was the last time you referred to this

19 manual?

20     A    We get updates, policy updates, and I'll

21 review those as they come in.

22     Q    How do you get those policy updates?

23     A    Through e-mail.

24     Q    And how frequently would you say these

25 policy updates go out?

Contains Confidential Portion

Page 59

1       A   Whenever they have -- whenever a change is.

2   It could be every couple months maybe.

3           MR. WHITE:  Do you mind if we take a break

4   early so I can review it and --

5           MR. JEW:  Sure.  Let's go off the record.

6           THE VIDEOGRAPHER:  Off the record.  The

7   time is 10:11 a.m.

8           (Brief recess.)

9           THE VIDEOGRAPHER:  We are on the record.

10  The time is 10:40 a.m.

11          MR. JEW:  While we were off record, counsel

12  for Mr. Klein and Susan Porter discussed the -- what

13  has been marked as Exhibit, I believe, 3?

14          THE WITNESS:  2.

15          MR. WHITE:  I have 2.

16          MR. JEW:  What has been marked as Exhibit

17  2.  And the witness and counsel present have had the

18  opportunity to review Exhibit 2, the relevant

19  sections that we plan to cover.

20  BY MR. JEW:

21      Q   Mr. Klein, after having reviewed the

22  sections on the body-worn camera during our break, do

23  you believe that this is a fair and accurate

24  representation of the policies and procedures on the

25  body-worn camera?

Contains Confidential Portion

Page 60

1          MR. WHITE:  Just to make a clear record,

2     the sections we were told would be covered that

3     we've -- or that I've reviewed at least, are Section

4     6.131, and there's kind of an abbreviated Section

5     6.131 towards the front of the binder manual that we

6     were given, and then maybe about two-thirds or

7     three-quarters of the way there's a several-page

8     Section Number 6.131.  And thank you.

9          MR. JEW:  And that is correct.

10    BY MR. JEW:

11        Q   Mr. Klein, after having reviewed Section

12    6.131, both the abbreviated version and the longer

13    version, do you have any reason to believe this is

14    not the policies and procedures on body-worn cameras?

15        A   No, sir.

16        Q   Is this a fair and accurate representation

17    of what you know to be the policies and procedures of

18    the body-worn camera?

19        A   Yes, sir.

20        Q   Is there any difference from this policy

21    and procedure from what you can recall when you were

22    in training in 2017?

23        A   It looks similar, yes, sir.

24        Q   So I'd like to go to the abbreviated

25    Section 6.131 at the very beginning of the manual.

Contains Confidential Portion

Page 61

1    And it says here that "the San Diego County Sheriff's

2    Department authorizes the use of body-worn camera

3    technology with the goal of providing an additional

4    layer of documentation for events, actions,

5    conditions and statements made during critical

6    incidents and to improve reports, collection of

7    evidence and testimony in court"; do you see that?

8         A    Yes, sir.

9         Q    And when we go to the longer section

10   towards the end of the manual, do you see where it

11   says "Section 6.131, body-worn cameras," Mr. Klein?

12        A    Yes, sir.

13        Q    For the record, can you please repeat and

14   read out loud the first paragraph underneath that

15   section?

16        A    "The body-worn camera is an on-the-body

17   audio and video recording system assigned to a deputy

18   sheriff/community service officer, as an additional

19   means of documenting specific incidents in the field,

20   law enforcement service bureau and court service

21   bureau.  Deputies/community service officers are

22   responsible for knowing and complying with this

23   procedure as well as the body-worn camera operational

24   manual."

25        Q    Do you see the section directly underneath

Contains Confidential Portion

Page 62

1    that paragraph that says "training"?

2         A    Yes, sir.

3         Q    Can you please read that sentence

4    underneath the word "training"?

5         A    "Deputies/community service officers will

6    not use the BWC until they have successfully

7    completed the required training."

8         Q    And to make the record clear, BWC is

9    referring to body-worn camera?

10        A    Yes, sir.

11        Q    Do you see the section underneath that

12   sentence that says "general"?

13        A    Yes, sir.

14        Q    Can you read for the record the first two

15   bullet points?

16        A    "Body-worn cameras shall be operated in

17   accordance with the manufacturer's guidelines and

18   department training policies and procedures.  The

19   body-worn camera shall be worn and used by uniform

20   personnel at all times during on-duty hours in law

21   enforcement capacity unless directed by a

22   supervisor."

23        Q    And do you see the section directly

24   underneath those bullet points that says "general

25   operational prohibitions and restrictions"?

Page 63

1    A    Yes, sir.

2    Q    Can you please read the first sentence

3  there for me.

4    A    "Sheriff's department personnel shall not

5  tamper with or dismantle any hardware or software

6  components of any BWC device."

7    Q    And onto the following page, do you see

8  where it says "camera position"?

9    A    Yes, sir.

10    Q    Directly above that section, there is one

11  paragraph that starts with "deputies are authorized."

12    A    Yes, sir.

13    Q    Can you please read that paragraph for me?

14    A    "Deputies are authorized and may wear their

15  assigned body-worn cameras while working overtime

16  assignments, however, deputies shall ensure that the

17  use of the camera while working overtime will not

18  interfere with the use of the body-worn camera while

19  working their regular shift."

20    Q    And if we go further down that page,

21  there's a section that says "when and where to

22  record"; do you see that?

23    A    Yes, sir.

24    Q    Can you please read the first sentence

25  there.

Page 64

1          A    "It is the intent of the sheriff's

2     department to record all law enforcement-related

3     contacts and other contacts deemed appropriate."

4          Q    And directly underneath that there's a

5     section that says "enforcement related contacts"; do

6     you see that?

7          A    Yes, sir.

8          Q    I'll read it out loud and you can let me

9     know if I misstated it.  For the record, it says

10    "Deputies/community services officers shall activate

11    the BWC to record all law enforcement-related

12    contacts.  While away from department facilities,

13    deputies shall keep their BWC powered on and in

14    stand-by mode.  The record mode of the camera should

15    be activated prior to actual contact with the citizen

16    (victim/witness/suspect) or as soon as safely

17    possible, and continue recording until the contact is

18    completed.  Deputy shall begin recording prior to

19    arriving at an incident if the call has potential to

20    involve immediate enforcement upon arrival --

21    sorry -- immediate enforcement action upon arrival."

22              Is that a correct reading of that section,

23    Mr. Klein?

24          A    Yes, sir.

25              MR. WHITE:  Just note that the document

Page 65

1    speaks for itself.  But in the third paragraph, you

2    read -- you said "deputy shall" when it says "deputy

3    should," under the enforcement-related contacts.

4            MR. JEW:  Understood.

5            MR. WHITE:  I may have misheard that.

6    BY MR. JEW:

7        Q   And finally, on the next page over, there's

8    one paragraph there at the top.  I'm going to read it

9    out loud again.  "Law enforcement-related contacts

10   include but are not limited to the following:

11   Traffic stops, field interviews, vehicle tows,

12   issuing of citations, issuing of parking tickets,

13   detentions, arrests, persons present at radio calls

14   who are accused of crimes, serving court orders or

15   civil papers, investigative interviews,

16   deputy-initiated central encounters and private

17   person-initiated contacts of a confrontational

18   nature."

19           Mr. Klein, is that a correct reading of

20   that top paragraph?

21       A   Yes, sir.

22       Q   Okay.  We can close this up.

23           Now, switching gears to the day of the

24   incident, were you present at the Issa protest on

25   October 17th, 2017?

Contains Confidential Portion

Page 66

1     A   Yes, sir.

2         MR. JEW:  And what I'm going to introduce

3   as Exhibit 3, please take a look and let me know when

4   you've had a chance to review.

5         (Exhibit 3 was marked for identification.)

6   BY MR. JEW:

7     Q   Mr. Klein, do you recognize what this

8   document is?

9     A   Yes, sir.

10    Q   And what does it appear to be?

11    A   Appears to be the citation that I wrote.

12    Q   For Ms. Porter, the plaintiff in this case?

13    A   Yes, sir.

14    Q   Do you have any reason to believe this is

15  not the citation that you wrote?

16    A   No, sir.

17    Q   Before the day of the incident, were you

18  aware of the weekly Issa protests?

19    A   Yes, sir.

20    Q   And how were you aware of them?

21    A   They just -- it was just known, hey, it's

22  Tuesday, they were at their weekly protest.

23    Q   At the time of the incident, do you know

24  how long the protests were ongoing for?

25    A   No, I don't.

Contains Confidential Portion

Page 67

1    Q   Did you know that it was ongoing for a few
2  months at least?
3    A   Yes, sir.
4    Q   And do you recall when you were first made
5  aware of the Issa protest?
6    A   No, sir.
7    Q   But it sounds like you were made aware by
8  discussion in the department generally?
9    A   Yeah, it was -- it was more, hey, it's a
10  Tuesday, just so you know, there's a few people out
11  there.
12    Q   Who would have said that to you?
13    A   Usually it was in a briefing.
14    Q   And do you have briefings every day when
15  you're on duty?
16    A   Yes, sir.
17    Q   Before you go and leave the office?
18    A   Yes, sir.
19    Q   And who conducts these briefings?
20    A   It's done by the team.  Sometimes the
21  sergeant will do it, sometimes the deputy will do it.
22    Q   Have you ever done these briefings?
23    A   Yes, sir.
24    Q   Have you ever done a briefing that involved
25  the Issa protest, to your recollection?

Contains Confidential Portion

Page 68

1       A   No, sir.

2       Q   Had you previously discussed the Issa

3    protest with anyone prior to the date of the

4    incident?

5       A   No, sir.

6       Q   You had not discussed it with anybody?

7       A   No, sir.

8       Q   Other than the people you were discussing

9    it with in the department?

10          MR. WHITE:  Objection, misstates testimony.

11      A   I've never spoken about it other than hey,

12   it's Tuesday, there's going to be a weekly protest.

13   That's not uncommon.  If there's protests going on --

14   not even protests, if there's an event, a car club,

15   if the downtown area is going to be shut down, that

16   would be information relayed just so people were

17   aware.

18   BY MR. JEW:

19      Q   So during a briefing there would be a list

20   of events that may be happening in the City of Vista

21   that you would be made aware of?

22      A   No, not always.

23      Q   Before the day of the incident, had you

24   previously observed the Issa protest while on duty?

25      A   I've driven past, yeah.

Contains Confidential Portion

Page 69

1      Q    Have you -- about how many times have you

2  driven past, prior to the incident?

3      A    I would estimate maybe five or six times,

4  maybe a dozen times.

5      Q    And were you instructed to drive by the

6  protest or was that part of your patrol?

7      A    If I was driving to a radio call and I just

8  so happened to take the road and I would drive past

9  it.

10     Q    Before the day of the incident, had you

11 previously observed the protest while off duty?

12     A    No, sir.

13     Q    And while you were on duty and you had

14 driven past the protest maybe six to a dozen times

15 you had stated I believe, what did you observe when

16 you were driving past the protest?

17     A    Groups of people standing out there.  There

18 would be someone talking on a microphone or

19 something.  They would have signs.  They -- the

20 people, the protestors had their own type of traffic,

21 people out there with stop signs and safety vests on.

22 And then -- yeah, just people out and about, just

23 doing their thing.

24     Q    That was generally the case each time you

25 drove by prior to the incident?

Page 70

1      A    Yeah.

2      Q    Did you observe any traffic violations at

3  those times when you were driving by?

4      A    Not that I recall.

5      Q    Were you specifically looking for any

6  traffic violations at the times you were driving by?

7      A    Not specifically.  Not that I recall.

8      Q    And had you issued any citations to anyone

9  at the Issa protest before the day of the incident?

10     A    Not specifically there, no.

11     Q    Can you elaborate on that, not specifically

12 there?

13     A    I don't know.  I issued other citations

14 throughout the city, but I don't know if they were --

15     Q    Protestors?

16     A    Yeah, protesting, but just stopped in

17 another area of the city.

18     Q    But prior to the incident, you had never

19 pulled over and gotten out and written a ticket to a

20 protestor?

21     A    No, sir.

22     Q    Do you know what the protests in front of

23 the Darrell Issa's offices were about?

24     A    No, sir.

25     Q    Did you ever participate in a protest while

Contains Confidential Portion

Page 71

1   off duty?

2        A    No, sir.

3        Q    Do you know anyone that has?

4        A    No, sir.

5        Q    No family or friends?

6        A    No, sir.

7        Q    Do you know why the protestors were

8   protesting against Issa?

9             MR. WHITE:   Objection, asked and answered.

10       A    No, I don't.

11  BY MR. JEW:

12       Q    Do you know if the protest concerned Donald

13  Trump in any way?

14            MR. WHITE:   Objection, asked and answered.

15       A    No, I don't.

16  BY MR. JEW:

17       Q    Do you know who Darrell Issa is?

18       A    Yeah, he's a congressman.

19       Q    Did you know that at the time of the

20  incident?

21       A    I knew because that's a congress -- that's

22  -- the congressman's building was in the city and

23  that's important to know.

24       Q    Did you know his political leanings at the

25  time of the incident?

Contains Confidential Portion

Page 72

1      A    Yes, sir.

2      Q    And can you elaborate; how did you know his

3   political leanings?

4      A    Watch the news.

5      Q    Do you know whether he's a Democrat or

6   Republican?

7      A    He's a Republican.

8      Q    And when you drove past the protest prior

9   to the day of the incident, did you observe any

10  protestors there that were in support of Darrell

11  Issa?

12         MR. WHITE:  Objection, calls for

13  speculation.

14     A    Yeah, I don't know who was there supporting

15  or protesting.

16  BY MR. JEW:

17     Q    Did you observe any protestors there in

18  support of Trump?

19         MR. WHITE:  Objection, calls for

20  speculation.

21     A    Again, I don't know who is for or against

22  or what their political leanings are.

23  BY MR. JEW:

24     Q    You didn't observe any of the signs?

25     A    I didn't really pay attention to them.

Contains Confidential Portion

Page 73

1    Q   So prior to the incident, you had just

2  driven past, you weren't really there to observe the

3  scene?

4    A   Yes, sir.

5        MR. JEW:  Okay.  I am going to introduce as

6  Exhibit 4 some digital body cam footage from your

7  body cam on the day of the incident.

8        MR. WHITE:  So how do you want to identify

9  it for the record I guess; do you use timestamps or

10 something?

11       MR. JEW:  There is a timestamp on it and I

12 can ask the witness about it and have him

13 authenticate that this is, in fact, his body cam

14 footage.

15       MR. WHITE:  Yeah, if you can reference that

16 for questions later on.

17       MR. JEW:  Oh, yeah.  When I am asking

18 questions specifically about the body cam footage, I

19 will specifically indicate the times I'm going to and

20 the times that I'm ending.

21       MR. WHITE:  Thank you.  Maybe describe for

22 the record what this is.

23       MR. JEW:  And I will represent for the

24 record that what I have just done is placed an

25 extended digital monitor in front of the witness that

Page 74

1    shows the body cam footage.

2         Do we have a copy, Natasha?

3         MR. WHITE:  (Inaudible.)

4         MR. JEW:  Why don't we go off the record.

5         THE VIDEOGRAPHER:  Off the record.  The

6    time is 10:57 a.m.

7         (Brief recess.)

8         THE VIDEOGRAPHER:  We are on the record.

9    The time is 11:07 a.m.

10        MR. JEW:  Mr. Klein, prior to going off the

11   record, I introduced Exhibit 3, which I'm handing the

12   court reporter now for her to mark as Exhibit 3.

13        THE REPORTER:  You mean Exhibit 4?

14        MR. JEW:  Sorry.  For the record, it's

15   Exhibit 4.

16        (Exhibit 4 was marked for identification.)

17   BY MR. JEW:

18     Q   And what I just placed in front of you is

19   an extended monitor that is going to show the body

20   cam footage.  We'll play the first few seconds of it

21   so you can verify that this is, in fact, your body

22   cam footage on the day of the incident.  I don't

23   think there is audio for the first 20 seconds of the

24   video.

25        (Video clip played.)

Contains Confidential Portion

Page 75

1    BY MR. JEW:

2         Q    Mr. Klein, do you know what this video is?

3         A    Yeah, that's my body-worn camera video.

4         Q    And is that the body-worn camera video on

5    the day of the incident?

6         A    Yes, sir.

7         Q    And how do you know that?

8         A    I heard my voice.

9         Q    At the top right of the footage there's

10   some numbers and letters there; are you familiar with

11   those?

12        A    It's the date -- the time -- I think the

13   time is off on it because it says 17:03, which would

14   be 5:03 p.m., which that's -- that's probably not

15   accurate.  And then it has, I guess, the body camera

16   number.

17        Q    Okay.  And you said that the time is

18   probably not accurate; why do you think it's probably

19   not accurate?

20        A    Because it was in the morning and the

21   citation has 10:45 a.m.

22        Q    Are you aware of when the Issa protest

23   started on the day of the incident?

24        A    No.

25        Q    Are you aware of when the Issa protest

Page 76

1    started each week?

2        A    No, other than it was in the morning

3    sometime.

4        Q    Okay.  So you have no reason to believe

5    this is not the body cam footage from your body-worn

6    camera on the day of the incident?

7        A    Yes, sir.

8            MR. JEW:  Okay.  So we will jump to the

9    part of the body cam footage starting at 35 minutes

10   exactly.

11           MR. WHITE:  Do you mean it will say 17:35?

12           MR. JEW:  I'm sorry, the video is an hour

13   and 12 seconds long and we are jumping forward to the

14   part of the video that begins at 35 minutes in.

15           MR. WHITE:  Okay.  Just for the record, if

16   possible, can we get both?

17           MR. JEW:  Yeah, the timestamp on the top

18   right corner and -- sure.

19   BY MR. JEW:

20       Q    So we are jumping forward to what's going

21   to be 34 minutes and 58 seconds into the video and

22   the timestamp at the top right of the video is

23   17:37:27.

24           Is there a better way to state that time?

25       A    Yeah, I guess that would be -- that would

Page 77

1  be, I would feel, the most accurate because there's

2  hour, minute and seconds.

3          MR. JEW:  Sure.  Go ahead and play it.  And

4  pause it.

5  BY MR. JEW:

6      Q   So Mr. Klein, we are at now 35 minutes in

7  and two seconds.  The time at the top right is

8  17:37:30.

9          Do you see the video?

10     A   Yes, sir.

11     Q   Do you recall using your body cam on the

12 day of the incident?

13     A   Yes, sir.

14     Q   And it appears, in this video, there is a

15 big group on the left standing on the sidewalk in

16 front of Issa's office; is that correct?

17     A   Yes, sir.

18     Q   And the large group on the left sidewalk

19 appears to be protesting against Issa; is that

20 correct?

21         MR. WHITE:  Objection, calls for

22 speculation.

23     A   I don't know what they were protesting.  I

24 don't know who those people are or who is involved

25 with the group.

Page 78

1   BY MR. JEW:

2        Q    You didn't know which side the protestors

3   were standing on?

4        A    No, sir.

5        Q    It appears there's a small group of

6   protestors on the other side of the road; is that

7   correct?

8        A    Yes, sir, on the south side, I guess.

9        Q    Do you know if they were for or against

10  Issa?

11       A    No, sir, I don't.

12       Q    How many would you say are on the right

13  side of the road, on the other side of the Issa

14  office?

15       A    From the south side, it looks like three.

16       Q    And you don't know if they're Issa

17  protestors or supporters?

18       A    No, sir.

19            MR. JEW:  I'm going to play the video for

20  20 seconds.  It starts at 35 minutes and 2 seconds

21  in.  The timestamp on the right-hand corner is

22  17:37:30 and we're going to play it for 20 seconds.

23            (Video clip played.)

24  BY MR. JEW:

25       Q    Mr. Klein, it appears that the individual

Contains Confidential Portion

Page 79

1  you are approaching in this 20 second clip is wearing

2  a Make American Great Again hat; is that correct?

3      A   Yes, sir.

4      Q   And for the record, we paused the video at

5  35 minutes and 22 seconds in; the top right-hand

6  timestamp is 17:37:50.

7          It appears this man that's wearing the Make

8  American Great Again hat is also holding a Trump

9  sign; is that correct?

10     A   Yes, sir.

11     Q   And there's an individual behind him with a

12  sign; is that correct?

13     A   Yes, sir.

14         MR. JEW:  For the record, I'm going to

15  rewind the video two seconds.

16         (Video clip played.)

17         MR. WHITE:  Can we pause for a

18  clarification.  Is the court reporter supposed to

19  transcribe everything she hears being said on the

20  video as well or just what's being said in this room?

21         MR. JEW:  Just what's being said in the

22  room.  I'll make the record clear as to what's going

23  on.

24         MR. WHITE:  Thank you.

25         MR. JEW:  For the record, I'm going to

Contains Confidential Portion

Page 80

1    pause it at 35 minutes in, 20 seconds.

2            (Video clip played.)

3            MR. JEW:  So the video is now paused at 35

4    minutes and 20 seconds in.  The timestamp on the top

5    right is 17:37:49.

6    BY MR. JEW:

7        Q    Mr. Klein, I previously asked you, behind

8    this man wearing the MAGA hat and holding the Trump

9    sign, there are another two individuals holding

10   signs; is that correct?

11       A    Yes, sir.

12       Q    And are you able to discern what the sign

13   said immediately behind the man wearing the MAGA hat?

14       A    Yes, sir.

15       Q    What does it say to you?

16       A    It says "Darrell Issa Working For You."

17       Q    That's what it looks like to me as well.

18            So is it fair to say there are three

19   individuals on this side of the road here that are

20   supporting Issa?

21            MR. WHITE:  Objection, calls for

22   speculation.

23       A    I don't know what their political views

24   are.

25   BY MR. JEW:

Contains Confidential Portion

Page 81

1      Q   Based on this video frame, would you say

2   these protestors are protesting against Issa?

3          MR. WHITE:  Objection, calls for

4   speculation.

5      A   I don't know what their political views

6   are.  They could be there just to cause problems.

7          MR. JEW:  What I'm going to do now is play

8   the video for 20 seconds starting at where I paused

9   it at 35 minutes and 20 seconds in.

10         (Video clip played.)

11  BY MR. JEW:

12     Q   After watching that clip, Mr. Klein, it

13  appears you gave the man wearing a MAGA hat a ticket

14  for his motorcycle being parked the wrong way; is

15  that correct?

16     A   Yes, sir.

17     Q   And did you hear the man wearing the MAGA

18  hat saying "that's their side"?

19     A   I hear it now.  I don't remember if I heard

20  it out there.

21     Q   But you hear it now?

22     A   Yes, sir.

23     Q   What do you take him to mean by "that's

24  their side"?

25         MR. WHITE:  Objection, calls for

Page 82

1    speculation.

2         A    That he's meaning those are the protestors

3    that the -- I guess against Darrell Issa.

4    BY MR. JEW:

5         Q    I think that's a fair assumption.

6              So is it safe to assume that the people on

7    this side are not there to support Issa based on that

8    video clip?

9              MR. WHITE:   Objection, calls for

10   speculation.

11        A    By him saying that, yeah, I would assume

12   that that's what he's saying.

13             MR. JEW:   What I'm going to do now is jump

14   ahead and take the video to 35 minutes in, 53

15   seconds.

16             (Video clip played.)

17             MR. JEW:   I've just paused the video at 35

18   minutes and 53 seconds.   The timestamp on the top

19   right of the video is 17:38:22.

20   BY MR. JEW:

21        Q    Mr. Klein, it appears that the man that is

22   wearing the MAGA hat is also wearing a tag on his

23   shirt that says, in all capital letters, "Trump

24   motorcycle guy"; is that correct?

25        A    Yes, sir.

Page 83

1    Q   Had you previously interacted with the
2 Trump motorcycle guy prior to the day of this
3 incident?

4    A   No, sir.

5    Q   Were you ever made aware of his presence at
6 these weekly Issa protests?

7    A   No, sir.

8    Q   It never came up in briefing?

9    A   No, sir.

10    Q   Why were you present at the day of the
11 incident?

12    A   I was told to go to this area and enforce
13 traffic.

14    Q   Who told you that?

15    A   Lieutenant Muncy.

16    Q   Lieutenant Muncy?

17    A   Yes, sir.

18    Q   And was that an oral or written
19 instruction?

20    A   I don't remember how he had told me.  I
21 didn't -- he didn't e-mail me, he didn't -- or
22 anything like that.

23    Q   Were you -- sorry, go ahead.

24    A   I was going to say, I don't -- I know I was
25 directed by him to go out there.

Contains Confidential Portion

Page 84

1     Q   Were you instructed to go out there at the

2   briefing prior to your shift?

3     A   No, sir.

4     Q   So the instruction from Muncy to attend the

5   protest was received by perhaps a radio call?

6     A   Over the radio he may -- again, I don't

7   remember specifically.  I know he didn't -- I didn't

8   get an e-mail.  He didn't call me.  I believe he just

9   said, over the radio, Hey, come out here and enforce

10  traffic.

11    Q   Had you been patrolling that area prior to

12  him calling you out?

13    A   No.

14    Q   Where were you located prior to arriving to

15  this Issa protest?

16    A   I don't remember.

17    Q   So do you recall what time your shift

18  started on the day of that incident?

19    A   6:00 a.m.

20    Q   It started at 6:00 a.m.?

21    A   Yes, sir.

22    Q   And you would not have patrolled outside of

23  Vista; is that correct?

24    A   No, sir.

25    Q   Did you communicate with anyone else about

Contains Confidential Portion

Page 85

1    the Issa protest before this?

2        A    No, sir.

3        Q    It was just Mike Muncy?

4        A    Yes, sir.

5        Q    And what did he say when he called you out

6    to the protest?

7        A    I believe he had said, Hey, just start

8    enforcing the traffic laws around here.

9        Q    Do you know why he said that?

10           MR. WHITE:   Objection, calls for

11   speculation.

12       A    I don't know, sir.

13   BY MR. JEW:

14       Q    He didn't explain why he wanted you to go

15   out there and start enforcing traffic laws?

16       A    I don't -- I don't remember.

17       Q    Had you ever communicated with the City of

18   Vista on the day of the incident?

19       A    No, sir.

20       Q    Prior to the day of the incident?

21       A    No, sir.

22       Q    After the day of the incident?

23       A    No, sir.

24       Q    Other than Lieutenant Muncy, had you

25   communicated with anyone after you had arrived on the

Contains Confidential Portion

Page 86

1    day of the incident that was not -- strike that.

2              Other than Lieutenant Muncy on the day of

3    the incident, when you arrived did you communicate

4    with any other sheriff's deputies?

5         A    Yeah, I believe, after reviewing that, my

6    sergeant had pulled up.

7         Q    Other than that sergeant that pulled up,

8    was there any other employee of the sheriff's

9    department that you had communicated with regarding

10   the Issa protest?

11        A    CSO, our community service officer, Cesar,

12   when I had asked for parking tickets.

13        Q    And who was the sergeant that pulled up,

14   from your recollection?

15        A    It looked like Sergeant Gonzales.

16        Q    And he was not your direct supervisor?

17        A    He was my direct supervisor.

18        Q    And he also patrols as well?

19        A    He has other duties, but he doesn't -- he

20   has -- obviously he's in a car, he can stop people if

21   he deems necessary, but he's -- I don't know what his

22   job is.

23        Q    When you arrived at the incident, had you

24   communicated with your sergeant regarding the

25   incident?

Contains Confidential Portion

Page 87

1    A    No, sir.

2    Q    So he was not aware that Lieutenant Muncy

3  had asked you to arrive at the protest?

4         MR. WHITE:   Objection, calls for

5  speculation.

6    A    I don't know.

7  BY MR. JEW:

8    Q    And you had not been personally assigned to

9  patrol the Issa protest prior to the day of the

10  incident; is that correct?

11    A    That is correct, I was not assigned to

12  these protests.

13    Q    Would you consider that, on the day of this

14  incident, that you were assigned to patrol and

15  enforce the law at this protest?

16    A    Yes, because my lieutenant told me to go

17  out there.

18    Q    And when a lieutenant tells you to do

19  something, you have to do it?

20    A    As long as it's a lawful order.

21    Q    Do you recall doing anything else at the

22  time when Lieutenant Muncy called you to the scene?

23    A    No, sir.

24    Q    And you perceived Lieutenant Muncy's

25  instruction to come here and enforce the law as a

Page 88

1    lawful order?

2         A    Yes, sir.

3         Q    Do you have discretion to refuse Lieutenant

4    Muncy's instructions?

5         A    Not if it's a lawful order.

6         Q    And how do you know you don't have

7    discretion to refuse?

8         A    Because he's my supervisor.

9         Q    If the order is -- from Lieutenant Muncy is

10   to write tickets at the protest, do you have

11   discretion not to write tickets?

12        A    I do have discretion, yes.

13        Q    So if a lieutenant instructs you to go to a

14   scene and tells you start writing parking tickets,

15   you have the discretion to not write parking tickets?

16        A    If the lieutenant told me to go and write

17   parking tickets, I would go write parking tickets.

18        Q    But do you have discretion to refuse to do

19   that?

20             MR. WHITE:  Objection, vague and ambiguous.

21             MR. JEW:  Let me rephrase.

22   BY MR. JEW:

23        Q    Do you have the discretion to not write a

24   parking ticket despite a lieutenant telling you to go

25   somewhere and write parking tickets?

Page 89

1        A    I guess I could refuse.  But if it's a

2    lawful order and he's giving -- he's telling me to do

3    something, then that could be insubordination.

4        Q    Have you ever patrolled the Issa protest

5    after the day of the incident?

6        A    No, sir.

7        Q    Had you ever given any warnings to anyone

8    about the Issa protest at the day of the incident?

9        A    During -- I'm sorry, can you --

10       Q    Sure.

11            After the day of the incident, had you

12   given any warnings to anybody about the Issa protest?

13       A    No, sir, I hadn't been back.

14       Q    On the day of the incident, how long were

15   you at the Issa protest?

16       A    About an hour.

17       Q    So it appears, in the very beginning of the

18   body cam footage, you had already been onsite when

19   the footage was recording; is that correct?

20       A    I had pulled up.  I don't know when I --

21   what I was doing before I activated it.

22       Q    Do you -- is there a reason why you

23   activated the body cam footage after you had pulled

24   up --

25       A    No.

Contains Confidential Portion

Page 90

1        Q    -- and not before?

2        A    No.

3        Q    So do you know who Lieutenant Mike Muncy

4    is?

5        A    Yes, sir.

6        Q    And were you aware that he was onsite on

7    the day of the incident?

8        A    Yes, sir.

9        Q    Other than Mike Muncy, are you aware of any

10   other deputies that were there to patrol?

11       A    No, sir.

12       Q    How many other sheriff's deputies were

13   onsite when you arrived?

14       A    Lieutenant Muncy.

15       Q    No other sheriff's deputies, to your

16   knowledge?

17       A    No, sir.

18       Q    Are you aware if any other sheriff's

19   deputies were called to the scene?

20       A    Because it was a traffic issue or

21   traffic-related issue, that's why I went out.

22       Q    Could that call maybe have gone out to

23   other sheriff's deputies in the area?

24       A    No.

25       Q    It would have gone strictly to you?

Contains Confidential Portion

Page 91

1     A   Yes, sir.

2     Q   During the time of the protest when you

3  were there on the day of the incident, how many

4  sheriff's deputies arrived?

5     A   Other than seeing my sergeant, I don't

6  remember anybody else, and then the CSO, community

7  service officer.

8     Q   Does the community service officer -- who

9  was that?

10    A   His name was Cesar.

11    Q   Do you know his last name?

12    A   Perez.

13    Q   Does he work for the sheriff's department?

14    A   Yes, sir.

15    Q   What was his role again?

16    A   He's a community service officer, so

17 they -- if someone calls in and their car is broken

18 into and there's no suspect information, so the

19 deputies aren't essentially tied up on those kind of

20 calls, they have community service officers that will

21 go and they'll take those reports for those people.

22 And part of their other duties are writing parking

23 tickets or whatever else the sergeant asked for.

24    Q   So they are not classified as sheriff's

25 deputies?

Page 92

1      A    Yeah, they're not law enforcement.  They
2  don't have peace officer powers, so they can't arrest
3  anybody, they can't pull people over.  They help out
4  with traffic control.  I use them -- if someone hits
5  a telephone pole and there's wires across the road,
6  I'll have them come out and help, because it could be
7  extended times where having a deputy out there where
8  there's only five or six people working in the city,
9  so you're not tieing those other patrol deputies up.
10     Q    Do you know why Mr. Perez was present on
11 the day of the incident?
12     A    I asked him to bring me any parking cites
13 he might have.
14     Q    Is that because you ran out of parking
15 cites?
16     A    Yes, sir.
17     Q    On the day of the incident, did you
18 communicate with anyone regarding the Issa protest
19 after you left the protest?
20     A    No, sir.
21     Q    Did you file a report?
22     A    I'm sorry, like a police report?
23     Q    (Nods head.)
24     A    No, sir.
25     Q    When you finished your shift on the day of

Contains Confidential Portion

Page 93

1    the incident, did you file any written report that,

2    in any way, related to the Issa protest?

3         A    I didn't -- I didn't write a police report

4    or anything.

5         Q    Did you have to report to anybody about

6    what you did that day?

7         A    Yeah, Lieutenant Muncy asked me how many

8    citations I wrote.

9         Q    When did he ask you that?

10        A    I don't specifically remember.  It was --

11   maybe that day.

12        Q    Why did you run out of citations on that

13   day of the incident?

14        A    Because I write parking tickets.  I was out

15   of citations.

16        Q    How many citations are in a given citation

17   booklet?

18        A    I believe 25.

19        Q    How often do you refill these?

20        A    As needed.

21        Q    When Lieutenant Muncy called you to the

22   scene, did he specify how many tickets he wanted you

23   to write?

24        A    No, sir.

25        Q    How many did you expect that you would

Page 94

1    write?

2        A    I don't know.

3        Q    Have you ever posted about the Issa protest

4    on social media?

5        A    No, sir.

6        Q    Do you know what social media is?

7        A    Yes, sir.

8        Q    Does Facebook qualify as social media?

9        A    Yes, sir.  I don't have social media.

10       Q    You don't have social media?

11       A    No, sir.

12            MR. JEW:  I'm going to go to the body cam

13   footage starting at 29 minutes and 4 seconds in.

14            MR. WHITE:  Before you play, can you get

15   the timestamp.

16            MR. JEW:  Yeah, I'm going to get the -- the

17   video is now paused at 29 minutes in, 4 seconds.  The

18   timestamp on the top right is 17:31:32.

19            Mr. Klein, I'm going to play 16 seconds of

20   this video.  Please focus on the video.

21            (Video clip played.)

22            The video is now paused at 29 minutes and

23   20 seconds.  The timestamp on the top right is

24   17:31:48.

25   BY MR. JEW:

Contains Confidential Portion

Page 95

1    Q   Mr. Klein, is that Lieutenant Muncy?

2    A   Yes, sir.

3    Q   That's addressing you in the video clip?

4    A   Yes, sir.

5    Q   Is it correct that Mr. Muncy states to you

6    in the clip, "see that guy on the motorcycle, write

7    him up"?

8         MR. WHITE:  Objection, misstates video.

9    Speaks for itself.

10        MR. JEW:  I'll replay the video.  The video

11   is now stopped at 29 minutes and 4 seconds,

12   timestamped at 17:31:32.  I'm going to play the next

13   16 seconds again.  Mr. Klein, please focus on what

14   Lieutenant Muncy is saying to you in the video.

15        (Video clip played.)

16        MR. JEW:  I've just now paused the video at

17   29 minutes and 10 seconds, timestamp is 17:31:38.

18   BY MR. JEW:

19   Q   Mr. Klein, what does Lieutenant Muncy say

20   to you in that video?

21   A   He said if the guy is violating any law,

22   cite him.

23   Q   And is the motorcycle that Lieutenant Muncy

24   is referring to, is that the same motorcycle from the

25   previous clip that I showed you, the Trump motorcycle

Page 96

1    guy?

2        A    Yes, sir.

3        Q    And why do you think Lieutenant Muncy told

4    you to "cite the motorcycle just like everybody

5    else"?

6             MR. WHITE:  Objection, calls for

7    speculation.

8        A    I don't know.

9    BY MR. JEW:

10       Q    What did you understand him to mean by

11   that?

12       A    Write him a parking ticket.

13       Q    Do you know why Mr. Muncy was focussed on

14   the motorcycle specifically?

15       A    I think he had issues with him in the past.

16       Q    Why do you think that?

17       A    Because in the body camera video, when I

18   reviewed it, I thought he had said something that

19   I've been telling this guy to stop parking that way.

20       Q    How long have you known Lieutenant Muncy?

21       A    About two years.

22       Q    Have you ever worked with Lieutenant Muncy

23   on any particular assignment?

24       A    No.

25             MR. WHITE:  Objection, vague and ambiguous.

Contains Confidential Portion

Page 97

1          THE WITNESS:  Sorry.  No, sir.

2     BY MR. JEW:

3          Q   Do you know Lieutenant Muncy's political

4     leanings?

5          A   No, sir.

6          Q   What about yourself?

7          A   Yes.

8          Q   Are you a Democrat?

9          A   No, sir.

10         Q   Are you a Republican?

11         A   Yes, sir.

12         Q   Would you classify yourself as pro Trump?

13         A   I don't -- if we're going to talk politics,

14    I don't like a lot of stuff he does.  He's pretty

15    frustrating.

16         Q   Do you recall speaking with Lieutenant

17    Muncy on the day of the incident?

18         A   Just here, yes, sir.

19         Q   What do you mean "just here"?

20         A   Just at the incident.

21         Q   And do you recall what was discussed when

22    you arrived?

23         A   No, sir, other than just start enforcing

24    the traffic laws.

25         Q   Do you recall speaking with Lieutenant

Page 98

1   Muncy about the Issa protest prior to the day of the

2   incident?

3        A    No, sir.

4        Q    Do you see Lieutenant Muncy on a daily

5   basis?

6        A    No, sir.

7        Q    On the day of the incident, prior to the

8   day of the incident, how often did you see Lieutenant

9   Muncy in the office?

10       A    Rarely.

11       Q    And why is that?

12       A    I'm usually -- because we're busy so I go

13   to a lot of calls.  Where my office is is different

14   from where his office is in the station.

15       Q    Do you ever receive direct orders from

16   Lieutenant Muncy?

17       A    On this date, yes, but not in the past.

18       Q    Prior to this incident, had you ever

19   received a direct order from Lieutenant Muncy?

20       A    Not that I can recall.

21       Q    Is it typical for a lieutenant to give a

22   direct order to a deputy sheriff?

23       A    I don't -- I don't see it being uncommon.

24       Q    But is it more common that a sergeant would

25   be the one giving the order?

Page 99

1      A   Yes, that would be more common.

2      Q   After the day of the incident, do you

3  recall speaking with Mike Muncy about the Issa

4  protest?

5      A   No, sir.

6      Q   Do you recall speaking with Captain Charles

7  Cinnamo on the day of the incident?

8      A   No, sir.

9      Q   How about after the day of the incident?

10     A   Not specifically about this, but I talk to

11 him.

12     Q   Had Captain Cinnamo ever questioned you

13 about the Issa protest?

14     A   No, sir, not that I recall.

15     Q   Did you speak with Captain Cinnamo about

16 your deposition today prior to attending this

17 deposition?

18     A   No, sir.

19     Q   Are you aware that we deposed Captain

20 Cinnamo yesterday?

21         MR. WHITE:  Just object.  Anything that

22 comes from your attorney, I'll object on

23 attorney/client privilege and instruct you not to

24 answer.  If you know from some other source other

25 than this office or sheriff legal, you can answer.

Contains Confidential Portion

Page 100

1       A    No, sir.

2    BY MR. JEW:

3       Q    You don't know from a source other than

4    your attorney that Captain Cinnamo was here

5    yesterday?

6       A    Correct.

7           MR. JEW:  I am now going to the footage

8    that begins at 1820.  The video is now paused at 18

9    minutes and 20 seconds.  The timestamp on the top

10   right is 17:20:49.  Mr. Klein, I'm going to play

11   about 42 seconds of this video.

12           (Video clip played.)

13           MR. JEW:  The video is now paused at 19

14   minute necessary two seconds, the timestamp is

15   172131.

16   BY MR. JEW:

17      Q    Mr. Klein, can you please describe what you

18   just saw in that clip starting at 1820 going to 1902?

19      A    My sergeant pulled up and asked what I was

20   doing.

21      Q    And who is the sergeant that pulled up?

22      A    Sergeant Gonzales.

23      Q    Do you know why he pulled up?

24      A    Probably -- no, I don't know.

25      Q    Does he normally patrol that area on the

Contains Confidential Portion

Page 101

1    day of the incident?

2           MR. WHITE:  Objection, calls for

3    speculation.

4       A   I don't know.  I mean, in the city he

5    can -- he can go anywhere.

6    BY MR. JEW:

7       Q   At the time of the incident when you

8    arrived at the protest, was -- would your sergeant be

9    made aware that you arrived at the protest?

10          MR. WHITE:  Objection, calls for

11   speculation as phrased.

12      A   I'm sorry, can you repeat the question.

13   BY MR. JEW:

14      Q   At the time of the incident, when you

15   arrived, would your sergeant be notified of your

16   arrival of the incident?

17          MR. WHITE:  Same objection.

18      A   No, sir.

19   BY MR. JEW:

20      Q   In the video clip that I just showed you,

21   you purposely turned off the audio to your body cam;

22   is that correct?

23      A   Yes, sir.

24      Q   Why did you do that?

25      A   I had a conversation with my sergeant.

Page 102

1    Q   Were you directed by anyone to turn off

2  your audio?

3    A   No, sir.

4    Q   Were you permitted to turn off your audio

5  on the day of the incident?

6    A   Yes, sir.

7    Q   You were permitted?

8    A   I can turn my audio off when I deem it

9  necessary.

10   Q   And what is the foundation for you saying

11 that you are able to do that?

12   A   The camera is on my body.  If I don't -- if

13 I don't think something is necessary, needs to be

14 recorded, I can turn my camera off or the audio

15 recording.

16   Q   Were you working overtime at the time you

17 turned off your audio?

18   A   No, sir, it was my regular day on.

19   Q   Prior to speaking with your sergeant in the

20 video clip, you say you were writing a ticket for no

21 front license plate; is that correct?

22   A   Yes, sir.

23       MR. JEW:  I'm going to continue playing the

24 video for a few seconds.  The video is stopped at 19

25 minutes in, 3 seconds; timestamp is 17:21:32.

Contains Confidential Portion

Page 103

1    Starting to play the video.

2              (Video clip played.)

3              MR. JEW:  The video is now paused at 19

4    minutes in and 30 seconds -- I'm sorry, 39 seconds,

5    and the timestamp is 17:22:08.

6    BY MR. JEW:

7       Q   Mr. Klein, it looks like from the video,

8    prior to you speaking to your sergeant, you were in

9    the middle of writing a ticket for no front license

10   plate, and after you spoke with your sergeant it

11   looks like you finished writing that ticket; is that

12   correct?

13      A   Yes, sir.

14             MR. JEW:  I'm going to go back to 18

15   minutes in and 20 seconds.  The video is now paused

16   at 18 minutes 20 seconds in.  The timestamp is

17   17:20:48.

18             Mr. Klein, I'm going to play six seconds of

19   this video footage.  And I want you to focus on what

20   your sergeant is saying to you, okay.

21             (Video clip played.)

22             MR. JEW:  The video is paused at 18 minutes

23   in and 26 seconds.  The timestamp is 17:20:55.

24   BY MR. JEW:

25      Q   Mr. Klein, what did your sergeant say to

Contains Confidential Portion

Page 104

1    you?

2         A    Something like what are you doing.

3         MR. JEW:  I'll play it back for you one

4    more time.

5              (Video clip played.)

6         MR. JEW:  The video is now paused at 18

7    minutes and 29 seconds; timestamp 17:20:57.

8    BY MR. JEW:

9         Q    Could you hear that, what he said to you?

10        A    Yeah.  He said "what are you doing?"

11        Q    Why do you think he said that?

12        MR. WHITE:  Objection, calls for

13   speculation.

14        A    I don't know.  Asking what am I doing.  I

15   don't know why he asked me that.

16   BY MR. JEW:

17        Q    He says "really, that's what he told you to

18   do"; is that correct?

19        MR. WHITE:  Objection, the video speaks for

20   itself.  You can answer.

21        A    Yes.

22   BY MR. JEW:

23        Q    At the time of the incident, what do you

24   understand that question to mean, when he said

25   "really, that's what he told you to do"?

Page 105

1    A    I don't know.  I don't -- I don't know why

2  he asked me.  I don't know.  Maybe he's wondering

3  because why didn't the sergeant -- why didn't that

4  come from the sergeant, why are we out there.

5    Q    Would you agree he sounds a little shocked

6  when he's asking you that?

7        MR. WHITE:  Objection, calls for

8  speculation.

9    A    Yes.

10  BY MR. JEW:

11    Q    Could it be that he was asking you why you

12  were possibly writing a ticket for no front license

13  plate?

14        MR. WHITE:  Objection, calls for

15  speculation.

16    A    I don't know why he -- it could have been

17  why are we out there in the first place.

18        MR. JEW:  Okay.  I'm going to continue

19  playing the footage for another 32 seconds.  The

20  video is paused at 18 minutes and 29 seconds.  The

21  timestamp is the 17:20:57.

22            (Video clip played.)

23        MR. JEW:  The video is now paused at 19

24  minutes and two seconds.  The timestamp is 17:21:30.

25  BY MR. JEW:

Contains Confidential Portion

Page 106

1    Q   Mr. Klein, it appears that you purposely

2  turned off your audio for about 30 seconds; is that

3  correct?

4    A   Yes, sir.

5    Q   Do you recall why you turned off your

6  audio?

7    A   No, sir.

8    Q   Can you think of any reason why you might

9  have turned off your audio there?

10    A   I don't know.

11    Q   It appears that you turned off your audio

12  right after the sergeant asked you "really, that's

13  what he told you to do"; is that correct?

14    A   Yes, sir.

15    Q   You don't recall what you might have

16  discussed in that roughly 30 seconds of the audio

17  being off?

18    A   No, sir.

19    Q   Could it be that he was asking you why you

20  were there giving tickets for no front license plate?

21    A   Possibly, yes.

22    Q   Could it be that he was asking you why you

23  were dispatched to the location by a lieutenant?

24    A   Possibly, yes, sir.

25    Q   Mr. Klein, when you arrived at the Issa

Contains Confidential Portion

Page 107

1   protest on the day of the incident, did you know that

2   other sheriff deputies were called to the scene?

3       A   No, sir.

4       Q   Did your sergeant explain to you why he was

5   there?

6       A   From my understanding is there had been

7   complaints about people crossing the roadway, so

8   Lieutenant Muncy started going out there on a weekly

9   basis just to prevent any issues with the protestors.

10      Q   And who told you that?

11      A   I don't know.

12      Q   Did your sergeant ever tell you why he was

13  there?

14      A   No, sir, not specifically.

15      Q   You never asked?

16      A   No, sir.

17      Q   Are you aware if he wrote any tickets to

18  anybody on the day of the incident?

19      A   No, sir.

20      Q   Do you know how long, approximately, he was

21  present at the Issa protest on the day of the

22  incident?

23      A   My sergeant?

24      Q   Correct.

25      A   No.

Page 108

1    Q   Do you know if your sergeant had spoken to

2  Lieutenant Muncy after this video clip of him

3  speaking to you?

4    A   Other than seeing in the video, him pulling

5  up and having a conversation, I don't specifically

6  remember him hanging around or staying in the area.

7    Q   Are you aware what they discussed,

8  Lieutenant Muncy and your sergeant?

9    A   No, sir.

10   Q   Were you ever disciplined for any action

11 you took while on duty in relation to the incident?

12        MR. WHITE:  Objection, calls for personnel

13 information made confidential by California Penal

14 Code Sections 832.5, 832.7 and 832.8, protected by

15 the Peace Officer's Bill of Rights, the Official

16 Information Privilege and/or the privacy rights of

17 the witness.  And I would instruct the witness not to

18 answer questions regarding his personnel file,

19 discipline investigations.

20 BY MR. JEW:

21   Q   Are you choosing not to answer?

22   A   Yes, sir.

23   Q   Were you ever reprimanded for any action

24 you took while on duty in relation to the incident?

25        MR. WHITE:  Objection.  That calls for

Contains Confidential Portion

Page 109

1    personnel information made confidential by California

2    Penal Code Sections 832.5, 832.7 and 832.8, protected

3    by the Peace Officer's Bill of Rights, the Official

4    Information Privilege and/or the privacy rights of

5    the witness.  Instruct the witness not answer on that

6    basis.

7    BY MR. JEW:

8        Q   Are you choosing not to answer, Mr. Klein?

9        A   Yes, sir.

10       Q   Were you ever made aware of any complaints

11   about your conduct at the incident from concerned

12   citizens?

13           MR. WHITE:  Objection, calls for personnel

14   information made confidential by California Penal

15   Code Sections 832.5, 832.7 and 832.8, protected by

16   the Peace Officer's Bill of Rights, of Official

17   Information Privilege and/or the privacy rights of

18   the witness and/or third parties.  I instruct the

19   witness not to answer on that basis.

20   BY MR. JEW:

21       Q   Are you choosing not to answer?

22       A   Yes, sir.

23           MR. JEW:  I am going to now introduce what

24   can be marked as Exhibit 5.

25           (Exhibit 5 was marked for identification.)

Contains Confidential Portion

Page 110

1    BY MR. JEW:

2        Q    Mr. Klein, please feel free to review

3    Exhibit 5 and let me know when you're done reviewing.

4            MR. WHITE:   Since we're going to break at

5    noon, I don't know, if you have 10 or 15 minutes on

6    this exhibit, then maybe it makes sense to go through

7    it.  If you think it's going to be longer, I'd like

8    to --

9            MR. JEW:   I just have a few questions.  So

10   we'll finish with the exhibit and take a lunch break;

11   is that okay with you?

12           THE WITNESS:   Yeah.

13   BY MR. JEW:

14       Q    Mr. Klein, have you finished reviewing

15   Exhibit 5?

16       A    Yes, sir.

17       Q    Do you recognize this document?

18       A    It looks like a printout of our CAD.

19       Q    Can you explain what a CAD is?

20       A    It's where our calls come in from when

21   people call in.  It goes to our CAD system, which

22   it's given an incident number, and there's usually

23   information in there.

24       Q    I'll represent this document has been

25   produced by your counsel and it's been Bates stamped

Contains Confidential Portion

Page 111

1    CSD0027 to CSD0037.

2         Do you have any reason to believe this is

3    not a background event chronology of the day of the

4    incident?

5         A    No, sir.

6         Q    On the first page, towards the middle,

7    you'll see an entry for the date 10/17/17, the time

8    entry is 9:43:20, terminal VTAD and operator is

9    106664; do you see that?

10        A    Yes, sir.

11        Q    At the very end of that line entry there's

12   an number there, 107275; do you see that?

13        A    Yes, sir.

14        Q    Is that your personal identification

15   number?

16        A    Yes, sir.

17        Q    Going two lines down from that entry, if

18   you look at the column for "terminal," there is an

19   entry there that's $31T1A; do you see that?

20        A    Yeah.

21        Q    Is that your vehicle terminal?

22        A    Yes, sir.  It's my call sign.

23        Q    Can you explain what your call sign is?

24        A    So every city is given a call sign.  So

25   Vista, the call signs are in the 30s.  The T would

Contains Confidential Portion

Page 112

1    represent a traffic unit for -- alphabetical for Tom,

2    a Tom unit.  The 1 is just the number and the A

3    represents dayshift.

4        Q    And that is your vehicle terminal that you

5    were driving on the day of the incident?

6        A    That's my call sign.  So the terminal would

7    be the call sign.  So the other ones that say VTAD,

8    that's the dispatcher's terminal, so the dispatcher

9    working then.

10       Q    Understood.

11            So if you go to the first time entry and if

12   you go to the fourth line under the first time entry,

13   you see a number 101497; do you see that number?

14       A    101497, no, sir.

15       Q    Under the first entry on the fourth line.

16       A    Okay.

17       Q    Do you see it now?

18       A    Yes, sir.

19       Q    The number there is 101497, correct?

20       A    Yes, sir.

21       Q    Do you know who that personal identifying

22   number is associated with?

23       A    I believe it's 30 Paul Lincoln, so it would

24   be Lieutenant Muncy.

25       Q    Do you know your sergeant's personal

Contains Confidential Portion

Page 113

1    identifying number?

2         A    No, sir, I don't.

3         Q    Would you be able to discern his personal

4    identifying number from these logs?

5         A    No, sir.

6         Q    You would be able to tell it's the sergeant

7    based on the events that are happening in the

8    "action" column?

9         A    Yeah, just because it says 30 PL DP, which

10   would be dispatched, the location and his ID, his

11   unit or his employer -- sheriff's ID number.

12        Q    Can you please take the time, Mr. Klein, to

13   go through this one more time to quickly skim it to

14   see if there's any identifying information that would

15   associate with your sergeant.

16        A    I don't see, sir.

17        Q    So in your review, Mr. Klein, you don't see

18   any description that would reference your sergeant?

19        A    No, sir.

20             MR. JEW:   Thank you.   I have no -- we can

21   take a break and have lunch.

22             MR. WHITE:   Sure.

23             THE VIDEOGRAPHER:   Off the record, 11:59

24   a.m.

25             (Lunch recess.)

Contains Confidential Portion

Page 114

1          THE VIDEOGRAPHER:  We're on the record.

2     The time is 1:01 p.m.

3     BY MR. JEW:

4          Q   All right.  Mr. Klein, at the time of the

5     incident, were you aware of whether any noise

6     complaints were made regarding the Issa protest?

7          A   Not specifically that day, not on that day.

8          Q   Can you elaborate on the other days that

9     you were made aware of noise complaints?

10         A   People in the neighborhood had been calling

11    in noise complaints.  I don't know specific dates,

12    but they call in noise complaints or people would

13    call in about the pedestrians crossing the road,

14    traffic hazard, just various.

15         Q   How were you made aware that people were

16    calling in?

17         A   I would hear on the radio.

18         Q   So when -- say, for example, if I called

19    911 to complain about something, you would be able to

20    hear that on the radio?

21         A   Yeah, if you called for a noise complaint,

22    you would call, talk to the call-taker at the

23    dispatch center and then the dispatcher would

24    dispatch it over the air to a deputy working or they

25    would -- they would, you know, say there's a call

Contains Confidential Portion

Page 115

1   pending which would be like a noise call or

2   something.

3        Q   Did these complaints happen often?

4        A   I don't specifically remember.  I just

5   remember sometimes hearing them on those days.

6        Q   On the days that the protests were going

7   on?

8        A   Yes, sir.

9        Q   Do you recall when you started -- when you

10  first heard one of these complaints?

11       A   Not specifically.

12       Q   Can you estimate the month that it happened

13  prior to the October 17th incident?

14       A   It would have probably been within a month

15  of the incident.

16       Q   Okay.  During the day of the incident, was

17  it loud when you were there?

18       A   Yes, sir.

19       Q   Could you hear the traffic from the highway

20  next to Thibido Road?

21       A   The traffic that's going on on the freeway?

22       Q   Yeah.

23       A   Not that I remember.

24       Q   When you say it was loud, can you elaborate

25  on why you thought it was loud?

Contains Confidential Portion

Page 116

1      A   I could hear a loudspeaker, people

2  cheering.  It just seemed loud.

3      Q   Can you estimate how many protestors were

4  there that day?

5      A   A couple hundred.

6      Q   But you don't know the exact amount?

7      A   No.

8      Q   What other sounds were you hearing other

9  than the protestors cheering and the microphone?

10     A   I did hear people honking their horns.

11     Q   Was that pretty frequently?

12     A   I don't remember it actually being that

13 frequent until I reviewed the body camera video which

14 it was a lot -- it happened a lot more frequently

15 than I remember being there.

16     Q   Okay.  So after you reviewed the body cam

17 video, you recall seeing a lot of incidences of

18 honking?

19     A   Yeah, hearing it or recognizing it more.  I

20 wouldn't say I didn't hear it.  It happened two years

21 ago, so kind of -- but playing or watching it back, I

22 was, like, Oh.  But out there I might not have heard

23 it if I focussed on something else.

24     Q   When you were hearing those honks, were you

25 able to discern the reason why somebody was honking?

Contains Confidential Portion

Page 117

1      A    No, sir.

2      Q    Were there various different types of honks

3  in the video?

4      A    I would hear a couple beeps from what I

5  remember.

6      Q    On the day of the incident, how many

7  tickets did you write for violation of the California

8  Vehicle Code Section 27001?

9      A    One.

10      Q    When you were at the incident, did you

11  personally observe any of those horn-honkers?

12      A    Not when I was outside my car when I was

13  writing parking tickets.

14      Q    But when you were in your car, were you

15  observing the general area of the protest?

16      A    Yes, sir.

17      Q    And were you observing other people honking

18  as well?

19      A    Not that I remember.

20      Q    Other than the megaphone that you mentioned

21  on the day of the incident, could you hear any other

22  amplified sound device?

23      A    Not that I remember.

24      Q    Do you recall having trouble hearing

25  conversations with anybody at the protest on the day

Contains Confidential Portion

Page 118

1    of the incident?

2         A   I remember it was loud.

3         Q   But no specific recollection that it may

4    have been difficult for you to hear a conversation?

5         A   No, sir.

6         Q   Could you still hear passing cars on the

7    street during the protest on the day of the incident?

8         A   I don't remember.

9         Q   Do you recall hearing any music on the day

10   of the incident?

11        A   I believe there was music, but I'm not --

12   I'm not a hundred percent sure.

13        Q   Do you know if the decibel levels were ever

14   measured on the day of the incident?

15        A   I don't know, sir.

16        Q   Do you know if they were measured any other

17   day other than the day of the incident?

18        A   No, sir.

19        Q   Have you ever personally seen a measurement

20   of the sound levels at the Issa protest?

21        A   No, sir.

22        Q   Do you personally have the ability to

23   measure the decibel levels of your surroundings?

24        A   No, sir.

25        Q   And why is that?

Page 119

1       A    I don't even know where you would get that

2   equipment.

3       Q    So a traffic sheriff's deputy would not be

4   assigned any equipment that would be able to

5   measure --

6       A    Oh, no, no.

7       Q    Mr. Klein, I'm going to show you a portion

8   of your body cam footage which is going to start at

9   29 minutes and 45 seconds into the video.  We'll load

10  that up.  Can you see the screen?

11      A    Yes, sir.

12          MR. JEW:  29 minutes, 35 seconds.  So the

13  video is now paused at 29 minutes in, 45 seconds.

14  The timestamp is 17:32:13.

15          Mr. Klein, I'm going play about 45 seconds

16  of this video for you.

17          (Video clip played.)

18          MR. JEW:  The video is now stopped at 30

19  minutes, 30 seconds in, timestamped 17:32:59.

20  BY MR. JEW:

21      Q    Mr. Klein, can you please describe this

22  document that your finger is pointing to in this

23  video?

24      A    It's a city parking cite guide.

25      Q    Was that assigned to you by the sheriff's

Contains Confidential Portion

Page 120

1    department?

2        A    They have them at the station.   Every city,

3    contract city, they are going to be different.

4        Q    By "they are going to be different," you

5    mean that the --

6        A    Yeah, each city will have a different one

7    which they might have different municipal codes on

8    them.

9        Q    How did you come into possession of this

10   document?

11       A    I got it from the station.

12       Q    And they're just available there for the

13   deputies to use and pick up?

14       A    Yeah.

15       Q    Do you have to return them when you're done

16   with your shift?

17       A    No.

18       Q    So it's like a reference guide?

19       A    Yeah.

20       Q    And is it typical for other sheriffs to

21   have a document like this?

22       A    Yeah.

23       Q    Is this the only pocket reference guide

24   that you carry when you're on patrol?

25       A    No, I have one for vehicle codes that I

Contains Confidential Portion

Page 121

1    bought, one for penal codes that I bought.

2        Q    That you personally bought?

3        A    Yeah.  I have, like, the typed-up cheat

4    sheet with different vehicle codes on it.

5        Q    And did you type up that cheat sheet

6    yourself?

7        A    It was passed -- they're usually kind of

8    passed around.  Someone on training will make one and

9    they'll send it to a bunch of people.  And over the

10   years, you kind of -- as the Vehicle Code changes,

11   you update your own, or you make it kind of geared

12   towards what you're going to use it for.

13       Q    Does the sheriff's department train

14   sheriff's deputies on the Vehicle Code particularly?

15       A    In the academy, yeah.  There's some

16   learning or some classes for the Vehicle Code.

17       Q    But when you're going to cite someone for

18   violation of the Vehicle Code, the onus is on you to

19   look up the section that you want to cite them for?

20       A    Yeah, if you don't know it off the top of

21   your head.

22       Q    What happens if you don't know it and you

23   don't have one of your pocket guides?

24       A    You just use the resources you have.  You

25   ask somebody.  Everybody's got a phone, so you can

Contains Confidential Portion

Page 122

1  use Google, any way you've got to kind of figure it

2  out.

3      Q   Do you need approval from the sheriff's

4  department to use these types of cheat sheets?

5      A   No.

6      Q   And in this video, do you recall why you

7  were looking at this document?

8      A   Because I don't -- I didn't know which --

9  what the Vehicle Code section was for parking the

10  wrong way on the road.

11      Q   How often would you say that you reference

12  a cheat sheet when you're performing traffic stops?

13      A   In reference to parking tickets?

14      Q   Correct.

15      A   Usually every time.

16      Q   And to be clear, when you say "parking

17  ticket," does that ticket vary from the ticket that

18  you wrote Ms. Porter?

19      A   Yeah.

20      Q   Can you elaborate how that's different than

21  the ticket you wrote Ms. Porter?

22      A   So that ticket is a notice to appear so

23  it's a summons.

24      Q   I'm sorry, when you say "that ticket,"

25  you're referring to Ms. Porter's citation?

Contains Confidential Portion

Page 123

1        A    Yeah, Ms. Porter's citation.

2             MR. JEW:  Can you please read back the

3     exhibit number for the --

4             MR. WHITE:   I believe it's 3.

5             MR. JEW:  Is that Exhibit 3?

6             THE WITNESS:  Yes, sir.

7             MR. JEW:  For the record, the witness is

8     referring to Exhibit 3 when he is saying it is Ms.

9     Porter's citation.

10             THE WITNESS:  So this is a Notice to

11    Appear.  So this ticket goes to traffic court or it

12    will go to criminal court, because on this Notice to

13    Appear, also there's traffic violations, there's

14    nontraffic and misdemeanor, so you can cite somebody

15    for methamphetamine, for example.  So this also

16    satisfies an arrest if you arrest somebody for a

17    misdemeanor, because then you're given a court date

18    at a later date.  The parking citation is -- they're

19    city specific, so each one, the parking citation

20    would say City of Vista and it would have the vehicle

21    information you put on there.

22    BY MR. JEW:

23        Q    And earlier in one of the clips I showed

24    you, you had indicated that you had called a CSO to

25    the site because you had run out of tickets; is that

Contains Confidential Portion

Page 124

1   correct?

2       A   Yes, sir.

3       Q   What kind of tickets had you run out of?

4       A   The parking citations.

5       Q   But did you not run out of regular tickets?

6       A   Notice to Appear, no, sir.

7           MR. JEW:  I am now going to show you part

8   of your body cam footage that starts at 4220.  The

9   video is now paused at 42 minutes and 20 seconds in.

10  The timestamp is 17:44:48.  And Mr. Klein, I'm going

11  to play about a minute and 40 seconds for you.  We'll

12  stop at 43 minutes and 58 seconds.

13          (Video clip played.)

14          MR. JEW:  We can pause it here.  The time

15  is 43 minutes, 8 seconds.  Timestamp 17:45:36.

16  BY MR. JEW:

17      Q   Mr. Klein, what is this document you're

18  flipping through in this clip?

19      A   That's just a cheat sheet of different

20  vehicle codes.

21      Q   So similar to the pocket reference that you

22  had?

23      A   Yes, sir.

24      Q   Was this document provided to you by the

25  San Diego Sheriff's Department?

Contains Confidential Portion

Page 125

1      A    No, sir.

2      Q    How did you come to be in possession of

3  this particular sheet?

4      A    I don't specifically remember.  I was on

5  training and usually your training officer will give

6  you a bunch of stuff and at some point someone gave

7  one to me.

8      Q    Do you remember if you purchased this

9  document?

10     A    No, it's not a work document.  It's typed.

11     Q    How often do you reference this document

12 when you perform traffic stops?

13     A    Not as much anymore.  I was only in traffic

14 for about a month.  So as time goes on you start

15 learning the different vehicle codes.  There's so

16 many sections and each subsection is a different --

17 can be a different violation.  When I was brand new,

18 these are the majority of the Vehicle Code sections

19 that are violated or commonly written for.

20     Q    Do you still have that document or a copy

21 of that document?

22     A    Yeah.

23          MR. JEW:  Okay.  I'm now going to show you

24 footage that starts at 43 minutes and 55 seconds.

25 The video is now paused at 43 minutes and 55 seconds.

Contains Confidential Portion

Page 126

1    The timestamp is 17:46:23.  Mr. Klein, I'm going to

2    play about a minute of this video for you right now.

3                (Video clip played.)

4                MR. JEW:  The video is now paused at 44

5    minutes and 57 seconds.  The timestamp is 17:47:25.

6    BY MR. JEW:

7         Q    Mr. Klein, can you please describe what you

8    were doing in this clip I just showed you?

9         A    I was looking for the section on Google.

10        Q    On your phone?

11        A    Yes, sir.

12        Q    Do you typically do that when you're

13   performing a stop?

14        A    Sometimes.  I have in the past.

15        Q    And that's to look up the section that the

16   particular person may be violating?

17        A    Uh-huh.  I may use it for penal codes as

18   well.

19        Q    Could it be that you might have been

20   texting at that time?

21        A    No, I was not texting.

22        Q    E-mailing somebody?

23        A    No.

24        Q    Do you recall what specifically you were

25   trying to look up on your phone during this clip?

Contains Confidential Portion

Page 127

1    A    The subsection.

2    Q    For?

3    A    For what the ticket was issued for.

4    Q    The horn-honking statute?

5    A    Yes, sir.

6    Q    Does that mean that the horn-honking

7    statute was not in any other reference chart?

8    A    I ended up finding it on the piece of

9    paper.  Like I said, I was newer to the unit.  There

10   were three or four pages.  Now I can reference things

11   a lot quicker.  But at the time I was still new, so I

12   was looking on the paper.  Like I said, sometimes the

13   codes might be -- there might be different

14   subsections, it might be a new section, so I just was

15   confirming or making sure that the right one was

16   applied.

17          MR. JEW:  Mr. Klein, I'm going to start

18   showing you another portion of the video starting at

19   40 minutes and 38 seconds.  The video is now paused

20   at 40 minutes 38 seconds, time stamped 17:43:06.

21           Mr. Klein, I'm going to play about a minute

22   of this video from here.

23          (Video clip played.)

24          MR. JEW:  The video is now paused at 49 --

25   40 minutes and 53 seconds, timestamped 17:43:22.

Page 128

1    BY MR. JEW:

2        Q   Mr. Klein, before I let this play for the

3    remainder of the minute, I want to show you, did you

4    hear the horn honking in that few seconds of the

5    clip?

6        A   Yes, sir.

7        Q   From your knowledge, was that the -- was

8    that horn coming from Ms. Porter?

9        A   Yes, sir.

10       Q   And how many honks did you hear?

11       A   I would have to go back, but I remember at

12   the scene hearing a -- just a lot of them in

13   succession, just a lot of repeated --

14       MR. JEW:  Okay.  I'm now going to play the

15   video starting at 40 minutes and 53 seconds,

16   timestamp 17:43:22.

17       (Video clip played.)

18       MR. JEW:  The video is now stopped at 41

19   minutes and 40 seconds, timestamp 17:44:09.

20   BY MR. JEW:

21       Q   Mr. Klein, this is the footage of you

22   pulling Ms. Porter over for honking her horn; is that

23   correct?

24       A   Yes, sir.

25       Q   At the time you pulled her over, was there

Contains Confidential Portion

Page 129

1    other noise going on aside from her honking?

2        A    The noise of the protest.

3        Q    What did that noise include?

4        A    People cheering, people -- someone on a

5    loud speaker, microphone.

6        Q    Do you recall hearing music as well?

7        A    I don't remember hearing -- I wasn't really

8    paying attention to the music.

9        Q    As Ms. Porter was honking her horn, you

10   could hear the protestors cheering?

11       A    Yes, sir.

12       Q    It also appears one of the protestors was

13   on a megaphone, correct?

14       A    Yes, sir.

15           MR. JEW:  Mr. Klein, I'm now going to show

16   you a portion of the video beginning at 43 minutes

17   and 15 seconds.  The video is now paused at 43

18   minutes, 15 seconds, timestamped 17:45:43.  I'm going

19   to play this video for about 25 seconds.  Please

20   focus on what Lieutenant Muncy is telling you in this

21   short clip.

22           (Video clip played.)

23           MR. JEW:  The video is now paused at 43

24   minutes and 40 seconds, timestamped 17:46:08.

25   BY MR. JEW:

Contains Confidential Portion

Page 130

1      Q   Mr. Klein, in this clip it appears that

2  Lieutenant Muncy approaches you and asked you "what

3  did you get," correct?

4      A   Yes, sir.

5          MR. WHITE:  Objection, speaks for itself.

6  BY MR. JEW:

7      Q   And you then replied "horn honking"; is

8  that correct?

9      A   Yes, sir.

10     Q   He then says, at 43 minutes and 21 seconds

11  to 43 minutes and 30 seconds, "Oh, illegally honking

12  the horn, if you want to, um, because everybody does

13  it, if you feel like it and don't have any cites,

14  warn them; if you don't, well, it's up to you.

15  Whatever you choose to do, it's your choice and I'll

16  back your play"; is that correct?

17     A   Yes, sir.

18     Q   What did you understand Lieutenant Muncy to

19  mean when he said "everybody does it"?

20     A   That -- I'm assuming he means that all the

21  protestors have been honking their horn or people in

22  support of or whatever, why they're honking their

23  horn.

24     Q   And you wrote Ms. Porter a ticket for

25  honking her horn, unreasonable use of horn; is that

Contains Confidential Portion

Page 131

1   correct?

2        A    Yes, sir.

3        Q    At the time, why didn't you let Ms. Porter

4   go with a warning?

5        A    While I was sitting there, I was watching

6   and as she approached, it was a lot of honking, more

7   so than what I had heard or remembered hearing.  It

8   was unsafe, people are crossing the street, people

9   aren't looking, there's cheering, I hear people on

10  loudspeakers, so by honking the horn and laying on

11  the horn, you're diminishing the effectiveness if

12  there's an emergency.  If people are just hearing

13  horn honking and they're hearing people just --

14  they're not going to be paying attention to hey, this

15  might be -- there might be somebody approaching,

16  they're honking their horn, somebody not paying

17  attention while crossing the road and then they get

18  hit.

19            MR. JEW:  Court reporter, can you please

20  repeat his answer.

21             (The requested portion of the record was

22  read by the reporter at 1:28 p.m.)

23  BY MR. JEW:

24       Q    Mr. Klein, you said it was unsafe when she

25  was honking her horn; what made you believe it was

Page 132

1    unsafe?

2         A    Because people are crossing the road,

3    people driving on that road 35, 40 miles per hour.

4         Q    When Ms. Porter was honking her horn during

5    this unsafe moment, how were you able to discern that

6    she was not honking her horn for a safety reason?

7         A    Because I was watching.  I didn't see

8    anybody.  When I stopped her, I said I stopped her

9    for what I said and she said a lot of people are

10   honking for the protestors.  It wasn't -- it wasn't I

11   was honking my horn because somebody was walking out

12   in the road, I was trying to avoid a collision.

13        Q    When you say that it was unsafe, though,

14   when she was honking her horn, what caused you to

15   believe that it was unsafe other than people crossing

16   the street?

17             MR. WHITE:  Objection, misstates prior

18   testimony.

19   BY MR. JEW:

20        Q    Let me rephrase.

21             What was going on at the time when she was

22   honking her horn that caused you to believe it was

23   unsafe?

24             MR. WHITE:  Same objection.

25        A    It was the amount of the honking.  It

Contains Confidential Portion

Page 133

1   wasn't driving by, one honk on the horn and continue

2   on, someone is -- when she's continuously hitting the

3   horn, it -- that's what drew attention to me watching

4   it.

5   BY MR. JEW:

6       Q    Could it have been the case she was honking

7   her horn to tell someone who was crossing the street

8   not get in front of her vehicle?

9           MR. WHITE:   Objection, calls for

10  speculation.

11      A    I don't think so, because when I asked her

12  or when I contacted her, she said a lot of people

13  were honking for the protestors.  She didn't say --

14  she didn't make any mention of hey, there was

15  somebody that came out.

16      Q    Going back to what you had just said, when

17  you said it was unsafe, she was honking her horn,

18  when you said she was "blaring her horn," is that

19  correct?

20      A    I don't remember the exact verbiage I just

21  used, but it was a lot more than what the other

22  people I had heard.

23      Q    When a horn is being blared, how do you

24  perceive -- what would that sound like?

25      A    A lot of honking the horn or --

Contains Confidential Portion

Page 134

1     Q   Successive honking?

2     A   Yeah.

3     Q   Holding the horn down?

4     A   Yes, sir.

5     Q   Did you hear Ms. Porter holding her horn

6  down?

7     A   No, sir.

8     Q   When you pulled Ms. Porter over, do you

9  recall what you told her when you approached her at

10  her window?

11     A   I told her why I had stopped her.

12     Q   And that was for unreasonable use of the

13  horn?

14     A   I told her I stopped her for, yeah, using

15  her horn.

16     Q   And why did you think that she was using

17  her horn improperly?

18     A   Because she said she was using it for the

19  protestors.

20     Q   But before she said that, had you already

21  formed that belief in your mind when you decided to

22  pull her over?

23     A   Yeah, that's why I made the traffic stop.

24     Q   And what do you think she was trying to

25  convey when you -- before you approached her window,

Page 135

1   what did you perceive she was trying to do by honking

2   her horn?

3           MR. WHITE:  Objection, calls for

4   speculation.

5       A   I didn't -- I don't know what she was

6   trying to do.

7   BY MR. JEW:

8       Q   But you didn't think it was for a safety

9   related emergency?

10      A   Yes, sir.  I did not think it was because

11  somebody had stepped out in front of her vehicle.  I

12  didn't see anybody that had stepped out.

13      Q   So it seemed like she was trying to

14  communicate something, then, when she was honking her

15  horn?

16          MR. WHITE:  Objection, calls for

17  speculation.

18      A   I don't know.

19  BY MR. JEW:

20      Q   But you were able to discern that by her

21  honking her horn, you did not believe she was

22  communicating an emergency?

23      A   I didn't see an emergency.  I was watching

24  the traffic.  I don't know what -- what she was

25  trying to communicate by honking her horn, but I

Page 136

1    didn't see anybody out on the road.

2        Q    So by not seeing any traffic hazard, you

3    were able to discern from the context that there was

4    no emergency when she was honking her horn?

5        A    Yes, sir.

6        Q    At the time she was honking her horn and

7    you pulled her over, did you personally believe she

8    was trying to communicate with the protestors?

9        A    I don't know what she was trying to do.  I

10   don't know why she was honking the horn.

11       Q    But it wasn't for an emergency reason?

12       A    Yes, sir.

13       Q    And you were able to discern that?

14       A    Yes, sir.

15            MR. WHITE:  Objection, asked and answered

16   multiple times.

17            MR. JEW:  Mr. Klein, I'm going to show you

18   footage from your body cam that starts at 51 minutes

19   and 9 seconds.  The video is now paused at 51 minutes

20   and 9 seconds, timestamped 17:53:37.  Mr. Klein, I'm

21   going to play this video for about a minute and 40

22   seconds.

23            (Video clip played.)

24            MR. JEW:  The video is now paused at 51

25   minutes and 50 seconds, timestamped 17:54:19.

Contains Confidential Portion

Page 137

1   BY MR. JEW:

2       Q    Can you please describe to me, Mr. Klein,

3   what you just saw in the video?

4       A    That was me issuing her -- giving her her

5   license and registration back and having her sign the

6   citation.

7       Q    And what was the violation that you cited

8   her for?

9       A    For using the horn.

10      Q    Under Vehicle Code Section 27001?

11      A    Yes, sir.

12      Q    What is your understanding of Vehicle Code

13  Section 27001?

14      A    Horns are only supposed to be used in

15  emergency situations.

16      Q    And that was your understanding at the time

17  of the incident?

18      A    Yes, sir.

19      Q    How did you come to believe that?

20      A    Well, I knew you weren't -- you're not

21  supposed to use a horn unless it's an emergency.

22  That's why I double-checked and made sure under the

23  Vehicle Code.

24      Q    How did you know you weren't supposed to

25  use your horn?

Contains Confidential Portion

Page 138

1      A    Because I looked up the law.

2      Q    Prior to this incident, had you ever cited

3  someone for unreasonable use of horn?

4      A    No, sir.

5      Q    This was the first time?

6      A    Yes, sir.

7      Q    How did you know there was a law

8  prohibiting the use of -- I'm sorry.

9           How did you know there was a Vehicle Code

10  section that prohibited the unreasonable use of horn?

11     A    I know that you're -- from your training,

12  from word of mouth, that you are only supposed to be

13  using your horn in emergency situations.  Just like

14  you know you can't punish somebody, you can't hit

15  somebody, you know that's illegal and then you

16  would -- if you don't know the exact Penal Code

17  section, then you would start looking up what would

18  be the most appropriate.

19     Q    Going back to Exhibit 3, which is the

20  citation that you wrote to Ms. Porter, it appears

21  that on the first page of the citation, which is

22  Bates stamped CSD0096, in the middle of that citation

23  it says "code in section," you wrote 27001A; is that

24  correct?

25     A    Yes, sir.

Page 139

1    Q   And the CVC after that is California

2    Vehicle Code I'm assuming; is that correct?

3    A   Yes, sir.

4    Q   And then you did a dash, "unreasonable use

5    of horn"; is that correct?

6    A   Yes, sir.

7    Q   And that's classified as an infraction?

8    A   Yes, sir.

9    Q   On the next page, which has been Bates

10   stamped CSD0097, you have your notes here; is that

11   correct?

12   A   Yes, sir.

13   Q   Can you please explain to me what your

14   notes are here?

15   A   So ID'd with CDL, California driver's

16   license; I wrote her statement and then I drew a

17   diagram of the vehicle, who is in the vehicle.

18   Q   Can you please state for the record what

19   you have in quotes that you believe she stated?

20   A   "Lots of people use their horns to support

21   the protestors."

22   Q   And why did you feel that you need to put

23   that in your notes?

24   A   If I -- for when I go to traffic court, I

25   will put a note of what the person said when I

Contains Confidential Portion

Page 140

1    contacted them.  So I'm putting in the notes that she

2    didn't say someone jumped out in the road and I was

3    trying to avoid a collision, because if it goes to --

4    when it goes to traffic court or if it goes to

5    traffic court and I have to testify, that helps

6    refresh my memory.  So when she says -- if she were

7    to say no, I told him that there was someone in the

8    road and I was honking my horn, then I could go back

9    and say well, according to my notes she had said

10   this.

11        Q   So did this note here, did this confirm the

12   probable cause you believe you had when you pulled

13   her over?

14        A   Yes.

15        Q   And what is that "S" on the top line?

16        A   Suspect ID'd with California driver's

17   license.

18        Q   And this little diagram you drew at the

19   bottom right says "WFA"?

20        A   Uh-huh.

21        Q   What does WFA stand for?

22        A   White female adult.

23        Q   Does the sheriff's department train you

24   guys to use acronyms like this?

25        A   Yeah, we use those acronyms.  So for the

Contains Confidential Portion

Page 141

1   citation, that lets me know, when I go to court, that

2   there was a white female adult driver.  So if someone

3   shows up with -- somehow makes her ID and it's a

4   black female juvenile, I would say no, that's not the

5   person I issued a ticket to.  It also lets me know if

6   she were to show up at traffic court and they would

7   say well, I had three people in my car, I would say,

8   well, according to my notes there was only one person

9   in the vehicle.  So I would put, on the next box, if

10  she had her husband, if she's married, like white

11  male adult, or if she had someone in the back seat.

12  So it would just designate to say, okay, if someone

13  showed up to court, that could have been the person.

14      Q    And where on a Notice to Appear does this

15  note section show up -- I'm sorry, let me rephrase

16  that.  Strike that.

17           When you write someone -- when you give

18  someone a Notice to Appear, do you also give them

19  your deputy notes?

20      A    No, that goes on the back of the citation.

21  So it's a triplicate.  So they will get the yellow

22  copy, and then when I would go to court, if it were

23  to go to traffic court, they would have that ticket

24  set aside and then they would give it to you prior to

25  going to court just so you can review your notes.

Page 142

1    Q    Are you aware of whether or not Ms. Porter
2    appealed or showed up to court?
3    A    No, I'm not.
4    Q    Did you go to court to -- at any time in
5    relation to this ticket that you wrote?
6    A    No, sir.
7    Q    And if I represent to you that Ms. Porter
8    did, in fact, go to court to contest this ticket and
9    I asked you why you decided not to show up, why did
10   you not decide to show up?
11   A    I couldn't tell you.
12   Q    So taking that a step back, when you write
13   a ticket to somebody and they want to contest it or
14   they don't want to pay the fine and they show up to
15   court to contest it, how are you notified to go to
16   court?
17   A    We're given a subpoena.  But traffic court,
18   sometimes you don't -- it's not like at criminal
19   court where a felony or misdemeanor where you are
20   required to show up.  You're given the subpoena and
21   if you can make it, you go.  If you don't, then they
22   usually will throw the ticket out.
23   Q    And you don't recall ever receiving a
24   subpoena in relation to the citation?
25   A    I probably did.  I don't remember.  I know

Contains Confidential Portion

Page 143

1   I didn't go to court.

2       Q    And by choosing not to go to court, you are

3   aware that the ticket is going to get thrown out; is

4   that correct?

5       A    Yes.

6       Q    Did you discuss the court date with anybody

7   for this ticket?

8       A    No, sir.

9       Q    How often do you write a ticket and receive

10  a subpoena and choose not to go to court?

11      A    Well, I work at night, so most of the time

12  court is in the morning, so I'm usually getting off

13  at 3:00 a.m.  If traffic court is at 8:00 a.m., I,

14  most of the time, don't end up making it because of

15  my schedule.

16      Q    Does the sheriff's department have a

17  specific quota of tickets that you need to write in

18  any given day?

19      A    No, sir.

20      Q    In any given month?

21      A    No, sir.

22      Q    Year?

23      A    No, sir.

24      Q    Do you -- is there a policy from the

25  sheriff's department that requires you to attend

Contains Confidential Portion

Page 144

1    these court hearings when someone shows up to court

2    to contest a citation?

3        A    I don't know the specific -- what the

4    specific policy section is or says.

5        Q    So in your mind, you believe it's

6    discretionary to contest tickets?

7        A    To show up to traffic court?

8        Q    Correct.

9        A    Yes, sir.

10       Q    Have you -- are you aware of any other

11   sheriff's deputy who has been reprimanded for not

12   showing up to traffic court?

13       A    No, sir.

14       Q    Have you personally ever been reprimanded

15   for not showing up to traffic court?

16            MR. WHITE:   Objection.   Objection, calls

17   for personnel information made confidential by

18   California Penal Code 832.5, 832.7 and 832.8,

19   protected by the Peace Officer's Bill of Rights, the

20   Official Information Privileges and/or privacy rights

21   of the witness.   I instruct the witness not to answer

22   based on those objections.

23   BY MR. JEW:

24       Q    Mr. Klein, are you choosing not to answer?

25       A    Yes, sir.

Contains Confidential Portion

Page 145

1      Q    Going back to Exhibit 3, Mr. Klein, are you

2  able to discern from this when the court date was

3  scheduled?

4      A    12/12/2017.

5      Q    And after you wrote this citation, did you

6  discuss this citation with anybody in the department?

7      A    Not that I remember.

8      Q    Could it have been possible that you

9  discussed the citation with someone at the sheriff's

10 department?

11     A    I mean, I believe I told Lieutenant Muncy

12 that I had written X amount of parking tickets and a

13 moving violation and he was there.

14     Q    Are you -- I'm sorry, go ahead.

15     A    But specifically talking about this ticket,

16 no, not that I remember.

17     Q    Did you discuss this 12/12/17 court date

18 with anybody, to your recollection?

19     A    No, sir.

20     Q    Are you aware that Lieutenant Muncy was

21 interviewed by a reporter regarding the Issa protest?

22     A    No, sir.

23     Q    Are you aware of any publication by any

24 news outlet regarding the Issa protest?

25     A    No, sir.

Contains Confidential Portion

Page 146

1    Q   Were you ever contacted by a reporter to

2  comment on the Issa protest?

3    A   No, sir.

4        MR. JEW:  Mr. Klein, I'm going to show you

5  what we will mark as Exhibit 6.

6        (Exhibit 6 was marked for identification.)

7  BY MR. JEW:

8    Q   Mr. Klein, please take time to review this

9  document and let me know when you finish.

10   A   Okay.

11   Q   Mr. Klein, what is this document?

12   A   It's a printout of the California Vehicle

13 Code Section 27001.

14   Q   And do you have any reason to believe that

15 this is not the California Vehicle Code Section

16 27001?

17   A   No, sir.

18   Q   Is this a fair and accurate representation

19 of the California Vehicle Code Section 27001?

20   A   Yes, sir.

21   Q   Now, going back to Exhibit 3, in the middle

22 of the citation, it appears that you cited Ms. Porter

23 for violation of 27001A; is that correct?

24   A   Yes, sir.

25   Q   And the reason -- the description on the

Contains Confidential Portion

Page 147

1   citation says "unreasonable use of horn"; is that

2   correct?

3        A    Yes, sir.

4        Q    Now, going back to Exhibit 6, which is the

5   statute that I just gave you, can you please read out

6   loud, for the record, Subsection A of 27001.

7        A    "The driver of a motor vehicle, when

8   reasonably necessary to ensure safe operation, shall

9   give an audible warning with his horn."

10       Q    Now, going back to the citation, Exhibit 3,

11  you cited Ms. Porter for violation of 27 A (sic),

12  unreasonable use of horn.

13            How do you read Subsection 27001A as

14  prohibiting unreasonable use of horn?

15       A    Because it wasn't being used to ensure safe

16  operation while driving.

17       Q    In your reading of the statute, does it say

18  that that is the only reason one may use their horn?

19       A    In the Subsection B, which is more of the

20  definition, "the horn shall not otherwise be used

21  except as theft alarm system which operates as

22  specified in Article 13."  So the B section is, from

23  what I understand, is just the -- a definition.  I

24  don't know if it's an infraction.  Sometimes some

25  sections will be reference sections, so you won't

Page 148

1   cite for a reference section.  So I don't know if

2   this is -- if the B section is a reference section.

3       Q   Were you ever trained by the police academy

4   or the sheriff's department on this particular

5   section?

6       A   Not that I recall specifically this

7   section.

8       Q   Now, going to Subsection B, you had

9   mentioned -- it says "the horn shall not otherwise be

10  used except as a theft alarm system"; is that

11  correct?

12      A   Yes, sir.

13      Q   What is a theft alarm system?

14      A   A car alarm.

15      Q   Do you know how a car alarm sounds?

16      A   Like a horn.

17      Q   Like one single horn?

18      A   No.  Most of the time it's usually a lot of

19  beeping, or horn noises I should say.

20      Q   Are you able to discern the difference

21  between a theft alarm system and a honk that shall

22  give audible warning with his horn?

23      A   Um --

24      Q   Let me rephrase that.

25          Are you able to discern the difference

Contains Confidential Portion

Page 149

1   between a theft alarm system -- let me rephrase that

2   again.

3           Are you able to discern the difference

4   between the sound of a theft alarm system and the

5   sound of one honking their horn?

6       A   A theft alarm system, they can sound

7   different.  It could be, like, whaling noises, it

8   could be the loud "erk" noise.  I think the alarm

9   system is different than a honking horn.

10      Q   How is it different?

11      A   It would depend on the type of vehicle.

12      Q   Does it go on longer than a normal horn

13  honk?

14      A   Yes.

15      Q   How much longer?

16          MR. WHITE:  Objection, calls for

17  speculation, vague and ambiguous.

18      A   I don't know.

19  BY MR. JEW:

20      Q   Going back to Subsection A of Exhibit 6 of

21  the statute, when you were citing someone for

22  violation of the statute, how are you able to

23  determine whether or not someone honked their horn to

24  ensure safe operation?

25      A   In this instance?

Contains Confidential Portion

Page 150

1      Q   Generally.

2      A   Well, the -- if you don't see a pedestrian

3  walking in the roadway or if there's not a collision

4  that's about to occur and someone is honking their

5  horn.

6      Q   So you have to not only hear the horn is

7  what I'm hearing, you have to observe; is that

8  correct?

9      A   To issue a citation?

10     Q   Correct.

11     A   I would not issue a citation without seeing

12 the vehicle that I was planning on stopping.  If I'm

13 driving and I hear a horn honking as it's passing me

14 and I can't discern which vehicle it is, I wouldn't

15 stop the vehicle I thought it was just because I --

16 Oh, I thought I saw you or I thought I heard you

17 honking.  That wouldn't --

18     Q   Why not?

19     A   Because to issue the citation I would have

20 to see it.

21     Q   And why would you have to see it if --

22     A   You would have to see the violation being

23 committed on any moving violation.  If I'm at a stop

24 sign and I'm going to write --

25     Q   I'm sorry, go ahead.

Contains Confidential Portion

1      A    If I'm at a stop sign and I'm going to

2  write a stop sign ticket, I would need to see, okay,

3  where's the limit line, I would need to be able to

4  see and articulate, yes, I saw you roll that stop

5  sign, a California stop.  If I'm writing a speeding

6  ticket to someone, I would visually estimate what

7  their speed is, I would confirm it using my laser or

8  radar, we use lasers in the sheriff's department, so

9  I would confirm what I observed.

10     Q    Fair enough.  So walk me through your

11 thought process.  If you wanted to cite someone for

12 27001A, what's your thought process; you see someone

13 honk the horn first?

14     A    Yes, you initially hear a horn honking.

15     Q    Then what?

16     A    I would look to see, okay, first identify

17 which vehicle it was that was honking.  After I

18 identified the vehicle, I would see if there's a

19 reason; somebody in the street, a kid in the roadway,

20 a car coming at them, why they may have not -- why

21 they would be honking the horn and if I did not see

22 a -- anything that was -- that would be a -- that

23 was -- that they were trying to notify somebody, then

24 I would initiate the traffic enforcement stop.

25     Q    And when you say they were trying to notify

Page 152

1    somebody, you mean by conveying a message that --

2        A    Of an emergency.

3        Q    Of an emergency?

4        A    Yes, sir.

5        Q    Mr. Klein, have you ever heard a theft

6    alarm sound?

7        A    On a vehicle?

8        Q    Correct.

9        A    I've heard car alarms.

10       Q    Is that the same thing as a theft alarm?

11       A    I would assume, without looking at Article

12   13, commencing with Section 28085, that a theft alarm

13   and a car alarm would probably be the same.

14       Q    I'm sorry, what were you referring to just

15   now?

16       A    That Article 13, commencing with section --

17       Q    Ah, so Subsection B of 27001?

18       A    Yes, sir.  So I don't know -- usually in

19   the Vehicle Code they define, like, okay, this is

20   what a roadway is, this is what a vehicle is.  So I'm

21   assuming that is the theft car alarm system is

22   covered under that article, what the definition of a

23   theft alarm system is.

24       Q    Okay.  Have you ever heard a car alarm

25   personally go off?

Contains Confidential Portion

Page 153

1        A    Yes, sir.

2        Q    Has your own car gone off before?

3        A    Yes, sir.

4        Q    And what does that sound like?

5        A    It's like a -- it's usually -- my car, it's

6    like a whining noise, like a whaling noise, and then

7    the lights start flashing, the hazard lights on the

8    side and the headlights.

9        Q    Is there honking that goes on?

10       A    It's usually like a system, like a whining

11   and a honking noise and then there's another audible

12   noise that's different.  It would be like a cycle.

13       Q    Can you tell the difference between a theft

14   alarm -- strike that.

15            Can you tell the difference between a car

16   alarm and a horn that's telling someone to move?

17       A    A car alarm would generally be -- the

18   vehicle would not be moving.  So if the vehicle -- if

19   it's moving, it's because there's a key in the

20   ignition and someone's driving it.

21       Q    Could you tell the difference between a

22   theft alarm and somebody honking their horn to pick

23   their kids up from school?

24       A    I would think I could.

25       Q    How?

Contains Confidential Portion

Page 154

1     A    Just like I said, based on the noises.  My

2  car alarm personally, it's a cycle.  It would be a

3  whaling noise, a honking noise followed by another

4  loud audible noise, and it just continues that cycle.

5     Q    Prior to the day of the incident, had you

6  ever warned anybody for unreasonable use of horn?

7     A    Not that I recall.

8     Q    Do you recall ever thinking about warning

9  somebody for using their horn unreasonably?

10    A    Yes.

11    Q    You do recall?

12    A    I could say that in the past, yeah, I've

13  seen Vehicle Code violations and if I'm going

14  somewhere else, if I'm on another call thinking Oh,

15  that person should probably -- that person should

16  probably be issued a citation for a specific Vehicle

17  Code violation, not just any Vehicle Code.

18    Q    And in those situations when you're

19  thinking about warning someone in the past, how come

20  you never actually cited them for unreasonable use of

21  horn?

22    A    I don't know specifically, like I said.

23  But I thought -- usually it's because I'm going to a

24  call or I'm -- I'm occupied with something else going

25  on at work.  I've been on car accidents and people

Contains Confidential Portion

Page 155

1  have driven through my cone pattern and thought that

2  person probably deserves or that person should

3  probably get a ticket, however, I can't just jump in

4  my car and chase that person down.

5      Q   After the day of the incident, have you

6  ever cited anybody for violation of Section 27001?

7      A   No, sir.

8      Q   So the only time in your entire career with

9  the sheriff's department, the only time you've cited

10  anybody for violation of Section 27001 was

11  Ms. Porter?

12      A   Yes, sir.

13      Q   Do you observe -- strike that.

14          How often do you observe unreasonable use

15  of horn on your daily patrol?

16      A   Not very often.  And the reason that I

17  haven't stopped more people for it is because, again,

18  it's difficult if I'm driving or if I'm at an

19  intersection and I hear someone, let's say, hit the

20  horn one time, I might say, okay, somebody is honking

21  the horn over here.  Unless I can determine who it

22  is, I can't stop somebody because of -- and pull them

23  over and anticipate, hey, I stopped you because you

24  honked your horn and see what they say.  So I need to

25  know that it's that person.

Contains Confidential Portion

Page 156

1    Q   Do you think honking your horn not in
2  compliance with this statute is a big deal?
3         MR. WHITE:  Objection, vague and ambiguous.
4         MR. JEW:  Let he rephrase that.
5  BY MR. JEW:
6    Q   Do you personally think, Mr. Klein, that
7  honking your horn should warrant a ticket?
8    A   Yes, I do.  The reason we have horns on
9  vehicles is to notify people or to let people know
10 that hey, if someone's in the street, like I said, to
11 me it's a safety issue.  If they didn't have the
12 statute and people just drive around honking their
13 horns, laying on their horns all day, you would
14 become -- you would become numb to that noise and it
15 would lose its effectiveness for what it's designed
16 to be.
17   Q   So going back to your description of the
18 timeframe and the events that were surrounding your
19 citation of Ms. Porter, before you turned on your
20 lights and you flagged her down, you were able to
21 discern, at the time she was honking her horn, that
22 it was a nonsafe environment, there were protestors
23 walking; is that correct?
24   A   Yeah, there had been people walking around
25 the whole time.

Contains Confidential Portion

Page 157

1    Q   Is it possible that by honking her horn,

2  that she was notifying these protestors they were

3  walking -- strike that.

4        It is possible, by honking her horn, it was

5  for a safety reason because she didn't want to hit a

6  protestor?

7    A   No, I don't think so, because she said she

8  did it for the protestors.

9    Q   Had she not said that to you, could that

10  have been a reasonable reason given the situation?

11   A   Yeah, but I would have clarified that

12  before I issued the citation.

13   Q   How would you have clarified that?

14   A   I would have asked is there a reason you

15  honked your horn.

16   Q   Could she have possibly made the situation

17  safer by honking her horn so someone would not cross

18  the street as she was driving by?

19        MR. WHITE:  Objection, calls for

20  speculation.

21   A   I don't know.  I mean, it was what happened

22  in front of me is what I saw and that's why I

23  initiated the traffic stop.

24  BY MR. JEW:

25   Q   Let me rephrase this in terms of a

Contains Confidential Portion

Page 158

1   hypothetical.  If I personally am driving by a

2   protest on a single-lane road and there are a bunch

3   of protestors on both sides of the street, some

4   walking across, some not, and it's a crowded sidewalk

5   and I'm honking my horn as I drive by, could it be

6   possible by me honking my horn, I'm notifying them

7   not to step into the street?

8           MR. WHITE:  Objection, vague and ambiguous,

9   calls for speculation.

10      A    I would think it would be more of a

11  distraction to people, even not in a protest setting,

12  but if you're driving down the road and you're on

13  what you describe and someone's honking their horn a

14  bunch of times, people want to look and see what's

15  going on.  So I would think people are going to --

16  it's going to draw more attention to you than if you

17  just drove by and didn't make any noise.

18      Q    But if there are a lot of protestors on the

19  road, wouldn't it be good to draw attention to

20  yourself as you're driving by these protestors?

21      A    I would think it wouldn't be.

22          MR. WHITE:  When you get a second, can we

23  take a quick bathroom break?  It's a little past

24  2:00.  If you have a few questions on the same topic,

25  that's fine.

Contains Confidential Portion

Page 159

1          MR. JEW:  Just two or three more questions.

2          MR. WHITE:  Sure.

3    BY MR. JEW:

4      Q   Mr. Klein, have you ever cited anyone for

5    honking -- sorry.

6          Have you ever cited anyone for honking

7    under a different Vehicle Code section?

8      A   No, sir.

9      Q   Are you -- to your knowledge, are you aware

10   of any other Vehicle Code section that prohibits

11   unreasonable use of horn?

12     A   No, I'm not, sir.

13         MR. JEW:  We can take a break here.  Go off

14   the record.

15         THE VIDEOGRAPHER:  Off the record.  The

16   time is 2:02 p.m.

17         (Brief recess.)

18         THE VIDEOGRAPHER:  We're on the record.

19   The time is 2:16 p.m.

20          MR. JEW:  Mr. Klein, I'm going to show you

21   footage of your body cam on the day of the incident

22   that begins at 56 minutes and 28 seconds in.  The

23   video is now paused at 56 minutes 28 seconds.  The

24   timestamp is 17:58:56.  Mr. Klein, I'm going to play

25   the video for a little bit and please pay attention

Page 160

1    and we can --

2                (Video clip played.)

3                MR. JEW:  The video is now paused at 59

4    minutes and 20 seconds, timestamped 18:01:48.

5    BY MR. JEW:

6        Q   Mr. Klein, can you please describe what you

7    saw in that clip I showed you?

8        A   It was the postal worker driving by and

9    honking her horn.

10       Q   And you pulled her over for unreasonable

11   use of horn; is that correct?

12       A   Yes, sir.

13       Q   And in that video clip, she indicated to

14   you that she had previously honked her horn for the

15   protestors on prior Tuesdays; is that correct?

16       A   Yes.

17       Q   Did you end up writing her a ticket for

18   unreasonable use of horn?

19       A   No.

20       Q   Why not?

21       A   I don't have to write everybody tickets

22   that I stop.

23       Q   It's discretionary?

24       A   Yes, sir.

25       Q   Is there a reason why you felt like you

Page 161

1    didn't want to write her a ticket there?

2        A    Not particularly, no.

3        Q    Had you run out of tickets?

4        A    I don't -- I believe I still had tickets.

5        Q    And prior to you pulling her over, why do

6    you think the mail woman honked her horn?

7        A    I don't know.

8        Q    Did you perceive any traffic emergencies at

9    the time she honked her horn?

10       A    No, I didn't.

11       Q    What was the basis for your pulling her

12   over?

13       A    For the horn.  For honking her horn.  There

14   was no emergencies.

15       Q    How are you able to discern there were no

16   emergencies when she honked her horn?

17       A    Because I was facing the same direction as

18   she was, so I knew there was nobody in the road.

19       Q    Did she give you a reason for honking her

20   horn?

21       A    Yeah, I believe she said she honked every

22   Tuesday.

23       Q    And what message do you -- was the mail

24   woman conveying by honking her horn?

25            MR. WHITE:  Objection, calls for

Page 162

1    speculation.

2         A    I don't know.

3    BY MR. JEW:

4         Q    What do you understand her horn honking to

5    be?

6         A    She was honking and waving.

7         Q    To who?

8         A    To the protestors.

9         Q    What is your understanding of the rights of

10   persons who engage in free speech?

11        MR. WHITE:  Objection, calls for a legal

12   conclusion.

13        A    That they're allowed to have free speech

14   under the First Amendment.

15   BY MR. JEW:

16        Q    Do you know what free speech means?

17        MR. WHITE:  Same objection.

18        A    Yes.

19   BY MR. JEW:

20        Q    What does it mean to you?

21        A    That you're allowed to -- as long as it --

22   as long as it's not a danger to other people, you're

23   allowed to express your views, your religious

24   beliefs, your personal beliefs.

25        Q    Did you receive any training on First

Contains Confidential Portion

Page 163

1    Amendment right to free speech by the sheriff's

2    department?

3         A    Yes, sir, in the academy.

4         Q    In the academy?

5         A    Uh-huh.

6         Q    What did that training entail?

7         A    It was in our law classes where they went

8    over the amendments, and specifically, the ones

9    that -- that we, as law enforcement, will come into

10   contact with, the First Amendment, the Second

11   Amendment, Fourth Amendment.

12        Q    You mentioned law classes.

13             How many law classes do you take at the

14   academy?

15        A    I don't specifically remember.  I know

16   there was a few -- some of the classes are not --

17   like you don't go to class -- you might have a

18   four-hour block one day and you might not have that

19   class again for a week.  There's quite a few classes

20   I went to.

21        Q    About how many classes do you think you

22   attended that covered free speech rights?

23        A    At least one.

24        Q    But it could have been more than one?

25        A    It could have been more than one.

Contains Confidential Portion

Page 164

1     Q   More than five?

2     A   Yeah, it's a whole block, so there's

3  different learning domains and blocks.  So it could

4  have -- that learning domain could have been eight,

5  nine classes.  I don't know specifically.

6     Q   In these classes are you tested?

7     A   Yes, sir.

8     Q   Were you tested on free speech rights?

9     A   Yes, sir.

10    Q   Do you recall how many times you were

11 tested on free speech rights?

12    A   No, sir.

13    Q   Are you aware of whether or not the

14 sheriff's department has any policies or procedures

15 on how to handle a civilian's free speech rights?

16        MR. WHITE:  Object, calls for speculation.

17    A   I don't know.

18 BY MR. JEW:

19    Q   Have you personally seen any policy or

20 procedure regarding handling free speech rights?

21    A   No, not that I can recall.

22        MR. JEW:  Do you have anything -- I have

23 nothing further.

24        MS. SAGGAR-SHETH:  Can we go off the record

25 just for a minute?

Contains Confidential Portion

Page 165

1          MR. JEW:  Sure, let's go off the record.

2          THE VIDEOGRAPHER:  Off the record.  The

3    time is 2:25.

4          (Discussion was held off the record.)

5          THE VIDEOGRAPHER:  We're on the record.

6    The time is 2:28 p.m.

7

8                    EXAMINATION

9    BY MS. SAGGAR SHETH:

10        Q    Good afternoon, Deputy Klein.  My name is

11   Natasha Saggar Sheth.  I'm here on behalf of

12   Defendant Warren Stanley, Commissioner of the

13   California Highway Patrol in his official capacity.

14   I have a couple of questions for you.

15          I want to start by going back to the video

16   that plaintiff's counsel showed you.  And thank you

17   to plaintiff's counsel for allowing me to use this.

18   I'm going to take you to 40 minutes and 34 seconds in

19   the video, timestamp on the right is 17:43:03.  And

20   before I play it, I'm going to ask you to listen for

21   how many honks you hear.  This is right before --

22   I'll represent to you this is right before you

23   stopped Ms. Porter for unreasonable use of her horn.

24   So try to listen in and see if you can count, okay?

25        A    Yes, ma'am.

Contains Confidential Portion

Page 166

1      Q   I'm going to play the video now.  I'm going

2    to stop at 40 minutes 55 seconds, timestamped

3    17:43:24.  Did you --

4           MR. WHITE:  Is it possible to do it one

5    more time?

6           MS. SAGGAR SHETH:  Sure.  I'll go back

7    to -- was it 40 minutes and 34 seconds I had said?

8           MR. JEW:  You stopped at 40 minutes, 55

9    seconds.

10          MS. SAGGAR SHETH:  Okay, we're going back.

11          MR. WHITE:  17:43:03, that's what you said

12   last time.

13          MS. SAGGAR SHETH:  I'm going to start at

14   4036 this time which is still before the honking

15   begins.  It's at 17:43:05 and I'm going to play,

16   okay.

17          (Video clip played.)

18          MS. SAGGAR SHETH:  And I stopped again at

19   4055.  And at this point in the video, I'll

20   represent, for the record, that you have turned your

21   vehicle around and about to stop Ms. Porter.

22   BY MS. SAGGAR SHETH:

23      Q   Are you able to tell how many times you

24   heard honking?

25      A   Both times I hear about 14.

Contains Confidential Portion

Page 167

1    Q   Is that consistent with your recollection
2  of what you heard at the time?
3    A   Yes, sir -- yes, ma'am.  Sorry.
4    Q   That's okay.  You've been saying yes, sir
5  all day.  And thank you for that.  I wanted to get
6  that clear for the record.
7        And the rest of my questions pertain to the
8  CHP.  And when I say "CHP," you understand I'm
9  referencing the California Highway Patrol?
10   A   Yes, ma'am.
11   Q   On the day of incident, October 17, 2017,
12  were there any officers at the protest outside of
13  Representative Issa's office?
14   A   Not that I saw, ma'am.
15   Q   Do you have any reason to believe they
16  would be there or they were there?
17   A   No, ma'am.
18   Q   Do you have any reason to believe that CHP
19  officers are present at any of the other protests
20  that happen weekly outside of Representative Issa's
21  office?
22   A   No, ma'am.
23   Q   To your knowledge, did CHP direct the San
24  Diego County Sheriff's Office to go out to the
25  protest on October 17, 2017 and enforce the Vehicle

Contains Confidential Portion

Page 168

1   Code?

2          MR. WHITE:  Objection, calls for

3   speculation.

4          A   No, ma'am.

5   BY MS. SAGGAR SHETH:

6          Q   To your knowledge, did the CHP offer any

7   input or otherwise direct the San Diego County

8   Sheriff's Office as to how to respond to the protest

9   on October 17, 2017?

10         A   No, ma'am.

11         Q   Did the CHP train or otherwise offer

12  guidance to you or anyone at the San Diego Sheriff's

13  Office on Vehicle Code Section 27001?

14         MR. WHITE:  Objection, calls for

15  speculation.

16         A   No, ma'am.

17  BY MS. SAGGAR SHETH:

18         Q   Did CHP train the San Diego County

19  Sheriff's Office on how to manage protests generally?

20         MR. WHITE:  Same objection.

21         A   I don't know.

22  BY MS. SAGGAR SHETH:

23         Q   Did you receive training from the CHP on

24  how to manage protests?

25         A   No, ma'am.

Contains Confidential Portion

Page 169

1    Q   To your knowledge, did the CHP participate

2  in drafting any policies that the San Diego County

3  Sheriff's Office has related to the enforcement of

4  Vehicle Code Section 27001?

5    A   No, ma'am.

6    Q   Did you ever communicate with anyone at the

7  CHP about the events of October 17, 2017?

8    A   No, ma'am.

9    Q   Did you ever communicate with anyone at CHP

10 about the enforcement of Vehicle Code Section 27001

11 generally?

12   A   No, ma'am.

13       MS. SAGGAR SHETH:  That's all I have for

14 you.  Thank you.

15       MR. JEW:  I have some further questions.

16

17                    RE-EXAMINATION

18 BY MR. JEW:

19   Q   Mr. Klein, did you attend any of the other

20 Issa protests other than the day of the incident?

21   A   No, sir.

22   Q   Could it be possible that a CHP officer may

23 have driven by those protests on those days?

24   A   It could.  I mean, I don't -- I don't -- I

25 don't know.

Contains Confidential Portion

Page 170

1    Q   You have no information or belief to

2  believe that a CHP officer was not ever present at

3  these protests; is that correct?

4    A   I'm sorry, one more time.

5    Q   Do you have any reason to believe that a

6  CHP officer never attended these protests?

7    A   I think I'm kind of confused by the

8  question.  Do I think that they may have been

9  there --

10   Q   Let me rephrase the question.  I apologize.

11        Is it possible that at these other protests

12 that you did not attend, that a CHP officer may have

13 been present?

14   A   Yeah, it's possible.

15   Q   Do you have any reason to believe that CHP

16 officers were never present during the protests?

17   A   I don't believe that they were.  It's a

18 traffic call within the City of Vista, so it's --

19 because we contract -- we're a contract city, it

20 would get dispatched to the traffic unit, not to CHP.

21   Q   And Mr. Klein, do you know if CHP enforces

22 the California Vehicle Code?

23   A   Yes, sir.

24   Q   Do you know if CHP can cite someone for

25 violation of Vehicle Code Section 27001?

Page 171

1       A    I don't know.

2       Q    You don't know if they have the ability to

3   cite someone for that section?

4            MS. SAGGAR SHETH:   Objection, lacks

5   foundation.

6       A    I don't know if they're -- if they do.   I

7   don't know -- if it's in the Vehicle Code book they

8   can.   Any law enforcement officer can cite somebody

9   for it.

10  BY MR. JEW:

11      Q    So regardless of whether you're CPH or --

12  strike that.

13           If you are CHP, you are able to enforce the

14  Vehicle Code?

15           MS. SAGGAR SHETH:   Objection, lacks

16  foundation.

17           MR. WHITE:   Go ahead.

18      A    I assume that they do.   I mean, I know that

19  they -- I see them write tickets, but I don't know

20  what sections they're citing for for certain things.

21  BY MR. JEW:

22      Q    Do you know if CHP uses a different Vehicle

23  Code when they're on duty?

24      A    I would imagine they don't.   It's the same

25  one.

Contains Confidential Portion

Page 172

1    Q   Do CHP -- have you ever participated in a
2  training or a police academy class or course with a
3  CHP officer?
4    A   Yes, I have.
5    Q   When?
6    A   When I went through the drug recognition
7  expert course that was -- that's handled -- the CHP
8  is in charge of that program.  So it was CHP
9  instructors and there are CHP officers there.
10   Q   Do you know if CHP and San Diego sheriff's
11 deputies attend the same academy?
12   A   They don't.
13   Q   They don't?
14   A   CHP is in Sacramento and the sheriff's
15 department is here.
16   Q   So each entity has its own police academy?
17   A   Yes, sir.
18   Q   Is there ever a situation where you attend
19 CHP's police academy for training?
20   A   No.  I think their academy is inhouse, so
21 anybody that gets hired with the CHP goes to the CHP
22 academy, but I don't know specifically if they allow
23 (indecipherable).
24   Q   Going back to when you testified that you
25 had taken a training course with the CHP officer in

Contains Confidential Portion

1   the past, what setting was that in?

2       A    It was a classroom setting.  Actually, I'm

3   sorry, when I went to the advanced roadside driving,

4   I believe that one also was a CHP instructor, but

5   those were classes related to DUIs.

6           MR. JEW:  Kad, do you have anything to add?

7   BY MR. JEW:

8       Q    Mr. Klein, so those classes that you just

9   mentioned, they were related to traffic enforcement?

10      A    DUI enforcement.

11      Q    Is that separate from traffic enforcement?

12      A    It wasn't -- the class wasn't related.  The

13  class was about impaired driving and impaired driving

14  training.

15      Q    Do you have any reason to believe why a CHP

16  officer would not enforce the Vehicle Code?

17          MS. SAGGAR SHETH:  Objection, calls for

18  speculation, lacks foundation.

19      A    No, sir.

20  BY MR. JEW:

21      Q    No reason to believe that?

22      A    Yes, sir.

23          MR. JEW:  No further questions.  Off the

24  record.

25          MR. WHITE:  Let's wrap it up.

Page 174

1    THE VIDEOGRAPHER:  Off the record.  2:38

2  p.m.

3        (Brief pause.)

4    THE VIDEOGRAPHER:  Back on the record.  The

5  time is 2:40 p.m.

6    MR. WHITE:  So off the record, Mr. Perez

7  was kind enough to point out that Deputy Klein

8  testified with respect to his employee ID number, not

9  his badge number, that may be confidential, and so

10  the parties have agreed to mark the portion of the

11  deposition transcript that is the question and answer

12  with respect to Deputy Klein's employee ID as

13  confidential and just have that page separately

14  prepared and marked confidential.  And then if it

15  needs to be used for some reason or anything else, I

16  guess, on that page needs to be used or that portion

17  of the video, then we can meet and confer regarding

18  the best way to do that.  Agreed?

19    MR. JEW:  Agreed.

20    MR. WHITE:  And then lastly, the transcript

21  will be prepared and either sent directly to our

22  office or sent to the noticing party's, and they will

23  send it to us so we can have Deputy Klein review and

24  sign the transcript, if it needs to be signed, in our

25  office or at his station, rather than going to the

Contains Confidential Portion

Page 175

1    court reporter for that.

2            MR. JEW:  Agreed.

3            MR. WHITE:  Off the record.

4            THE VIDEOGRAPHER:  This concludes today's

5    proceedings.  We're off the record at 2:42 p.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Contains Confidential Portion

Page 176

1                        I N D E X

2

3    WITNESS          EXAMINATION              PAGE

4    Deputy Kyle Klein

5                 By Mr. Jew                5

6                                          169

7            Ms. Saggar Sheth              165

8

9                    E X H I B I T S

10   NO.          PAGE        DESCRIPTION

11   Exhibit 1      9         Notice of Deposition

12   Exhibit 2     57         San Diego Sheriff's

13                            Department policy and

14                            procedure manual

15   Exhibit 3     66         Written citation

16   Exhibit 4     74         Flash drive with video

17                            footage

18   Exhibit 5    109         Printout of CAD

19   Exhibit 6    146         Printout of California

20                            Vehicle Coe Section 27001

21

22

23                CONFIDENTIAL SECTION

24                  PAGE TO PAGE

25                   26        26

Contains Confidential Portion

Page 177

1    STATE OF CALIFORNIA        )

2                              ) ss

3    COUNTY OF LOS ANGELES      )

4

5

6

7                  I, DEPUTY KYLE KLEIN,

8    hereby certify under penalty of perjury under the

9    laws of the State of California that the foregoing is

10   true and correct.

11        Executed this     day of             ,2019

12   at                                          ,

13   California.

14

15

16

17

18

19         _____

20                  DEPUTY KYLE KLEIN

21

22

23

24

25

Contains Confidential Portion

Page 178

1   STATE OF CALIFORNIA       )

                              ) ss

2   COUNTY OF LOS ANGELES     )

3        I, KATHERINE FERGUSON, Certified Shorthand

4   Reporter, for the State of California, do hereby

5   certify:

6        That prior to being examined, the witness named in

7   the foregoing deposition, was by me duly sworn to

8   testify the truth, the whole truth and nothing but the

9   truth;

10       That the testimony of the witness and all

11  objections made at the time of the examination were

12  recorded stenographically by me;

13       That the foregoing transcript is a true record of

14  the testimony and all objections made at the time of the

15  examination.

16       Before completion of the deposition, review of the

17  transcript [X] was [ ] was not requested.  If requested,

18  any changes made by the deponent (and provided to the

19  reporter) during the period allowed are appended hereto.

20       I hereby certify that I am not interested in the

21  event of the action.

22       IN WITNESS WHEREOF, I have subscribed my name this

23  5th day of December, 2019.

24  _____

25       Katherine Ferguson, CSR 12332

Contains Confidential Portion

Page 179

```
 1          ERRATA SHEET OF THE TRANSCRIPT OF:
 2     Case Name:        Susan Porter v. William D. Gore,
 3                       et al.
 4     Dep. Date:        November 20, 2019
 5     Deponent:         Deputy Kyle Klein
 6
 7                       CORRECTIONS:
 8     Pg.  Ln.      Now Reads        Should Read     Reason
       ___  ____     _____   _____  _____
 9
       ___  ____     _____   _____  _____
10
       ___  ____     _____   _____  _____
11
       ___  ____     _____   _____  _____
12
       ___  ____     _____   _____  _____
13
       ___  ____     _____   _____  _____
14
       ___  ____     _____   _____  _____
15
       ___  ____     _____   _____  _____
16
       ___  ____     _____   _____  _____
17
       ___  ____     _____   _____  _____
18
19                   _____
                     Signature of Deponent
20
21
       SUBSCRIBED AND SWORN BEFORE ME
22
       THIS_____DAY OF_____, 2019.
23
24     _____
25     (Notary Public)  MY COMMISSION EXPIRES: _____
```