# EXHIBIT 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SUSAN PORTER,

Plaintiff,

vs. Case No.18-cv-1221-GPC-JMA

WILLIAM D. GORE, Sheriff of San Diego County, in his official capacity; WARREN STANLEY, Commissioner of California Highway Patrol, in his official capacity,

Defendants.

---

VIDEOTAPED DEPOSITION OF SERGEANT WILLIAM BECK

Conducted Virtually

Tuesday, May 26, 2020

9:38 A.M. PDT

Remotely Reported by:
Debby M. Gladish
RPR, CCRR, CLR, CSR No. 9803
NCRA Realtime Systems Administrator

Job No. 10069309

is Debby Gladish, and she may now swear in the witness.

SERGEANT WILLIAM BECK,

having been sworn, testified as follows:

MS. O'GRADY: Excuse me a minute. I can't actually see the witness. I just see John.

THE TECHNICIAN: Do you see any other smaller videos or if you look at the top right of your screen there's something that --

MS. O'GRADY: No. I was seeing Bill earlier, but now all I see is your head.

THE TECHNICIAN: Okay. Do you have anything that looks like a grid or like a little -- a bunch of little squares.

THE REPORTER: Would you like to go off the record?

MR. JEW: Yes. Please go off the record while we troubleshoot.

THE TECHNICIAN: We're going off the record at 9:40 a.m.

(Off the record.)

THE VIDEOGRAPHER: Back on the record at 9:41 a.m.

**purposes. Do you see the cadets for anything other than instructional purposes?**

A. I mean, I physically see them every day, but my job is -- is to instruct them.

**Q. Understood. Thank you.**

**Sergeant Beck, have you published any professional papers?**

A. No.

**Q. Do you belong to any professional organizations?**

A. Let's see. I just -- I just joined one. It's like an instructor -- instructor organization, but I literally just joined it, like, a couple of weeks ago, and I forget what it's called. Sorry about that.

**Q. Okay. No -- no problem. Any --**

A. I have no history, per se, with them, no.

**Q. Okay. The CHP doesn't require you to join any professional organizations as a sergeant?**

A. No.

**Q. Any community outreach programs?**

A. Well, the CHP has a variety of community outreach programs, but my particular job at the moment is -- is cadet training so I'm not doing those at the moment, if that makes sense.

**Q. Understood. That makes perfect sense. Thank you.**

**Sergeant Beck, do you do any research?**

A. I --

MS. O'GRADY: Objection. Vague and ambiguous.

THE WITNESS: Yeah, can you be more specific?

BY MR. JEW:

**Q. Yes, I can. Do you currently do any research work?**

A. Currently, no.

**Q. Have you ever done any research work?**

A. I don't know if it's research work. Not specifically that I can think of research. No, I can't think of anything specific. I mean, I've looked things up, like, vehicle codes or laws and things like that, but no research work, per se.

**Q. Have you done any testing?**

MS. O'GRADY: Objection. Vague and ambiguous.

THE WITNESS: What do you mean by "testing"?

BY MR. JEW:

**Q. Have you ever done any scientific testing**

**to test any hypotheses?**

A. No, sir.

**Q. Have you done any testing related to anything you do with the CHP?**

MS. O'GRADY: Same objection.

THE WITNESS: In regards to research testing or little --

BY MR. JEW:

**Q. Yes.**

A. -- little unclear what you mean there.

**Q. Research testing related to any topic of the CHP, related to the CHP.**

A. Not that I can think of, no.

**Q. Sergeant Beck, have you ever attended any seminars related to the opinions that you are giving in this case?**

A. No.

**Q. Have you ever taken any courses or received any education regarding your expert opinions in this case?**

A. I'm sorry. You said "taken any courses"?

**Q. Yes. Let me -- sorry. That was -- let me ask that separate -- differently.**

**Have you ever taken any courses regarding your expert opinion in this case?**

A. I'm not sure I understand the question.

**Q. Let me rephrase.**

**Have you ever received any education regarding the expert opinions that you are going to provide in this case?**

MS. O'GRADY: Objection. Vague and ambiguous.

THE WITNESS: The only -- the only education I've received is just basically my academy training and then my experience on the job.

BY MR. JEW:

**Q. Have you ever taken any classes regarding the expert opinions that you going to give in this case outside of the academy?**

A. No.

**Q. And, Sergeant Beck, do you realize that you have been designated an expert in this case?**

A. Yes.

**Q. When did you learn that you would be designated as an expert?**

A. Ballpark -- I -- I'm not sure on the date. It seems like it's been a couple months.

**Q. And how did you learn that you would be designated as an expert in this case?**

A. Just talking with Ms. O'Grady, here.

**Q. Are you aware of whether you are up for a promotion or a raise?**

A. I'm not up for a promotion.

**Q. Are you aware of whether your chances of a promotion or a raise are affected by providing expert testimony today in this case?**

A. I'm not aware of that one way or another.

**Q. Are you aware of any potential effect your testimony may have on your employment with CHP?**

A. No.

**Q. Do any of your commanding officers know that you are taking a deposition today?**

A. Yes, my lieutenant.

**Q. Anyone other than your lieutenant?**

A. I believe my captain may know, but -- and he's, you know -- he's over my lieutenant, but outside of that no commanding officers that I know of.

**Q. Are you being compensated additionally and separately for testifying today?**

A. No.

**Q. What about testifying at trial?**

A. No.

**Q. And going back to your expert witness experience. How many times have you served as an**

**expert witness in a lawsuit?**

A. This is my first time.

**Q. And do you know what expert opinions you will be providing in this case?**

A. Yes.

**Q. Which expert opinions are those?**

A. I believe there's four. One was, in essence, whether or not horn honking can be distracting. The second one was if horn honking is legalized or it wasn't against the law and officers could not enforce it, would it lose its effect as a warning device for the safe operation of a motor vehicle.

The other one was in regards to, is the state statute of 27001, which is honk honking to ensure safe operation of the vehicle, is that a better statute to enforce than a local ordinance.

And the last one was, in essence, the difference between 27001 of the vehicle code and 415(2) of the penal code and basically the difference between the two in regards to enforcing them.

**Q. Anything else?**

A. That's all I'm aware of.

**Q. And do you anticipate offering these same**

**expert opinions at trial if we get to trial?**

A. Yeah. Sure. Yes.

**Q. Any other opinions you might offer at trial?**

A. I don't have any opinions except basic for the ones you guys asked me. That's it.

**Q. Understood. Thank you.**

**As of the time of your expert designation, Sergeant Beck, what steps have you taken to support these opinions?**

A. You know, I -- I'm just -- I'm just testifying based on my own experiences and my own opinions.

**Q. Have you done any research?**

A. No.

**Q. Any reading?**

A. No, just the vehicle code section itself and the penal code section, but no research or anything like that related to this.

**Q. Any interviewing of anybody?**

A. No.

**Q. Anything else that I'm missing that you've done to prepare for your expert opinion?**

A. No. I'm just coming in with what's in my head from experience and my own knowledge. That's

it.

Q. Understood. And -- and earlier, Sergeant Beck, you said that -- when I -- when I had asked you that was all that you would be testifying to in terms of your expert opinions, you said, "That's all I'm aware of." What is the basis of your awareness?

A. Well, those four thing that I just mentioned, that's all that I'm aware of that I'm testifying to.

Q. And who made you aware of your -- your testimony on those points?

MS. O'GRADY: Objection. Vague and ambiguous.

MR. JEW: Okay. I'm going to introduce an exhibit. Let me pull it up and I'll screen share.

John, this is going to be the document titled, "Defendant Stanley Amended Expert Witness Disclosure."

(Plaintiff's Exhibit 1 marked.)

BY MR. JEW:

Q. Sergeant Beck, I'm sharing my screen with you right now. Do you see the document in front of you?

A. Yes.

Q. Do you see where I'm highlighting the text?

A. Yes.

**Q. And it says, "DEFENDANT COMMISSIONER STANLEY'S AMENDED EXPERT WITNESS DESIGNATION"; is that correct?**

A. Yes.

**Q. Have you seen this document before?**

A. Yes.

**Q. Were you involved in preparing this document?**

A. No.

**Q. You were not?**

A. No.

**Q. And let's see here.**

**It says here at page 2, beginning at line 4 -- I'm highlighting the text for you -- "Sergeant Beck is expected to testify on the subject of the state's interest in being able to enforce Vehicle Code section 27001 as a matter of public safety."**

**Is this an accurate statement of the scope of your retention as an expert witness?**

A. Yes.

**Q. Is there anything else that you believe you'll be testifying to?**

A. Just, you know, like I said, Mr. Jew, just

four separate paragraphs that talk about -- yeah, that right there.

**Q. Right, right, right. Understood.**

**So the four points that you had previously mentioned; correct?**

A. That's correct.

**Q. Did you have any input into the comments or -- into the contents of this document?**

A. Okay. Yeah, so I did review this document.

**Q. Before you reviewed the document, as it was being written, did you -- did you offer any input as to how these paragraphs should be drafted?**

A. Not specifically. I -- I -- from what I recall, I recall talking about the certain things that I would be able to testify to, but the actual preparing of the document itself, I didn't prepare it, the language of it, just reviewed it.

**Q. Understood. So other than the four paragraphs and the four points in this document you don't plan on testifying as to any other expert opinions in this case; is that correct?**

A. That's correct.

**Q. And did you provide any input into the substance of the document before you reviewed it?**

MS. O'GRADY: Objection. Asked and

answered.

BY MR. JEW:

**Q. You can answer -- yeah. You can answer the question.**

A. Yeah, yeah. Like I said, I -- I remember us talking about the subjects that I would be able to testify to per se. So I guess if that's your question. I didn't prepare the document, but we talked about the topics that I would be testifying to. Does that make sense?

**Q. That makes sense. Thank you.**

A. Okay.

**Q. And, Sergeant Beck, do you think that there's -- do you think that there's anything difficult or complicated to understand about your opinion?**

A. I hope not. I -- I think it will -- I will be straightforward.

**Q. Understood. And does any part of your opinion require scientific or technical knowledge?**

A. No.

**Q. Do you understand what a layperson is, Sergeant Beck?**

A. I believe it's -- a layperson would just be somebody who may not have the knowledge or expertise

on a subject. That's what you're getting at.

**Q. Yup. That's exactly what I'm getting at.**

**And do you believe a layperson could easily understand your opinions?**

A. I believe so.

**Q. Is there any part of your expert opinion a layperson would need help understanding?**

A. Not that I know of.

**Q. And how does your expert opinion help a layperson's understanding of this case?**

A. Um, I don't know. I -- I think I would just try to put it in straightforward terms that the average person would be able to understand.

**Q. And, Sergeant Beck, have you ever provided an opinion like this before whether related to a legal proceeding or not?**

A. No.

**Q. Have you ever testified in a case involving facts similar to this case?**

A. No, just the previous deposition for this case specifically, but not another.

**Q. And are you aware of any other cases with similar facts?**

A. No, I'm not.

**Q. And, Sergeant Beck, you don't have a law**

**degree, do you?**

A. No.

**Q. And you agree you're not here to offer any legal opinions; correct?**

A. Legal opinions? In what way? I -- I -- I guess not for -- not as a lawyer, no.

**Q. Understood. And you had mentioned earlier that was your first time testifying as an expert; is that correct?**

A. That's correct.

**Q. And in terms of your expert testimony today, what subject matters do you claim to be qualified as an expert in regard to?**

A. I would say vehicle code. I would say that it's hard to be an expert in the vehicle code because it's so big, but I would -- I would argue that I would know more than the layperson.

**Q. Any other subject matters that you claim to be qualified in?**

A. I mean, various accident investigation would be one. I -- I would say some various criminal law topics. But currently I'm not working in that department. I'm just working for vehicle code and accident investigation.

**Q. Understood. Anything else, Sergeant Beck?**

A. No. I would just say, you know, for the department specifically, for the CHP, I'm just the expert on vehicle code.

**Q. And what qualifies you as an expert in the vehicle code?**

A. Just my position as a sergeant in the vehicle code, it would -- it would -- it would basically just be on experience within the department.

**Q. And -- and you're still seeing the screen in front of you; is that correct?**

A. Yes.

**Q. And in this page 2, beginning at line 5 through 7, it says, "His testimony will be based on his 24 years of experience working for the CHP."**

**Do you see that?**

A. Yes.

**Q. Was -- were you aware of the vehicle code for those 24 years?**

A. Yes.

**Q. For all 24 years?**

A. Yes.

**Q. And were you trained on the vehicle code in your first year of experience with the CHP?**

A. Yes.

**Q. And earlier you testified, Sergeant Beck, that you would deem yourself expert on the vehicle code. What specific aspects of the vehicle code, if any, are you an expert in?**

A. That's a great question. It's a -- it's such a large document. As you know, it's 40,000-plus codes, so I have to look up codes just like any other officer would. It's just, I think, repeated use of certain codes, having a work knowledge of those codes, you know, would -- would make me an expert or know more than the average officer in the vehicle code.

**Q. Do you claim to be an expert in the history of the vehicle code?**

A. No.

**Q. You claim to be an expert in the interpretation of the vehicle code?**

A. The interpretation? That would be different vehicle code section by vehicle code section. I give an opinion, if I'm asked, on what a specific section means. So for some purposes, yes.

**Q. So hypothetically if a cadet had a -- had a question about a particular vehicle code section you would be the person to ask about the interpretation of that vehicle code section?**

A. Yes. They would ask me or another officer that works in my unit.

**Q. An -- an officer that is the same rank as you or below or above?**

A. Below.

**Q. Is there anyone higher ranking than you that would be an expert in the vehicle code?**

A. I'm -- I'm sure there are. I don't want to say whether certain people are experts or not, but I would -- I would believe that -- I would believe that every CHP officer, you know, would know more than the average person about the vehicle code.

**Q. And, Sergeant Beck, do you claim to be an expert in Vehicle Code section 27001?**

A. I know what the -- I know, in essence, what the code says, yes.

**Q. But do you claim to be an expert in that section of the vehicle code?**

A. I -- I know -- I don't -- maybe I should ask you, Mr. Jew, I don't really know your definition of what an expert is versus what I'm thinking it is.

**Q. Sure. Let me clarify. Let me clarify for you.**

**So when I ask you, do you claim to be an**

**expert in Vehicle Code section 27001, I guess I'm asking you do you claim to be an expert in knowing why Vehicle Code section 27001 was enacted?**

A. No, I do not.

**Q. Are you aware of the various times that it's been amended over the years?**

A. No.

**Q. Are you aware of the last time that Vehicle Code section 27001 was amended?**

A. No.

**Q. And do you have the same level of expertise and knowledge with respect to Vehicle Code 20 -- Vehicle Code section 27001 as you do with the entire vehicle code?**

MS. O'GRADY: Objection. Vague and ambiguous.

THE WITNESS: In relation to --

BY MR. JEW:

**Q. Let me rephrase.**

A. Okay.

**Q. Yes. Let me rephrase.**

**Do you -- do you have the same level of knowledge with respect to Vehicle Code section 27001 as you would with any other particular section of the vehicle code?**

A. So, yeah, like I said before, I would know possibly what a specific section says in today's standards, but when they were enacted or when they were amended, no, I would not.

**Q. Is there a particular vehicle code section that you claim to have more knowledge in than section 27001 today?**

A. In regards to when it was enacted and amended or --

**Q. No. In regards -- in regards -- in regards to just basic knowledge. For example, if you just know a particular vehicle code section that's consistently violated on a day-in day-out basis, perhaps you may know more about that section than you would Vehicle Code section 27001.**

A. Okay. I understand your -- I understand that. Yes, so I -- I have familiarity with a lot of vehicle code sections, if -- if that's what you're asking, that I'm more familiar or -- or that are more common, yes.

**Q. And can you give me an example of one that you're more familiar with compared to Vehicle Code section 27001?**

A. More familiar? Mr. Jew, did you mean, like, ones that I've seen violated more or I -- or

what did you mean by that?

**Q. Yeah. Correct. The ones that you are more familiar with in the sense that it's violated more.**

A. Okay. I understand what you're saying. So speeding, exceeding the maximum speed limit of 65 miles per hour. California, the state law says that you cannot exceed 65 miles per hour unless the roadway is posted 70. The Vehicle Code section is 22349(A). There's one. I can give you another one, if you'd like.

**Q. Yeah. Sure. Just give me another example.**

A. Safety belt, 27315(d), David, (1), is a mandatory seat belt law in the state of California, was enacted in 1986. And --

**Q. Right.**

A. -- prior --

**Q. I'm sorry. For both of those examples that you just gave me, are you reading off anything in front of you or did you know those vehicle code sections off the top of your head?**

A. I know them off the top of my head.

**Q. And prior to your involvement in this case, did you know Vehicle Code section 27001 off the top of your head?**

A. I knew the -- I knew the law, but I didn't

know the number off the top of my head, if that makes sense.

**Q. That makes sense. And -- and what -- what was your understanding of the law before looking up the actual vehicle code section?**

A. Just that, in essence, using the horn unnecessarily is against the law.

**Q. And what was your understanding of "unnecessarily" before you actually looked up the vehicle code?**

A. Just using it when it wasn't for -- for traffic safety purposes, using it for other means than to warn somebody of a traffic safety issue.

**Q. Before you looked up the vehicle code section, were you aware that there was a carve-out for use of the theft alarm?**

A. No, actually didn't know that. I never thought of that, actually.

**Q. And, Sergeant Beck, did your understanding of Vehicle Code section 27001 change after you actually looked up the vehicle code section and read it?**

A. I guess just how -- how it's worded changed a little bit. I used to think of it unnecessary use of the horn, but, you know, after reading it, it

says, you know, the driver could use it to ensure safe operation of a vehicle. So just the wordage changed.

**Q. Understood. And going back to your claim to be an expert on the vehicle code, did you receive any specific training on the vehicle code? I know you mentioned that you were, you know, you received training in the academy. Did you receive any other training?**

A. Academy training in the vehicle code and then we have an annual legislative update that is -- basically talks about new laws that are coming out for the new year.

**Q. And at this -- I'm sorry. Go ahead.**

A. No. Go ahead.

**Q. And -- and at these annual legislative updates, do you guys ever talk about existing laws?**

A. No.

**Q. Do you recall ever discussing sections 27001 at any of these annual legislative updates that you've attended?**

A. No. And, Mr. Jew --

**Q. Are you aware of --**

A. -- your -- your previous question --

**Q. Go ahead.**

A. Sorry about that. Your previous question about do we discuss current laws, I guess we would discuss them if they're amended.

**Q. Okay. And are you aware if Vehicle Code section 27001 was ever discussed at any of these annual legislative updates?**

A. I don't recall any.

**Q. Other than the -- the two instances of training that you just mentioned, your academy training on the vehicle code and these annual legislative updates, is there anything else where you received specific training on the vehicle code?**

A. Just my FTO program when I was a -- when I was a new officer. All new officers go through an FTO program where they learn from a more-experienced officer.

**Q. And how long did you participate in the FTO program?**

A. That's a good question. Let me think. I don't remember. It was -- I want to say it was ballpark, like, two or three months.

**Q. So other than your academy training, these annual legislative updates, the FTO program, any other thing -- or any other specific training on the vehicle code?**

A. Not that I can think of right now.

**Q. Do you take any continuing education programs or seminars regarding the vehicle code in your current capacity as sergeant?**

A. No.

**Q. What was your previous position before you reached the rank of sergeant?**

A. I was an officer.

**Q. And during your time as an officer, did you receive any specific continuing legal education regarding the vehicle code?**

A. Just the same stuff that I mentioned before.

**Q. Understood. What -- what else qualifies you as an expert on the vehicle code, Sergeant Beck? Did we leave anything out other than your experience and these -- these trainings you just mentioned?**

A. That's all I can think of right now.

**Q. Have you reviewed any documents or communications regarding the vehicle code other than what we just mentioned? And -- and I'm sorry. Let me rephrase that. Strike that question.**

**Other than your specific academy training, the annual legislative updates, your FTO program, and your just general 24 years of experience, have**

**you reviewed any documents or communications outside of those circumstances regarding the vehicle code?**

A. Not that I can think of right now.

MS. O'GRADY: Counsel, do you want to ask him what the FTO stands for just for the record for clarification?

MR. JEW: Yes. Thank you. Thank you, Sharon.

BY MR. JEW:

**Q. Sergeant Beck, can you please spell out what "FTO program" means?**

A. It's just the -- FTO is field training officer.

**Q. Thank you.**

**Sergeant Beck, to your knowledge, have you ever been disqualified in a court of law from giving any expert opinions?**

A. No.

**Q. Have you ever been disqualified for giving lay opinions?**

A. Not that I can think of.

**Q. Have you ever done --**

A. I don't remember -- I don't remember.

MS. O'GRADY: I'm sorry. I think you just interrupted the witness.

THE WITNESS: I just want to make sure --

BY MR. JEW:

**Q. Yeah. I'm sorry.**

A. -- I understand what you're asking me. I don't remember ever being disqualified as a -- as a witness or in court or anything like that, if that's what you're asking.

**Q. That's what I'm asking. Thank you.**

A. Okay.

**Q. Have you ever been reprimanded in any court of law?**

A. No.

**Q. Have you ever participated in another lawsuit other than this one in which you testified as a lay witness?**

A. No, not that I recall.

**Q. To your knowledge --**

MS. O'GRADY: Just to clarify --

MR. JEW: I'm sorry, Sharon. Go ahead.

MS. O'GRADY: Are you talking about testifying at trial or in a deposition? I -- I -- I think maybe --

MR. JEW: Yeah. Yeah. No. Thank you for the clarification.

BY MR. JEW:

**Q. Sergeant Beck, have you ever testified as a lay witness at trial or in another deposition other than in this case?**

A. I want to understand what you guys are asking me. So the only thing I can think of is I've just been involved in my own cases. Does that make sense? Like, not me personally, but work-related cases that I've testified to, whether it's criminal or civil, but I don't remember ever being an expert witness like this, if that's what you're asking.

**Q. That -- that --**

A. Or --

**Q. That's what I'm asking.**

A. Okay.

**Q. Thank you.**

A. Uh-huh.

**Q. And, Sergeant Beck, to your knowledge, are you listed in any expert witness directories?**

A. No.

**Q. And, Sergeant Beck, do you care who prevails in this lawsuit?**

A. No. I'm just going to give you my opinion here.

**Q. And -- and going to your preparation for**

**today, what did you do in order to prepare for your deposition today?**

A. Just the document that I'm -- that you have on the screen right now. I reviewed that. And then I got a subpoena. I reviewed the subpoena. And then I reviewed my -- the deposition that we took a couple months ago here, I reviewed that.

**Q. I'm -- I'm sorry. Sergeant Beck, are you referring to the deposition transcript?**

A. Yes.

**Q. Anything else?**

A. No.

**Q. Going back to the screen in front of you. Going back to Exhibit 1 that I've introduced. Regarding your expert opinions described in these paragraphs, did you review any other materials related to these topics described in these paragraphs?**

A. No.

**Q. Did you review section 415(2) of the penal code?**

A. Not since the deposition. I know I did before the last deposition, but not since then.

**Q. Did you review Vehicle Code section 27001 since your last deposition?**

A. I think I've read that a couple times. I would say -- I would say couple, three times.

**Q. Understood. So two to three times between your last deposition and your expert deposition today?**

A. Right. And that's just -- that's just ballpark. I know I reviewed it.

**Q. Understood. And in your 24 years of experience with the CHP, were there any specific events that occurred that helped inform your opinions of this case?**

A. The case that we're -- that you guys are represent -- representing, I'm still not completely familiar with. I know there was a -- a horn-honking citation issued, but the specifics of the case I'm -- I'm not really sure of except it had something to do with a political rally.

**Q. And are you -- are you aware of what that political rally was for?**

A. It had -- it was some kind of political protest, but the details I'm not sure of.

**Q. Do you know who the target of the political protest was?**

A. I want to say -- I think I remember -- was it Darrell Issa? Is that -- is that his name?

**Q. That's correct. That's correct.**

A. Okay. Yeah.

**Q. And -- and are you -- and are you aware of who Plaintiff Susan Porter was protesting for or against?**

A. No. I -- I --

**Q. Understood.**

A. Through conversation, yeah.

**Q. I'm sorry.**

A. I don't know if she was in support of Mr. Issa or not. I'm not sure what -- what the protest actually was for. I just know there was a political protest, I want to say at his residence or something like that, but I don't know when it was in regards to.

**Q. Understood. Going back to this document in front of you on your screen, we were going through all the materials that you had reviewed to prepare for today. Is there anything else we may have left out?**

A. Not that I know of at the time, but right now I can't think of anything.

**Q. And were all of the documents that you reviewed provided to you by Ms. O'Grady?**

A. Yes. This one was. The subpoena and then

the transcript of the deposition, yes. Those were all provided by her.

**Q. What about Vehicle Code section 27001?**

A. When I -- when I -- when I want to review that, I just look in the vehicle code, just the actual vehicle code.

**Q. Were there any other statutes of the vehicle code that you looked at in relation to this case?**

A. I looked at 27000.

**Q. And what is your understanding of 27000?**

A. In essence, just that a horn is required on the vehicle.

**Q. Any other sections?**

A. Not that I can think of right at the time.

**Q. Were any materials provided to you recently?**

A. I think Sharon gave me copies just in case I lost any copies. I'm going to say that was a week or two ago she gave me copies, but it was same -- the stuff we're looking at today.

**Q. Did anything you do in preparation for today, did you look at any -- were -- were any documents provided to you within the last week?**

A. I don't know if the e-mail was in the last

week or not. I --

**Q. I don't want to get into the substance of your e-mails. I don't want to know about your -- the privileged communications you've had with your counsel. I'm just asking -- to be clear, I'm just understanding if any documents were transmitted to you to prepare for today within the last week?**

A. Yeah. Like I said, she sent me these documents that we're looking at now. I don't know if it was a week ago, maybe two weeks ago. I'm not sure.

**Q. Okay. But nothing else was provided to you by anyone else other than Ms. O'Grady?**

A. That's correct.

**Q. You didn't receive anything from your captain or lieutenant?**

A. No.

**Q. Did you have anybody underneath you do any research into the vehicle code?**

A. Into the vehicle code? No.

**Q. Into anything?**

MS. O'GRADY: Objection. Vague and ambiguous.

BY MR. JEW:

**Q. I'm sorry. Did you have anybody underneath**

**you look into anything regarding the vehicle code in relation to this case?**

A. So, like, are you talking predeposition or since then?

**Q. I'm talking, yeah, predeposition, including the time between now and the prior deposition.**

A. Okay. I had one of my officers -- I mentioned this in the deposition -- look up to basically find if there is any more specific policy that I knew of in our policies, in our CHP policies, and he didn't find any.

**Q. Specific policies regarding Vehicle Code section 27001?**

A. Yes. That's correct.

**Q. And since your prior deposition, have you had anybody else look at -- look at anything regarding section 27001?**

A. No.

**Q. And in preparing for today's deposition, did you look at -- did you look for anything independently other than what was given to you by Ms. O'Grady?**

A. No.

**Q. Did you perform any Google searches or internet searches regarding the vehicle code?**

A. No. Like I said, I just used the vehicle code itself.

**Q. Have you been provided any documents to review with regards to any expert opinion that you may give at trial that's different than what you previously mentioned?**

A. I haven't -- I haven't been preparing for or heard anything specific about a trial.

**Q. Other than your own deposition transcript, have you reviewed anybody else's deposition transcripts?**

A. No.

**Q. Any news articles?**

A. No.

**Q. Any legislation?**

A. No.

**Q. Photos?**

A. No.

**Q. Videos?**

A. No.

**Q. Training material?**

A. Training material? Training material?

MS. O'GRADY: Objection as to time. At any time or in preparation for this deposition?

BY MR. JEW:

**Q. In preparation for this deposition or -- and/or trial. Sergeant Beck, did you review any training material?**

A. Training material? Just --

**Q. Any CHP -- any CHP training material?**

A. Training material? Before the deposition, I reviewed the LD 28 workbook, which is the -- to see if there was anything on horn honking on this.

MS. O'GRADY: I -- I think he's talking about this deposition.

But do you want to clarify?

BY MR. JEW:

**Q. Yeah. This deposition.**

A. No. I haven't reviewed that between the first deposition and this one.

**Q. So to be clear, Sergeant Beck, the LD 20 material that you just referenced that was reviewed in preparation for other deposition, not for your deposition as an expert today; is that correct?**

A. That's correct.

**Q. And you didn't rereview that in between the time of your prior deposition and this deposition today; is that correct?**

A. That's correct. I don't remember reviewing it again.

**Q. And there was any legislative history -- I'm sorry. Go ahead.**

A. There was nothing to review. Sorry.

**Q. Sure. And did you review any legislative history?**

A. No.

**Q. And did you review any legal statutes other than section 27001?**

A. Just like I mentioned before, just the 27000.

**Q. And --**

A. I want to say --

**Q. And that was reviewed -- and that was reviewed between your prior deposition and today's deposition?**

A. I -- I believe so. Yes. I -- I -- I remember reviewing that not too long ago. I want to say it was, you know, within a last month or so.

**Q. Understood. And is there anything else that you have done to prepare for your deposition today outside from what we've just reviewed in terms of documents and your communications with your attorneys?**

A. Not that I can think of right now.

**Q. And if you had to estimate, Sergeant Beck,**

**how long would you say that you worked with your attorney to prepare for your testimony today?**

A. Estimation, maybe couple hours.

**Q. And do you know when those couple of hours occurred?**

A. I -- you know, since the last deposition, but I couldn't tell you exactly when.

**Q. Was it -- was it any time within the last week?**

A. I believe -- I know we've talked in the last week.

**Q. So those two hours that you just quoted me involved just everything that you've done between your prior deposition and -- and today?**

A. Yeah, it was --

MS. O'GRADY: Objection. Vague and ambiguous. Are you talking about in preparation for this deposition or?

MR. JEW: That -- that's correct.

BY MR. JEW:

**Q. In preparation for this deposition, Sergeant Beck. You gave me two hours of time. Is that correct?**

A. Yeah. I -- I think that would be a ballpark guesstimate, couple hours.

**Q. In your -- in your meetings with your counsel, was anybody else present?**

A. Yeah. We had one meeting where my lieutenant was present and also an -- an attorney for our department.

**Q. And what was the -- can you please provide the name of your lieutenant?**

A. Sure. It's Brian Maynard. Brian with an "i," and then Maynard is M-a-y-n-a-r-d.

**Q. And do you know Lieutenant Maynard was present at one of your meetings?**

A. Just so when we -- when we discuss the formalities and -- and today's event just to make sure that my supervisor was aware of what was going on.

**Q. Anything else?**

A. No, that's it.

**Q. And how long would you say that meeting lasted?**

A. Maybe a half hour.

MS. O'GRADY: Counsel, when you get to a stopping point, let's have a break. We've been going about an hour.

MR. JEW: Sure. Let me -- let me take a look here at my notes.

Yeah. Sergeant Beck, are you okay -- Sharon, are you guys okay going another ten minutes?

MS. O'GRADY: Sure.

THE WITNESS: I'm okay.

MR. JEW: Great.

Tim, are you okay with that?

MR. WHITE: Yeah, ten minutes would be about the limit, but that's fine.

MR. JEW: Sure.

BY MR. JEW:

**Q. Sergeant Beck, have you had any other communications with any other individuals regarding this case between your prior deposition and today?**

A. Well, like I said in the meeting, it was one of our departmental attorneys was Kristen Preston. She was -- she was there. We had a teleconference.

**Q. Anybody else that you spoke about this case with?**

A. Not this -- not specifically about it, just -- I mean, my wife knows that I'm here today, you know, but maybe my kids overheard me talking to my wife about it, but that's -- nothing, you know -- my wife can't really give me an opinion about this. No offense.

**Q. Sure.**

A. You know what I'm saying? Just household talk, I would say.

**Q. Okay. But you -- but in terms of -- but in terms of substantive communications regarding the actual details of this case nobody else?**

A. Correct.

**Q. Understood. And have you sent or received any materials regarding this case that you've not already identified?**

A. Sent or received materials? You mean like the one on the screen?

MS. O'GRADY: Again, are you talking about --

MR. JEW: Yes.

MS. O'GRADY: -- in preparation for this deposition as opposed to his prior deposition?

MR. JEW: Yes, yes.

BY MR. JEW:

**Q. In preparation for today's expert deposition testimony, Sergeant Beck, have you sent or received any materials that were not already identified, including the document in the -- in the screen in front of me?**

A. Just this, like I said, the subpoena, the

deposition transcript. Oh, the -- just the policies that we talked about in the first deposition. Excuse my ignorance, the exhibits, I think they were. There was a policy on traffic enforcement and then one on civil disturbance.

**Q. I'm sorry. Those were documents that you did review between your prior deposition testimony and today?**

A. Yes.

**Q. And you said they were exhibits to your prior deposition?**

A. I think so. I think they were labeled as exhibits, from what I remember.

**Q. Anything else that we have forgotten?**

A. Not that I -- not that I can think of right now.

**Q. Have you consulted with any other expert in this field regarding your findings and conclusions in this case?**

A. No.

**Q. Have you discussed the case substantively with any of your colleagues?**

A. No.

**Q. Not your lieutenant?**

A. No, just -- he's aware of it. He's aware

of the -- the -- the -- I don't know -- I don't know the details of the case. Does that -- does that -- do you understand that? So --

**Q. I understand.**

A. -- we talked about the vehicle code section, per se, but not the case specifics.

**Q. So let me -- let me rephrase that question.**

**Did you discuss, not the facts of the case, but the interpretation of Vehicle Code section 27001 with any of your colleagues?**

A. I haven't asked them for their interpretation because I have my own. I mean, I -- interpretation of the actual section itself. I have my own. That's my job.

**Q. So you haven't received anybody else's interpretation of the vehicle code section between your prior deposition testimony and today?**

A. Correct.

**Q. What about before your prior deposition?**

A. No. Like -- like I said just -- go ahead, sir.

**Q. The cadet that performed the research for you prior to you -- to your earlier deposition, did you ask him for his interpretation of the vehicle code section?**

A. The cadet that did research for me? I don't --

**Q. I'm sorry.**

MS. O'GRADY: You're mischaracterizing his testimony.

BY MR. JEW:

**Q. Yea. So, Sergeant Beck, you previously testified that in preparation for your earlier deposition you had asked someone to research whether or not there were any policies or anything regarding section 27001; is that correct?**

A. Yeah, that was an officer.

**Q. I'm sorry. I misclassified him as a cadet. So that -- that officer, what was his name?**

A. Mike Maher.

**Q. And did you ask Mike Maher at any time prior to today about his personal interpretation of Vehicle Code section 27001?**

A. No.

**Q. Okay. And other than everyone that we just went over, did you discuss the case with any other person, the facts of the case or Vehicle Code section 27001?**

A. No.

**Q. If you -- if you personally -- I'm sorry.**

**Go ahead?**

MS. O'GRADY: I think you cut him off.

THE WITNESS: I just want to make sure we have the right people. So you have Mike Maher, who was an officer. Okay? And then my lieutenant was in the teleconference, but I haven't even asked him what his interpretation of the code is, but he knows about this. And the captain knows about it, but I didn't ask him his opinion on the vehicle code section. So if that's what you're asking, that's -- that's the only people I can think of.

BY MR. JEW:

**Q. Would your lieutenant or the captain have the expertise to be an expert in the vehicle code?**

MS. O'GRADY: Objection. Calls for speculation.

Answer if you know it.

THE WITNESS: I -- I don't know. I mean, like I said before, I -- I -- they know more than me than a layperson, if that defines an expert. But I can't say -- I can't say if -- if they're an expert for court purposes or not, I can't say.

BY MR. JEW:

**Q. If you personally were going to consult with an expert on this case regarding the**

**interpretation of Vehicle Code section 27001, is there anybody else that you would go to?**

A. No. I mean, I would -- I'm just giving you my own interpretation of it.

**Q. So let's say hypothetically if you had a question regarding the interpretation of a vehicle code section, who would you go to to clarify that question?**

A. Hypothetically I think I would probably ask a previous vehicle code instructor, maybe even one of the instructors I have now or -- or a previous one. I mean, technically could ask any -- any -- I would technically ask any CHP officer, but if I would -- one that I felt that I could trust with the interpretation or, you know, I would probably go to a prior instructor.

**Q. Anybody else?**

A. No.

**Q. And other than everything we've just discussed, did you do anything else to prepare for today?**

A. Not that I can think of.

**Q. Have you received any additional assignments regarding this particular case?**

A. No.

**Q. Regarding your expert work in this case?**

A. No.

**Q. So nothing else -- nothing else you did to prepare for today other than what we've just covered?**

A. That's correct.

**Q. You didn't interview anybody?**

MS. O'GRADY: Asked and answered.

THE WITNESS: No, I did not.

BY MR. JEW:

**Q. Did you review any reports -- did you review any reports of others?**

A. No.

**Q. Did you review any textbooks?**

A. No.

**Q. Any periodicals or journals?**

A. No.

**Q. Any studies, surveys or other kinds of data sets?**

A. No.

**Q. Did you inspect the scene of the incident?**

A. No.

**Q. And by "incident," Sergeant Beck, I mean the protests where plaintiff Susan Porter was cited?**

A. No.

**Q. Did you have anybody inspect the incident?**

A. No.

**Q. And asking one last time, have you told me everything you did to prepare for this deposition today that you can recall?**

A. That I can recall.

MR. JEW: Okay. I think now is a good stopping point.

THE WITNESS: Okay.

MS. O'GRADY: Okay.

THE VIDEOGRAPHER: Okay. We're going off the record at 10:48 a.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record at 11:03 a.m.

BY MR. JEW:

**Q. Great. Sergeant -- Sergeant Beck, I'd like to get into just kind of just your expert opinions now.**

**Just to confirm, we've gone through all -- all of the specific expert opinions that you'll be providing in this case; correct? We haven't missed anything?**

A. Correct.

**Q. And -- and just -- just to reiterate, it's**

**those four points that were covered by your disclosure, the document that I had on the screen before; is that correct?**

A. Yes. That's correct.

**Q. Great. So what we're going to now is just kind of walk through the factual basis for your opinions in this case. I know you testified earlier that you don't know all the facts of the case, but can you give me what facts you consider material to your expert opinion today?**

A. So like I mentioned before, there was a -- some sort of political protest at Darrell -- excuse me if that's not his name -- Darrell Issa, at his residence, and somebody got a citation for honking the horn at that protest.

**Q. Do you know any other facts specific to that incident?**

A. No.

**Q. Did you review Deputy Klein's bodycam footage from the day of that incident?**

A. No.

**Q. Did you review any bodycam footage in relation to that incident?**

A. No.

**Q. Where you aware of how fast Ms. Porter was**

**going when she was horning her horn or if she was even moving at all.**

A. I'm not aware of that.

**Q. Are you aware of how many people -- just ballpark, how many people were at that protest?**

A. I'm not -- I'm not aware of that.

**Q. Are you aware of whether any other citations were written that day?**

A. I'm not aware of that either.

**Q. Any other facts that you consider material to your expert opinion today?**

A. Not at this time.

**Q. Would any facts here change your opinion if, say, for example, she had honked her horn and there were a bunch of cars in front of her, would that have changed your opinion today, your expert opinion?**

MS. O'GRADY: Objection. I don't -- he -- he hasn't -- he's not rendering any opinions having to do with the incident.

MR. JEW: Correct. I'm asking him a hypothetical based on the fact -- he -- there's a --

BY MR. JEW:

**Q. Sergeant Beck, you had previously testified that the facts that you consider material to your**

**opinion today are that she honked her horn; is that -- Ms. Porter honked her horn; is that correct?**

MS. O'GRADY: Mischaracterizes his testimony.

THE WITNESS: I think I'm -- I think, from what I understand, Mr. Jew, I'm just here to give an opinion on what -- on what was on that -- the paperwork we saw before, those four categories. But in regards to this specific case, I'm unaware of the facts of the case, except for what I mentioned.

BY MR. JEW:

**Q. Okay. And have you prepared an expert report in this case?**

A. No. I'm -- I don't know what that is so I'm going to say no.

**Q. Have -- have you been asked to prepare any written reports in regards to this case?**

A. No.

**Q. Do you plan to prepare any written reports in regards to this case?**

A. Not unless I'm told to, but I -- I haven't planned on preparing any, no.

**Q. And did you know that you were going to be serving as an expert at the time of your prior deposition?**

A. No. I -- I -- I believe Sharon had mentioned that that was a possibility in the future, but I can't -- I didn't know for sure until afterwards.

**Q. How soon after your prior deposition were you aware that you were going to be an expert in this case?**

A. I don't -- I don't know. I'm not even sure how much time has been in between. I -- I don't know.

**Q. And other than your 24 years of experience as a CHP officer, what other documents or materials form the basis of your expert opinions in this case?**

A. I don't have -- I just have the -- my opinion based on experience and the vehicle code.

**Q. Any discussions with anybody that form your opinion today?**

A. No.

**Q. Sergeant Beck, did you prepare any summaries, verbal or written, regarding the expert opinions in this case?**

A. No.

**Q. Do you plan to provide any verbal or written summaries regarding your expert opinions in this case outside of this deposition testimony and**

**outside of court?**

A. Let me -- on that last question. I don't even know what is -- what's a summary? I'm not sure what that is.

**Q. Just a verbal summary of what your -- what your expert opinions are in this case.**

A. Just talking with Sharon. That's it.

**Q. You don't need to report anything up to anybody else in CHP?**

A. I haven't been told to, no.

**Q. Did you take any notes during your review of this case at all at any time prior to today?**

A. No.

**Q. You didn't write any notes to yourself, any personal notes?**

A. Personal notes? No.

**Q. Did you prepare any form of writings with regards to your expert opinions in this case?**

A. No.

**Q. Did you perform any fact investigation with regards to your opinions in this case?**

A. No.

**Q. Including your deposition testimony and your participation in your prior deposition, how much time would you ballpark that you spent on this**

**case in total?**

A. Say a couple hours. That's a -- that's a big ballpark. I'm going to eight hours, maybe, thinking about it or testifying or not -- think about testifying or, you know, thinking about these four categories, maybe eight hours total, counting the meetings we had.

**Q. And is this type of preparation typical of your regular job duties as a sergeant?**

A. I think a lot of is mental preparation, preparing for court or testimony. A lot of it is just, you know, running through things in your head. That's mostly what it is.

**Q. So would you -- so the mental preparation you just described, that's -- you would say that's typical of your regular job duties as a sergeant for the CHP?**

A. No.

MS. O'GRADY: Objection. Objection. Vague and ambiguous.

THE WITNESS: I think I misunderstood you, Mikle.

BY MR. JEW:

**Q. Yeah.**

A. So -- no. My regular -- my regular job

duties, I would say, are not every day am I mentally preparing for a deposition or court. That's occasionally if we were -- if we had a subpoena, you know. So this would be an occasional thing that I would do.

**Q. Okay. And have you ever provided expert opinion as a regular part of your job duties?**

MS. O'GRADY: Objection. Asked and answered. But . . .

THE WITNESS: No.

BY MR. JEW:

**Q. And do you plan on doing any additional preparation for this case?**

A. As long as it's just based on my experience and my opinion based on that, it's -- I can only -- I can only give you what I know.

**Q. And testifying is not a regular part of your job duties then; is that correct?**

A. Well, I mean, regular -- testifying in court can be regular, if -- especially if you're working road patrol, but currently I'm in an administrative assignment and it's not as common.

**Q. If you could ballpark for me, how many times would you say you've testified in a court of law over the last year?**

A. Over the last year? I don't even know if I have in the last year.

**Q. What about in the last five years, if you can ballpark it?**

A. Last five years? I've been at the academy for four years. Four. I would say -- I would say five times in the last -- well, in the last five years, maybe -- maybe more than that. Maybe about ten.

**Q. And going back to your preparation for your expert opinions today, do you plan to review any other documents or materials after today's deposition testimony?**

A. No, just the ones we mentioned. Hopefully I don't have to review any, but if I did, it's just the ones that I've been provided and the vehicle code.

**Q. Understood. And do you plan on having any communications other than with your counsel after today's deposition today?**

A. Like I said before, I'll probably -- my wife or my -- she might ask me how this went, but the specifics, no.

**Q. So going back to your previous answer where you said five to ten times over the last five years**

**you've testified in a court of law, that's correct; right?**

A. Yeah. That's a ballpark, uh-huh.

**Q. So given you've only testified five to ten times ballpark, would you still say that testifying in a court of law is a part of your regular job duties as a sergeant?**

A. I mean, it's -- it's always a possibility. I don't know if it's -- if it's something I'm going on a regular basis, but there's always a possibility that I could get a subpoena.

**Q. Right. But there's a -- there's a lot of possibilities, correct, in -- but you're not expected to testify in a court of law when you're a sergeant of the CHP; is that correct?**

A. Oh, no, you are. You're expected to if you get a subpoena. If you're -- if you're a witness at a case or you write a citation or, you know, you investigate a collision or something like that and you get a subpoena, a sergeant may have to testify, yes.

**Q. But going back to my prior question. You would still say that it's typical to testify in a court of law as being -- being a sergeant of the CHP?**

A. I would say it's not as common as an officer. That -- that would be the best way for me to explain it. Officers do it on a regular basis. I would say it's less regular for a sergeant.

**Q. But you would say that it is part of the regular duties of a sergeant?**

A. It's -- it's a required duty if you're subpoenaed. I -- I know I -- my language with my department may be a little different than the questions you're asking, so forgive me for not fully understanding, but --

**Q. Let me -- let me --**

A. Yeah.

**Q. Yeah. Let me give you some hypotheticals to -- to -- so -- so if -- if I'm a Starbucks barista, I would consider my regular duties making coffee, taking orders and possibly working the cash register. Those are what I consider regular duties because I'm performing those regular duties day in and day out.**

**Now, when I ask you is testifying in a court of law a regular duty for a sergeant of the CHP, is it your answer that it is a regular duty or is your answer that it is something that occurs occasionally and may occur occasionally?**

MS. O'GRADY: Objection. Vague. Ambiguous. Compound.

THE WITNESS: I would say it -- it -- it could. It depends on the individual sergeant. So for me right now it's not common that I regularly testify, but a sergeant that's working road patrol that is out there issuing citations, he or she could be in court on a regular basis. I mean, I -- yeah.

MS. O'GRADY: I'm going to object. You -- you've been interrupting the witness and I know it's all on video, but I would appreciate it if you'd let him finish his answer before you come up with your next question or comment on it.

MR. JEW: Sure.

BY MR. JEW:

**Q. Sergeant Beck, you can finish your thought.**

A. In my mind, it's, you know -- because I'm -- I'm thinking of my own experience and I've -- I've known a sergeant or two that was in court a lot. I've known sergeants that I've never seen in court. My particular job right now, it's -- I'm not in court on a regular basis. Like I said, maybe five to ten times in the last five years. So it's not as common as -- as some who are out on patrol versus an administrative assignment, if that makes

sense.

Q. That makes sense. Thank you.

Okay. Sergeant Beck, I'm going to share my screen with you again. It's going to be the same Exhibit 1 that I showed you previously.

A. Okay.

Q. Let me get it up and you can let me know once you see it.

A. All right.

Q. Okay. Sergeant Beck, are you looking at this document now titled, "DEFENDANT COMMISSIONER STANLEY'S AMENDED EXPERT WITNESS DESIGNATION"?

A. Yes.

MS. O'GRADY: Can you make it a tiny bit larger or is that not --

MR. JEW: Yeah, I can do that.

BY MR. JEW:

Q. Is that better?

A. That's better.

Q. Okay. We're going to focus on the expert opinions described in this document now, Sergeant Beck. So let me scroll down to the first -- here we are.

So starting at page 2, line 4, of Exhibit 1, it says, "Sergeant Beck is expected to

**testify on the subject of the state's interest in being able to enforce Vehicle Code section 27001 as a matter of public safety. His testimony will be based on his 24 years of experience working for the California Highway Patrol."**

**Do you see that, Sergeant Beck?**

A. Yes.

**Q. And earlier you testified that you did not participate in preparing this document; is that correct?**

MS. O'GRADY: Objection. Mischaracterizes his testimony.

THE WITNESS: Yeah, so the four subjects that we're going to talk about, I reviewed that after it was prepared.

BY MR. JEW:

**Q. After it was prepared, but did you inform your counsel of the substance of these four points prior to this document's preparation?**

MS. O'GRADY: Objection. Attorney-client privilege.

MR. JEW: Okay.

MS. O'GRADY: He's testified he discussed the subject matter with counsel already.

BY MR. JEW:

Q. Sorry. I'm just looking at my notes, Sergeant Beck. You haven't lost me.
A. Yeah, no problem.
Q. So going back to this specific paragraph here, starting at page 2, line 4, in addition to the 24 years of experience with working for the California Highway Patrol, did you rely on anything else to form your opinion here described here?
A. No.
Q. Is any of your expert opinion described here in this paragraph based on any scientific data or research?
A. No.
Q. Is it based on any studies or surveys?
A. No.
Q. Is it based on any written or recorded facts or evidence?
A. No.
Q. Are you aware of how decibel levels work, Sergeant Beck?
A. No.
Q. Are you aware of what decibel level human hearing starts to be negatively impacted?
A. No.
Q. Are you aware of the physiological impact

**of noise on human health?**

A. No.

**Q. Are you aware of the mental impact of noise on human health?**

A. Scientifically, no.

**Q. Is there any other way you would understand it other than scientifically?**

A. Well, to be honest with you, when my kids are playing Xbox at night and I can't sleep because they're being loud, that's the first thing I thought of. Sorry, guys.

**Q. Fair enough. Fair enough.**

A. Yes, in -- yeah, okay.

**Q. Anything else? Any other way you would understand the mental impact of noise on human health other than your kids playing Xbox?**

A. Just -- you know, that's probably a bad example, but just noise in general. I think it prevents people from sleeping, which, you know, in my opinion, can cause -- cause some mental fatigue. So . . .

**Q. But you're not an expert in this; is that correct?**

A. I am not.

**Q. And are you aware of the health impact of**

**noise on animal health?**

A. No.

**Q. And how do you think public safety would be affected if CHP wasn't allowed to enforce Vehicle Code section 27001?**

A. I -- in my opinion, the horn itself is a great warning device for traffic safety. It's a great device. It's how, in essence, you know, most people that are driving an automobile, for example, on our highways can communicate if there's a hazardous situation. So I think if we're not able to enforce it, I think that the public in general would -- you know, they would, in essence, be okay to use your horn whenever you want for whatever purpose and I feel that people would not recognize the horn as something that's used for safety or to warn them of a hazard.

**Q. Anything else?**

A. Yeah, I -- I just think that it's -- it's used as a warning device to protect people from dangerous situations on the roadways, the effectiveness of the horn would be diminished.

**Q. Is that your expert opinion?**

A. Yeah, that's my opinion.

**Q. That's your lay -- layperson or is that**

**your expert opinion?**

MS. O'GRADY: Objection. He's here today as an expert.

THE WITNESS: Yeah.

BY MR. JEW:

**Q. I just want to clarify for the record.**

A. It's based on my experience a highway patrolman and also personal experience as well, but -- so, yeah, that's my expert opinion.

**Q. And the basis for your expert opinion is based on your personal experience?**

A. As a high patrolman and also just in personal life, yes.

**Q. Is there any other basis for your expert opinion that you just described?**

A. Not that I can think of right now.

**Q. In your 24 years of experience with the CHP, Sergeant Beck, are you aware of any specific accident or collision that was caused by the use of a vehicle horn, in general?**

A. No.

**Q. Are you aware of any accident that was caused by the use of a horn to express support for a political protest?**

A. No.

**Q. Any accident caused by the use of a vehicle horn to express support for a political candidate?**

A. No.

**Q. Any accident caused by the use of a vehicle horn to express a greeting?**

A. No.

**Q. What about to support a charitable cause?**

A. No.

**Q. Going back to Exhibit 1, Sergeant Beck, second page, line -- beginning at line 16 here, it says, "Sergeant Beck is expected to opine, based on his experience as a member of the CHP, that when a vehicle horn is used improperly, it can create a dangerous situation by startling or distracting drivers or others."**

**Do you see that?**

A. Yes.

**Q. Is that your expert opinion today?**

A. Yes.

**Q. And is your opinion today based on anything other than your experience with the CHP?**

A. Yeah, just my experience and -- and like I mentioned before also my personal experience.

**Q. But you haven't read any studies or any -- any research regarding the danger -- the possibility**

of a dangerous situation created by startling or distracting drivers through the use of a vehicle horn?

A. That's correct, I have not.

Q. Are you aware of any study that has been conducted to determine whether when a vehicle horn is used improperly it creates a dangerous situation by startling or distracting drivers and others?

A. No. I'm not aware of any studies.

Q. Are you aware of any reports?

A. No.

Q. Legislative analysis?

A. No.

Q. Research?

A. No.

Q. And, Sergeant Beck, would you agree that drivers can be startled by other sources of loud noises?

A. Yes.

Q. For example, the screech from rusty brakes?

A. That could distract somebody, sure.

Q. What about a driver yelling out of his or her window?

A. That could distract somebody, sure.

Q. What about a passenger in a car sounding a

**blow horn as he's passing by?**

A. That could distract somebody.

**Q. What about a car stereo system that's blasting loud music?**

A. I don't know if it's distracting -- distracting, per se. I think that's -- I think that's a little more common. I mean, I guess it could, but I think that's more common where it may not distract people as much.

**Q. And of these examples that I gave you, Sergeant Beck, do you know if the vehicle code prohibits any of these examples?**

A. The last one that I mentioned, the loud music, the vehicle code under 27007 prohibits sound amplification coming out of a vehicle on a highway in excess of 50 feet. So that one -- that -- I mean, based on your example, you didn't say how loud it was, but I guess it could be -- if it was loud enough, it could be against the law.

**Q. But the prior three examples?**

A. Yeah. What was the one you mentioned about something with the air horn?

**Q. Yeah. If a passenger, not the driver, but if a passenger in a vehicle is sounding a blow horn, do you think the vehicle code prohibits that action?**

A. Yeah, so I mean, it's not equipped on the car. So, yeah, I would say it doesn't -- it doesn't prohibit it. It could -- I mean, if it's in a particular time at night, but -- yeah, vehicle code, no. But it could be against -- I'm assuming it could be against another ordinance or a -- possibly a penal code section, but not vehicle code.

**Q. In your expert opinion, do you believe the vehicle code should prohibit such actions?**

MS. O'GRADY: Objection. Vague and ambiguous.

THE WITNESS: You know, the CHP, like, our policy is just to enforce the laws, so I -- I have no -- you know, I have no opinion on that one way or another.

BY MR. JEW:

**Q. But you claim to be an expert in the vehicle code; is that correct, Sergeant Beck?**

A. Yes.

**Q. And in this expertise of yours, does that involve considering what you believe should be against the law?**

A. No.

**Q. Is it fair to say that your expertise is limited to the interpretation of the vehicle code?**

A. Of what -- what's in the vehicle code today, yes.

**Q. But it's not about what should be in the vehicle code; that's -- is that correct?**

A. That's correct.

**Q. And with specific regards to section 27001, how long does a horn need to be honked in order to violate that section?**

A. It doesn't say in the vehicle code.

**Q. If I was an officer working for the CHP and I went to you as the expert on the vehicle code and I asked you that -- the same exact question, how could you -- would you answer that question?**

A. That's a good question. I would tell the officer to use sound professional judgment, make sure that the sounding of the horn was to ensure traffic safety and in regards to the horn itself, I would just tell them to use sound professional judgment as to the length of the horn, but technically it's against the law unless it's for safe vehicle operation, but use good judgment.

**Q. And with regards to the specific incident at issue in this case, the Issa protest where Susan Porter was cited for violation of section 27001, are you aware, Sergeant Beck, that there was a DJ that**

**was in attendance in the protest that was playing loud music at times?**

A. I was not aware of that.

**Q. And going back to the vehicle code section itself, Sergeant Beck, are you aware of when section 27001 itself was enacted?**

A. No.

**Q. What about the statutory predecessor to 27001?**

A. No.

**Q. What about the vehicle code itself? You know when that was enacted?**

A. No. I -- 1920s, I believe, but I don't know specifically when.

**Q. And do you think that the state's interest in enforcing Vehicle Code section 27001 or related earlier provision is the same now as it was when it was first enacted?**

MS. O'GRADY: Objection. Calls for speculation.

You can answer.

THE WITNESS: Yeah, I don't know.

MR. WHITE: Join in the objection.

BY MR. JEW:

**Q. So to be clear, Sergeant Beck, you're**

**unaware of what the text of section 27001 read was when it was enacted; is that correct?**

A. That's correct.

**Q. Are you aware of the text of the vehicle code section 27001 other than as it's written now in any prior iteration?**

A. No.

**Q. What about its statutory predecessor?**

A. I'm not aware of it.

**Q. And do you think that the state's interest in enforcing section 27001 is the same now as it was in the 1910s?**

MS. O'GRADY: Objection. Calls for speculation.

MR. WHITE: Join.

BY MR. JEW:

**Q. You can answer, Sergeant Beck.**

A. Like I was saying, I think -- I think the vehicle code -- yeah, I -- I think 1920s, but I'm not sure as to -- I'm not sure as to what the intent was then versus -- versus now.

**Q. What about the 1920s?**

A. I don't know.

**Q. Are you aware of what the public roadways looked like in the 1910s?**

A. No.

**Q. What about the 1920s?**

A. No.

**Q. Are you aware of the proportion of motor vehicles to animal-driven carriages on public roadways at that time?**

A. No.

**Q. Would you agree that there have been major technological advancements in car safety technology since the 1920s?**

A. Based on what the vehicles look like then and look like now, I would -- I would say there's been some advances, yes.

**Q. What you consider lane-assist technology an enhancement?**

A. Yes.

**Q. Collision-avoidance systems?**

A. Yes.

**Q. Self-driving cars?**

A. Yes.

**Q. Traffic lights?**

A. Yeah. Was there traffic lights in the '20s? I'm not sure. I'm not sure, actually. I -- I don't know. But if there is now and there wasn't, I would say that's an improvement.

**Q. And do you believe that these advances in technological -- in -- in car safety technology, do you believe that these advancements may have affected the state's interest in -- in enforcing the vehicle code since the 1920s?**

MS. O'GRADY: Objection. Vague and ambiguous. Overbroad.

THE WITNESS: I'm not sure.

MR. WHITE: Join. Also calls for speculation.

BY MR. JEW:

**Q. Sergeant Beck, are you aware that vehicle -- vehicles shared roads with animals in the 1920s?**

A. We technically still do. Technically we do. I mean, I'm assuming you mean more commonly back then, but I'm not aware of it either way.

**Q. And with all these differences in -- in how the public roadways and cars have changed since the 1920s, does that affect your opinion on whether the state's interest has changed at all?**

A. I haven't -- I haven't thought about it one way or the other. I've only looked at the vehicle code as it stands today.

**Q. But if I asked you to think about it now,**

**do you think it would affect your opinion how the state's interest has changed since the 1920s?**

A. I don't -- I really don't know. I -- I just -- our -- our job as, you know, highway patrol, we enforce the law that -- that stands now, so I don't -- I don't have an opinion on that.

**Q. So you -- do you think that auto-driving cars -- self-driving cars and collision-avoidance technology affects the state's interest in regards to the vehicle code?**

MR. WHITE: Objection. Vague and ambiguous.

MS. O'GRADY: Join.

THE WITNESS: I'm not sure what you mean by "affects the state's interest."

BY MR. JEW:

**Q. Sure. We'll move on.**

**Going back to this Exhibit 1, Sergeant Beck, in front of you, page 2, line 20, do you see that? It says, "Sergeant Beck is expected to opine, based on his experience as a member of the CHP, that the vehicle horn's usefulness as a warning device would be diminished if law enforcement officers were unable to enforce Vehicle Code section 27001.**

**"Absent Vehicle Code section 27001, people**

would be free to, and could be expected to, use the horn for purposes unrelated to traffic safety. That would, in turn, diminish the usefulness of the vehicle horn for its intended purpose, which is to be used as a warning or for other purposes related to the safe operation of a vehicle."

Do you see that, Sergeant Beck?

A. Yes.

Q. And is your opinion described here in this paragraph, is that based on anything other than your experience as a member of the CHP?

A. And just my own personal opinion.

Q. But nothing else?

A. Correct is.

Q. Are you aware of any studies that may have conducted to determine whether or not the usefulness of a horn as a warning device would be diminished if law enforcement officers were unable to enforce section 27001?

A. No.

Q. Any reports?

A. No.

Q. Legislative analysis?

A. No.

Q. Anything I may have missed I may have

**described the usefulness of a horn being diminished --**

A. No.

**Q. -- you could --**

A. Not that I can think of now.

**Q. And what are the factual bases for your expert opinion that, quote, "Absent Vehicle Code section 27001, people would be free to, and could be expected to, use the horn for purposes unrelated to traffic safety"?**

A. What's the -- what's -- I'm sorry. What was the first part of that?

**Q. Yeah. What is the basis of your expert opinion. And I'll --**

MS. O'GRADY: Objection.

BY MR. JEW:

**Q. And I'll highlight -- and I'll highlight the specific language here for you.**

**So in this highlighted language, Sergeant Beck, what are the factual bases for your expert opinion for that statement?**

A. I think if -- if there's no law that says that you can't use your horn unless it's for safe operation of the vehicle, then, you know, the public would just use the horn for any purpose that they

feel that they need to.

**Q. Anything else?**

A. Yeah. And it wouldn't be -- it wouldn't be used for traffic safety, which is -- which, I believe, is the purpose of the horn.

**Q. And you're basing that opinion solely on your experiences as a CHP officer and your personal experience?**

A. Yes.

**Q. Sergeant Beck, is it your opinion that civilians, non-CHP officers, are aware of vehicle code section 27001?**

A. I -- I would think some people are aware of and some people may not.

MR. WHITE: Calls for speculation.

BY MR. JEW:

**Q. Would you agree that the majority of the population would not know Vehicle Code section 27001 and what it specifically prohibits?**

MR. WHITE: Objection.

MS. O'GRADY: Objection. Calls for speculation.

BY MR. JEW:

**Q. You can answer, Sergeant Beck.**

A. Okay. You know what, based on my opinion,

I'm not sure how many people know the law or not.

**Q. Sergeant Beck, do you think your wife knows the -- what section 27001 prohibits?**

MR. WHITE: Objection. Irrelevant. Argumentative.

MS. O'GRADY: Are you talking about whether she knows -- is aware of the code section or the --

MR. JEW: That's correct.

MS. O'GRADY: -- or the --

THE WITNESS: I'm not sure.

BY MR. JEW:

**Q. Would you -- Sergeant Beck, would you agree that the majority of the population does not know that horn honking is illegal other than for use of a safety device or for --**

MS. O'GRADY: Objection. Calls for --

BY MR. JEW:

**Q. -- theft alarm?**

MS. O'GRADY: Objection. Calls for speculation.

MR. WHITE: Join.

THE WITNESS: Yeah, I don't know how many -- I don't know how many people are aware or unaware of the law, per se.

BY MR. JEW:

**Q. Do you believe that the average nonlaw enforcement Californian is aware of Vehicle Code section 27001?**

A. I --

MR. WHITE: Same objections.

MS. O'GRADY: Join.

THE WITNESS: I don't know.

BY MR. JEW:

**Q. If you don't know that, Sergeant Beck, then why do you -- why does it say here that people would be free to and could be expected to use the horn for purposes unrelated to traffic safety if you're unaware of whether or not a Californian -- the average Californian knows that there's Vehicle Code section 27001?**

MR. WHITE: Objection. Argumentative.

MS. O'GRADY: Join.

THE WITNESS: Well, I think most people don't use their horn, you know, unless it's to warn somebody. Do people use it, sometimes not to? Yes. But, you know, for those people that do use their horn when it's unlawful and the police aren't doing anything about it or not enforcing the law, then it's just, you know, if -- like speeding. If we're not out there enforcing the speeding law, then

people go faster. But I think if we're not out there enforcing that or have the ability to enforce that law, I think over time more people would just use the horn freely.

BY MR. JEW:

**Q. Sure. And -- and if Vehicle Code section 27001 was struck down as a result of this lawsuit, do you believe that this would change the way people would be using their horns?**

A. I don't know.

**Q. But, Sergeant Beck, isn't it your professional opinion here that if there was no section 27001 people would be free to and could be expected to use the horn for purposes unrelated to traffic safety?**

MR. WHITE: Objection.

THE WITNESS: It's possible, yeah. I think it's both.

BY MR. JEW:

**Q. Right.**

A. It's possible that it could be used that way, but I also think that, you know, it may not. Maybe some people will just use it for traffic safety.

BY MR. JEW:

**Q. Right. But what I'm trying to understand here, Sergeant Beck, is your specific expert opinion that I'm highlighting right here that says people could be expected to use their horn for purposes unrelated to traffic safety if there was no section 27001. I'm trying to understand why you believe people would be expected to.**

A. I think it's could be expected to. I think it's a -- it's a possibility that people could be expected to. If there was no law, then there's nothing -- there's no, you know, repercussion for using your horn for other purposes than traffic safety and there's -- if that law never's enforced, then people could be expected to use it for any purpose they feel they need to.

**Q. And are you aware of any studies that have been conducted in order to determine if people would be and could be expected to use their horns for purposes unrelated to traffic safety absent Vehicle Code section 27001?**

A. No.

**Q. Any reports?**

A. No.

**Q. Legislative analysis?**

A. No.

Q. Okay. So if we go to the third page, Sergeant Beck, of your -- of this Exhibit 1, beginning at line 1. Says, "Sergeant Beck is expected to opine, based on his experience as a member of the CHP, that local noise ordinances are not adequate or practical substitutes for Vehicle Code section 27001. CHP officers may enforce laws in general, including local ordinances. But they are not instructed on, or in the ordinary course provided with copies of, local noise ordinances and it would not be practical to do so.

"There are 58 counties and hundreds of cities in California. Moreover, since much of the CHP's enforcement activities take place on highways, it would not always be clear to a CHP officer which local jurisdiction's ordinances would apply to a specific enforcement action.

"Under state law, all vehicles in California are required to have horns and those horns must be loud - capable of being heard at a distance of no less than 200 feet; it make sense that their use should be subject to a single state-wide standard, not piecemeal local ordinances."

Do you see that, Sergeant Beck?

A. Yes.

**Q. And is your opinion here based on anything other than your experience as a CHP officer?**

A. Just my experience and -- and personal opinion.

**Q. And what is the basis for your expert opinion that local noise ordinances are not adequate or practical substitutes for Vehicle Code section 27001?**

A. I think, you know, the state of California is such a big state, not only geographically, but populationwise, our traffic volume is immense. And I think having one stabilized standard -- one stabilized standard under the vehicle code, which applies anywhere in the state, is -- is great for traffic safety.

It creates consistency and not only for the public, but also for the CHP, which is primarily responsible for traffic safety throughout the entire state. So I think it works well for the public and for the CHP.

Local -- local noise ordinances, there's so many jurisdictions in California, whether it be counties or cities, that it would be very complex to enforce, you know, if unnecessary use of a horn was

just a noise ordinance. It would be confusing possibly for the public and also for law enforcement.

**Q. Anything else?**

A. I --

**Q. Anything else?**

A. I'd just -- I'd just like to tell you -- I just think that having that statewide law for that, you know, I think it's better for efficiency, traffic safety for the public and for law enforcement. That's it.

**Q. So repeating those four points that you just made as to why we should have Vehicle Code section 27001, you said efficiency, traffic safety, and what were the last two?**

A. I think --

MR. JEW: If you could just repeat his answer for me, Debby.

(The following record was read:

"A. I'd just -- I'd just like to tell you -- I just think that having that statewide law for that, you know, I think it's better for efficiency, traffic safety for the public and for law enforcement.

That's it."

MR. JEW: Thank you.

MS. O'GRADY: It was really hard to hear -- excuse me. It was -- I could not hear the court reporter. She could reread that.

THE WITNESS: It sounded like she was a little bit under water.

(The following record read:

"A. I'd just -- I'd just like to tell you -- I just think that having that statewide law for that, you know, I think it's better for efficiency, traffic safety for the public and for law enforcement. That's it.")

MR. JEW: Did you get that, Sharon?

MS. O'GRADY: Yes, I did that time.

MR. JEW: Thank you.

BY MR. JEW:

**Q. Sergeant Beck, these four points that you just make as to why we should have Vehicle Code section 27001, why --**

A. Mr. --

**Q. -- we should have that -- I'm sorry?**

A. Hold on just a second. I counted -- you

counted four. I counted three, and I think Sharon counted two.

**Q. So let's --**

A. I --

**Q. Let me -- let me -- yeah. Let me backtrack.**

**So the reasons you say why we should have -- why CHP should be able to enforce 27001 over local noise ordinances is because of efficiency, traffic safety for the public and for law enforcement; is that correct?**

A. Yes.

**Q. Now, those four points, do you believe -- is it your expert opinion that having section 27001 over -- over local noise ordinances for efficiency, traffic safety and law enforcement, do you believe that those four points trump a civilian's First Amendment rights to free speech?**

MS. O'GRADY: Objection. Calls for a legal conclusion. Mischaracterizes his testimony.

MR. WHITE: Join.

MS. O'GRADY: He's not here testifying as a First Amendment expert or legal expert.

BY MR. JEW:

**Q. Sergeant Beck, you can -- you can answer.**

MS. O'GRADY: And he's not -- and he's not opining on any First Amendment issue.

THE WITNESS: Yeah, I -- I can only -- I can only comment on what the law -- the state law is now. I don't have any --

BY MR. JEW:

**Q. Right. But -- right. But, Sergeant Beck, your -- your expert opinion today is that absent Vehicle Code section 27001 it would be too -- it sounds like it would be too onerous to -- for CHP to enforce the local noise ordinances; is that correct?**

MS. O'GRADY: Objection. Mischaracterizes his testimony.

BY MR. JEW:

**Q. Okay. Let me walk that back. Let me quote specifically from your expert opinion here, Sergeant Beck. I'm highlighting the language.**

**Do you see that highlighted language, Sergeant Beck?**

A. Yes.

**Q. It says, "that local noise ordinances are not adequate or practical substitutes for Vehicle Code section 27001." Is that correct?**

A. Right.

**Q. Now, do you believe that the inconvenience**

**of enforcing local noise ordinances trumps a civilian's right to free speech?**

MS. O'GRADY: Objection. Calls for a legal conclusion, well beyond the scope of his opinion.

MR. WHITE: Join.

BY MR. JEW:

**Q. You can -- you can answer, Sergeant Beck.**

A. I don't -- I don't have an opinion on that. You know, all I can tell you is that 27001 is the state statute now. I'm not even familiar with local noise ordinances that have to do with horn honking from a motor vehicle, so I don't have -- I don't have a -- I don't have an opinion to correlate those two.

**Q. Right. But I'm asking you if the state's interest in efficiency and traffic safety trumps the right to free speech because it would be too -- it would be too onerous to enforce the local noise ordinances instead of Vehicle Code section 27001?**

MS. O'GRADY: Objection. Calls for a legal conclusion.

MR. JEW: We can have a running objection for you, Sharon, and Tim. We can have a running objection, but I think it's breaking his train of thought. If he can just answer the question.

MR. WHITE: No. I think it's -- it's proper to -- to insert an objection to each question you -- you ask. So it's also objection. Lacks foundation and vague and ambiguous as to what plaintiff's counsel has in mind when he says "free speech" or "free speech rights."

MS. O'GRADY: Join.

BY MR. JEW:

**Q. So, Sergeant Beck, it says here, "local noise ordinances are not adequate or practical substitutes for Vehicle Code section 27001."**

**You testified earlier that they're not adequate or practical substitutes because of efficiency and traffic safety. Those are the two of the interests that you asserted and I'm trying to understand if you believe that the inconvenience of enforcing local noise ordinances over Vehicle Code section 27001 should trump First Amendment rights to free speech?**

MR. WHITE: Same objections.

MS. O'GRADY: Same objection.

BY MR. JEW:

**Q. You can answer, Sergeant Beck.**

A. Okay. So let's back up. I'm not saying that local noise ordinances -- with all due respect,

you kind of made it sound like I was saying those were -- it's not -- it's not that local -- local noise ordinances are not adequate by themselves, but I'm saying for efficiency and traffic safety having the one vehicle code section that's the statewide standard is -- I believe is better for everybody.

Because of the volume of traffic we have in the state, how many drivers we have on the road, having that statewide standard, in my opinion, is a good thing. I think it keeps people safe. I think it's efficient in regards to knowledge of the law on the one hand and officers enforcing law on another. It's more efficient that way and it's better for traffic safety.

In regards to the First Amendment, that's -- in my opinion, you know, I enforce or we enforce the state law that it is. The First Amendment is very important. I mean, I'm not trying to diminish the First Amendment at all. It's a constitutional right. But it's hard for me to correlate the two, because you have the state law that says, you know, you can only use the horn when it's necessary to ensure safe operation of a vehicle. So does that trump the First Amendment? Nothing -- nothing trumps the First Amendment, but

it's two separate -- in my mind it's two separate things.

BY MR. JEW:

**Q. Understood. Thank you.**

**Sergeant Beck, are you aware of --**

MS. O'GRADY: Excuse me. We've been now going for another hour. So we should break soon. Right? And I don't know if you want to do a lunch break or do you want to have --

MR. JEW: Yeah, I'll leave -- yeah, I was planning to allow everyone to take a one-hour lunch break. We can make that a 30-minute lunch break, whatever -- whatever you guys prefer, Sergeant Beck.

THE WITNESS: It's up to you guys. Either way is fine. I -- I'd say half-hour, if that's okay.

MR. JEW: Yup. Half-hour is fine.

And, Sharon, I'm almost done with my line of questioning here and then we can take a break after that.

MS. O'GRADY: Okay.

THE WITNESS: So I'm not -- I wasn't done with my answer.

MS. O'GRADY: Oh, I'm sorry.

THE WITNESS: No, that's okay.

If I could continue, Mr. Jew.

BY MR. JEW:

**Q. Yes, please.**

A. Yeah. So I don't want to diminish the state law or the First Amendment. That's not what I'm saying. I'm simply saying that the state law is there for us to enforce. We would want people to use sound professional judgment when it comes to enforcing that law. And I believe it's a good law, because, like I said, it's -- I think it's efficient, because it's a statewide standard and it helps protect the public and prevent traffic safety issues. But I would ask anybody, including my officers to use sound professional judgment when they're enforcing that law.

**Q. And, Sergeant Beck, are you aware of any studies that have been conducted regarding the practicality of enforcing local noise ordinances in lieu of the vehicle code?**

A. No.

**Q. Any reports?**

A. No.

**Q. Legislative analysis?**

A. No.

**Q. And are CHP law enforcement personnel**

**expected to know every section of the vehicle code while on duty?**

MS. O'GRADY: Of the vehicle code?

THE WITNESS: We would like them to in a perfect world, but I think that's asking a lot for any of us to expect that they know every code. That would -- it's -- if there's one out there, I want to meet him, him or her. That's for sure. But I don't think so, that they would be expected to know every single one, no.

BY MS. O'GRADY:

**Q. And do CHP law enforcement personnel have the ability to look up specific sections of the vehicle code while on duty?**

A. Yes.

**Q. And how do they go about doing that?**

A. They would actually look in the vehicle code itself or -- or what's called a ReadyWrap. That's kind of like a user-friendly shortened version of the vehicle code that has specific codes in it. Or online; they can look it up online.

**Q. And if they wanted to look it up online, how would they do that? Through their cell phone or computer in their patrol cars?**

A. Yeah, one way or the other. We have it on

the computers and if then a -- if they had a cell phone, they could do it on that as well.

**Q. Can they call dispatch or anybody to get a clarification on a vehicle code section?**

A. Sure. Yeah. They can do that.

**Q. Can they call their commanding officers or their colleagues?**

A. Normally they would call -- an officer would call a sergeant or an officer in charge or another officer for clarification.

**Q. And how often do you think that occurs whenever a civilian is pulled over for a vehicle code violation?**

A. Usually they'll know that a law has been broken and they're trying to find the actual numbered section of the law. It's not uncommon. It happens -- it happens occasionally where they'll call somebody else to ask them what the vehicle code section number is.

**Q. And do CHP law enforcement personnel have the ability to look up local noise ordinances while they're on duty?**

A. From my experience, no. We don't -- you know, if we look -- if we know a local ordinance and it happens in our jurisdiction among our normal

patrol, we can enforce it, but it's not a common -- it's not a -- it's not common.

**Q. What I'm asking you, Sergeant Beck, if they have the ability to do so.**

A. Well, I mean, I guess they could call the local city or, you know, the city police or sheriff's department. They can call them and ask them about an ordinance or if they have a question about an ordinance.

Are you guys still there, because something just happened on our screen.

BY MR. JEW:

**Q. Yeah. I just closed down Exhibit 1. I'm just taking a look at a document.**

A. Oh, okay.

**Q. Please -- please finish your testimony.**

A. So, yeah, they would just -- if they wanted to know about an ordinance, I think they would end up calling the local jurisdiction to find out what that ordinance is.

**Q. Could they possibly look it up? I'm sorry. Go ahead. Finish your thought.**

A. No problem. From my experience, unless it's parking tickets, we've been supplied occasionally in offices I've worked, like, list of

parking violations at our local ordinances, but beyond that I can't think of anything based on my own experience.

**Q. And you testified earlier that a CHP officer could look up a vehicle code section with their phone or computer; is that correct?**

A. Yes.

**Q. Couldn't they also do the same with the local noise ordinances?**

A. Yeah, they could. If they know -- if they know the jurisdiction they're in and, I guess, they could look online for that -- for a particular ordinance for a violation.

**Q. And could they enforce that local noise ordinance if they wanted to?**

A. Yes.

**Q. And isn't enforcement of section 27001 entirely up to the discretion of the agency and the officer?**

A. Well, we enforce all laws, but do you mean, like, the actual -- for example, if there was a citation issued or not?

**Q. Correct.**

A. Yeah. It would be -- it would be the judgment of the -- the officer that's on the traffic

stop.

**Q. And going back to your -- let me share my screen here to show you Exhibit 1 again.**

**Going back to --**

MS. O'GRADY: Mikle, are you going to wrap this up, because we've now gone well over an hour.

MR. JEW: Yes, Sharon. I'm almost done.

BY MR. JEW:

**Q. Sergeant Beck, it says -- you -- you state here in your expert opinion disclosure, "Moreover, since much of the CHP's enforcement activities take place on highways, it would not always be clear to a CHP officer which local jurisdiction's ordinances would apply to a specific enforcement action."**

**Do you see that?**

A. Yes.

**Q. And couldn't an officer -- a CHP officer use their GPS to identify the jurisdiction that they are in?**

A. Yeah, they could.

**Q. So they have means to identify the locality that they're in at any time; correct?**

A. Yeah. That's fair. I would say so, yes.

**Q. And are CHP officers assigned to any particular geographical stations or patrols while on**

**duty?**

A. Yes.

**Q. And if you personally, Sergeant Beck, if you were a CHP officer on duty, how would you go about looking up a local noise ordinance if you wanted to do so?**

A. Like I said, I would -- it's not common practice, but I would -- me personally I would probably call the -- whatever local jurisdiction that I'm in.

**Q. Anything else?**

A. If it's at night, it's hard to do. They're usually closed. Yeah. That's -- it's kind of like something -- from my experience, it's commonly something you have to know ahead of time. You should know ahead of time because it's going -- you know, it's going to take a while -- it could take a while to find that ordinance and then you're delaying somebody. So, yeah, if it's -- if it's daytime you can call.

MR. JEW: Okay. I think now is a good stopping point, everyone.

Thanks, Sergeant Beck.

THE WITNESS: You're welcome.

MR. JEW: Want to take a thirty-minute --

we'll take a 30-minute break and reconvene at 12:40.

THE VIDEOGRAPHER: We're going off the record.

MS. O'GRADY: Well, 12:40 --

THE VIDEOGRAPHER: Okay. We're off the record at 12:10 p.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record at 12:44 p.m.

BY MR. JEW:

**Q. Sergeant Beck, earlier you testified that it is ultimately up to the discretion of an enforcing officer to enforce section 27001; is that correct?**

A. That's correct.

**Q. And does that mean that two officers confronted with the same facts, witnessing the same event, might arrive at a different conclusion whether or not they should enforce section 27001?**

A. That's a possibility.

**Q. Great. And just to backtrack just a little bit. If we could go -- I'm going to share my screen and show you Exhibit 1 again.**

**All right. Sergeant Beck, can you see this document here, Exhibit 1 that I've been showing you?**

A. I can.

Q. And earlier I asked you -- I believe we had just gotten through your third expert opinion here regarding the adequacy and practicality of using local noise ordinances in -- in lieu of Vehicle Code section 27001.

Backtracking to your prior two opinions here in these paragraphs beginning at page 2, line 16, going through the end of the page, beginning at line 16, it says, "Sergeant Beck is expected to opine, based on his experience as a member of the CHP, that when a vehicle horn is used improperly, it can create a dangerous situation by startling or distracting drivers and others."

Do you see that, Sergeant Beck?

A. Yes.

Q. And I asked you earlier to confirm that that was solely based on your experience as a member of the CHP and you said it was and in addition to your personal experience; is that correct?

A. Yes.

Q. Now, when you say that it's based on your experience as a member of the CHP, are there any specific events that have occurred that inform your opinion here regarding the remainder of this

**paragraph or is that just a general experience from your 24 years?**

A. I think -- I think it's general experience where I've -- I've been distracted and, I believe, other people have been distracted as well that I've seen.

**Q. Is there any specific event that comes to mind where someone using their horn and startled or distracted a -- startled or distracted a driver or others in front of you?**

A. Like I said, I -- I think it's -- it's general experience. I think that the horn is used for -- the intent of the horn is used for vehicle safety. So when people hear a horn, a lot of people would think there's danger approaching, if you will, and it causes them to react.

**Q. Okay. But no specific concrete event comes to mind, right, a vivid event that you can recall that this may have occurred?**

A. No.

**Q. And -- and -- and in your 24 hours -- or years with the CHP, about -- if you could ballpark it for me, how many times would you say that you saw a dangerous situation created by the use of a vehicle horn?**

A. I -- I couldn't say. I -- I can't think of one specifically. I'm talking about my own experiences of hearing a horn or, you know -- I know it's distracting to me. I would assume it's distracting to others. As much as I've been on the road, driving, when I hear a horn my immediate reaction is to look around to see where that's coming from. So it distracts me. But I can't think of any particular specific experience of somebody else having that.

**Q. Great. Thank you.**

**And going further down --**

MR. WHITE: Can I -- can I interrupt real quick? I'm hearing a lot of background noise, like crumpling of paper or something. I'm not sure who it is, but just to let you know.

THE REPORTER: I hear it also.

MR. JEW: Yeah. I'm hearing that as well. It's not coming from my end.

BY MR. JEW:

**Q. Sergeant Beck, is somebody ruffling papers in that room?**

MS. O'GRADY: I think -- I think -- I think it may have been me. I'll try to be quiet.

MR. JEW: Okay. Thank you, Sharon.

BY MR. JEW:

**Q. Sergeant Beck, going back to page 2 of the exhibit. I'm highlighting some language here beginning at line 20. It says, "Sergeant Beck is expected to opine, based on his experience as a member of the CHP, that the vehicle horn's usefulness as a warning device would be diminished if law enforcement officers were unable to enforce Vehicle Code section 27001."**

**Do you see that?**

A. Yes.

**Q. And I asked you earlier to confirm that this was based on your experience as a CHP. Same line of questioning.**

**Is there any specific event that occurred in your 24 years of experience with the CHP that informs you on this expert opinion here?**

A. Well, I think it -- I think it could be similar to other laws. When we're not enforcing the law as much as we should, I think -- I think that, based on my experience, you have a tendency to see people break that law more. And I -- I could relate that to that's how I feel would happened in this case as well.

I think I might have mentioned before, like

speeding. If we're on a particular road, never enforcing a speed limit, naturally, I think, people's tendency is to increase their speed because they know that there's no law enforcement out there -- there's no law enforcement enforcing that law.

So I think that's, based on my experience with speeding and -- everything from speeding to bicycle helmets, on the other end of the spectrum, that people probably don't think about in regards for kids as well. You know, if we're educating kids on wearing your bicycle helmets, as soon as we don't do that anymore, most kids don't wear their helmets.

It's -- it's based on my experience that, I think, if we didn't enforce this law that people would be free to use their horn for whatever purpose they wish and the effectiveness from that would be the -- the intended purpose of the horn for automobile safety would be diminished.

**Q. So based on everything you just said it sounds like there's no specific event that comes to mind that would inform you that -- that would lead you to believe that your expert opinion is vehicle horn's usefulness as a warning device would be diminished if law enforcement officers were unable**

**to enforce Vehicle Code section 27001; is that correct?**

A. No specific event, right.

**Q. And the helmet example that you just provided, is the education of safety concerns, is that -- I'm sorry. Strike that.**

**Going back to the two examples that you just gave me regarding the vehicle -- I'm sorry -- the -- the helmet -- bicycle riding and helmet use and the speeding.**

**Is -- is it -- is it your testimony today that you are basing your opinion that the vehicle horn's usefulness as a warning device is based on those analogous situations that you claim are analogous?**

A. I think -- I think for, you know -- for debate of whether or not it would lose its usefulness as a warning device, the same principle can apply to different laws. And if we're not enforcing them, then I -- more people break that law if we're not out enforcing it.

**Q. But you haven't personally witnessed more people breaking the law and using their vehicle horns; is that correct?**

A. Not with vehicle horns, no.

**Q. Thank you.**

**And going back to page 3 of Exhibit 1, top paragraph here, starting at line 1, says, "Sergeant Beck is expected to opine, based on his experience as a member of the CHP, that local noise ordinances are not adequate or practical substitutes for Vehicle Code section 27001."**

**Same question. Are there any specific events that come to mind or that inform your opinion here on this expert opinion today?**

A. No. I have not generally enforced local ordinances in the past on rare occasions, but, like I said, having that statewide standard of that vehicle code, that would apply statewide and my opinion is would be more effective for law enforcement.

**Q. Are you personally aware of any situation where enforcement of a local noise ordinance was inadequate -- was an inadequate substitute for a vehicle code section?**

A. No.

**Q. Thank you.**

**So going back to this third page. If we go down to the last paragraph here. I believe -- yeah -- this is the last point that you were going**

to make in your expert opinion. It says -- starting at line 13, page 3 of Exhibit 1, "Sergeant Beck is expected to opine, based on his experience as a member of the CHP, that Penal Code section 415(2) also is not an adequate substitute for Vehicle Code section 27001.

"Section 415(2) requires that the offender act maliciously and that there be a specific victim who is disturbed by the noise. That typically would mean that CHP would have to receive a complaint and then investigate, not a situation in which an officer in the course of his duties observes improper use of a horn.

"Section 415(2) is more appropriate to a situation where, for example, a neighbor with a grudge is sounding the vehicle horn habitually or for a sustained period. Moreover, section 415(2) is a criminal statute, the violation of which is a misdemeanor, while violation of Vehicle Code section 27001 is an infraction. Where the lesser penalty, like that of section 27001, will be sufficient to serve the public interest, that is a better approach than prosecuting an offender for a misdemeanor.

"Further, improper use of a horn could startle or distract drivers and pose a safety issue

even if that use did not violate section Penal Code section 415(2). Thus, while there are circumstances in which 415(2) could be used in an enforcement action for improper horn use, it is not an adequate substitute for section 27001."

Do you see that, Sergeant Beck, this paragraph?

A. Yes.

Q. And is your opinion here based on anything other than your experience as a CHP officer?

A. No.

Q. And what is the basis, Sergeant Beck, for your opinion that Penal Code section 415(2) is not an adequate substitute for Vehicle Code section 27001?

A. Well, like -- like it says in there, like you just read, probably the biggest thing, in my opinion, is the fact that you're going to need -- you're going to need a -- a victim of somebody that's being actually disturbed by the sound of the horn, whereas in the vehicle code section you do not need a victim. It could just be, in essence, improper use of the horn for reasons other than traffic safety.

Q. Do you have any specific event that comes

**to mind that informs your experience here as to the inadequacy of Penal Code section 415(2) used in substitute of Vehicle Code section 27001?**

A. Mr. Jew, can you just re-explain, like, where I've observed it -- or maybe rephrase it. I'm sorry.

**Q. Yeah. So is there any specific event that comes to mind where you observed someone enforce Vehicle Code -- I'm sorry -- Penal Code section 415(2) in lieu of Vehicle Code section 27001?**

A. No.

**Q. Have you ever encountered any issues with someone doing as such in the CHP?**

A. Where they used 415(2) instead of 27001? Is that what you're asking?

**Q. Correct.**

A. I have not.

**Q. Are you aware of any issues that may have arisen with regards to the use of Penal Code section 415(2) instead of Vehicle Code section 27001?**

A. No.

**Q. Are CHP law enforcement personnel instructed to favor imposing an infraction over a misdemeanor violation when both are equally available for the conduct at issue?**

A. Well, no, not necessarily. I -- I think -- I think they're two separate -- I think they're two separate issues.

27001 is going to be a vehicle code infraction that's applying on a highway or a street, whereas 415(2) is out of the penal code and it's more general -- generally it's going to be more if -- if you want to compare it to horn honking, it'd be where, in essence, someone's on private property maybe honking their horn willfully, maliciously, annoying another person. We get a complaint. We go there. We're going to use 415(2).

If it's out on a public street or a highway where somebody's using their horn, you're going to -- most -- us, as a department, we're going to look more towards 27001. I think it's easier to prove. It doesn't mean you couldn't use 415(2) if there was -- you know, if it was willful and malicious and it was disturbing another person, but routinely, I think, we would go with 27001 more -- more often.

**Q. So 27001 can be enforced even when there's no victim?**

A. That's correct.

**Q. And it can be enforced even when there's no**

**safety risk?**

A. It's -- the law says "to ensure safe operation of the vehicle." So to me that means it's used to ensure safer operations so there -- alleviates that there's a potential hazard.

**Q. So when you bring up that "safe operation of the vehicle" language of the -- of the statute, is it your opinion that another CHP expert on the vehicle code may have a differing opinion than yours on what it means to be -- what -- what "safe operation" means?**

MS. O'GRADY: Objection. Calls for speculation. Lacks foundation.

THE WITNESS: I think my interpretation is one. I -- I think it's fair to say that somebody else may have a different interpretation of -- of a particular event if that was safe or not.

BY MR. JEW:

**Q. Sergeant Beck, are you aware of any studies that have been conducted regarding whether Penal Code section 415(2) is an adequate substitute for Vehicle Code section 27001?**

A. No.

**Q. What about any reports?**

A. No.

**Q. Any legislative analysis?**

A. No.

**Q. And, Sergeant Beck, what is the basis of your expert opinion that improper use of a horn could startle or distract drivers impose a safety issue?**

A. Just my own experience.

**Q. Any particular experience or event come to mind that informs your opinion here?**

A. Well, I mean, I know when I've been on duty I've used my horn before to -- to get the attention of somebody. One event that I can think of it worked well was I was stopped at an intersection at a red light in my patrol car. The vehicle that was in front of me had crossed the limit line too far into the intersection. They -- also, and I saw reverse lights come on on that vehicle. And I could tell that the -- well, it appeared to me that the driver wasn't looking in their mirror to look back. They just thought, "Oh, shoot. I, in essence, ran the red light, went into the intersection. I need to back up."

So I remember that when they were backing up, I was thinking, "Oh, no, you're going to hit me," right? So I hit my horn and the brake lights

came on. The car stopped. And, you know, I prevented a collision. So there's a lot of situations where, especially in parking lots where people are backing out and they don't see other people that are behind them. Person will sound their horn and it -- it startles the driver of that other vehicle to look. They hear the horn. They look for danger and they realize they were going to back into somebody.

So that's two examples of, I guess, backing incidents where somebody was -- the horn was effective and it startled somebody to look up for good purposes.

I know that when I have been on enforcement stops over my career some people like to -- it doesn't happen very often, but some people like to either whistle or yell obscenities or sometimes even think of pulling people over in certain situations, but I've had some people honk horns. Usually it's -- I think usually it's when we stop somebody and I -- I think the driver that's coming up has honked their horn probably to tell us, like, thank you for pulling that guy over, right, but it startles me. Like when I'm writing a ticket and all of a sudden the horn's going off, it's scary, right?

You're on a freeway or on a highway. So you look up. Where's that noise coming from?

I guess that's three different situations where I can think of. I've seen out there -- when I've heard horns honk, I've seen pedestrians that were crossing a road -- not crossing a road, but walking on a sidewalk. All of a sudden a horn goes off and everybody looks, you know, where that horn's coming from.

So I think those are situations where people can get startled or distracted from the use of the horn.

**Q. Thank you.**

**And -- and, Sergeant Beck, to be clear, my question was, was there any event that would inform your opinion that improper use of a horn could startle or distract drivers?**

**And the example you gave me, the first two examples where someone was backing up and may have not been looking behind them. If you used your horn to alert the driver that was backing up, wouldn't that be to ensure safe operation of the vehicle?**

A. Yes.

**Q. So it wouldn't be improper use of the vehicle horn; is that correct?**

A. No. That was -- that was proper use where the horn effectively worked towards somebody. So I -- I see what you're saying. Are there situations where the horn was not proper and it affected somebody? Is that what you're asking?

**Q. Right. Because here in you're -- in you're -- in this report it's saying you're going to opine on the -- the improper use of a horn could startle or distract drivers and pose a safety issue.**

**And I'm asking you if there's any specific event that comes to mind where the improper use of a horn had startled or distracted someone and posed a safety issue in your eyes.**

A. I can speak for myself only in that case. Like I said, when I'm writing a citation and somebody blasts their horn or I'm out working a traffic collision and somebody blasts their horn for a reason, it startles me to where anticipating there's going to be another crash or something. So it makes me look up, take my eyes off what I'm doing, which could affect my safety. And I would assume that a lot of times that happens with other officers and -- and pedestrians and bicyclists as well.

**Q. And, Sergeant Beck, are you aware of any**

**studies that have been conducted regarding whether improper use of a horn can startle or distract drivers and pose a safety issue?**

A. No.

**Q. Are you aware of any reports?**

A. No.

**Q. Any legislative analysis?**

A. No.

**Q. In your anecdotal situations where you got startled for improper use, for example, where a pedestrian is walking on the road instead of the sidewalk and someone honks their horn, in that example you gave me, who is the state worried about getting distracted and causing a traffic safety issue in that scenario? Is that the pedestrian or is it the driver?**

MS. O'GRADY: Objection. Mischaracterizes his testimony. Calls for speculation.

BY MR. JEW:

**Q. You can answer, Sergeant Beck.**

A. I don't -- I know our department were -- you know, our -- our goal is to protect life and property. That's our first goal, right? It's everybody that's there. Anybody that could be affected that could be killed or injured or their

property damaged. We care about everybody.

**Q. So using a horn to alert a pedestrian that's walking on the road, that would -- that would constitute safe operation of the vehicle in your eyes?**

A. If a pedestrian's walking in the roadway and --

**Q. Correct.**

A. -- and -- and a driver sounds their horn to warn that pedestrian that there's some danger, then that's -- I think that's okay.

**Q. And you would instruct the CHP officer, having that same question, you would instruct him that that's probably okay under the Vehicle Code section 27001?**

A. Yeah. For the driver to sound the horn in that situation, if they -- if it appeared to the officer that there was actually some danger approaching and -- and you heard the sound of the horn come from that vehicle and it appeared that that driver was trying to warn that pedestrian of, you know, their approach, because they're coming up on them in the roadway, then -- and I would say that's -- that's -- I lost my train of thought.

**Q. No worries.**

**And in your example where the pedestrian's walking on the road, if a pedestrian is startled by the improper use of a vehicle horn, how does that pose a traffic safety risk?**

A. If a pedestrian's startled by the improper use of a horn, if the pedestrian moves over a foot or two feet one way or another and let's say there's a -- you know, it causes them to jump the wrong way or they jump another way into some other kind of traffic situation, they could get hit by a car or fall or something like that.

**Q. Have you ever witnessed that happen?**

A. I have seen people jump out of the way of -- of cars for using their horn, yes.

**Q. Was anybody ever injured in the times that you've witnessed it?**

A. Not that I recall. No. I don't think so.

**Q. Are you aware of anyone ever being injured -- or -- I'm sorry.**

**Let me rephrase that question.**

**Are you aware of any incident where a pedestrian was injured through the improper use of a vehicle horn?**

A. No.

**Q. In the anecdotal situation that you just**

**gave me or improper use where you personally were startled when you were writing a ticket for somebody and somebody honked their horn, as you said it, maybe to support -- express support for you, was there any enforcement action taken as to the person that passed -- passed you and honked their horn?**

A. No, because I was already stopped. I was already dealing with a violator. So, no, not in that case.

**Q. Have you ever seen someone jump into traffic because of a horn honk?**

A. I have not, no.

**Q. Are you personally aware of any time that's ever happened in your 24 years of experience with the CHP?**

A. No.

**Q. And, Sergeant Beck, I'm sorry if we already covered this. I just want to be absolutely sure here.**

**Do you intend to provide any expert opinion on the state's interest in curbing noise pollution caused by horn honking?**

A. No.

**Q. And turning to just kind of recent events -- or not even recent events, just anything**

**that's happened in your personal experiences in your 24 years of working with the CHP. Have you ever investigated an accident caused by the use of a vehicle horn?**

A. No. Not specifically by the horn. No.

**Q. Have you reviewed any reports of accidents caused by the use of a vehicle horn?**

A. I've never been an accident review officer, so I haven't -- I haven't had that background, per se. I don't know if that made sense.

**Q. Are you aware -- that makes sense. Thank you.**

**Are you aware of whether any reports exist regarding accidents caused by horn honking?**

A. No. No. Not specifically horn honking. No.

**Q. And if it was reported to the CHP that someone used a vehicle horn in violation of section 27001, but no accident actually resulted, would there be a CHP accident investigation?**

A. Rephrase that, please, or say it again. I didn't understand.

**Q. Sure. If it was reported to the CHP that someone used their vehicle horn in violation of the section 27001, but no accident resulted, would there**

**be a CHP accident investigation?**

A. No.

**Q. And if it was reported that someone used a vehicle horn in violation of section 27001 and no accident resulted, would there be a CHP accident investigation report prepared?**

A. No. Let me make sure I understand that previous question.

**Q. Sure.**

A. So somebody -- somebody uses their horn in violation of 27001, but no accident happened, no traffic collision happened, if there was no traffic collision at all we would not investigate and we would not prepare a report.

**Q. Even if it was reported to CHP that that had occurred; is that correct?**

A. That 27001 had occurred, but there was no collision?

**Q. I'm sorry. Let me clarify.**

**So if a -- if a -- if a civilian that witnessed someone improperly use their horn in violation of section 27001, then called CHP officers and told them that what had occurred, but no accident had resulted, is it true that no CHP accident investigation or an accident investigation**

**report would be prepared in that situation?**

A. Right. As long as there was no damage or injury, we would not do an investigation or report.

**Q. Thank you. That is what I was getting at.**

A. Okay.

**Q. Now, turning to recent events.**

**What I'm going to show you on my screen, Sergeant Beck, is going to be a news article -- a few news articles that I'm going to show you in succession and ask you a few questions.**

MR. JEW: And this is for John to enter the exhibit into the chat for people to click on.

What I'm going to be showing is the exhibit titled "'Honk to End the Shutdown'"

(Plaintiff's Exhibit 2 marked.)

BY MR. JEW:

**Q. Sergeant Beck, what I'm showing you on my screen is going to be labeled Exhibit 2. Do you see what I'm showing you? Do you see this news article?**

A. Yes.

**Q. And it says here -- the title of it is, "'Honk To End the Shutdown' Protest Comes to Santa Barbara."**

MS. O'GRADY: Give him a chance to read -- actually read the article if you're entering it as

an exhibit.

MR. JEW: Sure. And -- and I -- I believe it should be linked the chat if you want to pull it up yourself.

MS. O'GRADY: We -- we can't really do that. We're -- we're just looking at a big screen.

MR. JEW: Okay. Let me -- let me have him read the pertinent part here.

BY MR. JEW:

**Q. Sergeant Beck, if you want to just read the first four paragraphs here on my -- on my screen. Let me know what you've finished.**

A. Mr. Jew, do you want me to read the part that starts with "Vehicles donned"? Is that what you're --

**Q. That's -- that's correct.**

A. Okay.

(Witness reads document.)

Okay. I read it.

MS. O'GRADY: Can you scroll? Is there more of the article?

MR. JEW: There is, but -- I mean, would you prefer that he read the whole article or just the part that I want to question him on?

MS. O'GRADY: Are you only questioning him

foundation. Calls for speculation.

THE WITNESS: It would -- it would -- it's -- it's hard to answer a hypothetical question or a what-if question, especially in law enforcement, because it has to be what the officer there at the scene is experiencing. That's why we tell everybody to use sound professional judgment with every encounter, because it's impossible to answer -- answer a hypothetical question in that way.

MR. JEW: Okay. We'll move on to the next exhibit here.

(Plaintiff's Exhibit 3 marked.)

BY MR. JEW:

**Q. So what I'm showing you now, Sergeant Beck, is going to be marked as Exhibit 3. The title is, "Caravan of honking horns" -- I'm sorry -- "Caravan of honking cars replaces traditional protest in San Antonio amid coronavirus crisis."**

**And I'll let you -- give you a chance to read the document.**

**First, Sergeant Beck, do you see the document in front of you?**

A. Yes.

**Q. Great. And I'll let you start reading**

**right where it says, "COVID-19 has even changed the way people protest."**

**Please let me know when you finished reading.**

A. Okay. "COVID-19 has even" -- I'm just going to read it out loud if that's okay with you guys or -- or do you want me to just read it silently?

**Q. Sure. You can read it out loud.**

A. Okay. And then how far down did you want me to read?

**Q. Let's see here.**

**You know, for purposes of this deposition, you can just read just these first two sentences, these first two paragraphs here that my cursor is here.**

A. Okay. "COVID-19 has even changed the way people protest.

"Dozens of immigration demonstrators plastered their vehicles with slogans bashing Immigration and Customs Enforcement on Sunday, parked outside of the agency's San Antonio office on the Northeast Side and leaned on their horns."

**Q. Thank you.**

**And, Sergeant Beck, do you know what this**

**document is that I'm showing you?**

A. It appears to be a San Antonio Express-News news article.

Sergeant William Beck Porter vs. Gore

**Q. And what was the date that it was published? Can you see that?**

A. April -- actually, I can't see the day. It looks like 19th. Is that what you guys see?

**Q. Yeah, let me --**

A. Okay. There it is.

**Q. Let me zoom up.**

www.aptusCR.com

A. April 19th, 2020.

**Q. And it says here, "Updated: April 20, 2020"; correct?**

A. Right. Correct.

**Q. And, Sergeant Beck, do you have any reason to doubt the authenticity of this article?**

A. Like -- like I said before, it's a news article. It's -- I don't doubt it, but I don't necessarily believe it either. I don't know who wrote it. I don't know the facts of the -- of the matter, so it's -- I guess that's up for speculation, but . . .

**Q. Okay. I'll represent to you that all the news articles that I've shown you and that I will show you were all news articles that were pulled off**

the internet.

Sergeant Beck, were you personally aware of this event?

Sergeant William Beck Porter vs. Gore

A. No.

Q. And based on what you just read, those first two paragraphs, was it reported that horn honking occurred?

A. Yeah. Says, "and leaned on their horns."

Q. And are you aware of whether or not any violation -- I'm sorry.

www.aptusCR.com

Are you aware of whether or not any citations to violating section 27001 were given by CHP at this event?

MS. O'GRADY: Objection. Lacks foundation. I believe San Antonio is in Texas.

MR. WHITE: Join.

BY MR. JEW:

Q. Sergeant Beck, do you believe that local law enforcement agencies should issue section 27001 citations for horns used in this example?

MR. WHITE: Same objections.

MS. O'GRADY: Join.

THE WITNESS: That's a different state. I don't know what Texas law is and what --

BY MR. JEW:

**Q. And we'll go back to using a -- sure. We'll go back to using a hypothetical as I did for the previous article.**

**So if there's dozens of immigration demonstrators plastering their vehicles with slogans, bashing Immigration and Customs Enforcement and they were parked outside an agency in California -- in a California office and leaned on their horns, in that scenario do you believe enforcement of section 27001 is warranted?**

MS. O'GRADY: Objection. Lacks foundation. Calls for speculation. Unrelated to this incident.

BY MR. JEW:

**Q. You can answer.**

MR. WHITE: Join.

BY MR. JEW:

**Q. You can answer, Sergeant Beck.**

A. Again, it would be encouraged that the officers on scene use sound professional judgment when enforcing 27001.

**Q. And if you personally were on the scene and at this protest demonstration in front of an ICE office in California, what would you take into consideration if you were deciding whether or not to enforce section 27001?**

A. I think me personally, I would be more in a civil disturbance mode, more protecting the peace of the people that are there, not only the ICE agents, but also the demonstrators, protecting -- making sure that everybody's being safe, peacefully protesting.

In regards to actually enforcing 27001, if it was in this state, you know, if an officer stopped somebody for that out on the highway that was using the horn or other than a foreseeable danger of traffic safety, I would tell the officer on scene that -- that asked me about it, I would say, "Use good judgment. Use your own judgment, sound professional judgment."

**Q. Right, Sergeant Beck, but I'm asking you for you personally.**

**You were a CHP officer on scene here at a -- at a hypothetical protest in front of an ICE agency in California, what would you personally consider in determining whether or not you wanted to enforce section 27001?**

MS. O'GRADY: Objection. Asked and answered.

THE WITNESS: Yeah, again, it's -- it depends on what is going on at the scene. And

there's so many factors going on. My first tendency would be to protect the public and make sure that everybody's safe. It's a safe peaceful protest. Beyond that, I'd be speculating as to whether or not I would enforce 27001 or not.

BY MR. JEW:

**Q. Okay.**

A. It depends on why I was there. If I was there for a traffic complaint for 27001 or a -- you know, I'm driving by and somebody's honking their horn for no useful purpose, I might do that differently than if they're parked at the protest, sounding their horn or stopped there. I just don't know. It's -- it's very speculative on my -- on my end. There's so many different variables that would come into play. And for myself I would have to use sound professional judgment in enforcing that law at the time.

**Q. Sure. Thank you.**

**And -- and going back to the article. Do you still see the article on your screen?**

A. Yes.

**Q. And do you see this picture that's in the article?**

A. Yes.

**Q. And if I could just point your attention to this picture and use it as a hypothetical example.**

**Say, for example, this building here, where my cursor's hovering over, is the entrance to the ICE agency and all these cars lined up parked here in this parking lot, if they were blaring -- as -- as the article reports, if they were leaning on their horns, if you were present at this -- at this scene, what would you consider as to whether or not you would enforce section 27001 here?**

A. Well, I think if they're all parked in a parking lot and they're honking their horns in a parking lot and there's no traffic nearby, if they can affect traffic on that road there, it may be an issue, but it's just what I see in the picture, just vehicles parked in a parking lot, I'm probably going to go and -- like I said before, probably more in a protecting-the-peace mode at that point.

**Q. And I -- I'm sorry. I'm having trouble understanding what you mean by "protecting-the-peace mode." What does that -- what does that mean?**

A. Well, I mean, you've got agitated -- potentially agitated people in those cars. So if they want to peacefully protest, that's fine. There's no issue with that. But I'm -- I would be

there making sure that nobody in the crowd decides to get unpeaceful, if you will, maybe somebody pulls out a weapon or --

**Q. Thank you.**

**And -- and to clarify, then. Your -- your understanding of what's peaceful or not, using -- leaning on their horn, parked in this parking lot, would -- you would consider that peaceful?**

A. I mean, I would think so. You know, if it's -- depends on the time of the day, obviously. It could -- you know, that could turn more -- it could turn into more of a 415 issue. If it -- like I said, it depends on the circumstances at the scene, what's around there. Is there a school nearby? Is there -- is there people in homes that are being annoyed by the noise? It could turn into more of a 415(2) like we talked about before versus a 27001 of the vehicle code.

So there's a lot of factors that come into play and just little different factors can change the whole scope of the situation.

**Q. Understood. Thank you.**

**So I'll -- I'll move on to the next exhibit.**

**Close that.**

**Q. And in a scenario like this, how does the CHP assist the deputies?**

MS. O'GRADY: Objection. Lacks foundation.

THE WITNESS: I -- I personally don't know why they were -- why they were there. It could have been because of the size of the crowd, possibly. They asked for some assistance with additional officers. It's hard to say.

BY MR. JEW:

**Q. And going back to the hypothetical that I've been giving you. If you were personally present at this Otay Mesa Detention Center and there were 30 cars parked in front of the facility and honking their horns, shouting and recording video, what would you take into consideration in whether or not to cite these protestors for violation of Vehicle Code 27001?**

A. Like I said in the previous ones, just sound professional judgment.

MR. JEW: Okay. Go on to the next exhibit. This is going to be Exhibit No. 9.

(Plaintiff's Exhibit 9 marked.)

BY MR. JEW:

**Q. The document is titled, "Protest at Capitol Targets California's" -- let's see here --**

**"Stay-At-Home Order, Demonstrators Ignore Social-Distancing Guidelines."**

**Sergeant Beck, do you have any reason to doubt the authenticity of this news article that I'm showing you?**

A. For purposes of this, I don't.

**Q. And do you see here that it was published on April 20th, 2020, in Sacramento, California?**

A. Yes.

**Q. And, Sergeant Beck, if you could just read the first three paragraphs and let me -- you can just read it to yourself and let me know when you finished reading.**

A. Okay.

(Witness reads document.)

Okay.

**Q. And if you could just -- see if I can highlight it. Oh, no. But if you can -- do you see this last paragraph that my cursor is hovering over down here?**

A. Yes.

**Q. If you could just read that to yourself and let me know when you finish just this paragraph.**

A. (Witness reads paragraph.)

Okay.

**Q. Sergeant Beck, after having read this where it's reported here in the paragraph you just read that the gathering was approved by the CHP for 500 attendees, were you personally aware of this event that took place in Sacramento?**

A. I think I heard about this one. I know there's been two or three. I can't remember how many has been down there. So I'm not -- I don't know if this is specifically one I knew about.

**Q. So you just said that you had heard of two or three. Can you further elaborate on these two or three events?**

A. I know there's been two or three events down there protesting, in essence, the governor and the stay-at-home order.

**Q. And were you personally involved in any of these -- in CHP's involvement?**

A. I was. I was at one of them. And I'm just trying to figure out if I was at this one. But I think I'm at the next one. I'm not sure. I can't --

**Q. You personally attended -- okay. So you personally attended one of the protests; is that correct?**

A. Yes.

**Q. And in what capacity did you attend the protest?**

A. I was there for civil disturbance, crowd control.

**Q. And do you recall kind of the month or the week -- the day of the month that you attended?**

A. When was this one? April 20th? I -- I'm guessing. I think it was the one after this one. It was one of the ones after this one, but I can't remember.

**Q. Was that --**

A. It was -- I -- I don't know the exact day. It was within -- seems like it was within the last month. I don't know if it's that particular day or it was another one.

**Q. Okay. So it might -- it may have been in April or it may have been in May?**

A. Right.

**Q. And how long were you present at that protest?**

A. I want to say it was ballpark a few hours.

**Q. And by "a few hours" is that, like, two, three, four, when you ballpark?**

A. Three or four hours, yeah.

**Q. Four hours. And -- and how many CHP**

**officers were there with you?**

A. I would estimate there was 100. I'm not sure on that.

**Q. There were 100 CHP officers, to your estimation?**

A. Yeah.

**Q. And what -- what was your role there particularly yourself?**

A. I was part of crowd control, civil disturbance. We were on the north side of the Capitol grounds.

**Q. And how many protestors would you say were there?**

A. Based on what I could see, maybe estimate a couple hundred.

**Q. So based on your estimation of a couple hundred and you -- you just previously stated that you estimated there being 100 CHP officers on site, so would that mean that your estimation is that there -- there is one CHP for every two protesters at this rally that you were at?**

A. I'm guessing, yeah. I -- we -- we went there later in the day. I don't know if that was the height of the protest or not. Just from what I could see from my vantage point, I remember seeing

approximately 100 officers and at -- at least 200 protesters.

**Q. And -- and who instructed you to attend that event that day?**

A. That would just be my lieutenant.

**Q. And how come you weren't present at the other two events that had took place, to your knowledge?**

A. I don't know. I wasn't assigned or I wasn't selected or assigned to go to those.

**Q. And when you were there, Sergeant Beck, were -- did you write any citations?**

A. No.

**Q. Are you aware of whether any CHP officer wrote citations?**

A. I didn't see anyone writing citations.

**Q. And -- and -- and you specifically testified a moment ago that you were there for a crowd control and a civil disturbance assignment; is that correct?**

A. Correct.

**Q. So what does that entail?**

A. It entails -- for that particular event it was guarding the Capitol. We were in a line formation across the north side of the -- the park,

the Capitol grounds there, just making sure that demonstrators don't get onto the Capitol grounds.

**Q. Were you in your patrol vehicle at that time?**

A. We went there in patrol vehicles, but when I was in the formation I was standing. I was on foot.

**Q. And for that four-hour estimate that you were there that day, how much of that time do you believe that you spent in your vehicle?**

A. Just the time it took to drive to the Capitol from the academy and from headquarters. So I was in my vehicle maybe -- maybe 20 minutes each -- each way.

**Q. Are you aware of whether or not -- sorry. Go ahead.**

A. Maybe 40 minutes total travel time and then -- and then there four hours. I don't remember how long we were there. It was -- it was, like I said, about four hours, give or take.

**Q. And are you aware of whether or not there were any CHP officers instructed to patrol the area in their vehicles?**

A. I'm not aware either way. I was there for a specific purpose and it was a fluid situation and

I was just there for the crowd control.

**Q. And are you aware of whether any CHP officers in attendance were -- were instructed on a traffic violation assignment?**

A. I'm not aware of any.

**Q. So is it safe to say that when you were present there you weren't looking to cite people for violation of section -- I'm sorry -- violation of the vehicle code?**

A. That I was looking to cite them or -- or not to?

**Q. Correct. Is it -- is it -- is it fair to say that while you were present there on your crowd control, slash, civil disobedience assignment that you weren't there to specifically enforce the vehicle code?**

A. Correct.

**Q. And did you see anybody honking their horns when you were there?**

A. I did.

**Q. Did you hear it?**

A. Yeah, you could hear it.

**Q. How many cars do you think were honking their horn when you were there?**

A. You ask some good questions. I don't know.

Several. How's that?

**Q. Over 50?**

A. I don't know. Several cars were honking their horns. I -- I couldn't -- I'd say -- I wasn't keeping track.

**Q. And -- and was the horn honking prevalent throughout the entire time that you were there?**

A. I would say a majority, yeah. At least a majority of the time I was there I remember people honking their horn out on that street in front of us.

**Q. And when you were there -- this -- this took place after your prior deposition; is that correct?**

A. Yes.

**Q. And -- and having participated in your prior deposition and knowing the facts of this case, when you were there at that protest in April or May, did you discuss the facts of this case or what's going on in this case with any of your colleagues?**

A. No.

**Q. You didn't discuss whether or not the horn honkers should have been cited for violation of section 27001 when you were there?**

A. No. I was -- no.

**Q. Why not?**

A. Well, I didn't really talk to anybody. I was on line at a protest and -- I mean, it was ironic, but it wasn't -- it wasn't anything I discussed with anybody at the time.

**Q. Were you aware -- at the time of your participation at this protest were you aware that plaintiff Susan Porter was also herself at a protest using her horn?**

A. I knew the deposition -- if that's what -- Susan Porter -- Porter had been issued a citation for. You mean she was at one of these protests or previous?

**Q. At a -- at a -- at a separate political protest.**

MS. O'GRADY: Objection. Vague and ambiguous.

THE WITNESS: I don't understand what you mean.

BY MR. JEW:

**Q. I'm sorry. Let me -- let me -- yeah. Let me rephrase the question for you.**

**So when you were attending this protest in April or May, at the time you attended this protest, you were -- you were aware that plaintiff Susan**

**Porter had herself been cited for violation of 27001 at a separate protest; is that correct?**

A. That's correct.

**Q. And why was it that you or -- you yourself, why did you yourself, as you were there, why did you not write any citations for section 27001 despite hearing prevalent horn honking the entire -- for the majority of the time you were there?**

A. Because I was there for a purpose that I -- I -- I couldn't do that if I wanted to. I was on foot. I was at a protest. My assignment was to not let protesters come onto the Capitol grounds. So I was in a civil disturbance mode, not in necessarily a traffic enforcement mode at the time.

**Q. So when you say that you -- you couldn't even if you wanted to, is that just out of practicality reasons, you couldn't reach the cars by foot?**

A. That's true. I -- I couldn't -- the cars were hundreds of yards away from me. I was on foot. They were on one side of the Capitol. I was on another side. I could not have jumped into a patrol car and pulled anybody over if I wanted to.

**Q. What about if someone was passing -- passing by in front of you with their horns blaring?**

A. Based on my assignment, I wouldn't have done that. I would have used sound professional judgment and let that go because I'm in a formation at a civil disturbance. So that would not be good judgment, in my opinion, to leave a line at a protest over on foot to go stop somebody for honking their horn.

**Q. And you testified earlier that you were unaware of whether or not any citations were written for violation of 27001 that day; is that correct?**

A. That's correct. I don't know if there was any written.

**Q. Is it possible that there may have been some that were written?**

MS. O'GRADY: Objection. Calls for speculation.

THE WITNESS: It's possible. If there was CHP officers that their specific assignment was to be out there, you know, enforcing traffic around Capitol. But, then again, it's not likely, because that's Sacramento police department's jurisdiction. So in that case we would probably bring all the officers back towards the Capitol, which is state property, and Sacramento police department would be out there.

**Q. The question I asked -- yeah. Let's see. Are you?**

A. I --Sergeant William Beck Porter vs. Gore

**Q. Yeah. I can ask you again.**

**Are you personally aware of any recent event in the past year where someone was cited for violation of section 27001?**

A. Okay. Me personally aware? No. Just what we talked about today with Ms. Porter and then these articles that we went over. But me personally? No. Just those.

**Q. Got it.**

A. Okay. And there was another question after that?

**Q. And the question after that was if you had looked for in -- in CHP's database the number of citations that were given for section 27001.**

A. Yeah, no. I have not looked in any database. I don't have any knowledge of that.

**Q. And you didn't have anybody do that for you; correct?**

A. No, no.

**Q. And -- and the question that I asked you that you didn't answer, have you personally ever cited anyone for violation of Vehicle Code section**

**27001?**

A. I have.

**Q. You have?**

A. I have, yes.

**Q. How many times?**

A. You know, it's -- it's interesting you ask me that, because I've been thinking about that a lot. And I want to say I've probably stopped people for it four or five times, maybe a handful of times. And then I -- I remember the last time that I stopped somebody for it I do remember I issued the -- the driver a citation for too.

**Q. I'm sorry. You're a little muffled there. Are you saying the last time that you stopped someone for it you did not write a citation?**

A. I did. I did, yeah.

**Q. You did write a citation?**

A. Yes.

**Q. And do you recall when that occurred?**

A. I was trying to remember that as well and that's hard -- hard. It was -- I don't remember when it was. It was -- it was several years ago. Sometime around -- this is a ballpark estimate. It was probably around 2013, 2014, somewhere in there.

**Q. And what was your rank with the CHP at the**

time?

A. I was an officer.

**Q. So you were patrolling the California highways at that time?**

A. Yes.

**Q. And in the -- in the four or five times that you recall ever pulling someone over for section 27001 violation, how many times have you written a citation for those four or five times?**

A. I just remember for sure that I wrote a citation the one time, the last one.

**Q. Sergeant Beck, is there a way -- if we wanted to look, is there a way we can look in the database to see how many times you have written a citation for violation of section 27001, you specifically?**

A. Possibly. That database is -- I don't know who controls it or who runs it, but I'm sure people have asked before. Like I said, I remember writing it once, but that's stopping at least a handful of people for it.

**Q. So is it safe to say that you get out more warnings than you did citations for the stops that you made?**

A. I don't -- that's what I'm trying to tell

you. I don't remember -- I don't remember specifically incidents where -- what happened on those previous encounters. Does that make sense? Like, I remember this -- I remember the last encounter, but I don't remember the ones before that.

**Q. Okay. So for the one that you do remember, can you just kind of give me the circumstances on what you remember from that day and why you gave the ticket?**

A. Yeah. And bear with me because it's been a few years. I remember it was in the middle of the night. It was -- "middle of the night" meaning 3:00 o'clock in the morning, maybe. And I was on graveyards, which is basically night shift.

And we were in the town of Sutter, which is an unincorporated area of Sutter county. And me and my graveyard partner were parked and I just hearing a horn honk. And I didn't think any of it. It -- it was -- it sounded like it was a ways away, but then again it sounded like it was fairly close, but it wasn't -- we couldn't see -- there was no traffic at all, couldn't see anything.

And then the horn just kept going. It was, like, every -- it seemed like it was every few

seconds you hear a horn honk. And so I started driving towards the location and kind of residential area and where the horn honking was coming from was a car, like a sedan parked in the street. He was stopped in the street and just kept honking.

And so I pulled up behind them. And he -- I would have figured he -- the guy would have got out of road, but he didn't. He just stayed kind of in the middle of the road. And so I turned my lights on, my emergency lights on. And he still stayed there in the road. And then I got out, contacted him. He said he was trying to get his friend's attention in the house.

And so I talked to him about -- I can't remember -- I remember he had -- there was a couple of other things going on with -- and I don't remember what it was -- with his, you know, registration card, for example, or something. And so I talked to him and -- about the horn honking. And he kind of -- in my opinion at the time, he kind of, from what I remember, wasn't -- wasn't really getting it, wasn't thinking it was a big deal. So I wrote him a ticket for it.

**Q. Thank you. Well, that's a good memory.**

**In that situation, Sergeant Beck, that you**

**just described, could you -- if you wanted to, could you have just instead of citing him for vehicle code section 27001, could you have cited him for violation of a local noise ordinance, given that he was blaring his horn at 3:00 a.m.?**

A. Yeah, but I -- I felt 27001(b) was specific to that and I didn't -- I don't know of any or didn't know of any local ordinances for -- for noise.

**Q. But if you wanted to you could have looked up a specific local noise ordinance to apply in that situation; is that correct?**

A. It's just not common practice. If there's a vehicle code section for our department, we're going to -- we're going to use the vehicle code section.

**Q. Right. I understand that. Yeah. I understand that it's not common practice, but I'm just wondering if there's a possibly.**

**Had you wanted to cite him for violation of a local noise ordinance, you could have done so in that situation; is that correct?**

A. I -- I could have tried to look up a local ordinance, sure.

**Q. And there's no -- there's no policy or any**

**CHP policy or anything stopping you from citing him for the violation of the local noise ordinance instead of the vehicle code; is that correct?**

A. Yeah. If I would have been aware of one, I could have -- I could have. But, like I said, I would -- I would encourage the officers to use the vehicle code, not to mention the cell service -- the cell service out there is not very good. I don't know if I could have looked anything up.

**Q. Fair enough. And going back to the four or five times that you recall in your career pulling someone over for violation of 27001, it's -- it's true that you only remember the specific details of the one you just described; is that correct?**

A. I do. And the reason I -- the reason I'm saying that there's been a few times is because that section, you know, even before I gave my deposition before and today, I was very familiar with that section. It wasn't a foreign section to me, because I've used it a handful of times in the past, but I can't recall when that was or -- or what the circumstances were.

**Q. But for the 24 years that you were a CHP -- I'm sorry.**

**For the 24 years of your experience with**

Sergeant William Beck

Porter vs. Gore

**usefulness as a warning device would be diminished if law enforcement personnel were unable to enforce the vehicle code at these political protests?**

MS. O'GRADY: Same objection.

THE WITNESS: Do I -- you mean -- say -- say it one more time. I apologize. Can you say that one more time?

BY MR. JEW:

**Q. Sure. So if the current section 27001, as you know it, if it was rewritten to include an exception for the use of a horn at a political protest, would that change your opinion that the vehicle horn's usefulness as a warning device would be diminished if law enforcement personal could not cite people for violating that statute at a political protest?**

MR. WHITE: Join.

MS. O'GRADY: Same objection.

THE WITNESS: Well, I think that -- I think that the law the way it's written is -- is good. I do. I think it -- I think if it was lawful to honk at a political protest, if -- if you're off the roadway and you're doing it, you know, as long as you're not disturbing the peace or something like that, you know, there's no issue.

Sergeant William Beck
Porter vs. Gore

I think once you get on that public street and you down the horn, you know, it changes things. So -- but ultimately the highway patrol is going to enforce the law as it's written.

BY MR. JEW:

**Q. So from what I understand your answer being is that if the code was rewritten and it had an exception it wouldn't, in your opinion, diminish the usefulness of the horn as a safety device if the protester was parked in, say, a parking lot using their horn versus actually being on the roadway; is that correct?**

A. Yeah. It's just -- it's just -- it just depends. I don't know how it would be rewritten. I don't know -- I don't know how they would particularly write it, how -- how -- how -- because there's -- again, it's -- there's so many circumstances as to -- when it comes to motor vehicles and horns, there's just so many factors that could, you know -- if there's a -- if there's a political protest where everybody's using their horns, but there's a freeway right there and all the people on the freeway don't know where the sounds are coming from that could create problems.

So ultimately we're going to enforce the

www.aptusCR.com

www.aptusCR.com

violated 27001 but not been subject to an enforcement action you would throw your brother into that category?

Porter vs. Gore
Sergeant William Beck

A. Yeah.

Q. Anybody else come to mind?

A. Not that I can think of, no.

Q. You have kids you mentioned; is that correct?

A. Yes.

Q. How old are your kids?

A. Twenty-five, 22, 17 and 13.

Q. Did any of them play sports?

A. Yes.

Q. Did you -- as their father, did you ever attend any of their sports events?

A. Yes.

Q. Any, like, homecoming games? Did any of those play football?

A. No. None of them played high school football.

www.aptusCR.com

Q. Of the sports they did play, did you attend any events where there was, like, horn honking or celebration of a win?

A. No.

Q. Sergeant Beck, have you ever discussed

Sergeant William Beck
Porter vs. Gore

**enforcement of 27001 prior to your involvement in this case?**

MS. O'GRADY: Objection. Vague and ambiguous.

THE WITNESS: Discussed --

BY MR. JEW:

**Q. Let me rephrase the question. Yeah. Let me rephrase that question for you.**

**Prior to your involvement in this case, Sergeant Beck, did you ever discuss the interpretation of section 27001 with anybody?**

A. I don't -- I don't remember ever doing that.

**Q. Did you ever review any legislative bill analysis conducted by the vehicle code unit in preparation for your opinions in this case?**

A. No.

**Q. And as far as you're aware, no -- no legislative bill analysis was ever performed on section 27001 by the vehicle code unit?**

www.aptusCR.com

A. No, not to my knowledge.

**Q. But you specifically had someone look to see if that was the case; is that correct?**

A. No. I had somebody look to see if there was any policy on enforcing or how we handle 27001.

Sergeant William Beck
Porter vs. Gore

**Q. But you haven't checked whether or not the vehicle code unit has ever done a legislative bill analysis on 27001?**

A. I have not checked.

**Q. Is there a reason why you have not checked?**

A. No.

**Q. And you haven't asked anybody else to do that check; is that correct?**

A. That's correct.

MR. JEW: All right. Sharon, Tim, do you guys have any cross? If we could just take, like, a five-minute break so that I can reconvene with my colleague and just get back on the record and close out questions. Is that okay? Can we take a five-minute break?

MS. O'GRADY: Five minutes. Okay.

THE VIDEOGRAPHER: We're going off the record at 2:58.

(Recess.)

THE VIDEOGRAPHER: Back on the record at 3:03 p.m.

www.aptusCR.com

MR. JEW: Okay. Sergeant Beck, thank you for your time. I have no further questions.

If Ms. O'Grady or Mr. White have any cross, I welcome it.

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ X ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 28, 2020

Debby M. Gladish
RPR, CLR, CCRR, CSR No. 9803
NCRA Realtime Systems Administrator



June 23, 2020

Debby M. Gladish
Aptus Court Reporting
600 West Broadway, Suite 300
San Diego CA 92101

RE: Susan Porter v. William D. Gore, et al
United States District Court, Southern District of California,
Case No. 3:18-cv-1221-GPC-LL

Dear Ms. Gladish:

Attached please find the corrections to the deposition transcript of Sergeant William Beck. Please let me know if you have any questions concerning this matter.

Sincerely,

SHARON L. O'GRADY
Deputy Attorney General

For XAVIER BECERRA
Attorney General

cc: Mikle Jew
Kadmiel Perez
Timothy White

SLO:rh

SA2018102010
42238312.docx

**Attachment**

Changes to Transcript of Deposition of Sergeant William Beck, May 26, 2020.

| Page/line | Change | Reason for change |
|---|---|---|
| 57:19-20 | "than me than" should be "than" | Mispoke or was misheard |
| 76:21-22 | "the effectiveness" should be "otherwise the effectiveness" | Mispoke or was misheard |
| 82:19 | "horn" should be "honk" | Mispoke or was misheard |
| 85:24 | "there wasn't" should be "there wasn't then" | Mispoke or was misheard |
| 126:17-19 | "obscenities or sometimes even think of pulling people over in certain situtations, but I've" should be "obscenities, sometimes even when I'm pulling people over in certain situations, I've" | Mispoke or was misheard |
| 181:15 | "Be it Sacramento" should be "But it's Sacramento" | Mispoke or was misheard |
| 183:3 | "we know" should be "we go" | Mispoke or was misheard |
| 201:2 | "down" should be "sound" | Mispoke or was misheard |

Subject to the above changes, I certify that the transcript is true and correct. Executed on June 22, 2020.

W. Beck

Sergeant William Beck